**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

    YURI LYUBARSKY and           Case No: 18-16659-LMI
    OLGA LYUBARSKY              Chapter 7

       Debtors.

_____/

**DEBTORS' OPPOSITION TO CHAPTER 7 TRUSTEE'S**
**OBJECTION TO DEBTOR'S CLAIMED EXEMPTIONS**

Debtors, Yuri Lyubarsky and Olga Lyubarsky, by and through undersigned counsel, hereby

file their Opposition to Chapter 7 Trustee's Objection to Debtor's Claimed Exemptions

Generally, under Florida law, exemptions are liberally construed and broadly interpreted

in favor of the claimed exemption. In re Stevenson, 374 B.R. 891, 894 (Bankr. M.D. Fla. 2007)

(citing Tramel v. Stewart, 697 So. 2d 821 (Fla. 1997) and Graham v. Azar, 204 So. 2d 193 (Fla.

1967)). The party objecting to the exemption has the burden to prove (by preponderance of the

evidence) that a debtor is not entitled to the claimed exemption. Fed. R. Bankr. P. 4003(c); In re

Wilbur, 206 B.R. 1002, 1006 (Bankr. M.D. Fla. 1997).

In their bankruptcy petition, Debtors, who are longtime residents of Florida, claimed their

disability insurance benefits under two disability policies ("Disability Policies") as exempt assets

pursuant to Florida law (Fla. Stat. § 222.18). Debtors also claimed two life insurance ("Life

Policies") policies as exempt pursuant to Florida law (Fla. Stat. § 222.14).

In her objection, Trustee combines all four policies/benefits under the term "Guardian

Policies" and objects to the exemptions under the doctrine of *res judicata* because of a 2016

decision resulting from Pennsylvania Court collection proceedings between the Debtors and one

of the creditors, Vertonix Ltd ("Vertonix"). In this response, Debtors will focus on the Disability

Policies and the Life Policies separately, with primary focus given to the Disability Policies.

**OPINION OF PENNSYLVANIA BANKRUPTCY TRUSTEE**

As a threshold matter, it is noted that the circumstances of the present case are significantly

out of the ordinary. The Debtors, Florida residents for over a decade, one of whom is disabled and

the other is a housewife who barely speaks English, have litigated against an aggressive creditor,

Vertonix, in Pennsylvania and New Jersey courts for an extended period of time. The affidavit of

Debtor Yuri Lyubarsky ("Affidavit"), attached hereto as Exhibit "A" (with further Exhibits A1-

A6 thereto), provides insight into the factual background of the underlying source of liability, and

the steps taken by Vertonix in the New Jersey and Pennsylvania proceedings.

Having obtained a Pennsylvania judgment by confession against Debtors in 2011 under a

2009 settlement agreement which specified Pennsylvania courts as the venue to adjudicate

liability, and apparently recognizing that the Debtors resided in Florida and had their assets there,

Vertonix domesticated its Pennsylvania judgment in Florida. However, even though the Debtors

had no assets in Pennsylvania, Vertonix then proceeded with an effort to execute against Disability

Policies and Life Policies in the Pennsylvania court which issued prior favorable rulings. This was

done despite the fact that at all relevant times Debtors were residents of Florida and received their

disability benefits in Florida from the national insurance company, Guardian, whose headquarters

are in neither Florida nor Pennsylvania. The disability policies were also not issued in

Pennsylvania. Even Vertonix itself is not believed to be a Pennsylvania company (having been

pursued by Vertonix for about a decade, the Debtors to this day do not know where Vertonix is

registered). In fact, the only thing that was located in Pennsylvania was the law office that represented Vertonix.

In its attempt to execute in Pennsylvania against Florida-based Debtors and their Florida-based assets, Vertonix obtained a favorable Pennsylvania court decision that was fact-based as of 2016. At the time, Debtors' counsel in Pennsylvania failed to contest to the subject matter jurisdiction of Pennsylvania courts with respect to the policies and did not properly object either to the issues of law in the Pennsylvania court decision, or to the facts presented by Vertonix in the Pennsylvania court.

As explained further below and in the attached legal opinion, Pennsylvania was improper jurisdiction for the collection effort by Vertonix.

The question before this Court now is what effect, if any, the partially fact-based Pennsylvania court decision from 2016 has on the present 2018 bankruptcy proceedings in Florida.

Due to the complexity of legal questions at issue, including questions of Pennsylvania law (which are not the principal specialty of Debtors' counsel or, for that matter, of the Trustee or this Court), prior to preparing this response, Debtors and their counsel have sought an opinion from an experienced Philadelphia-based Chapter 7 bankruptcy trustee, Gary Seitz, Esq. Having had no prior involvement with the Debtors or any matters involving them, and acting on a pro bono basis after having been apprised of Debtors' desperate circumstances and the unusual questions before this Court, Mr. Seitz has provided his opinion, which is attached hereto as Exhibit "B" ("Opinion").

For avoidance of repetition, and to save the Court's time, most of the arguments stated in the Opinion are not repeated in this pleading. Instead, the entire text of the Opinion is hereby

incorporated herein by reference as if set forth in full. The text below will instead provide additional legal and fact-based arguments on behalf of Debtors.

## GUARDIAN DISABILITY INSURANCE POLICIES

### I.  Res Judicata

The Trustee objects to the Debtors' claimed exemption of the Disability Policies due to a court order issued by a Pennsylvania Court under the doctrine of *res judicata*.

The Court shall apply federal principles of *res judicata* and collateral estoppel with respect to decisions rendered by a federal court, and must apply corresponding state principles with respect to decisions rendered by a state court. *See* Wolstein v. Docteroff (In re Docteroff), 133 F.3d 210, 214 (3rd Cir. 1997) (citing Heiser v. Woodruff, 327 U.S. 726, 732, 66 S.Ct. 853, 855-56, 90 L.Ed. 970 (U.S. 1945)) (federal principles are applied to a federal decision); Delaware River Port Authority v. Fraternal Order of Police, 290 F.3d 567, 573 (3rd Cir. 2002).

With respect to federal principles of *res judicata*, "[c]laim preclusion [(i.e., *res judicata*)] does not apply unless the present claim was or could have been raised in the prior proceeding." Corestates Bank, N.A. v. Huls America, Inc., 176 F.3d 187, 203 (3rd Cir. 1999); *see also* In re Piper Aircraft Corp., 244 F.3d 1289, 1296 1303 (11th Cir. 2001) (same). "Claim preclusion [under federal law also] requires: (1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action." Corestates Bank, 176 F.3d at 194 205; *see also* Piper Aircraft, 244 F.3d at 1296 (same). "In deciding whether two suits are based on the same `cause of action,' we take a broad view, looking to whether there is an `essential similarity of the underlying events giving rise to the various legal

claims.'" <u>Corestates Bank,</u> <u>176 F.3d at 194</u> (quoting <u>United States v. Athlone Industries, Inc.,</u> <u>746 F.2d 977, 984</u> (3rd Cir. 1984)). However, with respect to the issue of similarity of causes of action, "[w]e are thus [nothing more than] in keeping with `[t]he present trend . . . in the direction of requiring that a plaintiff present in one suit all the claims for relief *that he may have* arising out of the same transaction or occurrence.'" <u>Athlone Industries,</u> <u>746 F.2d at 984</u> (emphasis added). Therefore, two claims for relief — i.e., causes of action — are necessarily dissimilar if both could not have been brought in the prior proceeding in question.

Pennsylvania law regarding *res judicata* and collateral estoppel is essentially the same as federal law, that is essentially the same elements must be shown for *res judicata* or collateral estoppel effect to be accorded to a Pennsylvania decision. *See* 28 P.L.E.2d *Judgment* § 222 at 280-81 (Bender 2003) (*res judicata*); § 223 at 284-88 (collateral estoppel). Therefore, the Court can apply the same principles of *res judicata* and collateral estoppel. *In re Cowden*, 337 B.R. 512, 530 (Bankr. W.D. Pa. 2006).

Pursuant to Florida law, several conditions must be met before a party can invoke res judicata. The Florida Supreme Court has articulated the doctrine as follows: A judgment on the merits rendered in a former suit between the same parties or their privies, upon the same cause of action, by a court of competent jurisdiction, is conclusive not only as to every matter which was offered and received to sustain or defeat the claim, but as to every other matter which might with propriety have been litigated and determined in that action. Kimbrell v. Paige, 448 So. 2d 1009, 1012 (Fla. 1984) (quoting Wade v. Clower, 114 So. 548, 552 (Fla. 1927))

Courts will not invoke the doctrine "where it will work an injustice." Flesche v. Interstate Warehouse, 411 So. 2d 919, 924 (Fla. 1st D.C.A. 1982); see also State v. McBride, 848 So. 2d 287, 291 (Fla. 2003)

There are multiple reasons why *res judicata* cannot be invoked by the Trustee in the present bankruptcy proceedings, and each of these reasons alone would be sufficient to defeat the Trustee's objection.

Firstly, because the Trustee was neither a party to the Pennsylvania proceedings nor in privity with any party to those proceedings, the Trustee cannot rightfully use the res judicata concept against the Debtors.

Secondly, because the Pennsylvania court did not apply the proper (Florida) law, as explained in the Opinion and further below, and therefore there has been no adjudication on the merits with regard to the Florida statute at issue here.

Thirdly, there has been no adjudication on the merits even under Pennsylvania law, since it, too, was not properly applied, as explained in the Opinion and further below.

Fourthly, this Pennsylvania decision was not a final judgment on the Florida exemptions raised by the Debtors in this case.

Fifthly and finally, even if the Pennsylvania court hypothetically did have subject matter jurisdiction (which it did not), the issue that was before it in 2016 was whether the disability benefits were exempt from collection under **Pennsylvania law** as it applied in 2016 to then non-bankrupt out-of-state defendants based on those defendants' *factual* circumstances *at that time*,

whereas the issue before this Court is whether the Disability Benefits are exempt under **Florida law** *now* as applied to the bankrupt Debtors. Even if Pennsylvania law were to be applied (as it should not), and the incorrect statute were deemed appropriate (as it should not), and then the means test were administered (as it should not), the disability benefits would still be deemed exempt for the currently bankrupt Debtors.

## II. Philadelphia Court – Legal Error, Wrong Law

Pursuant to Pennsylvania law, 42 Pa.C.S.A. § 8124(c)(7), the net amount payable under any accident or disability insurance is exempt from attachment or execution on a judgment. The Philadelphia court improperly applied 42 Pa.C.S.A. § 8124(c)(3) which does not apply to disability benefits, as there is a specific and separate statute that specifically applies to disability benefits, namely the aforementioned 42 Pa.C.S.A. § 8124(c)(7). The latter statute expressly deals with disability benefits as a distinct form of insurance, to be treated differently than other forms of insurance subject to the preceding statute in the same section of Pennsylvania law. Indeed, if 42 Pa.C.S.A. § 8124(c)(3) were to apply to disability benefits (particularly making them subject to a means test), and if therefore disability benefits were to be treated in the same way as any other insurance proceeds, there would be no purpose in 42 Pa.C.S.A. § 8124(c)(7) at all.

Like in Florida, where the even stronger-worded Fla. Stat. § 222.18 makes disability benefits absolutely exempt from execution, the plain language of the Pennsylvania law also clearly treats disability benefits as an absolutely exempt asset. The text of 42 Pa.C.S.A. § 8124(c)(7) is clear and unambiguous:

> *§ 8124.  Exemption of particular property. [...] (c) Insurance proceeds. The following property or other rights of the judgment debtor shall be exempt from*

> *attachment or execution on a judgment: [...] (7)  The net amount payable under any*
>
> *accident or disability insurance.*

Similar to the Florida statutes, the Pennsylvania disability insurance exemption contains no contingencies or carve-outs, present in some other subsections of 42 Pa.C.S.A. § 8124(c) applicable to other exemptions.  Statutory construction dictates that the period at the end of 42 Pa.C.S.A. § 8124(c)(7) indicates completeness of this provision as wholly  separate from the other subsections. Therefore, for example, the means test for (c)(3) exemptions does not apply to (c)(7) exemptions.

The state whose substantive law is applied to the dispute "must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair., *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)). The conflict of laws principles applicable to exemptions outside of bankruptcy are set forth in the *Restatement (Second) of Conflict of Laws* section 132 (1971).  Under the *Restatement*, "the local law of the State of the debtor's domicile governs exemptions." See, RESTATEMENT, Comment (b) to section 132. Section 522(b)(3)(A) of the Bankruptcy Code continues to make the law of the debtor's domicile (or former domicile) the applicable law for exemptions.  Pennsylvania law is simply inapplicable to these Debtors' exemptions whether in or out of bankruptcy.

## III. Philadelphia Court - Fraud by Vertonix in 2016 Means Test

As attested in the Affidavit provided by the Debtors, Vertonix in prosecuting its claim in Pennsylvania made false representations to the Philadelphia court with respect to the Debtors' solvency. For example, Vertonix falsely represented to the Philadelphia court that the Debtors

owned a mansion in Ft. Lauderdale, Florida, and produced photos of that property from a real estate web site, when in fact Vertonix and its counsel conclusively knew, through their parallel prosecution of the domesticated Florida judgment against the Debtors, that at the time the subject property no longer belonged to the Debtors, having been foreclosed upon many months prior, and that the real estate listing they produced to the Philadelphia court was actually posted by its then-current new owner (not related to the Debtors) for purposes of selling the property post-foreclosure. Based on those and other similar false representations by Vertonix, the Philadelphia court, already applying the wrong law, then also applied an incorrectly informed means test to determine exemption status of the disability benefits. As attested in the Affidavit, the Debtors were unaware of the hearing when this took place, and were therefore unable to provide their Philadelphia counsel with correct information to counter the misrepresentations by Vertonix and its counsel.

## IV. Applicable Florida Law

The Florida law on the exemption for disability benefits, Fla. Stat. § 222.18, is even more clear than the Pennsylvania law. Its language goes far above and beyond the minimum necessary wording necessary to achieve its purpose, ensuring that this law is never misunderstood or misapplied. This language begs to be cited in full here:

> *222.18   Exempting disability income benefits from legal processes. e Disability income benefits under **any** policy or contract of life, health, accident, or other insurance **of whatever form**, shall not **in any case** be liable to attachment, garnishment, or legal process in the state, in favor of **any creditor** or creditors of*

*the recipient of such disability income benefits, unless such policy or contract of*

*insurance was effected for the benefit of such creditor or creditors.*[1]

(Emphasis added)

The care with which the drafters of this law enshrined the absolute right of Florida citizens to have their disability benefits protected from execution needs no commentary. The law enhances the protection of disability benefits from any assault by the inclusion of "any", "of whatever form", "in any case" and "any creditor or creditors" virtually everywhere English grammar would allow. Debtors submit that the purpose of this choice of language was precisely to avoid an accidental mis-application of the statute in a situation such as the one presently before this Court. If, as it does presently, the issue of disability benefits exemption were to ever be before a court, the purpose of this Florida statute, and particularly its emphasized language, is to guide the court to acknowledging that **any** case, including the present case before this Court, falls under the all-encompassing description "in any case" in the text of the law and that **any** creditor, including Vertonix, falls under the all-encompassing description of "any creditor" in the text of the law.

It is further observed that the proper procedure in 2016 for Vertonix to attempt execution against the disability benefits being paid in Florida to Florida-based Debtors, was to domesticate the Pennsylvania judgment in Florida, and execute in Florida. Indeed, as of 2016 Vertonix already had domesticated the Pennsylvania judgment in Florida, but for reasons unknown then abandoned execution of it, and improperly attempted to execute against the Disability Policies in Pennsylvania.

---

[1] It is not in dispute that the Disability Policies were not effected for the benefit of Vertonix.

The inability of disabled Florida residents to get proper representation in the wrong jurisdiction where they have never resided, and where the assets in question were never located, and the resulting ability of Vertonix to obtain an exemption decision under the inapplicable law from an improper court using fraudulently represented facts, should not be rewarded by giving Vertonix a windfall from Debtors' assets which are clearly and unambiguously exempt under Florida law. If this Court rewards this improper forum-shopping by Vertonix, the Florida law will be rendered meaningless: future creditors of disabled Florida residents will hypothetically be able to execute in any state of their choosing against clearly exempt disability benefits, and then use favorable decision of foreign courts to collect against such benefits.

The law was written in Florida the way it was to prevent precisely such a thing.

**LIFE POLICIES**

The same or very similar arguments that apply to Disability Policies also apply to Life Policies. The only difference is that, unlike Disability Policies, the Life Policies *are* subject to a means test under Pennsylvania law (but not under Florida law). This Court should consider the Life Policies issue separately, both from the legal perspective and the perspective of their purpose.

Principally, the purpose of disability policies is for a working person to provide a lifeline for himself/herself if and when he/she becomes disabled in the future. The law in Florida makes sure this lifeline cannot be cut by any means. Mr. Lyubarsky is in the unfortunate position of having been disabled for nearly a decade, and has been hospitalized numerously due to his disability. His only sources of income for many years have been the disability benefits and a comparatively small stream of Social Security benefits. Vertonix has attempted to execute against the disability benefits, and succeeded in improperly choking them in mid-2016. It has since used

this as a way to apply pressure on the Debtors to pay amounts grossly disproportionate to any possible liability they may have had to Vertonix. It was precisely to preclude such attempts and improper pressure on disabled debtors that the disability benefits statutes were effected.

By contrast, the purpose of life insurance policies is usually to protect one's heirs from the burden of debt incurred by the insureds. The "cash surrender value" of a life insurance is something an insured person could tap, most often in case of emergency. Because of this (the emergency purpose of life insurance cash surrender value), life insurance is differentiated under some state laws for purposes of execution, but sometimes not as strongly as disability insurance.

Under Florida law, there is virtually no difference. The applicable Fla. Stat. § 222.14 states:

> *222.14   Exemption of cash surrender value of life insurance policies and annuity contracts from legal process.—The cash surrender values of life insurance policies issued upon the lives of citizens or residents of the state and the proceeds of annuity contracts issued to citizens or residents of the state, **upon whatever form**, shall not **e** be liable to attachment, garnishment or legal process in favor **of any creditor** of the person whose life is so insured or of any creditor of the person who is the beneficiary of such annuity contract, unless the insurance policy or annuity contract was effected for the benefit of such creditor.[2]*

(Emphasis added)

This statute is written using the same all-encompassing language as the disability benefits exemption statute cited previously.

To the extent Pennsylvania law might be applicable (and it is Debtors' argument that it is not), and by contrast with disability benefits (which are absolutely exempt as described above and

---

[2] It is not in dispute that the Life Policies were not effected for the benefit of Vertonix.

in the Opinion), it would make the exemption for life insurance cash surrender value subject to a means test. However, even if Pennsylvania law were to apply, the means test must be performed at the time the issue of exemption is decided, i.e. presently. The Debtors have filed for bankruptcy protection on May 31, 2018. Bankruptcy Courts have determined that under section 522(b)(3) of the Bankruptcy Code, a debtor must be domiciled in a given state at the time of filing a bankruptcy petition in order to access – or be bound by – that state's exemption laws. *In re Willis*, 495 B.R. 856, 856 (Bankr. W.D. Wis. 2013) (finding debtors' residency for purposes of applying state exemption laws must be analyzed as it existed on bankruptcy petition date). The means test, even if it were applicable, must be applied as of the petition date. Accordingly, the means test performed in Pennsylvania in 2016 for a failed effort to execute upon disability insurance proceeds that were not subject to that court's jurisdiction no longer applies, and the decision of the Philadelphia court is irrelevant to the exemptions claimed here.

Wherefore, Debtors respectfully oppose the Trustee's objection to Debtors' claim of exemption of the disability benefits and the life insurance cash surrender value, and ask this Court to deny the Objection and sustain the exemptions.

Dated December 11, 2018.

/s/ Leonid Nerdinsky
Leonid Nerdinsky, Esq.
Nerdinsky Law Group
3800 S Ocean Drive, Suite 242
Hollywood, FL 33019
Tel: 954-237-6307
lnerdinsky@nerdinskylaw.com

I CERTIFY that a true and correct copy of the foregoing was served via Notice of Electronic Filing (CM/ECF) on this 11th day of December 2018, upon all registered users in this case, including:

- Marcia T Dunn mdunn@dunnlawpa.com,
mdunn@ecf.epiqsystems.com;acastro@dunnlawpa.com;rbasnueva@dunnlawpa.com;slebron@dunnlawpa.com
- Michael P Dunn michael.dunn@dunnlawpa.com,
rbasnueva@dunnlawpa.com;nnayor@dunnlawpa.com;tyler.stull@dunnlawpa.com
- Office of the US Trustee USTPRegion21.MM.ECF@usdoj.gov
- Alexis S Read alexis.read@dunnlawpa.com, nnayor@dunnlawpa.com

# EXHIBIT A
# (with Exhibits A1-A6 attached)

_____

**AFFIDAVIT OF YURI LYUBARSKY**
_____

I, Yuri Lyubarsky, hereby do solemnly affirm and declare as follows:

1. During a trip to Russia in the summer of 2004, I was offered an investment in a Moscow shoe distributor business named Reemstor. After reviewing company documents, I agreed.

2. After a few months I realized that the company had debts which were not disclosed to me previously, and most of my investment went to cover these expenses and loans.

3. Soon after I was told that the only way for the company to survive and for me not to lose my investment was to obtain more money and try to drum up business by shipping shoes from China.

4. I had no more money to contribute myself. Trying to save my original investment I looked for ways to get a loan for the company. Eventually, I was referred to a New Jersey man named Arkady Nisenzon, who did business in Russia and whose close friend was a Latvian banker. Arkady Nisenzon then made an arrangement with the Latvian bank to loan Reemstor $400,000 at 25% interest a year.

5. At the last moment Arkady Nisenzon called me and said I would have to personally guarantee the loan to Reemstor. He mentioned nothing about my wife having to be the guarantor at that time. He said somebody would come to my house with the documents for me to sign. I could not say "no" to this surprise new requirement because the money was already budgeted by Reemstor, and orders for shoes in China had already been placed.

6. Arkady Nisenzon sent a representative to my home in New Jersey with the documents I had to sign. When the representative arrived, he unexpectedly said that my wife Olga also had to sign as a guarantor. Olga had nothing to do with Reemstor of course. She also did not read English and could neither read nor understand any of these documents, but she signed them nevertheless. This was the worst mistake my wife and I have ever made in our life. I am not

100% certain, but I believe the representative visiting my home on that day was Eric Rayz, the lawyer for Vertonix.

7. It perplexes me to this day how or why Vertonix could have been involved at such an early stage, and why a Latvian bank loaning money to Reemstor in Moscow would suddenly demand my and my wife's personal guarantee in New Jersey, and have Vertonix involved.

8. In late 2006 I received a report stating that between January of 2005 and November of 2006 Reemstor made payments to the Latvian bank totaling $545,324. This left a balance of only $34,274 as of early November 2006. The report is attached as Exhibit "A1".

9. A substantial part of the $545,324 paid by Reemstor to the bank actually came from my son, who lived in Moscow at the time and was trying to help me and Reemstor pay down the 25% interest loan which I guaranteed. Because I borrowed a substantial amount of money from my son during that time (not just to pay down the Reemstor loan, but for other reasons as well), I told my son then that my cognac collection was now all his.

10. In early 2007 Arkady Nisenzon approached me in Moscow and offered that I pay $30,000 to him, and he would make an arrangement with the bank to close the loan, which he confirmed carried only a slightly higher balance at the time. This matched up with the report I had received earlier, stating that the balance was $34,274 in November 2006. Unfortunately, at that time I could not come up with the $30,000 to pay off the loan.

11. In the fall of 2008 I received a New Jersey lawsuit from Vertonix, a company I now know either belongs to Arkady Nisenzon or is controlled by him. If memory serves me right, that lawsuit demanded that my wife and I pay Vertonix, a company we had never heard from before, approximately $185,000. This was a shock and I still have no idea how this huge amount was calculated. I also still do not know how Vertonix got the debt assigned to it from the Latvian bank.

12. In 2009, unable to afford to hire a trial attorney to fight the New Jersey lawsuit head-on (I was told a full-blown legal fight would cost me even more than Vertonix was asking), and not understanding how I could possibly owe 6 times more than initial balance in November of 2006, I nevertheless signed a settlement agreement with Vertonix for $119,000. This

agreement is attached as Exhibit "A2". The agreement included a $5,000 initial payment, $24,000 in monthly payments of $1,000 each for 2 years, plus a $90,000 balloon payment which I was hoping to make from the sale of my house in New Jersey.

13. From January 2009 to March 2011, I dutifully paid $33,000 to Vertonix in monthly payments (including the initial $5,000 payment, and totaling $4,000 more than agreed). The roster of these payments is attached as Exhibit "A3". However, in the end I could not come up with the last $90,000 balloon payment because of the difficulties selling my house in New Jersey in the midst of the real estate crisis of those times. The house was "upside down" on the mortgage, and I could not sell it for more than I owed the bank, so that there would be enough to cover the $90,000 that I still owed Vertonix under the settlement agreement.

14. During the same period, in part because of all these events, but also because every other business I tried to enter also failed and crumbled, I started having more and more frequent and increasingly serious anxiety attacks, many of which began to require hospitalization. Soon after I was diagnosed with a "severe panic disorder," a mental disability which makes me handicapped to this day. Since that time, I have been taking medication to mitigate the effect of these attacks, but it does not always work, and I sometimes end up in a hospital anyway. New attacks are easily set off by stress, and was instructed by doctors to avoid stressful situations. Since then, with varying success, I have been trying to follow these instructions to manage my condition.

15. In March of 2011, I received a "confessed judgment" from Vertonix for $184,264. I had no idea what a "confessed judgment" was, but I now understand that the settlement documents I signed in 2009 apparently included my and my wife's permission to any lawyer representing Vertonix to simply walk into a courtroom, "confess" on our behalf, and obtain a judgment against us for whatever amount they claim. There was no calculation attached to the "confessed" judgment, no schedule showing how the $90,000 suddenly became $184,264. All that was attached was an affidavit by Vertonix that I owed them this amount. Unlike currently (in bankruptcy court in Florida), I did not know what to do – and, to my dismay ever since, I did not contest the $184,264 amount right away. Nevertheless, this amount was simply fraudulent, an attempt by Vertonix to make me owe more than I did under the

settlement agreement. Just like Vertonix is doing in bankruptcy court today by claiming I owe them $400,000 when the most I could possibly owe is around $158,000 (based on explicit language of a Pennsylvania court order which Vertonix has conveniently withheld from their claim documents), they did the same in 2011 – and it worked then because of my incompetence and inaction.

16. I do not understand to this day how a $119,000 debt under the 2009 Settlement Agreement, on which I diligently made $33,000 in monthly payments right up until March 2011 and had only a "balloon" balance of $90,000 left over as of that date, suddenly and immediately turned into a $184,264 judgment when I did not make the $90,000 payment. I had severe panic attacks at the time which required multiple hospitalizations, and had neither the mental energy nor the money to challenge what Vertonix was doing to me and my wife. I felt bamboozled and outfoxed by a shadowy and crafty opponent who knew how to "work the system" of courts and contracts much better than I possibly could, and could do magic tricks with numbers to increase my debts at will.

17. In May 2013, when my house in New Jersey was finally sold in a "short sale", Vertonix took $175,000 from that sale (see Exhibit "A4"). At that time I thought Vertonix would be content with the total of $208,000 ($33,000 plus $175,000) which they had received on the $34,274 debt (from 2006) or the $119,000 settlement agreement (circa 2009), and would finally leave me alone. soon learned that they were not.

18. In June 2013, I tried to settle with Vertonix because I thought that only a few thousand dollars remained unpaid, but Vertonix demanded another $60,000 without any explanation why the amount owed was so high. I could not afford to make such a payment because I only received $45,000 from the sale of the New Jersey house, and even most of that was used for immediate expenses and comparatively smaller debt payments I had to make to others.

19. I was living in Florida at the time, was officially declared disabled, and any stress brought on severe anxiety attacks requiring hospitalization and causing other serious health problems. I did not understand much about law and procedure. All I knew was that I had paid a total of $208,000 on a debt that was $34,274, and now, supposedly, still owed a lot more money.

20. I was depressed and medicated. I had no money to mount any meaningful effort to defend my rights. I hired a law firm in Philadelphia to help me resolve this, hoping to do so at a low cost, but was soon unable to make any significant payments to them for their work. I believe this may have resulted in them not paying enough attention to my case, and making some serious mistakes while handling it.

21. By 2014, I had been pursued by Vertonix in their ever-increasing demands for many, and gave up any hope of resolving the issue, because I knew that whatever I would pay them, they would figure some trick to claim to be owed more and my nightmare would never stop.

22. In June 2015, I moved out of my house in Fort Lauderdale, which was being lost in foreclosure. I signed away my title to this house to Wells Fargo Bank in November 2015, without receiving a penny because the house was heavily "under water." I began living in a rental apartment in Miami, which my children rented for me and were trying to buy so I would have a place to live. They borrowed money from friends and bought that apartment a year later, in June 2016.

23. In July 2016, there was a court hearing in Pennsylvania and a new judgment was issued against me, now for $141,102 (Exhibit "A5"). This was actually much lower than Vertonix was trying to demand, but still far more than I could possibly see myself owing. I do not know how this amount was calculated after I paid $175,000 against the prior $184,264 judgment which was issued just 3 years earlier, in 2013. The $184,264, which was already twice as high as the $90,000 "balloon" payment I should have owed under the $119,000 settlement agreement, was supposed to collect only 6% per year "post-judgment" interest, and the balance subject to such interest after the $175,000 payment should have been minimal. But I saw again that Vertonix figured out new tricks to put more and more on top of the already obscene debt amount.

24. At the same hearing in July 2016, Eric Rayz, the lawyer for Vertonix, was trying to stop my disability payments and have them go to Vertonix. The lawyer who represented me didn't even inform me about the hearing date, and I was not able to be there myself or provide him with any information. Later he told me that he never thought such a hearing could be lost, because the law in Pennsylvania was absolutely clear that disability payments are exempt

from collection. All lawyers I have discussed this with said that the court made a clear error in interpreting the law. I have read the law myself and the same is clear to me. The text of the law is attached as Exhibit "A6".

25. I now know more about that hearing. I have seen court records where Eric Rayz claimed to the court in Philadelphia that I was supposedly very wealthy. How he proved it was amazing: he used ancient records of my 2003 income, and claimed to the court that I had eight luxury cars and lived in a mansion in Fort Lauderdale. In reality, I only had two cars (one of which was leased, and the other had a large loan on it). More important, Rayz knew for sure that the house in Fort Lauderdale had been foreclosed the prior year, because he had a judgment against me "domesticated" in Florida and was watching the 2015 foreclosure closely, but he still pretended to the court in Philadelphia that I still owned this house was still living there in 2016. This was a lie.

26. Because I did not even know about the hearing (nor saw any documents that Eric Rayz was presenting as proof of my "wealth"), I was unable to give my attorney in Philadelphia any "ammunition" to prove that Rayz was lying to the court. My lawyer never told me about the hearing coming up or what was on the agenda. I believe this was a result of my being unable to afford to make any meaningful payments to the Philadelphia law firm representing me, and the lawyer handling my case with minimally necessary attention. The lawyer then called me and said the decision of the court was obviously erroneous, and that the law was squarely on my side. He said that there was no ambiguity in Pennsylvania law that disability insurance was not subject to collection, even if the Vertonix judgment amount had been valid. He said he would appeal the decision, and he was confident I was going to win. I told him only to appeal the obvious error about the disability insurance, but he said there were other things he planned to appeal as well. At the time, I relied on his judgment and expertise, as long as he would put his main effort on appealing the super-important disability benefits decision.

27. In the meantime, Guardian, the insurance company, put my disability payments on hold while all of this was being resolved. While they agreed that Pennsylvania law prohibited collection against disability benefits, they took the position that they would only pay the money if ordered to do so by the court.

28. It is my understanding that no court has ever ordered them to pay the money to anyone at any time (to this day), and that Vertonix has not reached my disability money to make it theirs. All Vertonix received was a lower-court decision that the Guardian money was not exempt from collection as of mid-2016.

29. I understand that this 2016 decision was based on me being determined to have financial means at that time (based on false information Eric Rayz presented), and an error by the court in interpreting the disability law in Pennsylvania. I also understand that this fact-based decision (deeming me to have had assets in 2016), even if it were legally correct at the time, is subject to review at later times as my financial circumstances change.

30. The law office in Philadelphia then filed an appeal on many issues, although I asked them several times to appeal <u>only</u> the wrong decision about my disability benefits. The lawyer explained that he knew better what to do, but that I should not worry, and he would certainly appeal the disability benefits decision. As I know now (from reading the appeal decision), the lawyer actually never appealed that one most important issue – the disability benefits. This was a grave mistake in my view, made contrary to my express instructions, and it leaves the lower court decision on this subject still un-reviewed by any higher court.

31. In the summer of 2017, I met with Eric Rayz in Acqualina Hotel in Florida. The purpose of the meeting was to discuss the settlement of the $141,102 revised judgment which was issued in July 2016 (Exhibit "A6"). This was a new, smaller judgment obtained by Rayz, after I had paid $175,000 against the previous judgment. This new judgment explicitly said on its face that it was accruing only 6% per year. I told Rayz that I was tired of going in and out of the hospital due to my panic attacks, and that what he was doing was going to eventually kill me. I was hoping he would discount the $141,102 number, and maybe I could borrow enough from friends to cover a lower figure. However, Eric's shocking offer was for me to pay him $200,000, even though this was more than I could possibly owe (the $141,102 judgment could not accrue more than 6% "post-judgment interest" in Pennsylvania). He said, however, that I should not worry about paying him the $200,000, he would explain to me how he managed to fool the Philadelphia judge with his false information and arguments, and how my lawyer badly mishandled my case that should have been impossible to lose. Rayz also

offered his lawyer who could sue my Philadelphia lawyers and supposedly get back the entire $200,000 for me. He said he knew the decision in Philadelphia was wrong, and bragged about how he was able to outfox my lawyer and the judge. I remember him saying sadistically that even though he did not yet get to my disability benefits, he would figure some way to do so in the future. I was disgusted with the entire conversation, refused his "help" and refused to pay the grossly inflated $200,000 amount which I did not owe.

32. In April 2018, I received word that my appeal in Pennsylvania was lost, and that, to my shock, the appeal court did not even consider the legality of the lower court's decision about my disability benefits. The appeals court wrote that my lawyer never appealed that decision.

33. By then I had been living for two years borrowing money from friends and from my children, counting on the "backlog" disability payments, which by then totaled over $150,000, to be paid to me soon. From this amount I was planning to cover at least some of what I borrowed. I also expected my disability income to resume afterwards, so I could stop borrowing and begin to pay my ongoing expenses. This was my only income, and I had virtually no assets left except some personal items in my apartment.

34. I spoke to several lawyers, all of whom told me that my disability money was definitely protected by Florida law, and that because Vertonix never "executed" against my disability income, if I filed for bankruptcy I would finally receive the $150,000+ in backlog payments being held by Guardian, and also would be able to collect my future disability income and begin to pay my expenses. The lawyers all read the Florida disability insurance law, which is statute 222.18, and said that because it says "...under any policy..." and "...shall not in any case be liable to attachment, garnishment or legal process..." there was no way Vertonix would get my disability benefits if I filed for bankruptcy protection in Florida.

35. There was no way I could pay back everyone I borrowed from, and handle the Vertonix onslaught any longer. I had no choice but to file for bankruptcy protection.

36. Soon after, my bankruptcy lawyer Leonid Nerdinsky told me that Eric Rayz had reached out and offered to meet. I gave my lawyer green light to meet with Rayz, expecting that Rayz would make as shady an offer to my lawyer as he had done to me at the Acqualina Hotel, and

I wanted this to be documented. After the meeting, Leonid Nerdinsky called me and said that Rayz offered to settle the debt for $250,000 by the following Monday, in exchange for which Rayz would not submit to the Trustee and the US Trustee documentation which he purported would show that I have substantial assets. Obviously, I refused to consider such an offer. Considering that the most I could owe Vertonix was $158,000, that I was in bankruptcy, and the nature of threats Rayz was making, the offer felt to me like pure extortion.

37. Eric Rayz has since filed an astounding $400,000 claim against me on behalf of Vertonix, less than two years after the Philadelphia court ruled that I owed Vertonix $141,102 plus 6% per year from May 2016. It is a continuation of the pattern I know too well, and hopefully the court in Florida will see it the same way. For clarity, I do not believe that even the $141,102 amount is correct, and neither was the previous amount of $184,264, based on everything I described above.

38. I believe the $400,000 is simply an attempt to "throw it and see if it sticks" by Vertonix, which hopes to succeed with this trick just like it worked for them before with the $184,264 and $141,102. In their "proof of claim" they included $6,000 worth of checks from me, when in fact they received $208,000, and attached the larger and older $184,264 judgment, hiding the $141,102 judgment from everyone.

39. I have just learned that because as of mid-2016 I had been living in Florida for about a decade, while the issue of my debt under the 2009 settlement agreement with Vertonix was in the jurisdiction of Pennsylvania courts, the issue of exemptions was not. I understand that what is exempt from collection has to be decided by the court of the state where the assets are located, and under the law of that state. Pennsylvania courts only had jurisdiction to decide on exemptions for assets located in Pennsylvania (I have no assets there). Since I lived in Florida and received my disability benefits here, my understanding is that Pennsylvania courts had no jurisdiction to deprive me of these benefits. My attorneys are planning to file paperwork making this argument in the bankruptcy case in relation to my disability benefits. The only reason I mention it here is because Vertonix, since late 2015 or early 2016, have been using Pennsylvania courts to deprive me of my disability benefits in the wrong (Pennsylvania) courts, and have succeeded, improperly, of choking off my disability income

and access to these benefits for over two years now. In conjunction of constantly demanding inflated amounts, I believe this reflects on their behavior relevant to their present claim.

40. I beg the Trustee and the court to look deeper at the history of this, and the pattern of what Vertonix and Rayz are doing. I finally have a good lawyer representing me, and he can show how Eric Rayz has presented knowingly false information at multiple stages of the past case, and is now doing it again in Florida.

41. To allow Vertonix to have taken a $34,274 debt and then manipulate the legal process and my mental health difficulties to turn it into a spigot that has already produced them $208,000 in cash payments, plus the ridiculous $400,000 claim today, seems unconscionable to me.

I hereby affirm and declare that the foregoing is true to the best of my knowledge and belief.

Yuri Lyubarsky

EXHIBIT A1

# Loan Amortization Schedule

| Loan Amount: | $ 400,000.00 |
|---|---|
| Annual Interest Rate: | 25.00% |
| Loan Length in Years | 2 |
| Number of Payments per Year: | 12 |
| Start Date of Loan: | 01/01/05 |
| Optional Extra Per Month Paym | $     - |

| Scheduled Monthly Payment: | |
|---|---|
| Scheduled Number of Payment | - |
| Actual Number of Payments: | - |
| Total Early Payments: | - |
| Total Interest: | |
| Total Principal Plus Interest: | |

| Payment Number | Payment Date | Beginning Balance | Scheduled Payment | Extra Payment | Total Payment | Principal | Interest | Ending Balance | Cumulative Interest |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 02/01/05 | $ 400,000.00 | $ 5,430.00 | $      - | $ 5,430.00 | -$ 2,903.33 | $ 8,333.33 | $ 402,903.33 | $ 8,333.33 |
| 2 | 03/01/05 | $ 402,903.33 | $ 8,333.33 | $      - | $ 8,333.33 | -$ 60.49 | $ 8,393.82 | $ 402,963.82 | $ 16,727.15 |
| 3 | 03/10/05 | $ 402,963.82 | $ 30,000.00 | $      - | $ 30,000.00 | $ 21,604.92 | $ 8,395.08 | $ 381,358.90 | $ 25,122.23 |
| 4 | 03/31/05 | $ 381,358.90 | $ 8,333.33 | $      - | $ 8,333.33 | $ 388.35 | $ 7,944.98 | $ 380,970.55 | $ 33,067.21 |
| 5 | 05/03/05 | $ 380,970.55 | $ 8,333.33 | $      - | $ 8,333.33 | $ 396.44 | $ 7,936.89 | $ 380,574.11 | $ 41,004.10 |
| 6 | 05/27/05 | $ 380,574.11 | $ 8,333.33 | $      - | $ 8,333.33 | $ 404.70 | $ 7,928.63 | $ 380,169.40 | $ 48,932.72 |
| 7 | 06/27/05 | $ 380,169.40 | $ 8,333.00 | $      - | $ 8,333.00 | $ 412.80 | $ 7,920.20 | $ 379,756.60 | $ 56,852.92 |
| 8 | 07/26/05 | $ 379,756.60 | $ 8,450.00 | $      - | $ 8,450.00 | $ 538.40 | $ 7,911.60 | $ 379,218.19 | $ 64,764.51 |
| 9 | 09/01/05 | $ 379,218.19 | $ 8,533.33 | $      - | $ 8,533.33 | $ 632.95 | $ 7,900.38 | $ 378,585.24 | $ 72,664.89 |
| 10 | 09/23/05 | $ 378,585.24 | $ 8,533.33 | $      - | $ 8,533.33 | $ 646.14 | $ 7,887.19 | $ 377,939.11 | $ 80,552.09 |
| 11 | 10/26/05 | $ 377,939.11 | $ 8,381.91 | $      - | $ 8,381.91 | $ 508.18 | $ 7,873.73 | $ 377,430.93 | $ 88,425.82 |
| 12 | 11/29/05 | $ 377,430.93 | $ 8,350.00 | $      - | $ 8,350.00 | $ 486.86 | $ 7,863.14 | $ 376,944.07 | $ 96,288.96 |
| 13 | 01/25/06 | $ 376,944.07 | $ 8,333.00 | $      - | $ 8,333.00 | $ 480.00 | $ 7,853.00 | $ 376,464.07 | $ 104,141.96 |
| 14 | 01/25/06 | $ 376,464.07 | $ 340.00 | $      - | $ 340.00 | -$ 7,503.00 | $ 7,843.00 | $ 383,967.08 | $ 111,984.97 |
| 15 | 02/02/06 | $ 383,967.08 | $ 35,806.00 | $      - | $ 35,806.00 | $ 27,806.69 | $ 7,999.31 | $ 356,160.39 | $ 119,984.28 |
| 16 | 03/13/06 | $ 356,160.39 | $ 8,500.00 | $      - | $ 8,500.00 | $ 1,079.99 | $ 7,420.01 | $ 355,080.40 | $ 127,404.29 |
| 17 | 03/15/06 | $ 355,080.40 | $ 12,000.00 | $      - | $ 12,000.00 | $ 4,602.49 | $ 7,397.51 | $ 350,477.91 | $ 134,801.80 |
| 18 | 03/16/06 | $ 350,477.91 | $ 10,000.00 | $      - | $ 10,000.00 | $ 2,698.38 | $ 7,301.62 | $ 347,779.53 | $ 142,103.42 |
| 19 | 03/21/06 | $ 347,779.53 | $ 6,000.00 | $      - | $ 6,000.00 | -$ 1,245.41 | $ 7,245.41 | $ 349,024.94 | $ 149,348.83 |
| 20 | 05/05/06 | $ 349,024.94 | $ 100,000.00 | $      - | $ 100,000.00 | $ 92,728.65 | $ 7,271.35 | $ 256,296.29 | $ 156,620.18 |
| 21 | 05/26/06 | $ 256,296.29 | $ 110,000.00 | $      - | $ 110,000.00 | $ 104,660.49 | $ 5,339.51 | $ 151,635.79 | $ 161,959.68 |
| 22 | 07/17/06 | $ 151,635.79 | $ 10,000.00 | $      - | $ 10,000.00 | $ 6,840.92 | $ 3,159.08 | $ 144,794.87 | $ 165,118.76 |
| 23 | 09/14/06 | $ 144,794.87 | $ 15,000.00 | $      - | $ 15,000.00 | $ 11,983.44 | $ 3,016.56 | $ 132,811.43 | $ 168,135.32 |
| 24 | 09/28/06 | $ 132,811.43 | $ 10,000.00 | $      - | $ 10,000.00 | $ 7,233.10 | $ 2,766.90 | $ 125,578.34 | $ 170,902.23 |
| 25 | 10/10/06 | $ 125,578.34 | $ 10,000.00 | $      - | $ 10,000.00 | $ 7,383.78 | $ 2,616.22 | $ 118,194.55 | $ 173,518.44 |
| 26 | 10/13/06 | $ 118,194.55 | $ 10,000.00 | $      - | $ 10,000.00 | $ 7,537.61 | $ 2,462.39 | $ 110,656.94 | $ 175,980.83 |
| 27 | 10/30/06 | $ 110,656.94 | $ 50,000.00 | $      - | $ 50,000.00 | $ 47,694.65 | $ 2,305.35 | $ 62,962.29 | $ 178,286.18 |
| 28 | 11/02/06 | $ 62,962.29 | $ 30,000.00 | $      - | $ 30,000.00 | $ 28,688.29 | $ 1,311.71 | $ 34,274.01 | $ 179,597.90 |



# EXHIBIT A2

Initials $\underline{YL}$ and $\underline{OL}$

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (hereinafter "Settlement Agreement") is entered into among VERTONIX LIMITED (hereinafter "Plaintiff"), as assignee for Reģionālā Investīciju Banka (Regional Investment Bank), YURI LYUBARSKY (hereinafter "YL") and OLGA LYUBARSKY (hereinafter "OL").

**WHEREAS**, Plaintiff has commenced a civil action (hereinafter "Action") in the Superior Court of New Jersey, Law Division, Monmouth County, captioned as <u>VERTONIX LIMITED v. LYUBARSKY, et al.</u>, Docket No. MON-L-1951-08, against YL and OL (hereinafter, collectively referred to as, "Defendants");

**WHEREAS**, the parties are desirous of amicably settling their differences and disputes without the expense or burden of continued litigation;

**NOW THEREFORE**, intending to be legally bound, the parties agree as follows:

1. <u>Release and Discharge.</u> In consideration of the undertakings set forth herein, and for other valuable consideration, receipt of which is hereby acknowledged, the parties do hereby release, remise, and discharge each other from any and all manner of claims, actions, causes of action, demands, defenses (of any and all kinds or nature), obligations, liens, rights, damages, costs, expenses and/or compensation of any nature whatsoever that they now have or may have had on account of or in any way growing out of certain Loan Agreement No. A-04/167, which is made a part of this Settlement Agreement by reference, or Defendants' guarantee for payment thereof, as set forth in the operative facts alleged in the Action from the beginning of time up to the date of the Settlement Agreement.

2. <u>Obligations.</u>

   a. <u>Payment.</u> In consideration of the promises and covenants contained herein, as payment in full for any and all amounts owed to Plaintiff, Defendants will pay Plaintiff the sum of $119,000.00 (hereinafter "settlement funds"), by way of: (1) one payment of $5,000.00, due within seven days of the signing of this Settlement Agreement (hereinafter "Initial Payment"); (2) twenty-four monthly, installment payments of $1,000.00 (hereinafter, individually, "Installment Payment"), each being due on the thirty-day anniversary of the Initial Payment; and (3) one payment of $90,000.00 payable on the thirtieth day after the last Installment Payment is due.

   b. <u>Form and Method of Payment.</u> All payments of settlement funds shall be made in cash, certified funds, and/or bank check, and delivered to:

      Kalikhman & Rayz, LLC
      c/o Eric Rayz, Esquire
      1051 County Line Road, Unit 102
      Huntingdon Valley, PA 19006

   c. <u>Requisite Payee.</u> When appropriate or necessary for payment, all drafts must be made payable to "Kalikhman & Rayz, LLC, as attorneys for Vertonix Limited."

   d. <u>Grace Period.</u> For all payments, Defendants shall have a "grace period" of three (3) calendar days from the due date to deliver settlement funds to Plaintiff.

3. <u>Default.</u> In the event, Defendants fail to issue payment as set forth above or if any payment is rejected or found to be deficient by any financial institution for any reason, Plaintiff has the right, to declare Defendants in default of this Settlement Agreement and, *inter alia,*

   a. Enter judgment against Defendants for the full amount of the outstanding balance

Initials *YL* and *OK*

under Loan Agreement No. A-04/167, as of the date of the entry of such judgment, and/or

b.    Confess judgment against Defendants, per the terms of the Surety Agreement and Disclosure and Waiver of Rights Regarding Confession of Judgment that are made a part of this Settlement Agreement, marked, and attached hereto as Exhibit "A."

4.    Discontinuance. Once Defendants have complied with their payment obligations, Plaintiff will take immediate steps to discontinue all claims asserted in the Action.

5.    Successors in Interest. This Settlement Agreement will be binding on and will inure to the benefit of the parties, their executors, administrators, heirs, successors, and assigns.

6.    Advice of Counsel. In entering into this Settlement Agreement, the parties represent that they relied on the legal advice of their respective counsel, who is a counsel of their own choice, and the terms of the Settlement Agreement have been read and explained to them by their attorneys.

7.    Governing Law. This Settlement Agreement shall be construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania. All actions arising out of this Settlement Agreement, including any questions related to its interpretation shall be brought solely in the Court of Common Pleas of Philadelphia, Pennsylvania, or the United States District Court for the Eastern District of Pennsylvania.

8.    Contract Interpretation. This Settlement Agreement shall be deemed as having been jointly drafted by the parties and shall not be construed in favor or against either of the parties, but will be given its plain meaning.

9.    Entire Agreement. This Settlement Agreement constitutes the entire understanding between the parties with regard to all disputes related to the matters set forth in the Action. There are no other understandings or agreements, verbal or otherwise, between the parties except as expressly set forth in this Settlement Agreement.

10.    Modification. This Settlement Agreement may not be modified except by writing executed by both parties.

11.    Non-waiver of Rights. The waiver by Plaintiff of any breach of this Settlement Agreement by the Defendants shall not be deemed a waiver of the same, or any other provision of this Settlement Agreement, nor shall any action by Plaintiff inconsistent with its rights that exist under this Settlement Agreement be considered to be a waiver of that right or any other rights existing under this Settlement Agreement.

12.    Language. This Settlement Agreement shall be written and executed in the English language. Any translation into any other language shall not be an official version thereof. In the event of any conflict in interpretation between the English version and such translation, the English version shall control.

13.    Counterparts. This Settlement Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

14.    Non-limitation of Remedies. Nothing in this Settlement Agreement shall be construed to limit any remedies available to the parties under the state and federal laws and statutes.

15.    Date of Execution. The Settlement Agreement shall be deemed executed and effective when signed on behalf of Plaintiff.

Initials _YL_ and _OL_

**IN WITNESS WHEREOF**, the parties hereunto set their hand and seal:

**On behalf of Plaintiff**

_____

_01.20.2009_
Date

**On behalf of Yuri Lyubarsky**

_____
Yuri Lyubarsky

_01.14.09_
Date

**On behalf of Olga Lyubarsky**

_____
Olga Lyubarsky

_01.14.09_
Date

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me by _Yuri Lyubarsky_ and _Olga Lyubarsky_ on the _14_ day of _January_, 200_9_.

_____
Notary Public,
State of _Florida_

My commission expires: _____

STEPHANIE L SMITH
NOTARY
My Comm. Expires
February 11, 2012
DD757591
PUBLIC
STATE OF FLORIDA

Page 3 of 3

# EXHIBIT "B"

Initials _YL_ and _OL_

## SURETY AGREEMENT

INTENDING TO BE LEGALLY BOUND, the undersigned, YURI LYUBARSKY and OLGA LYUBARSKY (jointly and severally "Surety") agree as follows:

1.    Unconditional Surety.

For full value received, Surety hereby unconditionally guarantees to VERTONIX LIMITED (hereinafter "Bank"), and becomes surety to Bank for, the due and punctual payment and performance of all Obligations (as defined below) of Surety to Bank, now existing or hereafter at any time or times incurred, and all expenses incurred by Bank in collecting same as set forth below. The term "Obligations" means any and all indebtedness, obligations, and liabilities of Surety to Bank, now existing or hereafter arising, direct or indirect, acquired outright, conditionally, or as collateral security from another, absolute or contingent, joint or several, secured or unsecured, matured or not matured, monetary or non-monetary, arising out of contract or tort, liquidated or unliquidated, arising by operation of law or otherwise, and all extensions, renewals, refundings, replacements, advances, and modifications of any of the foregoing, including without limitation all interest, expenses, costs (including collection costs) and fees (including attorney's fees and prepayment fees) incurred, arising or accruing (whether prior or subsequent to the filing of any bankruptcy petition by or against Surety) under or in connection with any of the foregoing. If any Obligation is not paid or performed by Surety punctually when due, including, without limitation, any Obligation due by acceleration of the maturity thereof, or if Surety fails to abide by all terms of this Agreement and all terms of any other documents executed by Surety in connection with any Obligation, Surety will, without demand or notice by Bank, immediately pay or perform all Obligations or cause the same to be paid or performed; and, in such event Surety shall immediately pay to Bank upon demand all costs and expenses, including without limitation all title search, title insurance, and appraisal costs, if any, and all attorney's fees and other costs incurred by Bank as a result of any proceeding, whether in bankruptcy or otherwise, involving any Obligor (defined herein to include Surety and any other person or entity liable for the payment of all or part of the Obligations as well as any other person or entity granting Bank a security interest in any collateral securing any of the Obligations), incurred by Bank to collect all or any portion of the Obligations from any Obligor. All such costs and expenses incurred by the Bank will accrue interest at the highest default rate in any instrument evidencing the Obligations until payment is actually received by the Bank. Interest shall continue to accrue on the Obligations after the entry of any judgment hereunder at the highest rate set forth in any document or instrument evidencing any Obligation.

2.    General Terms and Conditions.

a.    Surety hereby waives (i) notice of acceptance of this Agreement and of any action by Bank in reliance thereon; (ii) presentment, demand of payment, notice of dishonor or nonpayment, protest and notice of protest with respect to the Obligations, and the giving of any notice of default or other notice to, or making any demand on, any Obligor; (iii) notice of any creation, extension, or accrual of any of the Obligations or any election by Bank to sell any of the collateral mortgaged, assigned or pledged as security for any of the Obligations (hereinafter, collectively, the "Collateral") at a public or private sale (Surety agrees that, to the extent notice of such sale shall be required by law, five (5) days notice to Surety of the time and place any public sale or private sale is to be made shall constitute reasonable notification); (iv) any claim, right or remedy which Surety may now have or hereafter acquire against Surety or any other Obligor that arises hereunder and/or from the performance by Surety hereunder including, without limitation, (1) any claim, remedy, or right to seek subrogation, contribution, indemnification or any other form of reimbursement from any other Obligor or (2) any claim, remedy, or right of subrogation, reimbursement, exoneration, indemnification, or participation in any claim, right or remedy of Bank against Surety or any security which Bank now has or hereafter acquires,

whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise; (v) notice of any other nature whatsoever; (vi) any requirement that Bank take any action whatsoever against any Obligor or Collateral or file any claim in the event of the bankruptcy of any Obligor; (vii) the failure by Bank to protect, preserve, or resort to any Collateral or to perfect any security interest in or any lien upon the Collateral; (viii) any act or omission of the Bank which materially increases the scope of the Surety's risk, including negligent administration of any loan to Surety; and (ix) all defenses based on suretyship or impairment of collateral and any defenses any Obligor may assert on the Obligations, including but not limited to failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, lack of legal capacity, lender liability, accord and satisfaction, and usury, except the defense of payment of the Obligations in full. Surety further agrees that the guaranty and surety contained herein will not be discharged except by complete performance of all Obligations of the Surety and the liabilities of Surety hereunder.

b.      Surety hereby consents that from time to time, and without further notice to or consent of Surety, Bank may take any or all of the following actions without affecting or impairing the liability of Surety hereunder: (i) extend, renew, increase, modify, compromise, settle, or release the Obligations or any part thereof (including without limitation any increase or decrease in the interest rate); (ii) release or compromise any liability of any Obligor with respect to the Obligations; (iii) release, waive, or subordinate any security interest or lien in any Collateral or exchange, surrender or otherwise deal with the Collateral as Bank may determine; or (iv) exercise or refrain from exercising any right or remedy of Bank. The guaranty and surety contained herein is absolute and unconditional, primary, direct and immediate and shall be valid and binding upon Surety regardless of any invalidity, irregularity, defect or unenforceability of the Obligations or any note, instrument, or agreement evidencing same or relating thereto, or any other circumstance that might otherwise constitute a defense available to, or discharge of, any other Obligor, including but not limited to failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, infancy, statute of limitations, lender liability, accord and satisfaction, and usury. Surety hereby waives any right to require Bank to proceed initially against any other Obligor or any of the Collateral upon any default in the payment or performance of the Obligations. The obligations of Surety hereunder shall not be subject to any counterclaim, set-off, deduction or defense based upon any claim Surety may have against any Obligor or Bank, except payment or performance of the Obligations. No failure or delay on the part of Bank in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies of Bank hereunder are cumulative and concurrent and not exclusive of any other rights or remedies Bank may have.

c.      If any claim is ever made upon Bank for repayment of any amounts, or the recovery of any secured property, received by Bank from any Obligor in payment of any of the Obligations, and Bank repays all or part of said amounts or returns all or part of said secured property by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over Bank or any of its property or (ii) any settlement or compromise of any such claim accomplished by Bank with such claimant then and in such event Surety agrees that any such judgment, decree, settlement or compromise shall be binding upon Surety, notwithstanding any revocation hereof or the cancellation of any note or other instrument evidencing any Obligation, and Surety shall be and shall remain liable to Bank hereunder for the amounts so repaid or the secured property recovered

Initials __YL__ and __OL__

to the same extent as if such amounts or property had never originally been received by Bank. Surety agrees that Bank shall have no duty or affirmative obligation to defend against such claim and may object to or pay such claim in its sole discretion without impairing or releasing the obligations of Surety hereunder. This provision shall survive the termination of this Agreement.

d.      If less than all persons who are intended to sign this Agreement, or any other document evidencing any Obligation, do so, the same shall nevertheless be binding upon those who do sign, and if only one person shall sign any plural references shall be read as a singular.  Any notice to an Obligor by Bank shall not imply that such notice or any further or similar notice was or is required.

3.      Set-off.

As additional collateral security for the Obligations, and not in lieu of any other rights of Bank hereunder or under any other document, Surety hereby grants to Bank a security interest in, a lien upon, and a right of set-off against all funds, balances or other property of any kind of Surety, or in which Surety has an interest, now or hereafter in the possession, custody or control of Bank.  Bank may upon maturity (whether by demand, acceleration, stated maturity, or otherwise) of the Obligations appropriate and apply toward the payment of the Obligations in such order as Bank determines the balance of any account of Surety with, or each claim of Surety against, Bank.

4.      Venue and Exclusive Jurisdiction.

Surety hereby consents to the exclusive jurisdiction of the Court of Common Pleas of Philadelphia, Pennsylvania or the United States District Court for the Eastern District of Pennsylvania in any legal proceeding involving, directly or indirectly, any matter arising out of or related to this Agreement, or any relationship evidenced hereby, including the collection and enforcement hereof.  Surety expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such Court and waives any objection which Surety may have based upon lack of personal jurisdiction or improper venue and consents to the granting of such legal or equitable relief as is deemed appropriate by such court.  Surety waives personal service of the summons, complaint and any other process issued in any such action or suit and agrees that service of such summons, complaint, and any other process may be made by registered or certified mail, postage prepaid, addressed to the Surety at the address set forth below and that service so made shall be deemed completed upon the providing of such notice.  Nothing in this Agreement shall be deemed or operate to affect the rights of the Bank to serve legal process or to bring any action permitted by law against any Obligor or involving any Collateral in the appropriate court of any other appropriate jurisdiction or forum.

5.      Waiver of Jury Trial and Certain Damages.

Surety hereby waives trial by jury in any legal proceeding involving, directly or indirectly, any matter (whether sounding in tort, contract or otherwise) in any way arising out of or related to this Agreement.  The Surety represents and warrants that no representative or agent of the Bank has represented, expressly or otherwise, that the Bank will not, in the event of litigation, seek to enforce this jury trial waiver.  Surety further waives any right it may have to claim or recover, in any such suit, action or proceeding, any special, exemplary, punitive, or consequential damages or any damages other than, or in addition to, actual damages.  This provision is a material inducement for Bank to enter into, rely upon, or accept this Agreement.

6.      Miscellaneous.

No consent or waiver under this Agreement shall be effective unless in writing.  This Agreement and all documents executed hereunder shall be binding upon Surety and its executors, personal representatives, successors and assigns and shall inure to the benefit of Bank and its successors and

Initials __YL__ and __OL__

assigns. This Agreement has been delivered to and accepted by Bank in, and shall be governed by the internal laws, and not the law of conflicts of, the Commonwealth of Pennsylvania. If any provision hereof is found by a court of competent jurisdiction to be prohibited or unenforceable, it shall be ineffective only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability shall not invalidate the balance of such provision to the extent it is not prohibited or unenforceable, nor invalidate the other provisions hereof, all of which shall be liberally construed in favor of Bank in order to effect the provisions hereof. The execution and delivery of this Agreement is in addition to, and not in derogation of, any other Surety Agreement of any Obligor heretofore executed and delivered to Bank unless such prior Surety Agreement has been terminated in writing pursuant to the terms thereof. This Agreement and any prior Surety Agreement of Surety to Bank shall be construed as one agreement, and in the event of any inconsistency, the terms of this Agreement shall control the terms of any prior Surety Agreement. This Agreement may be amended or discharged only by a writing executed by Bank and Surety. The undersigned, if more than one, are jointly and severally liable. For purposes of this Agreement, the singular shall be deemed to include the plural and the neuter shall be deemed to include the masculine and feminine, as the context may require.

   7.    Confession of Judgment.

   **Surety hereby irrevocably authorizes and empowers the prothonotary or clerk or any attorney of any court of record to waive the issuance and service of process and to appear for and confess judgment therein against Surety and in favor of Bank or any subsequent holder hereof at any time, whether or not the indebtedness evidenced hereby has matured (by acceleration or otherwise), for the full amount of all Obligations due or that may become due, including but not limited to late charges and interest accrued at the rate provided herein. Such confession shall be with all costs of suit and an attorneys' commission in an amount equal to all attorneys' fees incurred but in no event less than the greater of ten percent (10%) of the full amount confessed hereunder or $1,000. Although Surety agrees that the confession may include the amounts of the attorneys' commission specified in the preceding sentence, Surety reserves the right only to contest the collection by Bank of any unreasonable attorneys' fees. The authority and power to appear for and confess judgment against Surety shall not be exhausted by the initial exercise thereof and the same may be exercised from time to time, as often as Bank shall deem necessary and desirable, and a copy of this Agreement shall be sufficient warrant. Bank may, in its sole discretion, exercise the authority contained herein against one or more Sureties at one and the same time or at different times. Such confession shall be with or without declaration or complaint filed, with release of errors, without stay of execution, and Surety waives the right of inquisition on any real estate levied upon pursuant to the provisions hereof, and does hereby voluntarily condemn same and authorizes the prothonotary to enter upon the writ of execution a voluntary condemnation, and further agrees that the real estate may be sold on a writ of execution with a waiver and release of all relief from all appraisement, stay or exemption laws or rules of court, now in force or hereafter enacted or adopted.**

   **In granting the above warrant of attorney to confess judgment, the Surety hereby knowingly, intentionally, and voluntarily waives any and all constitutional rights the Surety has or may have either upon the confession of judgment against the Surety or (after the maturity of the indebtedness evidenced hereby) upon execution process thereon, by garnishment or otherwise, against property of the Surety to: (i) prior notice; (ii) a prior judicial proceeding; (iii) prior review by an authorized public official; and (iv) the prior opportunity to raise a defense, setoff, or counterclaim. The Surety expressly waives such rights as an explicit and material part of the consideration hereof.**

   **IN WITNESS WHEREOF,** the parties hereunto set their hand and seal:

   **(SIGNATURE ON THE NEXT PAGE)**

Initials _YL_ and _OL_

On behalf of Olga Lyubarsky

_Olga Lyubarsky_
Olga Lyubarsky

_01. 14. 09_
Date

On behalf of Yuri Lyubarsky

_Yuri Lyubarsky_
Yuri Lyubarsky

_01. 14. 09_
Date

- SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me by
_Yuri Lyubarsky_ and _Olga Lyubarsky_ on the
_14_ day of _January_, 200_9_.

Notary Public
State of ____Florida____

My commission expires: _____

STEPHANIE L SMITH
NOTARY
My Comm. Expires
February 11, 2012
DD757591
PUBLIC
STATE OF FLORIDA

# EXHIBIT A3

**PAYMENTS TO VERTNOIX 2009-2011**

| Date | Amount | Balance |
|------|--------|---------|
| STARTING BALANCE | | $119,000 |
| 01/21/09 | $5,000 | $114,000 |
| 02/18/09 | $1,000 | $113,000 |
| 03/16/09 | $1,000 | $112,000 |
| 03/24/09 | $1,000 | $111,000 |
| 04/16/09 | $1,000 | $110,000 |
| 05/14/09 | $1,000 | $109,000 |
| 06/15/09 | $1,000 | $108,000 |
| 07/15/09 | $1,000 | $107,000 |
| 08/16/09 | $1,000 | $106,000 |
| 09/15/09 | $1,000 | $105,000 |
| 10/15/09 | $1,000 | $104,000 |
| 11/16/09 | $1,000 | $103,000 |
| 12/19/09 | $1,000 | $102,000 |
| 01/15/10 | $1,000 | $101,000 |
| 02/18/10 | $1,000 | $100,000 |
| 03/19/10 | $1,000 | $99,000 |
| 04/15/10 | $1,000 | $98,000 |
| 04/28/10 | $1,000 | $97,000 |
| 05/14/10 | $1,000 | $96,000 |
| 06/15/10 | $1,000 | $95,000 |
| 07/20/10 | $1,000 | $94,000 |
| 08/17/10 | $1,000 | $93,000 |
| 09/15/10 | $1,000 | $92,000 |
| 10/15/10 | $1,000 | $91,000 |
| 11/16/10 | $1,000 | $90,000 |
| 12/19/10 | $1,000 | $89,000 |
| 01/19/11 | $1,000 | $88,000 |
| 02/17/11 | $1,000 | $87,000 |
| 03/19/11 | $1,000 | $86,000 |

EXHIBIT A4



The Law Offices Of Rimma Elbert, LLC
ATTORNEY TRUST ACCOUNT
2698 HWY 516 SUITE E
OLD BRIDGE, NJ 08857

AMBOY
Amboy National Bank
OLD BRIDGE OFFICE / 09
Old Bridge, NJ 08857
55-441-212

3388

PAY    One Hundred Seventy Five Thousand AND no/100*******************************************

TO THE
ORDER OF  Kalikhman & Rayz, LLC

19 Shallow Brook Rd-Judgment payoff

DATE    04/29/2013

AMOUNT    175,000.00

AUTHORIZED SIGNATURE

Security features. Details on back.

⑆3388⑆ ⑆0212044◧6⑆ ⑆04◧◧6◧8◧8◧◧⑆

# KALIKHMAN & RAYZ, LLC
### ATTORNEYS AND COUNSELORS AT LAW

1051 COUNTY LINE ROAD, SUITE "A" HUNTINGDON VALLEY, PA 19006
PHONE: (215) 364-5030 ☙ FAX: (215) 364-5029

March 27, 2013

**Via E-mail Only**

Jeffrey M. Lehman, Esquire
JLehman@thelehmanlawfirm.com
The Lehman Law Firm, PC
281 Main Street
Woodbridge, NJ 07095

> **RE:** Vertonix Limited v. Lyubarsky, et al.
> Court of Common Pleas (Philadelphia County) February Term 2011, Docket No. 3388
> New Jersey Superior Court, Docket No. DJ-146520-11
> 17th Judicial Circuit (Broward County, Florida), Case No. CACE 12-003375 (02)

Dear Mr. Lehman,

As you are aware, I represent Vertonix Limited, the Plaintiff in the above-referenced matter.

By way of this letter, I wanted to confirm my client's agreement to accept, as payment towards the satisfaction of the lien against the property, held by Yuri and Olga Lyubarsky, at 19 Shallow Brook Drive, Morganville, NJ, the sum of $175,000.00, payable as follows:

    (1)    $40,000.00 from the mortgage holder (Chase); and

    (2)    $135,000.00 from the prospective purchaser.

Additionally, I wanted to confirm our agreement that acceptance of this payment is limited to the satisfaction of the lien at issue and nothing else. In other words, my client still has the right to pursue the remaining balance of the judgment owed by Mr. and Mrs. Lyubarsky. If this correspondence does not accurately reflect the terms of our agreement, please let me know in writing immediately.

It is my understanding that payment will be issued at the time of the closing. Accordingly, at your earliest convenience, please let me know the approximate time when the transaction will be finalized. I also ask that any draft be made payable to "Kalikhman & Rayz, LLC, as attorneys for Vertonix Limited" and be delivered promptly to my office.

If you have any questions, please do not hesitate to contact me.

### (SIGNATURE ON THE NEXT PAGE)

Page 2 of 2

Sincerely,

Eric Rayz, Esquire


ER/az

cc:   Vertonix Limited

| U.S. Department of Housing and Urban Development | A. Se **APPROVED**-JD-1) | | OMB Approval No. 2502-0265 |
|---|---|---|---|

**By Fatima Vijeila at 10:48 am, Apr 29, 2013**

| B. Type of Loan | | | | |
|---|---|---|---|---|
| 1.☐ FHA  2.☐ RHS  3.☐ Conv. Unins  4.☐ VA  5.☐ Conv. Ins | 6. File Number: TT41233 | 7. Loan Number: | 8. Mortgage Insurance Case Number: | |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower: | E. Name & Address of Seller: | F. Name & Address of Lender: |
|---|---|---|
| Yevgeniy Groysman<br>Anna Kripitser<br>23 Alex Circle<br>Staten Island, NY 10305 | Yuri Lyubarsky<br>Olga Lyubarsky<br>19 Shallow Brook Rd<br>Morganville, NJ 07751 | N/A |

| G. Property Location:<br>19 Shallow Brook Rd<br>Morganville, NJ 07751 | H. Settlement Agent:<br>Rimma Elbert, Esq.<br>2698 Route 516<br>Old Bridge, NJ 08857 | TIN:<br><br>Phone: (732) 607-2121 |
|---|---|---|
| Lot: 1.07 | Place of Settlement:<br>2698 Route 516<br>Old Bridge, NJ 08857 | I. Settlement Date: 4/29/2013 |
| Block: 155 | | Funding Date:  4/29/2013 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101. Contract sales price | 1,090,000.00 | 401. Contract sales price | 1,090,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 213,330.53 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes: | | 406. City/town taxes: | |
| to | | to | |
| 107. County taxes: | | 407. County taxes: | |
| to | | to | |
| 108. Assessments: | | 408. Assessments: | |
| to | | to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross Amount Due From Borrower** | 1,303,330.53 | **420. Gross Amount Due To Seller** | 1,090,000.00 |
| **200. Amounts Paid By Or In Behalf Of Borrower** | | **500. Reductions In Amount Due To Seller** | |
| 201. Deposit or earnest money | 75,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | 83,247.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | 909,627.66 |
| | | to Chase | |
| 205. | | 505. Payoff of second mortgage loan | 8,500.00 |
| | | to DTS Solutions | |
| 206. | | 506. | |
| 207. | | 507. Chase Incentive to Olga Lyubarsky | 45,000.00 |
| 208. | | 508. Vertonix Limited Judgment | 40,000.00 |
| 209. | | 509. Tzax sale cert #2013-025 | 1,500.00 |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes: 4/1/2013-4/29/2013 | 2,125.34 | 510. City/town taxes: 4/1/2013-4/29/2013 | 2,125.34 |
| to | | to | |
| 211. County taxes: | | 511. County taxes: | |
| to | | to | |
| 212. Assessments: | | 512. Assessments: | |
| to | | to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. Taxes Current Year $27955.05 | | 516. | |
| 217. Per Diem $76.58918 | | 517. | |
| 218. Seller Paid $6988.77 | | 518. | |
| 219. Seller Owes 119 days | | 519. | |
| **220. Total Paid By/For Borrower** | 77,125.34 | **520. Total Reduction Amount Due Seller** | 1,090,000.00 |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross Amount due from borrower (line 120) | 1,303,330.53 | 601. Gross amount due to seller (line 420) | 1,090,000.00 |
| 302. Less amounts paid by/for borrower (line 220) | 77,125.34 | 602. Less reductions in amount due seller (line 520) | 1,090,000.00 |
| **303. Cash ☒ From ☐ To Borrower** | 1,226,205.19 | **603. Cash ☒ To ☐ From Seller** | |

The Public Reporting Burden for this collection of information is estimated at 35 minutes per response for collecting, reviewing, and reporting the data. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number. No confidentiality is assured; this disclosure is mandatory. This is designed to provide the parties to a RESPA covered transaction with information during the settlement process.

© 2009-2010 Easy Soft. Previous editions are obsolete          Page 1 of 3          **HUD-1**

| L. Settlement Charges      File Number: IT41233    Loan Number: | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| **700. Total Real Estate Broker Fees** | | | |
| Division of Commission (line 700) as follows: | | | |
| 701. $38,150.00     to Keller Williams Monmouth | | | |
| 702. $27,250.00     to Keller Williams West Monmouth | | | |
| 703. Commission paid at settlement | | | |
| 704. | | | 65,400.00 |
| **800. Items Payable In Connection With Loan** | | | |
| 801. Our origination charge       $ | (from GFE #1) | | |
| 802. Your credit or charge (points) for the specific interest rate chosen   $ | (from GFE #2) | | |
| 803. Your adjusted origination charges N/A | (from GFE A) | | |
| 804. Appraisal fee to | (from GFE #3) | | |
| 805. Credit report to | (from GFE #3) | | |
| 806. Tax service to | (from GFE #3) | | |
| 807. Flood certification | (from GFE #3) | | |
| 808. | | | |
| 809. | | | |
| 810. | | | |
| 811. | | | |
| **900. Items Required By Lender To Be Paid In Advance** | | | |
| 901. Daily interest charges from 4/29/2013 to 5/1/2013 @ $ /day | (from GFE #10) | | |
| 902. Mortgage insurance premium for 0 months to | (from GFE #3) | | |
| 903. Homeowner's insurance for 0 years to | (from GFE #11) | | |
| 904. | | | |
| 905. | | | |
| **1000. Reserves Deposited With Lender** | | | |
| 1001. Initial deposit for your escrow account | (from GFE #9) | | |
| 1002. Homeowner's insurance    months @    per mo | $ | | |
| 1003. Mortgage insurance    months @    per mo | $ | | |
| 1004. Property taxes    months @    per mo | $ | | |
| 1005.    months @    per mo | $ | | |
| 1006.    months @    per mo | $ | | |
| 1007. Aggregate Adjustment | $0.00 | | |
| **1100. Title Charges** | | | |
| 1101. Title services and lender's title insurance Investors TItle Agency | (from GFE #4) | 620.50 | |
| 1102. Settlement or closing fee | | | |
| 1103. Owner's title insurance Investors TItle Agency | (from GFE #5) | 3,644.00 | |
| 1104. Lender's title insurance | | | |
| 1105. Lender's title policy limit | $ | | |
| 1106. Owner's title policy limit | $1,090,000.00 | | |
| 1107. Agent's portion of the total insurance premium | $ | | |
| 1108. Underwriter's portion of the total insurance premium | $ | | |
| 1109. Buyers Attorney Fee to Rimma Elbert, Esq | | 975.00 | |
| 1110. Wire/Courier Fee to Rimma Elbert, Esq/Jeffrey Lehman | | 100.00 | 70.00 |
| 1111. Title Review fee to Rimma Elbert, Esq | | 50.00 | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Government recording charges | (from GFE #7) | 130.00 | |
| 1202. Deed $130.00      Mortgage $      Release $300.00 | | | 300.00 |
| 1203. Transfer taxes | (from GFE #8) | 10,900.00 | |
| 1204. City/County tax/stamps: Deed $      Mortgage $ | | | |
| 1205. State tax/stamps: Deed $21,564.00      Mortgage $ | | | 10,664.00 |
| 1206. | $ | | |
| 1207. | $ | | |
| **1300. Additional Settlement Charges** | | | |
| 1301. Required services that you can shop for | (from GFE #6) | | |
| 1302. Survey to Titus Surveying | | 1,250.00 | |
| 1303. Judgment payoff to Vertinex | | 135,000.00 | |
| 1304. 2nd mortgage payoff to DTS Solutions | | 53,172.27 | |
| 1305. Sellers Title review fee to First Choice Title | | | 1,800.00 |
| 1306. Sellers Attorney Fee to Jeffrey Lehman, Esq | | | 4,200.00 |
| 1307. 2nd quarter taxes to Township of Marlboro | | 6,988.76 | |
| 1308. tax sale cert lien #2012-036 MTMUA | | 500.00 | 813.00 |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | 213,330.53 | 83,247.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Yevgeniy Groysman         Buyer/Borrower      Yuri Lyubarsky                Seller

Anna Kripitser         Buyer/Borrower      Olga Lyubarsky                Seller

This Settlement Statement which I've prepared is a true and accurate account of this transaction. I've caused or will cause the funds to be disbursed in accordance with this statement.

                                             4/29/2013

Rimma Elbert, Esq.         Settlement Agent      Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment.

EXHIBIT A5

**FILED**
03 MAY 2016 01:59 pm
**Civil Administration**
P. MARTIN

| | |
|---|---|
| VERTONIX LIMITED | COURT OF COMMON PLEAS |
| Plaintiff(s) | PHILADELPHIA COUNTY |
| v. | February Term 2011 |
| LYUBARSKY, et al. | Docket No. 3388 |
| Defendant(s) | |

## ORDER

AND NOW, this **6th** day of **July**, 20**16**, upon consideration of Plaintiff's Motion to Reassess Damages, it is hereby ORDERED and DECREED that:

1. The Prothonotary is to amend the judgment entered in this matter on February 24, 2011, for the Plaintiff and against Defendants, YURI LYUBARSKY and OLGA LYUBARSKY, to reflect that, as of May 3, 2016, the amount of the judgment is ~~$270,402.71~~ *$141,102.71*; and

2. Defendants are to pay interest at the legal rate of six (6) percent per annum, upon the amount of the judgment entered in this matter, from the date of this Order, and until it is paid in full.

BY THE COURT:

_____

Vertonix Limited Vs Lyu-ORDER

11020338800082

DOCKETED
JUL 07 2016
MICHAEL TIERNEY
JUDICIAL RECORDS

RECEIVED
JUL 07 2016
OFFICE OF JUDICIAL
RECORDS

Case ID: 110203388
Case ID: 110203388
Control No.: 16050338
Control No.: 16122014

EXHIBIT A6

# Pennsylvania General Assembly

https://www.legis.state.pa.us/cfdocs/legis/LI/consCheck.cfm?
vt_session_id=02D82350E39D11E8AD03BC764E11209A&txtType=HTM&ttl=42&div=0&chpt=81&sctn=24&subsctn=0&utm_source=BillsSEO

11/08/2018 04:28 PM

Home  /  Statutes of Pennsylvania  /  Consolidated Statutes  /  Title 42

# Title 42

Text Size: A  A  A

  Print

 A provision of this statute is set to expire in 2018 and 2019

**§ 8124.  Exemption of particular property.**
    **(a)   Goods.--**The following personal property of the judgment
debtor shall be exempt from attachment or execution on a judgment:
        (1)   Wearing apparel.
        (2)   Bibles and school books.
        (3)   Sewing machines belonging to seamstresses or used and
owned by private families, but not including sewing machines
kept for sale or hire.
        (4)   Uniforms and accoutrements as provided by 51 Pa.C.S. §
4103 (relating to exemption of uniforms and equipment).
    **(b)   Retirement funds and accounts.--**
        (1)   Except as provided in paragraph (2), the following
money or other property of the judgment debtor shall be exempt
from attachment or execution on a judgment:
            (i)   Certain amounts payable under the Public School
Employees' Retirement Code as provided by 24 Pa.C.S. § 8533
(relating to taxation, attachment and assignment of funds).
            (ii)   Certain amounts payable under the State
Employees' Retirement Code as provided by 71 Pa.C.S. § 5953
(relating to taxation, attachment and assignment of funds).
            (iii)   The retirement allowance provided for in the act
of May 24, 1893 (P.L.129, No.82).
            (iv)   Compensation or pension provided for in the act
of May 20, 1915 (P.L.566, No.242).
            (v)   Compensation or pension provided for in the act of
May 28, 1915 (P.L.596, No.259).
            (vi)   The retirement allowance, contributions and
returned contributions under the act of February 1, 1974
(P.L.34, No.15), known as the "Pennsylvania Municipal
Retirement Law."
            (vii)   Any pension or annuity, whether by way of a
gratuity or otherwise, granted or paid by any private
corporation or employer to a retired employee under a plan
or contract which provides that the pension or annuity
shall not be assignable.
            (viii)   Any retirement or annuity fund of any self-
employed person (to the extent of payments thereto made
while solvent, but not exceeding the amount actually
excluded or deducted as retirement funding for Federal
income tax purposes) and the appreciation thereon, the
income therefrom and the benefits or annuity payable
thereunder.
            (ix)   Any retirement or annuity fund provided for under
section 401(a), 403(a) and (b), 408, 408A, 409 or 530 of
the Internal Revenue Code of 1986 (Public Law 99-514, 26
U.S.C. § 401(a), 403(a) and (b), 408, 408A, 409 or 530),
the appreciation thereon, the income therefrom, the
benefits or annuity payable thereunder and transfers and
rollovers between such funds. This subparagraph shall not
apply to:
                (A)   Amounts contributed by the debtor to the
retirement or annuity fund within one year before the
debtor filed for bankruptcy. This shall not include
amounts directly rolled over from other funds which are
exempt from attachment under this subparagraph.
                (B)   Amounts contributed by the debtor to the
retirement or annuity fund in excess of $15,000 within

retirement or annuity fund in excess of $15,000 within a one-year period. This shall not include amounts directly rolled over from other funds which are exempt from attachment under this subparagraph.

       (C)  Amounts deemed to be fraudulent conveyances.

   (2)  The exemptions provided by paragraph (1)(i) through (vi) shall be subject to any inconsistent provision of the act of July 8, 1978 (P.L.752, No.140), known as the "Public Employee Pension Forfeiture Act."

  **(c)  Insurance proceeds.--**The following property or other rights of the judgment debtor shall be exempt from attachment or execution on a judgment:

   (1)  Certain amounts paid, provided or rendered by a fraternal benefit society as provided by 40 Pa.C.S. § 6531 (relating to benefits not attachable).

   (2)  Claims and compensation payments under the act of June 2, 1915 (P.L.736, No.338), known as "The Pennsylvania Workmen's Compensation Law," except as otherwise provided in the act.

   (3)  Any policy or contract of insurance or annuity issued to a solvent insured who is the beneficiary thereof, except any part thereof exceeding an income or return of $100 per month.

   (4)  Any amount of proceeds retained by the insurer at maturity or otherwise under the terms of an annuity or policy of life insurance if the policy or a supplemental agreement provides that such proceeds and the income therefrom shall not be assignable.

   (5)  Any policy of group insurance or the proceeds thereof.

   (6)  The net amount payable under any annuity contract or policy of life insurance made for the benefit of or assigned to the spouse, children or dependent relative of the insured, whether or not the right to change the named beneficiary is reserved by or permitted to the insured. The preceding sentence shall not be applicable to the extent the judgment debtor is such spouse, child or other relative.

   (7)  The net amount payable under any accident or disability insurance.

   (8)  Certain amounts paid, provided or rendered by a fraternal benefit society as provided by section 305 of the act of July 29, 1977 (P.L.105, No.38), known as the "Fraternal Benefit Society Code."

   (9)  Certain amounts paid, provided or rendered under the provisions of section 106(f) of the act of July 19, 1974 (P.L.489, No.176), known as the "Pennsylvania No-fault Motor Vehicle Insurance Act."

   (10)  Certain amounts paid, provided or rendered under the provisions of section 703 of the act of December 5, 1936 (2nd Sp.Sess., 1937 P.L.2897, No.1), known as the "Unemployment Compensation Law."

(Apr. 28, 1978, P.L.202, No.53, eff. 60 days; Oct. 5, 1980, P.L.693, No.142, eff. 60 days; Dec. 20, 1982, P.L.1409, No.326, eff. 60 days; Oct. 12, 1990, P.L.531, No.128, eff. 60 days; Feb. 18, 1998, P.L.170, No.26, eff. imd.; Dec. 20, 2000, P.L.742, No.105, eff. 60 days)

   **2000 Amendment.**  Act 105 amended subsec. (b)(1)(ix).
   **1982 Amendment.**  Act 326 added subsec. (c)(9) and (10).
   **1980 Amendment.**  Act 142 reenacted and amended subsec. (b), retroactive to the effective date of the act of July 8, 1978, P.L.752, No.140, known as the Public Employee Pension Forfeiture Act, and added subsec. (c)(8). Section 210(d) of Act 142 provided that, notwithstanding 1 Pa.C.S. § 1957 (relating to ineffective provisions not revived by reenactment in amendatory statutes), it is hereby declared to be the intent of (the amendment affecting subsec. (b)) to restore such provisions to their status prior to the partial repeal effected by section 5 of the Public Employee Pension Forfeiture Act except as otherwise expressly provided by such provisions as reenacted and amended hereby.
   **1984 Partial Repeal.**  Section 8 of the act of February 12, 1984, P.L.26, No.11, relating to motor vehicle financial responsibility, repealed section 8124(c)(9) insofar as it is inconsistent with Act 11.
   **References in Text.**  The act of July 19, 1974, P.L.489, No.176, known as the Pennsylvania No-fault Motor Vehicle Insurance Act, referred to in subsec. (c)(9), was repealed by the act of February

referred to in subsec. (c)(9), was repealed by the act of February
12, 1984, P.L.26, No.11. The subject matter is now contained in
Chapter 17 of Title 75 (Vehicles).

   Section 305 of the act of July 29, 1977, P.L.105, No.38, known
as the Fraternal Benefit Society Code, referred to in subsec. (c)
(8), was repealed by the act of Dec. 14, 1992, P.L.835, No.134,
known as the Fraternal Benefit Societies Code, which was repealed
by the act of July 10, 2002, P.L.749, No.110. The subject matter
is now contained in section 2433 of the act of May 17, 1921,
P.L.682, No.284, known as The Insurance Company Law of 1921.

   Section 6531 of Title 40 (Insurance), referred to in subsec.
(c)(1), was repealed by the act of Dec. 14, 1992, P.L.835, No.134,
known as the Fraternal Benefit Societies Code, which was repealed
by the act of July 10, 2002, P.L.749, No.110. The subject matter
is now contained in section 2433 of the act of May 17, 1921,
P.L.682, No.284, known as The Insurance Company Law of 1921.

   The short title of the act of June 2, 1915, P.L.736, No.338,
known as The Pennsylvania Workmen's Compensation Law, referred to
in subsec. (c)(2), was amended by the act of July 2, 1993,
P.L.190, No.44. The amended short title is now the Workers'
Compensation Act.

# EXHIBIT B



**GELLERT**
**SCALI**
**BUSENKELL**
**◆ BROWN, LLC**

November 21, 2018


SUBJECT:   IN   RE   YURI   LYUBARSKY   and   OLGA
LYUBARSKY
US BANKRUPTCY COURT, SD FLORIDA,
MIAMI CASE: 18-16659-LMI Chapter 7


Dear Sir or Madam:

I have been asked to provide an opinion on the propriety of the claim of Florida state exemptions of YURI LYUBARSKY and OLGA LYUBARSKY (the "Debtors") in circumstances where the Debtors litigated and lost their effort to enjoy the benefit of a Pennsylvania statutory exemption applicable to disability insurance with a judgment creditor prior to the commencement of the Debtor's chapter 7 bankruptcy case.

_____

My qualifications and background are set forth at: https://www.gsbblaw.com/team/gary-f-seitz/ highlight a few items of experience pertinent to this report:

- I am and have been a Chapter 7 panel trustee appointed to tens of thousands of cases filed in the United States Bankruptcy Court for the Eastern District of Pennsylvania, Philadelphia Division, since 1999.
- I am an attorney licensed to practice law in the Commonwealth of Pennsylvania since 1988.
- I also have been chosen to and frequently so act as counsel to many chapter 7 trustees in the Eastern District of Pennsylvania.
- As such, I frequently deal with the debtors' claims of exemption under both the federal and state exemption laws.

_____

In issuing this opinion, I have reviewed the following documents:

(1)   Debtors' petition, schedules and statement of financial affairs
(2)   Trustee's objection to Debtors' claim of exemptions
(3)   Disability policies

1201 N. ORANGE STREET
SUITE 300
WILMINGTON, DELAWARE 19801
P: 302. 425. 5800  |  F: 302. 425. 5814

8 PENN CENTER
1628 JOHN F. KENNEDY BLVD, SUITE 1901
PHILADELPHIA, PENNSYLVANIA 19103
P: 215. 238. 0010  |  F: 215. 238. 0016

WWW.GSBBLAW.COM



(4)     The Debtors' claims of exemption from execution off the judgment
(5)     Pennsylvania Superior Court's decision
(6)     Philadelphia Court of Common Pleas' decision
(7)     The parties' submissions in the Court of Common Pleas and Superior Court
(8)     The 2009 settlement agreement
(9)     The Bankruptcy Code
(10)    The relevant Pennsylvania Statutes
(11)    Cases and references cited below

_____

The facts applicable to this opinion are as follows:

The Debtors have been residents of Florida for approximately ten years.

In 2009, the Debtors entered into a settlement agreement with Vertonix LTD, out of which a judgment in favor of Vertonix LTD was confessed by Vertonix LTD against the Debtors in 2011. The settlement agreement incorporated a Pennsylvania choice of law and forum clause and also authorized Vertonix to confess judgment against Debtors upon default.

The settlement agreement was silent as to the law applicable to any efforts of Vertonix to execute upon any judgment it ultimately obtained.

In connection with the confessed judgment, Vertonix sought to execute upon four policies of the Debtors with the Guardian Life Insurance Company in proceedings commenced in the Court of Common Pleas for Philadelphia County. Two of the policies are life policies and two are disability policies.

The Debtors sought to exempt the disability policies raising a Pennsylvania statutory exemption identified at 42 Pa.C.S.A. § 8124(c)(7).

The exemption dispute with Vertonix was consolidated on appeal with several other issues arising out of the confessed judgment.

The Debtors filed a bankruptcy petition on May 31, 2018.

The Debtors have claimed the benefit of the Florida state exemptions to protect the disability policies from liquidation in their bankruptcy proceeding.

The Trustee objects to Debtors' use of Fla. Stat. §§ 222.14 and 222.18 to exempt the Guardian Policies which she claims are not exempt under state or federal law.



She relies on a decision in February of 2017 of the Superior Court of Pennsylvania affirming an Order from the Court of Common Pleas for Philadelphia County sustaining that the Guardian Policies were not exempt under Pennsylvania law, and thus subject to execution by creditor, Vertonix LTD.

The Trustee argues the Debtors' exemptions have already been adjudicated under Pennsylvania state law and as such the issue is res judicata.

---

My opinion based on my experience as a United States Bankruptcy Trustee appointed in cases pending in the United States Bankruptcy Court for the Eastern District of Pennsylvania since 1999 and an attorney licensed to practice law in the Commonwealth of Pennsylvania since 1988 is as follows:

In my opinion, to a reasonable degree of certainty, the Trustee's reliance on the Superior Court decision to oppose the Debtor's claims of exemption in the disability policies is legally and factually flawed for several reasons, including:

- The Superior Court decision by its own terms did not determine an adjudication of the underlying issue of the propriety of selecting an exemption of disability payments. It does not amount to res judicata.

- Disability payments are absolutely and completely exempt under Pennsylvania law.

- The Superior Court (as well as the Court of Common Pleas for Philadelphia County) lacked adjudicatory authority over the subject matter and persons governed by the judgment pertaining to the exemption. Specifically, the Court lacked subject matter jurisdiction over a Florida resident's claim of exemption in a disability policy issued in and paid in other states.

- The choice of law rules built in to the Bankruptcy Code require the application of Florida instead of Pennsylvania exemption law.

---

In forming my opinion, I have considered the following points and research.

**The "non-precedental" Superior Court decision by its own terms did not determine an adjudication of the underlying issue of exemption of disability payments in Pennsylvania. It does not amount to res judicata.**



The Superior Court specifically provides on Page 11, in the footnote, that it does not reach any determination on the exemption for the disability policies since the appellant never raised the issue.

The Pennsylvania Rules of Appellate Procedure provide that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa. R.A.P. 302(a). The rule only precludes the raising of new "issues" - not new "arguments" - for the first time on appeal. The Pennsylvania Superior Court nevertheless extends this waiver rule and refuses to consider "arguments" not presented. Newman Dev. Group of Pottstown, LLC v. Genuardi's Family Mkt., Inc., 98 A.3d 645, 658 (Pa. Super. 2014), citing Schultz v. MMI Products, Inc., 30 A.3d 1224, 1230 (Pa. Super. 2011).

Although the claim of exemption filed on behalf of the Debtors in the lower state court action clearly and unequivocally claimed the disability policies were exempt raising a Pennsylvania statutory exemption identified at 42 Pa.C.S.A. § 8124(c)(7), the Superior Court failed to decide the issue. See Decision, p.11.

Under Pennsylvania law, the doctrine of res judicata provides that a "final valid judgment upon the merits by a court of competent jurisdiction bars any future suit between the same parties or their privies, on the same cause of action." Delaware River Port Auth. v. Pennsylvania Pub. Utility Comm'n, 182 A.2d 682, 685 (Pa. 1962).

When the final disposition of an action is invoked as a bar to a subsequent action, Pennsylvania courts apply the res judicata doctrine upon "the concurrence of four elements: (1) identity of thing sued for; (2) identity of cause of action; (3) identity of person or parties; and (4) identity of quality of parties for or against whom claim is made." Official Court Reporters of Court of Common Pleas of Phila. County v. Pennsylvania Labor Relations Bd., 467 A.2d 311, 319 (Pa. 1983) (quotations omitted). "The test of the identity of causes of action for the purposes of determining the question of res judicata is the identity of the facts essential to their maintenance . . . ." Long v. Stout, 157 A. 607, 609 (Pa. 1931); accord Philadelphia Fraternal Order of Correctional Officers v. Rendell, 701 A.2d 600, 607 (Pa. Commw. Ct. 1997).

Here, the identity of the thing sued for and cause of action are both different. The Pennsylvania litigation involves claims for Pennsylvania exemptions by a Florida resident from the execution on disability payments to satisfy a Pennsylvania confessed judgment. The bankruptcy case involves a claim of exemption of disability payments arising under Florida state law by a Florida resident in a Florida bankruptcy proceeding with regard to the claims of all their creditors and to ensure their fresh start.

Moreover, the identity of the quality of the parties is very different. The Pennsylvania litigation involved the effort by a single judgment creditor to try and reach the disability payments the Debtor is entitled to in order to satisfy its judgment. In this case, the Trustee seeks to reach all the disability payments for the benefit of all the creditors of Debtor.



GELLERT
SCALI
BUSENKELL
◆ BROWN, LLC

The identity of the adversary in the Pennsylvania action is much more narrow; the liability much less. Given the disparity of identity and the limitations contained in the text of the Superior Court decision relied on by the Trustee, a Pennsylvania court would not apply the doctrine of res judicata to the Superior Court decision in these circumstances.

**Disability payments are exempt under Pennsylvania law for Pennsylvania residents.**

The Pennsylvania statute is clear. Payments on account of disability - whether from self-funded or employer funded insurance or governmental assistance, are fully exempt from execution.

The statute unequivocally provides:

> 42 Pa.C.S.A. § 8124. Exemption of particular property
> (c) Insurance proceeds. The following property or other rights of the judgment debtor shall be exempt from attachment or execution on a judgment:
>
>      \*         \*         \*
>
> (7) The net amount payable under any accident or disability insurance.

The statute clearly and unequivocally exempts the disability payments due to Debtor under the policies at issue here. See, In Re Kollar, 223 B.R. 288 (E.D. Pa. 1998) affirmed 176 F.3d 175 (3d Cir. 1999).

The Pennsylvania statute does not contain any qualification or limitation in the amount the debtor may exempt - unlike other specific statutory exemptions, there is no requirement under 42 Pa.C.S.A. § 8124(c)(7) that the payments be limited to any form of a "means or needs test".

In my experience, a Pennsylvania court would apply the clear language of the statute and find that all of the disability payments due the Debtors under these specific policies at issue here are completely exempt.

**The Superior Court (as well as the Court of Common Pleas for Philadelphia County) lacked adjudicatory authority over the subject matter and persons governed by the judgment. Moreover, the Court lacked subject matter jurisdiction. Therefore, the Superior Court decision is not applicable.**

An order of attachment to satisfy a judgment in Pennsylvania is applicable only to assets within the jurisdiction of the Court issuing the order. The disability payments at issue were never due to be paid in Philadelphia or, for that matter, Pennsylvania. The efforts of Vertonix with respect to the confessed judgment were insufficient to reach the disability payments made by a Connecticut insurance company to a Florida resident on account of disability.



The U.S. Supreme Court decided in 1998 in a case styled Baker by Thomas v. General Motors Corp., in no unclear terms: "Regarding judgments, however, the full faith and credit obligation is exacting. A final judgment in one State, if rendered by a court *with adjudicatory authority over the subject matter and persons governed by the judgment*, qualifies for recognition throughout the land. For claim and issue preclusion purposes, in other words, the judgment of the rendering State gains nationwide force. … " (emphasis added).

In other words, the bankruptcy court in Florida must recognize the Pennsylvania decision only if that court had both subject matter and personal jurisdiction. While the Pennsylvania court was given jurisdiction over the underlying dispute over the debt (note/guaranty/settlement agreement) by consent of the parties, it seems doubtful that it had subject matter jurisdiction to determine an exemption of a Florida resident in a right to receive disability payments made in Florida.

The judgment creditor must execute the judgment in the jurisdiction where the debtor has assets. The disability policies at issue are not located in Pennsylvania. They are not to be paid in Pennsylvania. The obligor on the policy does not make the payments in Pennsylvania. The policies were not procured or issued in Pennsylvania. Pennsylvania exemption law does not apply to the right of Florida residents to exempt disability payments received and due to them in Florida. Disability payments due to Florida residents paid in Florida are of no interest to the Pennsylvania forum.

A close reading of the disability policies indicates the obligor's concern and parties' intent that the policies fully and completely comply with the laws of the state of the beneficiaries' residence, which in this case is Florida. For example, the policies contain the following language, "Conformity with State Laws. Any provision of this policy which, on the date of issue, is in conflict with the laws of the state in which you reside on such date is hereby amended to conform to the minimum requirements of such laws." See both Policies, numbered page 9, PDF file pages 13-14.

Accordingly, the Philadelphia Court of Common Pleas and the Pennsylvania Superior Court lacked subject matter jurisdiction to determine the Debtor's rights in his disability policies. The decisions do not satisfy the doctrine of res judicata as applied to the exemptions raised in the Florida bankruptcy proceeding.

**The choice of law rules built in to the Bankruptcy Code require the application of Florida instead of Pennsylvania exemption law.**

"[T]he critical date for determining exemption rights is the petition date." "[T]he critical date for determining exemption rights is the petition date." Goswami v. MTC Dist. (In re Goswami), 304 B.R. 386, 391-92 (9th Cir. BAP 2003), citing White v. Stump, 266 U.S. 310, 313 (1924) and Harris v. Herman (In re Herman), 120 B.R. 127, 130 (9th Cir. BAP 1990). "[E]xemptions . . . are determined on the date of bankruptcy and without reference to subsequent changes in the character or value of the exempt property[.]" Culver, LLC v. Chiu (In re Chiu), 266 B.R. 743,



**GELLERT
SCALI
BUSENKELL
◆ BROWN, LLC**

751 (9th Cir. BAP 2001), aff'd, 304 F.3d 905 (9th Cir. 2002), citing Herman, 120 B.R. at 130; In re Friedman, 38 B.R. 275, 276 (Bankr. E.D. Pa. 1984).

Choice of exemption laws is determined by state of residence. The only exception to this rule are residency period requirements which would not apply here since the debtor has resided in Florida for ten years (more than 730 days - see below).

Under the Code, the debtor is given the option to choose either to have his exemptions determined under a set of federal bankruptcy exemptions set forth in § 522(d) of the Code or under applicable state (and other federal nonbankruptcy) law. The states, in turn, have their own option; the Code confers authority on the states to adopt legislation barring their residents who become bankruptcy debtors from electing the federal bankruptcy exemptions set forth in § 522(d) of the Bankruptcy Code. This is the so-called "opt-out"' provision of§ 522(b)(2), of which thirty-four states have availed themselves. Debtors in these jurisdictions must have their exemptions defined by state law. Florida is an opt out state; Pennsylvania is not. Since Florida made that decision, it has expressed a strong policy decision to provide for its residents with its own exemptions.

In determining the parties' rights in a bankruptcy proceeding, the bankruptcy court must first determine whether state or federal law governs the parties' rights. If state law governs a right, then the court must determine which state's law applies.

The choice-of-law rule provided in 11 U.S.C. § 522(b)(1) and (3)(A) for determining which state's exemptions a debtor may claim to exempt property from the bankruptcy estate provides:

"An individual debtor may exempt from property of the estate . . . State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 730 days immediately preceding the date of the filing of the petition or if the debtor's domicile has not been located at a single State for such 730-day period, the place in which the debtor's domicile was located for 180 days immediately preceding the 730-day period or for a longer portion of such 180-day period than in any other place."

Congress amended the provision in 2005 to prevent forum shopping by debtors who move from one state to another prior to filing bankruptcy to take advantage of a more generous state exemption statute. In re Jevine, 387 B.R. 301, 303 (Bankr. S.D. Fla. 2008). However, it also makes it clear that Florida and not Pennsylvania law must apply to these Florida residents' exemptions in their Florida bankruptcy proceeding.

Since Florida exemption law must be applied, the decisions in Pennsylvania are irrelevant to the Debtors' claims of exemption.

_____

I reserve the right to amend or supplement this report if additional information is provided to me.



I declare the following is true and correct under penalty of perjury under the laws of the United States of America. Executed in Jinan, Shandong, China, on November 20, 2018.

Very truly yours,

GELLERT SCALI BUSENKELL & BROWN, LLC

By: Gary F. Seitz
Gseitz@gsbblaw.com
215-238-0011