**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

    YURI LYUBARSKY and              Case No: 18-16659-LMI
    OLGA LYUBARSKY                Chapter 7

       Debtors.

_____/

**AMENDED DEBTORS' MOTION FOR ENFORCEMENT OF THE AUTOMATIC STAY, SANCTIONS AGAINST VERTONIX LTD AND ITS COUNSEL ARKADY "ERIC" RAYZ FOR FRAUD ON THE COURT AND CONTEMPT FOR WILLFUL VIOLATIONS OF THE AUTOMATIC STAY**

(amended only with respect to adding exhibit cover pages)

Debtors, Yuri Lyubarsky and Olga Lyubarsky ("Debtors"), through undersigned counsel, request that the Court enter an order awarding damages pursuant to Sections 362(k)(1) and 105 of the Bankruptcy Code and imposing sanctions pursuant to Rules 9011 and 9020 of the Federal Rules of Bankruptcy Procedure, against Creditor Vertonix Ltd ("Vertonix") and its counsel, Eric Rayz, Esq. ("Mr. Rayz")

This motion ("Sanctions Motion") is filed concurrently with Debtors' Reply ("Reply") to Creditor Vertonix Ltd's Response ("Response", [#54]) in Opposition to Debtors' Objection ("Objection", [#47]) to Vertonix Ltd's Proof of Claim ("POC", [POC-2]).

The content of this Sanctions Motion is an integral part of the concurrently filed Reply, wherein this Sanctions Motion is incorporated by reference. This incorporation is done in the interest of judicial economy because the facts, procedural history and most arguments of this Sanctions Motion and of the Reply are nearly identical.

**Introduction**

This Motion will assert that Vertonix, by and through their attorney Arkadiy "Eric" Rayz committed a willful and outrageous violation of the automatic stay by trying to extort $250,000 from Debtors, and then perpetrated fraud on the court by submitting (under oath by Mr. Rayz) a grossly inflated POC containing at least one significant bogus component (while knowingly and purposefully withholding a document proving beyond doubt the component is bogus).

**Principal Sanctionable Actions**

The principal two sanctionable actions that are the subject of this Sanctions Motion are:

1.    <u>An egregious willful violation of the automatic stay by Vertonix and its counsel Eric Rays: an attempt to obtain a $250,000 direct payment from Debtors under threat of reporting their purported misdeeds to the US Attorney and the Chapter 7 Trustee.</u>

This relates to a now fully admitted and documented extortionate attempt by Vertonix and its counsel Mr. Rayz, to force a $250,000 payment from Debtors in the early stages of these bankruptcy proceedings. These actions are described in detail in the Declaration of undersigned counsel which is attached as Exhibit A hereto, and in further parts of this Sanctions Motion.

In its effort to force an immediate payment from Debtors, Vertonix and its counsel Eric Rayz blatantly disregarded one of the chief tenets and purposes of the personal bankruptcy process, which is to protect individual debtors from aggressive

collection efforts by creditors (or, for that matter, from any collection efforts at all) while their bankruptcy petition is being considered. Indeed, the principal purpose of the present Debtors' bankruptcy petition was to protect themselves from *this exact type of conduct* by *this exact creditor* and *this exact counsel*.

The effort by Vertonix was particularly egregious in this case because it not only demanded payment (in an amount far exceeding the outstanding judgment in Pennsylvania), but also threatened, by and through Eric Rayz, severe repercussions to Debtors if they did not comply immediately.

Specifically, as evidenced by Exhibit A, on June 21, 2018, Mr. Rayz claimed to have evidence of Debtors' assets not included in their Petition and threatened to report this to the Trustee and US Attorney unless Debtors made an immediate $250,000 payment to Vertonix[1].

For purposes of the automatic stay violation., it is irrelevant whether Mr. Rayz' claims about the Debtors assets were true. Indeed, if Mr. Rayz' allegations *were* true, (which he clearly believed at the time and confirmed afterwards by e-mail, see Exhibit A3) his demand for payment was even more egregious. Specifically, the demand for payment in exchange for non-reporting of Debtors' allegedly criminal conduct to the US Attorney falls squarely under 18 U.S.C. § 873 which states, "*Whoever, under a threat of informing, or as a consideration for not*

---

[1] The claims by Mr. Rayz of inaccuracy of Debtors' Petition are of course disputed by Debtors, and these issues have now been settled between the Trustee and Debtors, together with the Trustee's objection to disability policy exemptions claimed by Debtors and the issue of a purported judicial lien against disability policies. Specifically, as can be seen from Trustee's Motion to Compromise Controversy [#65], the Debtors have agreed to use their disability proceeds to pay an amount equal to the appraised value of Debtors' declared assets, plus a portion of the accrued disability benefits, in exchange for a release of all known claims relating to their assets, a release of the judicial lien on disability policies, and an withdrawal of Trustee's objections to the exempt status of disability and life policies.

*informing, against any violation of any law of the United States, demands or receives any money or other valuable thing, shall be fined under this title or imprisoned not more than one year, or both*". It is hard to see any difference between the actions of Mr. Rayz and conduct describe by 18 U.S.C. § 873.

It is further noted that in exchange for his non-reporting the Debtors' alleged misconduct to the Trustee and the US Attorney, Vertonix was demanding a payment of $250,000.00, far in excess of the amount outstanding under the Pennsylvania judgment, which was $141,102.71 plus 6% interest for about 2 years. In other words, Vertonix was attempting to collect <u>a premium above the actual debt amount</u> in exchange for non-reporting of a purported criminal violation.

The threat against Debtors was made by Vertonix, by and through Mr. Rayz, with the full knowledge (from prior proceedings, including those involving Yuri Lyubarsky's disability benefits policy) that Debtor Yuri Lyubarsky suffered from a debilitating psychiatric condition, known as severe panic disorder, that was so serious that it had caused Mr. Lyubarsky to be declared disabled a decade ago, and has since required multiple hospitalizations and a regular medication regimen.

The threat resulted in an exacerbation of Mr. Lyubarsky's medical condition and made his and his wife's lives miserable since June 21, 2018. A full reading of Mr. Lyubarsky's declaration attached hereto as Exhibit C is needed to understand the full effect of the violations committed by Vertonix against Debtors. Rather than quote excerpts from Exhibit C here, Debtors and this counsel request that the court read Exhibit C in its entirety.

2.    **Fraud on the Court: (a) the filing by Mr. Rayz of a grossly inflated Proof of Claim that purposefully withheld facts and documents demonstrating a much lower claim amount; and, more egregiously, (b) the subsequent submission by Mr. Rayz of a knowingly false calculation of the amount of Proof of Claim while purposefully withholding Pennsylvania court documents demonstrating the falsity of such calculation.**

        a.    <u>The Filing of a Purposefully Inflated Proof of Claim.</u>

The initial Proof of Claim in the amount of $400,000.00 [POC 2] included a copy of the February 2011 (7+ years old) judgment for $184,269.19.

The POC was verified under oath by Rayz on behalf of Vertonix.

Withheld from the 88-page POC filing were any records related to (or any other mention of) a $175,000.00 payment made in 2013 (i.e. subsequent to the $184,269.19 judgment), as well as a much more recent court order entered on July 7, 2016 reassessing the damages in the amount of $141,102.71 plus 6% interest from July 7, 2016. The $141,102.71 order is attached as Exhibit B4 to Exhibit B hereto, the Declaration of Marina Kats, Esq.

b.    The filing of a false calculation including a bogus $96,800

component in order to justify the previously inflated $400,000 claim

amount.

When challenged by Debtors through their Objection to the

POC, Vertonix, by its Response filing supported by Mr. Rayz'

sworn declaration, finally produced the missing document

evidencing the lower $141,102.71 amount as part of a 279-

pagesubmission. Mr. Rayz also admitted receiving the $175,000

payment any mention of which was withheld from the original POC.

However, in the Response filing, verified by Mr. Rayz under

oath on behalf of Vertonix, Mr. Rayz alleged that since July 7, 2016,

the $141,102.71 award turned into $432,128.50, a more than 3-fold

increase (see Response ¶210):

| | |
|---|---|
| Principal Amount Due: | $141,102.71 |
| Interest (as of 12/27/2018): | $22,452.73 |
| Sanctions (as of 12/27/2018): | $96,800.00 |
| Costs: | $3,905.03 |
| Attorneys' Fees: | $168,075.00 |
| **TOTAL DUE:** | **$432,128.50** |

Crucially for the purposes of this Sanctions Motion, Mr.

Rayz claimed that this 3-fold increase happened in part because of

$96,800 in sanctions accrued in Pennsylvania under a 2012

sanctions order against the Defendants [Response, ¶¶48-49, ¶¶189-

191, ¶210].

**The above calculation, presented by Vertonix's counsel**

**under oath to this Court, was false and a fraud on this Court**

**and Debtors, particularly with respect to the $96,800 purported sanctions. This falsity is at the heart of the second sanctionable action by Mr. Rayz that is alleged by Debtors in the present Sanctions Motion.**

The $100/day sanctions had already been denied by the Pennsylvania court. To wit, Vertonix had already tried to collect $135,300 worth of the same $100/day sanctions in Pennsylvania in 2016 (representing sanctions from 2012 to 2016), and those exact $100/day sanctions were expressly denied by the Pennsylvania court when it issued its 2016 order reassessing damages at $141,102.71. Specifically, on May 3, 2016, Vertonix filed a Motion to Reassess Damages, a copy of which is attached as Exhibit B2, which included a request for $135,300 in sanction sunder the 2012 sanctions order. The amount of $135,300 was rejected by the Pennsylvania court in its $141,102.71 ruling, a copy of which is attached as Exhibit D2.

However, no mention of this was made in the pleadings and documents submitted by Vertonix's counsel in this Court, and the one key document proving this was missing from the voluminous and otherwise very detailed 279-page Response containing dozens of exhibits.

It is particularly curious that Vertonix and Rayz claim that the sanctions are due and owing starting on May 3, 2016, about 2 months *before* July 7, 2016, the day they were denied by the

Pennsylvania court (Response, ¶191). What Vertonix and Rayz withheld from this court was their own Motion to Reassess Damages dated the same day, May 3, 2016, in which it made the request to award sanctions that was denied on July 7, 2016.

Please see a Declaration of Marina Kats, Esq., counsel for Debtors in the Pennsylvania proceedings, attached as Exhibit B hereto, along with Exhibits B1-B4 which contain the requisite rulings.

No new orders for sanctions were issued after July 7, 2016, the date on which sanctions under the previous order were expressly denied (or after May 3, 2016, the date on which Vertonix filed its Motion to Reassess Damages).

The inclusion of the $96,800 in bogus sanctions, and the purposeful withholding of the document showing that the same sanctions were included in a prior calculation and were rejected by the Pennsylvania court, is fraud on this Court.

Adding insult to injury, in footnote 20 to paragraph 190 of the Response, Mr. Rayz feigns surprise that "neither Debtors nor their Counsel even bother to address the monetary sanctions in the Objection." This is written by counsel who knows full well the sanctions had been denied in 2016 but assumes that neither Debtors nor their counsel know about this.

.

.

.

**Relevant Proceedings and Events**

Below is a short list of proceedings in Pennsylvania and before this Court which are relevant to the content and context of the present Sanctions Motion and the related and separately filed Reply. Unless otherwise specified, none of the information below is in dispute between Vertonix and Debtors.

**A.  Relevant Procedural and Factual History – Pennsylvania Proceedings[2]**

1.    On February 24, 2011, Vertonix obtained a $184,264.19 judgment by confession against Debtors ("Original Judgment", see Response ¶33).

2.    On July 20, 2012, Debtors were ordered to respond to Vertonix's discovery requests or pay $100/day in sanctions ("Discovery Order", see Response ¶48).

3.    In April of 2013, Vertonix received a $175,000 payment (see Response ¶41). <u>This payment was not included in the POC and was only acknowledged in the Response.</u>

4.    On May 3, 2016, Vertonix filed a 37-page Motion to Reassess Damages. **<u>Crucially to the present Motion for Sanctions, unlike virtually all other court documents mentioned in the POC and the Response, a copy of this motion was inexplicably (and, Debtors submit, purposefully) withheld from the Response.</u>** A true copy of Vertonix's Motion to Reassess Damages is attached as Exhibit B2

---

[2] With the exception of one filing in the Pennsylvania proceedings, which was recently discovered by Debtors' counsel, the existence of all records described below are undisputed and are now included in both Vertonix's and Debtors' filings in these bankruptcy proceedings. The penultimate factual event is undisputed. The last factual event is disputed by Debtors and their Pennsylvania counsel. A declaration of Marina Kats, Esq., is attached to this Motion as Exhibit B and includes further Exhibits B1-B4 which are cited in this procedural history and more fully described in Exhibit B.

hereto. As can be seen, to justify an award of $276,402.71, Vertonix requested $135,300.00 in sanctions purportedly owed under the Discovery Order (see Exhibit B1, ¶25 and ¶28, with relevant parts highlighted). In the Response and the Rayz Declaration attached thereto, Vertonix's counsel omits any mention that the $100/day sanctions were part of this Motion to Reassess Damages.

5.    On July 1, 2016, a recently hired counsel for Debtors (who had been acting pro se until April 2016) filed a short Response to Plaintiff's Motion to Reassess [Damages], a true copy of which is attached as Exhibit B3 hereto. As can be seen, this response principally challenged the propriety of the $100/day sanctions for non-compliance with the Discovery Order. In the Response and the Rayz Declaration attached thereto, Mr. Rayz omits any mention that Debtors were contesting the $100/day sanctions back in 2016.

6.    On July 7, 2016, the Pennsylvania Court issued an order reassessing damages ("Updated Judgment", Exhibit B4). **The court crossed out the amount of $276,402.71 requested by Vertonix and entered $141,102.71 instead. The difference of $135,300.00, expressly denied by the court, was the entire amount of sanctions Vertonix had requested.** Accordingly, on July 7, 2016 the Pennsylvania Court expressly denied to award Vertonix any sanctions under the Discovery Order. The Updated Judgment was not included in the POC. It was only disclosed in the Response after Debtors filed their Objection. Conspicuously, no explanation was ever provided in the Response for the $135,300.00 difference between $276,402.71 and $141,102.71.

7.    In May 2017, Debtors made an offer to Vertonix's counsel settle the matter for $80,000. This is undisputed. (see Response ¶79)

8.    Vertonix's counsel claims that shortly after April 11, 2018, "*the Debtors' Pennsylvania counsel called my office to again communicate the Debtors' offer of $80,000.00.*" (see Affidavit of Eric Rayz, Exhibit 3 to the Response, ¶132). Debtors' Pennsylvania counsel denies ever making such a call (see Declaration of Marina Kats, Esq. attached hereto as Exhibit B, ¶¶13-19). Debtors also deny ever making or authorizing any offers in 2018 (see Exhibit C, ¶43). In general, however, it is irrelevant for purposes of post-bankruptcy violations of the automatic stay whether any offers were made pre-bankruptcy[3].

## B.  Relevant Procedural and Factual History – Present Bankruptcy Proceedings[4]

1.    On May 31, 2018, Debtors filed their petition under Chapter 7 ("Petition").

2.    In June 2018, Mr. Rayz made a demand on Debtors for an immediate payment of $250,000 to Vertonix, accompanied with a threat of release of information that could result in criminal prosecution and other grave ramifications for Debtors if they did not comply:

   a.    Around mid-June 2018, Vertonix's counsel requested a meeting with Debtors' counsel in Florida. This is undisputed.

---

[3] Even if hypothetically Mr. Rayz received a pre-bankruptcy call from Debtors' counsel as he purports, it would have been a pre-bankruptcy offer that predated the May 31, 2018 Petition. There are no exceptions to bankruptcy law, no "preferences through the automatic stay", allowing post-bankruptcy demands to be made by creditors demanding direct payment from debtors on the basis of alleged pre-bankruptcy settlement discussions. The suggestion by Mr. Rayz that his demand was permissible because it was a "counter-offer" is preposterous. If this was indeed permissible, the automatic stay would be rendered meaningless, as a large number of creditors would be able to continue to try to collect directly against debtors under the guise of making "counter-offers".

[4] In addition to procedural history which is a matter of record, item 2 below a description of an out-of-court event the which is undisputed, except that Vertonix's counsel's version of these facts is less detailed than Debtors' counsel. In particular, Mr. Rayz fails to mention the threats he made if his demands were not met.

b. On June 21, 2018, Vertonix's Pennsylvania counsel visited the Florida offices of Debtors' counsel and demanded a payment of $250,000 to satisfy Debtors' liability to Vertonix and avoid the prosecution of Vertonix's claim by Vertonix in these bankruptcy proceedings ("Payment Demand Meeting"). Attached as Exhibit A is this counsel's declaration about the Payment Demand Meeting, which describes the threats made by Mr. Rayz and the 4-day "next Monday" deadline imposed by Mr. Rayz on the $250,000 payment he tried to obtain from Debtors. The Payment Demand Meeting, the $250,000 amount of the demand and the 4-day deadline are confirmed by Vertonix's counsel in the Response (see Response, ¶¶106-113), his declaration (see Rayz Declaration, ¶¶135-142) and communications with Debtors' counsel attached as Exhibit A3.

c. Debtors refused to consider the $250,000 demand which they deemed extortionate and in violation of the automatic stay.

3. On July 10, 2018, Vertonix filed its Proof of Claim [POC 2] ("POC") alleging to be owed $400,000.00. The POC included a copy of a 2011 judgment for $184,296.19 ("Original Judgment"). The 88-page POC included no record of a $175,000.00 payment received by Vertonix since the entry of the Original Judgment, nor included a subsequent court order reassessing these damages as of a much later date, July 7, 2016, at $141,102.71 plus 6% interest therefrom ("Revised Judgment"). The POC was verified under penalty of perjury by Mr. Rayz. The verification included the following language:

> *I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, **the creditor gave the debtor credit for any payments received toward the debt**. I have examined the information in this*

*Proof of Claim and have a reasonable belief that the information is true and correct. I declare under penalty of perjury that the foregoing is true and correct.* (Emphasis added)

4.      On December 2, 2018, Debtors filed their Objection to Vertonix's Proof of Claim [#47] ("Objection"). As part of the Objection, the Debtors pointed to the misleading way in which the POC was filed, described the $175,000.00 payment, and attached a copy the Revised Judgment (see Exhibit A5 to the Objection, also included as Exhibit B4 hereto).

5.      On January 2, 2019, Vertonix filed their Response in Opposition to Debtor's Objection [#54] ("Response"), again verified by Mr. Rayz on behalf of Vertonix. The Response included 279 pages of pleadings and exhibits, including an affidavit by Vertonix's counsel. This time the $175,000 payment and the Revised Judgment were acknowledged, but Vertonix claimed that notwithstanding the language of the Revised Judgment, it was entitled to over $170,000 in legal fees and costs.

6.      In the Rayz Declaration, Mr. Rayz glosses over his improper post-bankruptcy $250,000 demand, made during the automatic stay imposed on May 31, 2018, as a "counter-offer" to the Debtors' $80,000 offer (which he fails to mention was made before the bankruptcy filing). Mr. Rayz also does not delve in the Rayz Declaration into the nature of threats he made against Debtors during the meeting and the 4-day deadline he imposed on the Debtors before the threats would be implemented. Those can be gleaned, albeit not fully, from Mr. Rayz' e-mail response to Debtors' counsel included as part of Exhibit A3.

**Violation of the Automatic Stay - Argument**

Automatic stay was imposed under §362 of the Code at the time of Debtors' filing of their Petition on May 31, 2018. On June 15, 2018 and thereafter, Mr. Rayz clearly knew about the bankruptcy filing and therefore was aware of the imposition of the automatic stay. See Exhibit A and Exhibit A1.

On June 15-21, 2018, Mr Rayz made arrangements for a face-to-face meeting with counsel for Debtors, Mr. Nerdinsky. See Exhibit A at ¶7 and Exhibit A1 thereto.

At the meeting on June 21, 2018, Mr. Rayz made a demand on Debtors in the amount of $250,000 and set a deadline for the payment of this amount as the following Monday, June 25, 2018. Mr. Rayz further threatened that if Debtors did not comply, he would release damaging information about them to the US Attorney and the Chapter 7 Trustee. See Exhibit A at ¶¶9-10 and Exhibits A2 and A3.

When confronted by counsel for Debtors about the impropriety of his actions, Mr. Rayz further responded that neither he nor his client cared about it. See Exhibit A3 and Exhibit A at ¶16. However, in the same communications (Exhibit A3), Mr. Rayz explicitly confirms the $250,000 demand he had made on June 21, 2018, the "next Monday" deadline of June 25, 2018, and the discussion about Debtors' purported criminal violations during the Payment Demand Meeting.

What Mr. Rayz claims had happened, using his own words from Exhibit A3, was a meeting where Mr. Rayz asserted that Debtors purportedly "engaged in criminal misconduct" but that Vertonix was "willing […] to accept $250,000, provided the matter would be finalized" by next Monday. This is apparently asserted by Mr. Rayz in Exhibit A3 to have been a benign communication, when in fact the payment demand and the threat for non-compliance are clear even from his version of events. It is clear that Mr. Rayz knew exactly what he was doing – he was trying to make an offer to Debtors that they "could not refuse".

Mr. Rayz' claims in Exhibit A3 and the Rayz Declaration that his $250,000 demand was merely a "counteroffer" to an earlier (pre-bankruptcy) proposal by Debtors are irrelevant. Debtors' Pennsylvania counsel states that she did not call Mr. Rayz. Yet again, even taking Mr. Rayz at his [false] word, even if such an offer had been made pre-bankruptcy, it is irrelevant. Any pre-bankruptcy offers and demands are of course made in the context of collection efforts by creditors, who are free to utilize normal litigation and collection tools to achieve their objectives. This includes demands, offers, counter-offers, counter-counter-offers etc., all of which are normal part of collection and litigation – all of which is supposed to stop at the time of bankruptcy. The purpose of a bankruptcy filing is to draw a bright line between all these happenings and the bankruptcy proceedings during which the automatic stay is imposed, and no further collection efforts can be made. This includes "counteroffers". If this was not so, every creditor could continue collection under the guise of making "counteroffers" in the context of some prior negotiations or communications with the debtor, and automatic stay would be meaningless.

It is also unclear why, if the "counteroffer" and the accompanying mention of Debtors' purported misdeeds were so benign, they could not simply have been communicated in writing to Debtors' counsel, but instead required a personal visit by a Pennsylvania attorney to the office of Debtors' counsel in Florida.

Further exacerbating the gravity of the automatic stay violation are:

    a. Mr. Rayz' threats to release information that would result in a criminal prosecution of Debtors if they failed to pay the $250,000 by next Monday; and

    b. The fact that the $250,000 being demanded was greater than the amount owed by the Debtors to Vertonix under the latest judgment amount from July 7, 2016; and

     c.   The fact that when confronted about it, Mr. Rayz defiantly stated that he and his client "didn't care" about the impropriety of their actions.

Blackmail is a crime under 18 U.S.C. § 873 ("*Whoever, under a threat of informing, or as a consideration for not informing, against any violation of any law of the United States, demands or receives any money or other valuable thing, shall be fined under this title or imprisoned not more than one year, or both*"). While it is not this court's prerogative to determine if a crime has been committed by Mr. Rayz, the indicia of such conduct are clearly present, and this Court has the power to take this into account in fashioning appropriate sanctions.

Section 362(k)(1) of the Bankruptcy Code provides redress for violations of the automatic stay. It mandates that, subject to exceptions not applicable in this case, "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, **in appropriate circumstances, may recover punitive damages**."4 11 U.S.C. § 362(k)(1). "A debtor alleging a violation of the automatic stay has the burden to demonstrate, by a preponderance of the evidence, that a violation was willfully committed by the respondent, and that the debtor suffered damage as a result of the violation." In re Panek, 402 B.R. 71, 76 (D. Mass. 2009). Proving that a creditor violated the automatic stay means proving that a creditor had knowledge of either the bankruptcy or the automatic stay when it committed the violation. In that case, a form of strict liability is created by section 362(h), which only additionally requires damages to be proved in order to take effect.

"A violation is willful if a creditor's conduct was intentional (as distinguished from inadvertent) and committed with knowledge of the pendency of the bankruptcy case." Laboy v. Doral Mortg. Corp. (In re Laboy), 647 F.3d 367, 374 (1st Cir. 2011) (quoting In re McMullen, 386 F.3d 320, 330 (1st Cir. 2004) (internal quotations omitted)). "A willful violation does not require

a specific intent to violate the automatic stay[,]" rather, the creditor need only intend the act which violates the stay. Fleet Mortg. Grp. v. Kaneb, 196 F.3d 265, 269 (1st Cir. 1999). A "technical" violation occurs when the creditor does not have notice of the pendency of the bankruptcy case and no damages should be awarded for such a violation. See McMullen, 386 F.3d at 330 (finding "[a]bsent [notice of the bankruptcy] on the part of a creditor, however, the violation is merely 'technical,' and no damages are to be awarded").

"[A]ctual damages should be awarded only if there is concrete evidence supporting the award of a definite amount." Heghmann v. Hafiani (In re Heghmann), 316 B.R. 395, 405 (B.A.P. 1st Cir. 2004). Whether to award punitive damages "is a fact-specific determination subject to bankruptcy court discretion." Panek, 402 B.R. at 77

The unrefutable facts in the present case make clear that Mr. Rayz and Vertonix "willfully" violated the automatic stay under applicable authority. See McMullen, 386 F.3d at 330; Fleet, 196 F.3d at 268. In McMullen, the First Circuit Court of Appeals limited "technical" violations of the automatic stay to violations where the creditor acted without notice of the pendency of a bankruptcy case. 386 F.3d at 330. That is clearly not the case here.

Having established that Mr. Rayz and Vertonix willfully violated the automatic stay, the Court must determine an appropriate award of damages under § 362(k), which mandates the award of actual damages, including attorneys' fees. See 11 U.S.C. § 362(k). "The burden is on the debtor to prove by a preponderance of the evidence that [he] suffered damages as a result of the stay violation." Heghmann, 316 B.R. at 404–05.

Debtors are in bankruptcy, with their principal source of income – disability benefits – temporarily cut off. Their actual damages are minimal, but not zero. Further, they obtained valuable legal services from Debtors' counsel, and while *they* are unable to pay them, it should not

absolve Mr. Rayz and Vertonix of their liability for the full fair value of legal services provided to Debtors. In this case, Debtors has suffered the following actual damages and attorneys' fees:

(1) Debtor Yuri Lyubarsky suffered from a psychiatric condition, known as severe panic disorder, that was so serious that it had caused Mr. Lyubarsky to be declared disabled and required multiple hospitalizations over the years, and a regular medication regimen. The violation of the automatic exacerbated Mr. Lyubarsky's condition and increased the frequency of the most severe panic attacks. See Exhibit C, ¶¶35-39, ¶46. While Medicare covered Mr. Lyubarsky's medical help, he incurred actual expenditures amount to $20 resulting from the increased incidence of severe panic attacks. See Exhibit C, ¶¶36-37, ¶46.

(2) Debtors incurred a liability for legal costs of in preparing this motion. While Debtors' counsel was retained on minimal fixed-fee terms and is presently unable to bill Debtors for preparing this Motion from Debtors, it is requested that the court allows such billing, and that Mr. Rayz be ordered to pay Debtors' counsel fees and costs in preparing and prosecuting this Motion. It is further requested that the court allows the billing for the cost of preparing the Objection, which should have been unnecessary had Vertonix acted honestly when filing their POC and disclosed the $175,000 payment and the Revised Judgment (the amount of which Debtors would have accepted, and do hereby accept as the appropriate amount of Vertonix's claim).

**Punitive Damages**

In addition, and principally, Debtors seek an award of punitive damages. The Court must award such damages recognizing that "[p]unitive damages should be awarded in an amount sufficient to serve their purpose of deterrence . . . and must be tailored not only based upon the egregiousness of the violation, but also based upon the particular creditor in violation." Panek, 402

B.R. at 77 (quoting In re Curtis, 322 B.R. 470, 486 (Bankr. D. Mass. 2005)). Courts have found circumstances where parties arrogantly defy the Bankruptcy Code to be most appropriate for the award of punitive damages. See id.

In this case, the actions of Mr. Rayz and Vertonix were egregious and defiant of the Bankruptcy Code. The extreme conduct and allegations caused the Debtor severe emotional distress and, compounding the injury after being informed of their abuse, the culprit (Mr. Rayz) stated that he and his client did not care rather than apologize for the violations and take steps to remedy their abuses.

The conduct here was far more egregious than that in the case where a $250,000 punitive damage award was entered against a mortgage lender, Nationstar Mortgage ("Nationstar") for, among other failings, filing an erroneous transfer of claim in a debtors' bankruptcy proceeding. See In re Mocella, 2016 Bankr. LEXIS 2472 (Bankr. N.D. Ohio June 15, 2016).

The amount Mr. Rayz and Vertonix attempted to collect, at $250,000, is also very significant. The threat being made against Debtors if they do not pay up, was very significant. And the person making these demands and threats – a prominent, very experienced and extremely talented attorney acting on behalf of a wealthy client (who can afford to pay legal fees for many years while collecting nothing).

There are no mistakes here, no mitigating factors or excuses. This was a willful, deliberate, outrageous and borderline criminal (or actually criminal) violation of the automatic stay and Debtors' rights.

It is suggested that a punitive damages award against Mr. Rayz and Vertonix should be calculated in reference to the $250,000 they were trying to extort from Debtors in willful violation of the automatic stay, that it be awarded as a reasonable multiple thereof, to provide a sturdy

deterrence to others who may ever consider harassing debtors in such an egregious manner. An award of this magnitude is just and fair in the circumstances of this case.

### Filing a Fraudulent Proof of Claim, Fraud on the Court

Mr. Rayz filed a $400,000 proof of claim on behalf of Vertonix and personally verified it under oath. In the 88-page POC package Mr. Rayz included only a 2011 judgment for $184,264.19, but withheld a much later 2016 ruling setting the amount at the lower $141,102.71 amount. He also failed to include any mention of an intervening $175,000 payment by Debtors.

When confronted through the Debtors' objection, Mr. Rayz, acting both as an attorney and an agent of Vertonix (who verified the Response on behalf of Vertonix), committed fraud on this Court by producing a bogus calculation containing $96,800 in sanctions which Mr. Rayz knew had already been denied by the Pennsylvania court. While including the $96,800, Mr. Rayz purposefully withheld a document, his own motion dated May 3, 2016, containing proof that his prior attempt to obtain such sanctions, in the amount of $135,300, was denied by the Pennsylvania court on July 7, 2016.

As such, the claim by Vertonix, in a significant part, was submitted fraudulently. Mr. Rayz substituted greed and blatant disregard to the truth for the duties of an officer of the court. The doctrine of *falsus in uno, falsus in omnibus*, should apply.

The filing of a false proof of claim in a bankruptcy case is a crime under 18 U.S.C. § 152(4). Although the federal criminal statute prohibiting the falsifying of a proof of claim does not provide a party with a civil right of action, a bankruptcy court is empowered by 11 U.S.C. § 105(a) to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The statute specifically allows a bankruptcy court to take "any action . . . necessary or appropriate . . . to prevent an abuse of process." Id.; see also Marrama v. Citizens Bank of Mass

549 U.S. 365, 375 (2007) (noting that bankruptcy courts have "broad authority" under § 105(a)). When a creditor files a false or fraudulent proof of claim, that filing contravenes the purpose of a specific bankruptcy statute and rule. Namely, under 11 U.S.C. § 501, a creditor is allowed to file a proof of claim, and under § 502(a), the mere filing of a proof of claim means that it is deemed allowed. Under Fed. R. Bankr. P. 3001(f), a proof of claim filed in accordance with the Bankruptcy Rules constitutes prima facie evidence of the validity and amount of the claim. When a creditor files a false or fraudulent proof of claim, which is deemed allowed by § 502(a), and entitled to prima facie presumption of validity and amount by Rule 3001(f), the creditor is abusing the bankruptcy process. E.g., Campbell v. Countrywide Home Loans, Inc., 545 F.3d 348, 356 n.1 (5 Cir. 2008) (noting that the bankruptcy court may use § 105 to impose sanctions on parties that abuse the procedural mechanism related to the filing of a proof of claim); B-Real, LLC v. Chaussee (In re Chaussee), 399 B.R. 225, 241 (B.A.P. 9 Cir. 2008) ("[I]f a purported creditor abuses the claims process, we are confident that § 105(a) provides an effective mechanism for addressing that misconduct."); Rojas v. Citi Corp Trust Bank FSB (In re Rojas), No. 09-7003, 2009 Bankr. LEXIS 2220 at *27 (Bankr. S.D. Tex. Aug 12, 2009) (holding that § 105(a) may be used in support of § 502 and Rule 3001 to hold a creditor in contempt for filing a false proof of claim); In re Varona, 388 B.R. 705, 717 (Bankr. E.D. Va. 2008) "[Section] 105 may be used to sanction the filing of a proof of claim violative of the Bankruptcy Code . . . The filing of a false or fraudulent claim would unquestionably constitute an abuse of the claims process as well as an attempted fraud upon the court.").

Mr. Rayz' misrepresentations to this Court did not stop with the amount and proof of the claim itself. In the Response to Debtors' Objection, Mr. Rayz plays fast and loose with evidence, such as grossly misquoting Debtors' affidavit (and calling Debtor Yuri Lyubarsky a liar on the

basis of the false quote) or including a 14-year old picture to demonstrate Debtors' purported *current* wealth – while purposefully cropping out a part of the picture containing a clock with large numbers showing that the picture was taken at a 2005 New Year's party. See Exhibit C, which must be read in its entirety to recognize the gravity of Mr. Rayz' violations and the devastating effect they have had on Debtors. Exhibit C is a desperate cry for help which speaks for itself, and this counsel suggests a full reading of it before a ruling on this Motion for Sanctions.

### Request for Sanctions – Fraud on the Court

Bankruptcy Court is a court of equity. Dismissing a creditor's claim is an equitable remedy, and this Court has the power to award it. In circumstances when the creditor has purposefully withheld information and committed fraud on the court by providing partially fraudulent information as part of a larger claim, the court has the power to invoke the *falsus in uno, falsus in omnibus* maxim and dismiss the entire claim. Had Mr. Rayz and Vertonix succeeded in their effort to inflate their claim, it would be to the detriment of other creditors, who would have received a smaller share of the available and distributable proceeds from the estate. Accordingly, an appropriate remedy could be a dismissal of the entire Vertonix claim (which would punish Vertonix and benefit Vertonix's potential victims), and/or an award of sanctions against Vertonix in favor of the estate.

Additional sanctions for in favor of Debtors are also requested.

### Request for Sanctions – Violation of the Automatic Stay

Under Rule 9011 the Court can also impose sanctions against anyone violating the automatic stay, particularly a creditor's attorney. Attorneys are held to a higher standard since they are doubtless fully aware of the rules of automatic stay. Mr. Rayz' actions described above are outrageous, and require proper action to punish him, provide Debtors with relief for their undue

suffering, and to deter others from future violations of the automatic stay, particularly such egregious violations as those committed by Mr. Rayz. <u>The present request for sanctions against Mr. Rayz and his client Vertonix Ltd for their willful and egregious violation of the automatic stay is the principal request of this Motion.</u>

Finally, sanctions for the violation of the automatic stay can also be imposed in favor of the estate. The improper demand made by Mr. Rayz and Vertonix on Debtors, had succeeded (i.e. if hypothetically Debtors had funds available to them, and had they succumbed to the threat and paid these funds Vertonix), would have siphoned money away from the estate, since all of Debtors non-exempt assets belonged to the estate after Debtors filed their Petition.

Accordingly, Debtors request that this Court impose sanctions it deems appropriate against Vertonix and Mr. Rayz for the above-described violation of the automatic stay and fraud on this Court. Debtors suggest the following sanctions:

1. The dismissal of the entire Vertonix claim (*falsus in uno, falsus in omnibus*);

2. Post-bankruptcy monetary sanction against Mr. Rayz and Vertonix in favor of Debtors;

3. Monetary sanctions against Mr. Rayz and Vertonix in favor of the bankruptcy estate;

4. Revocation of Mr. Rayz' pro hac vice admission to practice in this case and referral to the Professional Ethics Committee of The Pennsylvania Bar for further proceedings.

The Court may also, in its own discretion, refer this case to the US Attorney's Office for further proceedings to determine if Mr. Rayz violated 18 U.S.C. § 873.

Dated <u>March 14, 2019</u>

/s/ Leonid Nerdinsky
Leonid Nerdinsky, Esq.
Nerdinsky Law Group
3800 S Ocean Drive, Suite 242

Hollywood, FL 33019
Tel: 954-237-6307
lnerdinsky@nerdinskylaw.com

I CERTIFY that a true and correct copy of the foregoing was served via Notice of Electronic Filing (CM/ECF) on this 14th day of March 2019, upon all registered users in this case.

# EXHIBIT A

## DECLARATION OF LEONID NERDINSKY, ESQ.
## IN SUPPORT OF DEBTORS' MOTION FOR SANCTIONS

I, Leonid Nerdinsky, declare as follows:

1.      I make this Declaration in support of Debtors' Motion for Enforcement of the Automatic Stay, Sanctions against Creditor Vertonix Ltd and Its Counsel Arkady "Eric" Rayz for Fraud on the Court and contempt for Willful Violations of the Automatic Stay.

2.      The information set forth in this Declaration is based upon my personal knowledge.

3.      I represent the Debtors, Yuri and Olga Lyubarsky, in the present Chapter 7 bankruptcy proceedings, Bankruptcy Case No. 18-16659-LMI.

4.      The Debtors approached me in May 2018 because they were being relentlessly pursued by creditor Vertonix, Ltd. ("Vertonix") and by its attorney Eric Rayz ("Mr. Rayz"), that their disability benefits were suspended, and they had no money to pay their creditors or their living expenses.

5.      The Debtors were aware that once they file for bankruptcy, Vertonix and Rayz would not be able to harass them anymore due to the imposition of the automatic stay, and that it was against bankruptcy rules for a creditor to make demands on debtors who sought bankruptcy protection.

6.      The Debtors filed their Chapter 7 Bankruptcy Petition on May 31, 2018 ("Petition").

7.      On June 15, 2018, I was contacted by Mr. Rayz who wanted to schedule a face-to-face meeting at my office. When I wrote that I needed to confirm with the Debtors, he immediately suggested that the Debtors could attend the meeting as well. However, prior to the meeting he did not elaborate on the purpose of the meeting. Attached as Exhibit A1 is a copy of the e-mail trail (06/15/18 – 06/19/18) between Mr. Rayz and me setting up the meeting. As can be seen, Mr. Rayz did not elaborate in advance about what he wanted to discuss other than generally stating that he wanted to discuss the case.

8.      The Debtors chose not to attend the meeting.

9.      On June 21, 2018, Mr. Rayz met with me at my office in Hollywood Beach, FL. The following description is based almost on notes I recorded immediately after the meeting:

1

> *The meeting was quick. And as predicted it contained a threat. In short, Rayz said he knows the Debtors have substantial assets, and showed me some chart with a bunch of companies connected to each other. Said he has copies of business checks signed by Yuri. Said he can get affidavits from jewelers who communicated with Yuri about buying jewelry. Said he knows who the Debtors sold their house to when they made $40,000. Said if he does not get paid $250,000 by Monday, will release all information to US attorney and the bankruptcy Trustee.*

10.     As described in the notes above, Mr. Rayz made a clear and unequivocal demand that my clients pay $250,000 by the following Monday (the meeting took place on a Thursday), and if this payment was not made, he threatened to turn over what he believed was proof of Debtors' misconduct to the US Attorney's Office and the Chapter 7 Trustee. He said he expected me to relay this demand and repercussions (if the demand was not met) to my clients.

11.     I was quite stunned after the meeting, feeling that my clients were being blackmailed. The meeting and the demand made on my clients seemed grossly inappropriate to me, a kind that I have never had in my history of practicing bankruptcy law.

12.     As was my duty, I immediately relayed the above to the Debtors, including the $250,000 demand for payment, the threat being made against them, and the June 25, 2018 deadline.

13.     At the time, it took a few days to determine the proper course of action. I considered it of paramount importance at that time to properly document the demand, and ideally to obtain a written confirmation from Mr. Rayz that he had made the $250,000 demand on my clients.

14.     On June 26, 2018, I relayed information about the meeting to the Trustee. Attached as Exhibit A2 is a copy of my e-mail dated June 26, 2018 to the Trustee.

15.     On June 26, 2018, I also wrote to Mr. Rayz that his behavior, threats and the $250,000 demand were highly inappropriate, and that the Debtors rejected his demand. Since Mr. Rayz had been moot in his prior e-mails about the purpose of his visit, and never followed up in writing after his meeting with me, my principal goal at that time was to get a written confirmation from Mr. Rayz of his inappropriate demand, the deadline, and the threats.

2

16.     I received an almost instant reply in which Mr. Rayz expressly confirmed the $250,000 demand he had made on June 19, 2018, although he tried to gloss over what had happened at the meeting. In particular, he claimed that the $250,000 demand was a "counter-offer" to the Debtors' prior offer of $80,000. Mr. Rayz also stated at the end of his e-mail that he and his clients did not care about my belief that the meeting was highly inappropriate. Attached as Exhibit A3 is a true copy of the e-mail exchange with Mr. Rayz on June 26, 2018.

17.     The descriptions of the July 19, 2018 meeting in the June 26, 2018 e-mail from Mr. Rayz, and the in declaration filed by Mr. Rayz in support of his Response in Opposition to Debtors' Objection to Proof of Claim, are inaccurate. The description I provided above is what actually happened.

18.     Minor differences aside, however, both Mr. Rayz and I agree (i) that he had made the $250,000 demand, (ii) that he had alleged criminal actions by the Debtors in filing their Petition, and (iii) that he set the June 25, 2018 deadline for the payment (Mr. Rayz called it "*provided the matter would be finalized by June 25, 2018*" in his e-mail, see Exhibit A3).

19.     In particular, although in my view it does not change the nature of what Mr. Rayz had done, I recall no discussion meeting with Mr. Rayz of any prior $80,000 offer during the brief meeting on June 19, 2018, nor was the $250,000 presented as a "counter-offer" by Mr. Rayz. The only monetary figure other than $250,000 that was mentioned by Mr. Rayz during the meeting was the $40,000 that Debtors had purportedly "made" from the sale of a house. I noted the $40,000 figure in my notes cited above.

20.     I later found out that the $40,000 being "made" by my clients was a reference to a May 2013 "short sale" of their former New Jersey property, from which Vertonix received $175,000. I have seen records showing that the property had been in foreclosure for several years prior to the "short" sale. The sale took place over four years prior to the Debtors' filing of the bankruptcy petition.

21.     I have seen evidence of my clients' great distress after the $250,000 demand. They were extremely dismayed that this could happen despite their bankruptcy declaration.

22.     Of particular note, I have seen manifestations of Mr. Lyubarsky's anxiety/panic disorder through many of my interactions with him. I can attest that his anxiety substantially increased following Mr. Rayz' demand and threat made on June 21, 2018 and was substantially heightened for many months

afterwards.

I hereby affirm and declare that the foregoing is true to the best of my knowledge and belief.

*Leonid Nerdinsky*

Leonid Nerdinsky, Esq.

March 4, 2019

# EXHIBIT A1

**From:** Eric Rayz <erayz@kalraylaw.com>
**Sent:** Tuesday, June 19, 2018 9:27 AM
**To:** Leonid Nerdinsky <lnerdinsky@nerdinskylaw.com>
**Subject:** RE: Vertonix/Lyubarsky

Good morning,

As a precursor to our meeting, I am forwarding to you a copy of an opinion from the Court of Common Pleas of Philadelphia County (that was affirmed on appeal earlier this year).  I am not sure if Mr. and Mrs. Lyubarsky were appraised of Judge Ander's decision.

See you on Friday.

Sincerely,

Eric Rayz, Esquire
Kalikhman & Rayz, LLC
1051 County Line Road, Suite "A"
Huntingdon Valley, PA 19006
Telephone: (215) 364-5030
Facsimile: (215) 364-5029
E-mail: erayz@kalraylaw.com

www.kalraylaw.com
_____

Disclaimer: This message (which may contain information that is privileged, confidential and exempt from disclosure under applicable law) is intended only for the use of the individual or entity to which it is addressed. If the receiver of this message is not the intended recipient, or as the employee or agent responsible for opening this message, you are hereby notified that any dissemination, distribution or copying of this message or its attachment(s) is strictly prohibited. To ensure compliance with certain regulations promulgated by the U.S. Internal Revenue Service, we inform you that any federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code, or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein, unless expressly stated otherwise.  If you have received this message in error, please delete this message from your system and notify us immediately by telephone at (215) 364-5030.

**From:** Leonid Nerdinsky <lnerdinsky@nerdinskylaw.com>
**Sent:** Monday, June 18, 2018 4:03 PM
**To:** Eric Rayz <erayz@kalraylaw.com>
**Subject:** RE: Vertonix/Lyubarsky

My office. See below.

Leonid Nerdinsky, Esq.
Nerdinsky Law Group, P.A.
Hallmark of Hollywood Offices
3800 South Ocean Drive, Suite 242
Hollywood Beach, FL 33019
Tel.: 954-237-6307
Fax: 954-416-6188
E-mail: lnerdinsky@nerdinskylaw.com
Website: www.nerdinskylaw.com

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, please send an email to lnerdinsky@nerdinskylaw.com.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

---

**From:** Eric Rayz <erayz@kalraylaw.com>
**Sent:** Monday, June 18, 2018 3:37 PM
**To:** Leonid Nerdinsky <lnerdinsky@nerdinskylaw.com>
**Subject:** RE: Vertonix/Lyubarsky

That works.  Location?

---

**From:** Leonid Nerdinsky <lnerdinsky@nerdinskylaw.com>
**Sent:** Monday, June 18, 2018 3:36 PM
**To:** Eric Rayz <erayz@kalraylaw.com>
**Subject:** RE: Vertonix/Lyubarsky

Thursday afternoon is best.  4pm?

---

**From:** Eric Rayz <erayz@kalraylaw.com>
**Sent:** Monday, June 18, 2018 2:10 PM
**To:** Leonid Nerdinsky <lnerdinsky@nerdinskylaw.com>
**Subject:** RE: Vertonix/Lyubarsky

Thursday or Friday afternoon works.  I am staying at Acqualina, which is not far your office and your clients' residence.

Let me know what time/place works for you.

Eric

---

**From:** Leonid Nerdinsky <lnerdinsky@nerdinskylaw.com>
**Sent:** Monday, June 18, 2018 1:58 PM
**To:** Eric Rayz <erayz@kalraylaw.com>
**Subject:** RE: Vertonix/Lyubarsky

Eric:

Let me what days and times you are available this week.

Thank you.

Leonid Nerdinsky, Esq.
Nerdinsky Law Group, P.A.
Hallmark of Hollywood Offices
3800 South Ocean Drive, Suite 242
Hollywood Beach, FL 33019
Tel.: 954-237-6307
Fax: 954-416-6188
E-mail: lnerdinsky@nerdinskylaw.com
Website: www.nerdinskylaw.com

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, please send an email to lnerdinsky@nerdinskylaw.com.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

**From:** Eric Rayz <erayz@kalraylaw.com>
**Sent:** Friday, June 15, 2018 11:15 AM
**To:** Leonid Nerdinsky <lnerdinsky@nerdinskylaw.com>
**Subject:** RE: Vertonix/Lyubarsky

No prob.  You can bring to the meeting as well.

**From:** Leonid Nerdinsky <lnerdinsky@nerdinskylaw.com>
**Sent:** Friday, June 15, 2018 11:13 AM
**To:** Eric Rayz <erayz@kalraylaw.com>
**Subject:** RE: Vertonix/Lyubarsky

Let me confirm with my clients and I will get back to you.

Leonid Nerdinsky, Esq.
Nerdinsky Law Group, P.A.
Hallmark of Hollywood Offices
3800 South Ocean Drive, Suite 242
Hollywood Beach, FL 33019
Tel.: 954-237-6307
Fax: 954-416-6188
E-mail: lnerdinsky@nerdinskylaw.com
Website: www.nerdinskylaw.com

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, please send an email to lnerdinsky@nerdinskylaw.com.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

**From:** Eric Rayz <erayz@kalraylaw.com>
**Sent:** Friday, June 15, 2018 9:31 AM
**To:** Leonid Nerdinsky <lnerdinsky@nerdinskylaw.com>
**Subject:** Vertonix/Lyubarsky

Dear Mr. Nerdinsky,

As you may be aware, my office represents Vertonix, Ltd.

I will be in Sunny Isles next week and suggest that we meet to discuss your clients' bankruptcy filing.

Sincerely,

Eric Rayz, Esquire
Kalikhman & Rayz, LLC
1051 County Line Road, Suite "A"
Huntingdon Valley, PA 19006
Telephone: (215) 364-5030
Facsimile: (215) 364-5029
E-mail: erayz@kalraylaw.com

www.kalraylaw.com

_____

Disclaimer: This message (which may contain information that is privileged, confidential and exempt from disclosure under applicable law) is intended only for the use of the individual or entity to which it is addressed. If the receiver of this message is not the intended recipient, or as the employee or agent responsible for opening this message, you are hereby notified that any dissemination, distribution or copying of this message or its attachment(s) is strictly prohibited. To ensure compliance with certain regulations promulgated by the U.S. Internal Revenue Service, we inform you that any federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code, or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein, unless expressly stated otherwise.  If you have received this message in error, please delete this message from your system and notify us immediately by telephone at (215) 364-5030.

# EXHIBIT A2

**From:** Leonid Nerdinsky
**Sent:** Tuesday, June 26, 2018 6:35 PM
**To:** marcia.dunn@dunnlawpa.com
**Subject:** 8-16659-LMI Yuri Lyubarsky Olga Lyubarsky

Trustee Dunn:

I represent Yuri and Olga Lyubarsky, debtors in bankruptcy case no. 18-16659.

I am writing to inform you that last week I was contacted by Eric Rayz, a Pennsylvania-based attorney for creditor Vertonix, Ltd. Mr. Rayz proposed to meet in person to discuss the case.

The meeting took place last Thursday (06/21/18) at my office. Mr. Rayz stated that he had purported evidence of my clients' past wealth and businesses. He offered that my clients pay $250,000 to Vertonix, Ltd., or he would forward this evidence to you and the US Attorney's office. He gave my clients until today (Monday, 06/25/18) to accept this "settlement offer" and agree to pay the money.

I am not concerned with the purported evidence of my clients' past wealth and businesses. The purpose of my e-mail to you is just to be transparent and inform you about the actual contact with the creditor's attorney. I am not sure in what vein this "offer" was meant but it felt inappropriate.

I rejected his "offer".

Please contact me should you need any further information.

Respectfully,

Leonid Nerdinsky, Esq.
Nerdinsky Law Group, P.A.
Hallmark of Hollywood Offices
3800 South Ocean Drive, Suite 242
Hollywood Beach, FL 33019
Tel.: 954-237-6307
Fax: 954-416-6188
E-mail: lnerdinsky@nerdinskylaw.com
Website: www.nerdinskylaw.com

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, please send an email to lnerdinsky@nerdinskylaw.com.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be

# EXHIBIT A3

**From:** Eric Rayz <erayz@kalraylaw.com>
**Date:** June 26, 2018 at 7:19:17 PM EDT
**To:** Leonid Nerdinsky <lnerdinsky@nerdinskylaw.com>
**Subject: Re: Lyubarsky** _____

Dear Mr. Nerdinsky,          _____

I appreciate your e-mail, but it woefully misconstrues what took place on Thursday, June 21, 2018, in your office.

First, in our meeting, in response to your clients' earlier proposal (communicated by their Pennsylvania counsel without your apparent knowledge) to settle the underlying judgment for $80,000, I communicated my client's willingness to accept $250,000, provided the matter would be finalized by Monday, June 25, 2018.  Given that your clients failed indicate their acceptance by the provided deadline, the offer was unilaterally withdrawn. Therefore, your e-mail was unnecessary.

Second, in our meeting, I expressed my client's sincere belief that Mr. and Mrs. Lyubarsky have engaged in criminal misconduct by deliberately filing a bankruptcy petition containing false information.  In this regard, I specifically provided you with examples of assets that have been intentionally omitted from your clients' bankruptcy schedules.

Finally, I have been involved in this case for almost a decade. During this time, your clients had the benefit of at least 5 different legal counsel (in various states). These attorneys (at various times) accused my client of criminal extortion (e.g., threatening Mr. Lyubarsky's son with physical violence) in a formal pleading filed with the court and me – personally – of being a member of "a Russian mob" (in open court). Yet, both my client and I have persevered. For this reason, neither myself nor my client really care as to what your "personal reaction" was or may have been.

Sincerely,

Eric Rayz, Esquire
Kalikhman & Rayz, LLC
1051 County Line Road, Suite "A"
Huntingdon Valley, PA 19006
Telephone: (215) 364-5030
Facsimile: (215) 364-5029
E-mail: erayz@kalraylaw.com

www.kalraylaw.com
_____

Disclaimer: This message (which may contain information that is privileged, confidential and exempt from disclosure under applicable law) is intended only for the use of the individual or entity to which it is addressed. If the receiver of this message is not the intended recipient, or as the employee or agent responsible for opening this message, you are hereby notified that any dissemination, distribution or copying of this message or its attachment(s) is strictly prohibited. To ensure compliance with certain regulations promulgated by the U.S. Internal Revenue Service, we inform you that any federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code, or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein, unless expressly stated otherwise. If you have received this message in error, please delete this message from your system and notify us immediately by telephone at (215) 364-5030.

**From:** Leonid Nerdinsky <lnerdinsky@nerdinskylaw.com>
**Date:** Tuesday, June 26, 2018 at 6:34 PM
**To:** Work <erayz@kalraylaw.com>
**Subject:** Lyubarsky


Dear Mr. Rayz:

I am writing in response to your in-person offer last Thursday, made during your visit to my office in Florida, to settle my clients' purported debt to Vertonix, Ltd. for $250,000 in exchange for you not providing purported evidence of my clients' wealth and businesses to the Trustee and the US Attorney.

My initial personal reaction to your offer was that it seemed highly inappropriate, i.e., your clients' agreement not to release information about my clients to a third party (that your clients believe would damage my clients) if my clients paid $250,000.00 to your client.

I am authorized to inform you that my clients refuse to consider your offer.

Respectfully,

Leonid Nerdinsky, Esq.
Nerdinsky Law Group, P.A.
Hallmark of Hollywood Offices
3800 South Ocean Drive, Suite 242
Hollywood Beach, FL 33019
Tel.: 954-237-6307

Fax: 954-416-6188
E-mail: lnerdinsky@nerdinskylaw.com
Website: www.nerdinskylaw.com

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, please send an email to lnerdinsky@nerdinskylaw.com.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

# EXHIBIT B

## DECLARATION OF MARINA KATS, ESQ.
## IN SUPPORT OF DEBTORS' MOTION FOR SANCTIONS

I, Marina Kats, declare as follows:

1.      I make this Declaration in support of Debtors' Motion for Enforcement of the Automatic Stay, Sanctions against Creditor Vertonix Ltd and Its Counsel Arkady "Eric" Rayz for Fraud on the Court and contempt for Willful Violations of the Automatic Stay.

2.      The information set forth in this Declaration is based upon my personal knowledge.

3.      I am an attorney licensed to practice law in Pennsylvania. I am the owner of the Kats Jamison and Associates, a law firm in Philadelphia, Pennsylvania.

4.      Starting in early 2016, I represented Yuri and Olga Lyubarsky in Pennsylvania proceedings against Vertonix, Ltd. ("Vertonix"). Vertonix was represented by Arkady "Eric" Rayz, Esq. ("Mr. Rayz") in the Pennsylvania proceedings. All records cited below are from the Pennsylvania proceedings.

**Sanctions under the Pennsylvania Court's July 20, 2012 Order**

5.      On July 20, 2012, the Pennsylvania court entered an order imposing sanctions against Yuri and Olga Lyubarsky unless they comply with discovery requests from Vertonix. A true copy of the order is attached as Exhibit B1.

6.      On May 6, 2015, Mr. Lyubarsky attended a deposition taken by counsel for Vertonix. I know this because I have seen a copy of the deposition transcript.

7.      On May 3, 2016, Vertonix filed a Motion to Reassess Damages, a true copy of which is attached as Exhibit B2. Vertonix's calculation of total damages it asked to reassess included $135,300 in sanctions under the July 20, 2012 order. This constituted $100 per day for 1,353 days.

8.      Also included in the Motion to Reassess Damages was $100,100.82 in new legal fees and costs, $16,751.29 in previously awarded legal fees, $17,500.15 remaining principal

balance of the original debt (the last two figures being combined in the $34,251.44 figure titled "principal balance and accrued interest"), and $6,750.45 in additional interest.

9.     On July 1, 2016, having been just recently retained by Mr. and Mrs. Lyubarsky (who had previously acted pro se for about five years), I filed a short response to Vertonix's Motion to Reassess Damages, a true copy of which is attached as Exhibit B3. As can be seen, response principally challenged the imposition of $135,300 in sanctions.

10.     Regrettably, expecting the entire Motion to Reassess Damages to be denied in these circumstances, I did not contest the award of legal fees and costs claimed by Vertonix.

11.     On July 7, 2016, the Pennsylvania court ruled on the Motion to Reassess Damages, granting my request to strike the entirety of the $135,300 in sanctions from the amount Vertonix requested. A true copy of the court's ruling is attached hereto as Exhibit B4. As can be seen, the court crossed out the $276,402.71 amount requested by Vertonix, and replaced it with $141,102.71, which is exactly $135,300 less.

12.     No subsequent orders for sanctions were made by the Pennsylvania court, nor requested by Vertonix. While on July 1, 2016 the Pennsylvania court issued an order granting a motion by Vertonix to compel a deposition of my clients, no sanctions were ordered under that order.

**My purported phone call to Mr. Rayz in April 2018**

13.     I have reviewed the *Declaration of Arkady "Eric" Rayz in Support of the Response in Opposition to Debtors Objection to Proof of Claim*, which bears the signature of Mr. Rayz.

14.     In Paragraph 132 of his declaration, Mr. Rayz states that shortly after April 11, 2018, "*the Debtors' Pennsylvania counsel called my office to again communicate the Debtors' offer of $80,000.00.*"

15.     Mr. Rayz' statement in Paragraph 132 is false. I made no phone calls to Mr. Rayz in April-May 2018. In fact, I have not spoken to Mr. Rayz about the Debtors since long prior to April 2018 and until the present time.

16.     I am also not aware of any other attorney at my office speaking to Mr. Rayz between April 2018 and today. It is virtually impossible that any of them could have done it without speaking to me first.

17.     I did discuss possible settlement of the case with Mr. Rayz on two or three occasions in 2016 and 2017, but not after that.

18.     I also did discuss a possible settlement of the case on several occasions in 2016-2018 with Steven Maniloff, the attorney for Guardian Life Insurance Company. This included a discussion in April 2018. His client held a large amount of "suspended" disability benefits, some of which could be used to fund a settlement with Vertonix during that period.

19.     I know from Mr. Maniloff that he spoke to Mr. Rayz briefly in April 2018 about the possibility of settlement by way of "dividing" the suspended benefits between my clients and Vertonix, and Mr. Rayz said he was not interested. This was only an exploration of common ground, and not an offer settlement to Vertonix on behalf of my clients.

I hereby affirm and declare that the foregoing is true to the best of my knowledge and belief.

Marina Kats, Esq.
March 2, 2019

# EXHIBIT B1

**IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

| | | |
|---|---|---|
| **VERTONIX LIMITED** | : | |
| | : | **FEBRUARY TERM, 2011** |
| | : | |
| **v.** | : | **NO.    3388** |
| | : | |
| | : | **CONTROL NO.      12052539** |
| **YURI and OLGA LYUBARSKY, et al** | : | |

## ORDER

**AND NOW,** this _20_ day of July, 2012, upon consideration of Plaintiff's Second

Motion for Sanctions and no response thereto, it is hereby **ORDERED** and **DECREED** as follows:

1.  The Court finds that Defendants, Yuri Lyubarsky and Olga Lyubarsky, have willfully

    disregarded this Court's Orders of December 15, 2011 and April 12, 2012.

2.  Within thirty (30) days of the entry of this Order, Defendants shall pay Kalikhman & Rayz,

    LLC the sum of $557.68 representing filing costs of $57.68 and attorney fees of $500.00.

3.  Within thirty (30) days of this Order Defendant shall provide full and complete answers to

    the Interrogatories and full and complete responses to Plaintiff's Request for Production of

    Documents without objection or Motion for Protective Order.

4.  Should Defendants not comply with this Order, commencing August 19, 2012, Defendants

    are sanctioned $100.00 per day until they comply fully with this Court's Orders.

5.  Defendants are cautioned that their continued and unexplained failure to comply with

    Orders of the Court may result in further sanctions.

**BY THE COURT:**

_____

**IDEE C. FOX, J.**

DOCKETED

JUL 2 0 2012

T. DUGAN

Vertonix Limited Vs Lyu-ORDER



11020338800027
Control No.: 16050538

# EXHIBIT B2

FILED

03 MAY 2016 01:59 pm

Civil Administration

P. MARTIN

| | |
|---|---|
| VERTONIX LIMITED | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| Plaintiff(s) | |
| v. | February Term 2011 |
| LYUBARSKY, et al. | Docket No. 3388 |
| Defendant(s) | |

## ORDER

AND NOW, this _____ day of _____, 20____, upon consideration of Plaintiff's Motion to Reassess Damages, it is hereby ORDERED and DECREED that:

1.      The Prothonotary is to amend the judgment entered in this matter on February 24, 2011, for the Plaintiff and against Defendants, YURI LYUBARSKY and OLGA LYUBARSKY, to reflect that, as of May 3, 2016, the amount of the judgment is $276,402.71; and

2.      Defendants are to pay interest at the legal rate of six (6) percent per annum, upon the amount of the judgment entered in this matter, from the date of this Order, and until it is paid in full.

BY THE COURT:

_____
                                                                            , J.

| VERTONIX LIMITED | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
|---|---|
| Plaintiff(s) | |
| v. | February Term 2011 |
| LYUBARSKY, et al. | Docket No. 3388 |
| Defendant(s) | |

### ORDER FOR A HEARING

AND NOW, this _____ day of _____, 20_____, upon consideration of Plaintiff's Motion to Reassess Damages and any response thereto, it is hereby ORDERED that a rule is issued to show cause why the relief requested by Plaintiff should not be granted.

RULE RETURNABLE the _____ day of _____, at _____, in Court Room _____, City Hall, Philadelphia.

BY THE COURT:

_____
J.

2

Case ID: 110203388
Control No.: 16050538

**KALIKHMAN & RAYZ, LLC**
Eric Rayz, Esquire
Attorney ID No. 87976
1051 County Line Road, Suite "A"
Huntingdon Valley, PA 19006
Telephone: (215) 364-5030
Facsimile: (215) 364-5029
E-mail: erayz@kalraylaw.com

**ATTORNEY(S) FOR PLAINTIFF(S)**

| | |
|---|---|
| VERTONIX LIMITED<br><br>                     Plaintiff(s)<br><br>          v.<br><br>LYUBARSKY, et al.<br><br>                     Defendant(s) | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>February Term 2011<br><br>Docket No. 3388 |

<u>**PLAINTIFF'S MOTION TO REASSESS DAMAGES**</u>

Plaintiff Vertonix Limited (hereinafter "Plaintiff"), by and through counsel, Kalikhman & Rayz, LLC, files the following Motion and, in support thereof, avers as follows:

1.      On or about January 14, 2009, Defendants YURI LYUBARSKY and OLGA LYUBARSKY executed a certain Settlement Agreement and Release (hereinafter "Settlement Agreement and Release") with regard to an ongoing litigation between Plaintiff and Defendants, in the Superior Court of New Jersey, Law Division, Monmouth County, captioned and docketed <u>Vertonix Limited v. Lyubarsky, et al.</u>, Docket No. MON-L-1951-08, concerning a certain commercial loan obligation owed by Defendants.

2.      Per the terms of the Settlement Agreement and Release, Defendants were required to pay Plaintiff the sum of $119,000.00, by way of an initial payment, a series of monthly payments, and a final ballon payment of $90,000.00.

3.      To facilitate enforcement of the Settlement Agreement and Release, on January 14, 2009, Defendants executed a Surety Agreement, which is marked and attached hereto as Exhibit "A," the terms of which provide Plaintiff with the right to confess judgment against Defendants in the event that, *inter alia*, they fail to make any timely payment pursuant to the Settlement Agreement and Release.

4.      On January 14, 2009, Defendants also executed a Disclosure and Waiver of Rights Regarding Confession of Judgment, which is marked and attached hereto as Exhibit "B," the terms of which provide Plaintiff with the right to confess judgment against the the Defendants.

Case ID: 110203388
Control No.: 16050538

5.      Defendants then defaulted on their obligations, as set forth in Exhibit "A," in that they failed to issue the balloon payment as agreed.

6.      Per the terms of the Settlement Agreement and Surety Agreement, on February 24, 2011, a judgment was confessed for the Plaintiff and against Defendants in the sum of $184,264.19.

7.      The damages with respect to the judgment were assessed based on the following calculation:

| | |
|---|---|
| PRINCIPAL AMOUNT DUE | $167,512.90 |
| INTEREST | $ |
| LATE CHARGES | $ |
| SATISFACTION CHARGES | $ |
| ATTORNEYS' FEE (10% OF THE TOTAL AMOUNT DUE) | $16,751.29 |
| COURT COSTS | $ |
| **TOTAL BALANCE DUE:** | $184,264.19 |

8.      Defendants did not challenge the entry of the judgment.

9.      Instead, Defendants engaged in a protracted, blatantly-obstructionist course of conduct, seeking to avoid payment of the judgment.

10.      In this regard, Plaintiff was required to initiate post-judgment discovery in aide of execution, as well as voluminous motion practice.

11.      Plaintiff's efforts included multiple court appearances for Plaintiff's counsel, issuance of multiple subpoena (to various financial institutions), review of hundreds of pages of bank records, as well as investigation of dozens of corporate entities owned by, affiliated with, and/or related to Defendants, *inter alia*, in New York, New Jersey, and Florida.

12.      Moreover, Plaintiff transferred the judgment to the Superior Court of New Jersey, captioned and docketed as Vertonix Limited v. Lyubarsky, et al., Docket No. DJ-146520-11, because Defendants owned luxury real estate in the State of New Jersey.

13.      In addition, Plaintiff transferred the judgment to the Seventeenth Judicial Circuit for Broward County, Florida, captioned and docketed as Vertonix Limited v. Lyubarsky, et al., Case No. 12-3775-CA (2), because Defendants owned luxury real estate, valuable, and automobiles, in the State of Florida.

Case ID: 110203388
Control No.: 16050538

14. Defendants engaged in further obstructionist behavior in that they attempted strike the judgment in Florida.

15. Although Defendants did not succeed, their behavior required Plaintiff to retain local counsel, who – together with the undersigned – participated in multiple court appearances (telephonically and in person) and engaged in voluminous motion practice.

16. This required the undersigned counsel to make multiple, extended trips to Florida to appear for the proceedings in that jurisdiction.

17. Thus, due to Defendants' conduct, Plaintiff and Plaintiff's counsel had to engage in various post-judgment execution matters, including:

    a. Promulgating post-judgment discovery;

    b. Issuance of subpoenas;

    c. Review of Defendants' financial records that were turned over by third parties in discovery;

    d. Review of corporate records from various jurisdictions, regarding corporate entities owned, controlled, and/or affiliated with Defendants;

    e. Drafting and filing motions to compel Defendants' response to post-judgment discovery;

    f. Court appearances in various jurisdictions;

    g. Transfer and recording of the judgment in different states;

    h. Travelling to New Jersey and Miami, Florida, to interview, secure, and retain local counsel;

    i. Maintaining follow-up contacts with Plaintiff and Defendants' various counsel; and

    j. Drafting and filing this motion for reassessment of damages.

18. Accordingly, after the entry of the judgment in April of 2013, due to Defendants' failure to comply with the terms of the Settlement Agreement, Plaintiff incurred additional (and significant) fees and costs.

19. Indeed, since the entry of the judgment in this matter more than five (5) years ago,

Case ID: 110203388
Control No.: 16050538

Plaintiff has incurred over $30,000.00 in related costs and expenses (e.g., airfare, hotel stays, recording and/or filing costs), while its counsel spent well over 200 hours litigating this case across multiple jurisdictions.

20.     Because of Defendants' failure to comply with their discovery obligations, the Hon. Idee C. Fox entered a number of Orders against them.

21.     For instance, on December 15, 2011, the Hon. Idee C. Fox entered an Order, which is marked and attached hereto as Exhibit "C."  The Order states as follows:

> AND NOW, this 15 day of December, 2011, upon consideration of Plaintiff's Motion to Compel Defendants' responses to Post-judgment Discovery and any response thereto, it is hereby ORDERED and DECREED that:
>
> 1.     The Motion is GRANTED;
>
> 2.     Defendants, YURI LYUBARSKY and OLGA LYUBARSKY, must provide full and complete answers to the interrogatories and full and complete responses to the requests for production of documents without objection or motion for a protective order within thirty (30) days of this ORDER or sanctions shall be imposed.

Exhibit "C."

22.     Furthermore, following a Rule to Show Cause hearing, on April 12, 2012, the Hon. Idee C. Fox entered another Order, marked and attached hereto as Exhibit "D," which states as follows:

> AND NOW, this 12 day of April, 20[12] upon consideration of Plaintiff's Motion for Sanctions and any responses thereto, it is hereby ORDERED and DECREED that:
>
> 1.     The Motion is GRANTED;
>
> 2.     The Court finds that Defendants . . . are in willful disregard of this Court's Order of December 15, 2011, and that Defendants' willful disregard of this Court's Order caused irreparable harm and prejudice to Plaintiff;
>
> 3.     Within thirty (30) days of this Order, Defendants shall pay Kalikhman & Rayz, LLC: (a) $57.68 for the cost of filing the original Motion for Sanctions; and (b) $750.00 in counsel fees for the preparation of this motion and attendance of any related hearing(s);
>
> 4.     Within thirty (30) days of this Order, Defendants must provide full and complete answers to interrogatories and full and complete responses to the requests for production of documents, without objection or motion for a protective order; and

Case ID: 110203388
Control No.: 16050538

5.      Defendants are cautioned that their continued and unexplained failure to comply with the Orders of this Court may occasion even harsher sanctions.

Exhibit "D."

23.      Furthermore, on July 20, 2012, the Hon. Idee C. Fox entered another Order, marked and attached hereto as Exhibit "E," which states as follows:

AND NOW, this 20 day of July, 2012, upon consideration of Plaintiff's Second Motion for Sanctions and no responses thereto, it is hereby **ORDERED** and **DECREED** as follows:

6.      The Court finds that Defendants, Yuri Lyubarsky and Olga Lyubarsky, have willfully disregarded this Court's Orders of December 15, 2011 and April 12, 2012.

7.      Within thirty (30) days of this Order, Defendants shall pay Kalikhman & Rayz, LLC the sum of $557.68 representing filing costs of $57.68 and attorney fees of $500.00.

8.      Within thirty (30) days of this Order Defendants shall provide full and complete answers to the Interrogatories an full and complete responses to Plaintiff's Request for Production of Documents without objection or Motion for Protective Order.

9.      Should Defendants not comply with this Order, commencing August 19, 2012, Defendants are sanctioned $100.00 per day until they fully comply with this Court's Orders.

10.      Defendants are cautioned that their continued and unexplained failure to comply with the Orders of this Court may result in further sanctions.

Exhibit "E."

24.      Defendants have never fully complied with any of the Orders of the Court.

25.      Therefore, per the Order of July 20, 2012, through May 3, 2016, Defendants have incurred sanctions in the total amount of $135,300.00.

26.      As a result of the efforts of Plaintiff's counsel, however, in April of 2013, Plaintiff recovered $175,000.00 from the proceeds of the sale of Defendants' New Jersey property.

27.      This sum, however, was not sufficient to satisfy the entire outstanding balance of the judgment and, in accepting this partial payment, Plaintiff explicitly reserved the right to continue its collection efforts until the full amount was paid.

28.      Ultimately, solely due to Defendants' failure to issue timely payment, Plaintiff incurred or expended additional sums since the entry of the judgment and, given credit for any payments made by

Case ID: 110203388
Control No.: 16050538

Defendants, as of the day of this filing, the amount of the judgment should read as follows:

| | | |
|---|---|---|
| Principal balance and accrued interest (as of April 30, 2013) | | $34,251.44 |
| Additional Interest (as of May 3, 2016) | | $6,750.45 |
| Sanctions per the Court's Order of July 20, 2012 | | $135,300.00 |
| Legal fees (less $16,751.29 originally confessed) | | $68,528.71 |
| Costs | | $31,572.11 |
| | Total: | $276,402.71 |

29.     The judgment formerly entered against Defendants does not reflect any credit for payment received on account of the judgment, the accrued interest, the sanctions imposed by the Court, the above-referenced attorneys' fees, and/or additional costs.

30.     Accordingly, it is insufficient to satisfy the amount currently due.

31.     It is well-settled law in Pennsylvania that the Court may exercise its equitable powers to control the enforcement of a judgment and to grant any relief until that judgment is satisfied.  See Chase Home Mortgage Corporation of the Southwest v. Good, 537 A.2d 22, 24 (Pa. Super. 1988); Stephenson v. Butts, 142 A.2d 319, 321 (Pa. Super. 1958); 20 P.L.E. Judgments § 191.

32.     Indeed, the Superior Court has repeatedly cited the right of a judgment creditor to amend the amount of judgment.  See Nationsbanc Mortgage Corp. v. Grillo, 827 A.2d 489 (Pa. Super. 2003); Morgan Guarantee Trust Company of New York v. Mowl, 704 A.2d 923 (Pa. Super. 1998); Union National Bank of Pittsburgh v. Ciongoli, 595 A.2d 179 (Pa. Super. 1991).

33.     In B.C.Y. v. Bukovich, 390 A.2d 276 (Pa. 1978), the Pennsylvania Supreme Court reiterated its long-standing rule that a court has the inherent power to correct a judgment to conform to the facts of the case.

34.     Under the terms of the parties' Settlement Agreement and prevailing Pennsylvania law, Plaintiff is entitled to inclusion of the figures set forth above in the amount of the judgment against Defendants. See Exhibit "A."

35.     For instance, Plaintiff is unequivocally entitled in post-judgment interest at the statutory, yearly rate of six (6) percent.  See 42 Pa.C.S. § 8101 (declaring that "[e]xcept as otherwise provided by another statute, a judgment for a specific sum of money shall bear interest at the lawful rate from the date of the verdict or award, or from the date of the judgment, if the judgment is not entered upon a verdict or award. . . ."); 41 P.S. § 202 (setting the statutory rate of interest in the Commonwealth of Pennsylvania at six percent (6%) per annum); see also Osial v. Cook, 803 A.2d 209, 215 (Pa. Super. 1994)(explaining

Case ID: 110203388
Control No.: 16050538

that "the general rule is that a plaintiff is entitled to interest on a judgment from the date of the verdict, and for purposes of computing interest, judgment and verdict are synonymous. . . ."); <u>Pittsburgh Constr. Co. v. Griffith</u>, 834 A.2d 572, 582 (Pa. Super. 2003)(observing that a plaintiff receives statutory post-judgment interest as a matter of right where the damages are ascertainable by computation).

36.    In similar fashion, pursuant to the governing Pennsylvania case law, attorneys' fees and costs of collection are recoverable where the agreement of the parties provides for such recovery.  <u>See</u>, <u>e.g.</u>, <u>McMullen v. Kutz</u>, 985 A.2d 769 (Pa. 2009)(observing that the parties may contract to provide for the breaching party to pay the attorney fees of the prevailing party in a breach of contract case); <u>Corace v. Balint</u>, 210 A.2d 882, 887 (Pa. 1965); <u>see</u> <u>also</u> <u>J.C. Snavely and Sons, Inc. v. Web M&E, Inc.</u>, 594 A.2d 333, 336-7 (Pa. Super.), <u>appeal</u> <u>denied</u>, 602 A.2d 860 (Pa. 1991).

37.    Our courts have found that the fee-shifting provisions contained within written agreements are enforceable and failure to award counsel fee to the prevailing party constitutes an error of law.  <u>See</u> <u>Bayne v. Smith</u>, 965 A.2d 265 (Pa. Super. 2009)(finding that the fee-shifting provision of a lease agreement for the prevailing party is enforceable as it is neutral in its application and is intended as an indemnification for reasonable attorney's fees incurred); <u>see</u> <u>also</u> <u>De Lage Landen Financial Services, Inc. v. Rozentsvit</u>, 939 A.2d 915 (Pa. Super. 2007)(holding that a party that prevails in the underlying breach of contract case is entitled to counsel fees it expended, where the written agreement between the litigants provides for such fees and such fees are to be sought after the judgment is entered).

38.    Here, the Surety Agreement provided as follows:

> Surety hereby irrevocably authorizes and empowers the prothonotary or clerk or any attorney of any court of record to waive the issuance and service of process and to appear for and confess judgment therein against Surety and in favor of Bank or any subsequent holder hereof at any time, whether or not the indebtedness evidenced hereby has matured (by acceleration or otherwise), for the full amount of all Obligations due or that may become due, including but not limited to late charges and interest accrued at the rate provided herein. Such confession shall be with all costs of suit and an attorneys' commission in an amount equal to all attorneys' fees incurred but in no event less than the greater of ten percent (10%) of the full amount confessed hereunder or $1,000. Although Surety agrees that the confession may include the amounts of the attorneys' commission specified in the preceding sentence, Surety reserves the right only to contest the collection by Bank of any unreasonable attorneys' fees. The authority and power to appear for and confess judgment against Surety shall not be exhausted by the initial exercise thereof and the same may be exercised from time to time, as often as Bank shall deem necessary and desirable, and a copy of this Agreement shall be sufficient warrant. Bank may, in its sole discretion, exercise the authority contained herein against one or more Sureties at one and the same time or at different times. Such confession shall be with or without declaration or complaint filed, with release of errors, without stay of execution, and Surety waives the right of inquisition on any real estate levied upon pursuant to the provisions hereof, and does hereby voluntarily condemn same and authorizes the prothonotary to enter upon the writ of execution a voluntary condemnation, and further agrees that the real estate may be sold on a writ of execution with a waiver and release of all relief from all appraisement, stay or exemption laws or rules of court, now in force or hereafter enacted or adopted.

9

Case ID: 110203388
Control No.: 16050538

Exhibit "A" (emphasis supplied).

39.    Plaintiff's counsel spent well over 200 hours litigating this case, over the course of the past five years, across multiple jurisdictions.

40.    The rate $400.00 per hour is well within the relevant standard for attorneys with comparable years of experience, as determined by the Community Legal Services of Philadelphia Fee Schedule.  See https://clsphila.org/about-cls/attorney-fees, last visited on May 2, 2016.

41.    When calculated at the rate of $400.00, less $16,751.29 that was credited on account of counsel fees part of the original amount of the judgment, Plaintiff is entitled to reasonable counsel fees of $68,528.71.

42.    This amount is eminently reasonable.

43.    Given that Defendants agreed to the terms of the Surety Agreement, Plaintiff is entitled to the recovery of reasonable counsel fees and costs, even if Defendants will attempt to claim that they were unaware of this language.

44.    To date, Defendant(s) have failed and/or refused to comply with the terms of the parties' Settlement Agreement; in that, they have not made the requisite payments and, thereby, caused Plaintiff to incur and expend additional sums, while seeking payments from Defendants.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an order attached hereto.

Date: May 3, 2016

Respectfully submitted,
**KALIKHMAN & RAYZ, LLC**

Eric Rayz, Esquire
Attorney(s) for Plaintiff(s)
1051 County Line Road, Suite "A"
Huntingdon Valley, PA 19006
Telephone: (215) 364-5030
Facsimile: (215) 364-5029
E-mail: erayz@kalraylaw.com

Case ID: 110203388
Control No.: 16050538

**KALIKHMAN & RAYZ, LLC**                    ATTORNEY(S) FOR PLAINTIFF(S)
Eric Rayz, Esquire
Attorney ID No. 87976
1051 County Line Road, Suite "A"
Huntingdon Valley, PA 19006
Telephone: (215) 364-5030
Facsimile: (215) 364-5029
E-mail: erayz@kalraylaw.com

| | |
|---|---|
| VERTONIX LIMITED<br><br>Plaintiff(s)<br><br>v.<br><br>LYUBARSKY, et al.<br><br>Defendant(s) | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>February Term 2011<br><br>Docket No. 3388 |

<u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION</u>

**1.    Matter Before the Court**

This Memorandum of Law is being filed in support of the Motion to Reassess Damages, filed by

Plaintiff Vertonix Limited.

**2.    Statement of Questions Involved**

Whether the Honorable Court should reassess damages with respect to a judgment
entered in Plaintiff's favor more than five (5) years ago, in light of additional expenses
and fees incurred while seeking payments from the debtors?

Suggested Answer: <u>Yes</u>

**3.    Facts**

On or about January 14, 2009, Defendants YURI LYUBARSKY and OLGA LYUBARSKY

executed a certain Settlement Agreement and Release (hereinafter "Settlement Agreement and

Release") with regard to an ongoing litigation between Plaintiff Vertonix Limited and Defendants, in the

Superior Court of New Jersey, Law Division, Monmouth County, captioned and docketed <u>Vertonix Limited</u>

<u>v. Lyubarsky, et al.</u>, Docket No. MON-L-1951-08, concerning a certain commercial loan obligation owed

by Defendants.  Per the terms of the Settlement Agreement and Release, Defendants were required to

pay Plaintiff the sum of $119,000.00, by way of an initial payment, a series of monthly payments, and a

final ballon payment of $90,000.00.  To facilitate enforcement of the Settlement Agreement and Release,

on January 14, 2009, Defendants executed a Surety Agreement, which is marked and attached hereto as

Case ID: 110203388
Control No.: 16050538

Exhibit "A," the terms of which provide Plaintiff with the right to confess judgment against Defendants in the event that, *inter alia*, they fail to make any timely payment pursuant to the Settlement Agreement and Release.  On January 14, 2009, Defendants also executed a Disclosure and Waiver of Rights Regarding Confession of Judgment, which is marked and attached hereto as Exhibit "B," the terms of which provide Plaintiff with the right to confess judgment against the the Defendants.

Defendants then defaulted on their obligations, as set forth in Exhibit "A," in that they failed to issue the balloon payment as agreed.  Per the terms of the Settlement Agreement and Surety Agreement, on February 24, 2011, a judgment was confessed for the Plaintiff and against Defendants in the sum of $184,264.19.  The damages with respect to the judgment were assessed based on the following calculation:

| | |
|---|---|
| PRINCIPAL AMOUNT DUE | $167,512.90 |
| INTEREST | $ |
| LATE CHARGES | $ |
| SATISFACTION CHARGES | $ |
| ATTORNEYS' FEE (10% OF THE TOTAL AMOUNT DUE) | $16,751.29 |
| COURT COSTS | $ |
| **TOTAL BALANCE DUE:** | **$184,264.19** |

Defendants did not challenge the entry of the judgment.  Instead, Defendants engaged in a protracted, blatantly-obstructionist course of conduct, seeking to avoid payment of the judgment.

In this regard, Plaintiff was required to initiate post-judgment discovery in aide of execution, as well as voluminous motion practice.  Plaintiff's efforts included multiple court appearances for Plaintiff's counsel, issuance of multiple subpoena (to various financial institutions), review of hundreds of pages of bank records, as well as investigation of dozens of corporate entities owned by, affiliated with, and/or related to Defendants, *inter alia*, in New York, New Jersey, and Florida.[1]  Moreover, Plaintiff transferred the judgment to the Superior Court of New Jersey, captioned and docketed as Vertonix Limited v. Lyubarsky, et al., Docket No. DJ-146520-11, because Defendants owned luxury real estate in the State of New Jersey.  In addition, Plaintiff transferred the judgment to the Seventeenth Judicial Circuit for Broward

---

[1] During the pendency of this matter, Plaintiff discovered more than twenty (20) corporate entities – in various jurisdictions – that Defendants are affiliated with, as well as approximately a dozen bank accounts that Defendants control and/or use.

Case ID: 110203388
Control No.: 16050538

County, Florida, captioned and docketed as <u>Vertonix Limited v. Lyubarsky, et al.</u>, Case No. 12-3775-CA (2), because Defendants owned luxury real estate, valuable, and automobiles, in the State of Florida.

Defendants engaged in further obstructionist behavior in that they attempted strike the judgment in Florida. Although Defendants did not succeed, their behavior required Plaintiff to retain local counsel, who – together with the undersigned – participated in multiple court appearances (telephonically and in person) and engaged in voluminous motion practice. This required the undersigned counsel to make multiple, extended trips to Florida to appear for the proceedings in that jurisdiction. Thus, due to Defendants' conduct, Plaintiff and Plaintiff's counsel had to engage in various post-judgment execution matters, including:

a. Promulgating post-judgment discovery;

b. Issuance of subpoenas;

c. Review of Defendants' financial records that were turned over by third parties in discovery;

d. Review of corporate records from various jurisdictions, regarding corporate entities owned, controlled, and/or affiliated with Defendants;

e. Drafting and filing motions to compel Defendants' response to post-judgment discovery;

f. Court appearances in various jurisdictions;

g. Transfer and recording of the judgment in different states;

h. Travelling to New Jersey and Miami, Florida, to interview, secure, and retain local counsel;

i. Maintaining follow-up contacts with Plaintiff and Defendants' various counsel; and

j. Drafting and filing this motion for reassessment of damages.

Accordingly, after the entry of the judgment in April of 2013, due to Defendants' failure to comply with the terms of the Settlement Agreement, Plaintiff incurred additional (and significant) fees and costs. Indeed, since the entry of the judgment in this matter more than five (5) years ago, Plaintiff has incurred over $30,000.00 in related costs and expenses (e.g., airfare, hotel stays, recording and/or filing costs), while its

Case ID: 110203388
Control No.: 16050538

counsel spent well over 200 hours litigating this case across multiple jurisdictions.

Because of Defendants' failure to comply with their discovery obligations, the Hon. Idee C. Fox entered a number of Orders against them. For instance, on December 15, 2011, the Hon. Idee C. Fox entered an Order, which is marked and attached hereto as Exhibit "C." The Order states as follows:

> AND NOW, this 15 day of December, 2011, upon consideration of Plaintiff's Motion to Compel Defendants' responses to Post-judgment Discovery and any response thereto, it is hereby ORDERED and DECREED that:
>
> 1.    The Motion is GRANTED;
>
> 2.    Defendants, YURI LYUBARSKY and OLGA LYUBARSKY, must provide full and complete answers to the interrogatories and full and complete responses to the requests for production of documents without objection or motion for a protective order within thirty (30) days of this ORDER or sanctions shall be imposed.

Exhibit "C." Furthermore, following a Rule to Show Cause hearing, on April 12, 2012, the Hon. Idee C. Fox entered another Order, marked and attached hereto as Exhibit "D," which states as follows:

> AND NOW, this 12 day of April, 20[12] upon consideration of Plaintiff's Motion for Sanctions and any responses thereto, it is hereby ORDERED and DECREED that:
>
> 1.    The Motion is GRANTED;
>
> 2.    The Court finds that Defendants . . . are in willful disregard of this Court's Order of December 15, 2011, and that Defendants' willful disregard of this Court's Order caused irreparable harm and prejudice to Plaintiff;
>
> 3.    Within thirty (30) days of this Order, Defendants shall pay Kalikhman & Rayz, LLC: (a) $57.68 for the cost of filing the original Motion for Sanctions; and (b) $750.00 in counsel fees for the preparation of this motion and attendance of any related hearing(s);
>
> 4.    Within thirty (30) days of this Order, Defendants must provide full and complete answers to interrogatories and full and complete responses to the requests for production of documents, without objection or motion for a protective order; and
>
> 5.    Defendants are cautioned that their continued and unexplained failure to comply with the Orders of this Court may occasion even harsher sanctions.

Exhibit "D." Furthermore, on July 20, 2012, the Hon. Idee C. Fox entered another Order, marked and attached hereto as Exhibit "E," which states as follows:

Case ID: 110203388
Control No.: 16050538

AND NOW, this 20 day of July, 2012, upon consideration of Plaintiff's Second Motion for Sanctions and no responses thereto, it is hereby **ORDERED** and **DECREED** as follows:

1.  The Court finds that Defendants, Yuri Lyubarsky and Olga Lyubarsky, have willfully disregarded this Court's Orders of December 15, 2011 and April 12, 2012.

2.  Within thirty (30) days of this Order, Defendants shall pay Kalikhman & Rayz, LLC the sum of $557.68 representing filing costs of $57.68 and attorney fees of $500.00.

3.  Within thirty (30) days of this Order Defendants shall provide full and complete answers to the Interrogatories an full and complete responses to Plaintiff's Request for Production of Documents without objection or Motion for Protective Order.

4.  Should Defendants not comply with this Order, commencing August 19, 2012, Defendants are sanctioned $100.00 per day until they fully comply with this Court's Orders.

5.  Defendants are cautioned that their continued and unexplained failure to comply with the Orders of this Court may result in further sanctions.

Exhibit "E." Defendants have never fully complied with any of the Orders of the Court. Therefore, per the Order of July 20, 2012, through May 3, 2016, Defendants have incurred sanctions in the total amount of $135,300.00.

As a result of the efforts of Plaintiff's counsel, however, in April of 2013, Plaintiff recovered $175,000.00 from the proceeds of the sale of Defendants' New Jersey property. This sum was not sufficient to satisfy the entire outstanding balance of the judgment. In accepting this partial payment, Plaintiff explicitly reserved the right to continue its collection efforts until the full amount was paid. Ultimately, solely due to Defendants' failure to issue timely payment, Plaintiff incurred or expended additional sums since the entry of the judgment and, given credit for any payments made by Defendants, as of the day of this filing, the amount of the judgment should read as follows:

| | |
|---|---:|
| Principal balance and accrued interest (as of April 30, 2013) | $34,251.44 |
| Additional Interest (as of May 3, 2016) | $6,750.45 |
| Sanctions per the Court's Order of July 20, 2012 | $135,300.00 |
| Legal fees (less $16,751.29 originally confessed) | $68,528.71 |
| Costs | $31,572.11 |
| **Total:** | **$276,402.71** |

## 4.    Argument

The judgment formerly entered against Defendants does not reflect any credit for payment

15

Case ID: 110203388
Control No.: 16050538

received on account of the judgment, the accrued interest, the sanctions imposed by the Court, the above-referenced attorneys' fees, and/or additional costs. Indeed, solely due to Defendants' failure to issue timely payment, Plaintiff incurred or expended additional sums since the entry of the judgment and, given credit for any payments made by Defendants, as of the day of this filing, the amount of the judgment should read as follows:

| | |
|---|---:|
| Principal balance and accrued interest (as of April 30, 2013) | $34,251.44 |
| Additional Interest (as of May 3, 2016) | $6,750.45 |
| Sanctions per the Court's Order of July 20, 2012 | $135,300.00 |
| Legal fees (less $16,751.29 originally confessed) | $68,528.71 |
| Costs | $31,572.11 |
| **Total:** | **$276,402.71** |

Accordingly, it is insufficient to satisfy the amount currently due.

It is well-settled law in Pennsylvania that the Court may exercise its equitable powers to control the enforcement of a judgment and to grant any relief until that judgment is satisfied. See Chase Home Mortgage Corporation of the Southwest v. Good, 537 A.2d 22, 24 (Pa. Super. 1988); Stephenson v. Butts, 142 A.2d 319, 321 (Pa. Super. 1958); 20 P.L.E. Judgments § 191. Indeed, the Superior Court has repeatedly cited the right of a judgment creditor to amend the amount of judgment. See Nationsbanc Mortgage Corp. v. Grillo, 827 A.2d 489 (Pa. Super. 2003); Morgan Guarantee Trust Company of New York v. Mowl, 704 A.2d 923 (Pa. Super. 1998); Union National Bank of Pittsburgh v. Ciongoli, 595 A.2d 179 (Pa. Super. 1991). In B.C.Y. v. Bukovich, 390 A.2d 276 (Pa. 1978), the Pennsylvania Supreme Court reiterated its long-standing rule that a court has the inherent power to correct a judgment to conform to the facts of the case.

Under the terms of the parties' Settlement Agreement and prevailing Pennsylvania law, Plaintiff is entitled to inclusion of the figures set forth above in the amount of the judgment against Defendants. See Exhibit "A." For instance, Plaintiff is unequivocally entitled in post-judgment interest at the statutory, yearly rate of six (6) percent.[2] In similar fashion, pursuant to the governing Pennsylvania case law,

---

[2] See 42 Pa.C.S. § 8101 (declaring that "[e]xcept as otherwise provided by another statute, a judgment for a specific sum of money shall bear interest at the lawful rate from the date of the verdict or award, or from the date of the judgment, if the judgment is not entered upon a verdict or award. . . ."); 41 P.S. § 202 (setting the statutory rate of interest in the Commonwealth of Pennsylvania at six percent (6%) per annum); see also Osial v. Cook, 803 A.2d 209, 215 (Pa. Super. 1994)(explaining that "the general rule is that a plaintiff is entitled to interest on a judgment from the date of the verdict, and for purposes of computing interest, judgment and verdict are synonymous. . . ."); Pittsburgh Constr. Co. v. Griffith, 834

Case ID: 110203388
Control No.: 16050538

attorneys' fees and costs of collection are recoverable where the agreement of the parties provides for

such recovery.[3]   Here, the Surety Agreement provided as follows:

> Surety hereby irrevocably authorizes and empowers the prothonotary or clerk or any attorney of any court of record to waive the issuance and service of process and to appear for and confess judgment therein against Surety and in favor of Bank or any subsequent holder hereof at any time, whether or not the indebtedness evidenced hereby has matured (by acceleration or otherwise), for the full amount of all Obligations due or that may become due, including but not limited to late charges and interest accrued at the rate provided herein. Such confession shall be with all costs of suit and an attorneys' commission in an amount equal to all attorneys' fees incurred but in no event less than the greater of ten percent (10%) of the full amount confessed hereunder or $1,000. Although Surety agrees that the confession may include the amounts of the attorneys' commission specified in the preceding sentence, Surety reserves the right only to contest the collection by Bank of any unreasonable attorneys' fees. The authority and power to appear for and confess judgment against Surety shall not be exhausted by the initial exercise thereof and the same may be exercised from time to time, as often as Bank shall deem necessary and desirable, and a copy of this Agreement shall be sufficient warrant. Bank may, in its sole discretion, exercise the authority contained herein against one or more Sureties at one and the same time or at different times. Such confession shall be with or without declaration or complaint filed, with release of errors, without stay of execution, and Surety waives the right of inquisition on any real estate levied upon pursuant to the provisions hereof, and does hereby voluntarily condemn same and authorizes the prothonotary to enter upon the writ of execution a voluntary condemnation, and further agrees that the real estate may be sold on a writ of execution with a waiver and release of all relief from all appraisalment, stay or exemption laws or rules of court, now in force or hereafter enacted or adopted.

Exhibit "A" (emphasis supplied).   Alternatively, the Pennsylvania Rules of Civil Procedure and the

Philadelphia Local Rules create an enforcement mechanism for situations involving non-delivery of

settlement funds and the courts of our Commonwealth have sanctioned parties for failing to deliver

settlement proceeds in a timely fashion.   See Pa.R.Civ.P. 229.1; Phila. R.Civ. P. 229.1; Sanders v.

Allegheny Hospital, 833 A.2d 179 (Pa. Super. 2003)(affirming sanctions against hospital, after hospital

failed to timely pay settlement funds in a malpractice action); Kramer v. Schaeffer, 751 A.2d 241 (Pa.

Super. 2000)(finding that plaintiff is entitled to sanctions for defendant's failure to timely tender settlement

funds).

---

A.2d 572, 582 (Pa. Super. 2003)(observing that a plaintiff receives statutory post-judgment interest as a matter of right where the damages are ascertainable by computation).

[3] See, e.g., McMullen v. Kutz, 985 A.2d 769 (Pa. 2009)(observing that the parties may contract to provide for the breaching party to pay the attorney fees of the prevailing party in a breach of contract case); Corace v. Balint, 210 A.2d 882, 887 (Pa. 1965); see also J.C. Snavely and Sons, Inc. v. Web M&E, Inc., 594 A.2d 333, 336-7 (Pa. Super.), appeal denied, 602 A.2d 860 (Pa. 1991).  Our courts have found that the fee-shifting provisions contained within written agreements are enforceable and failure to award counsel fee to the prevailing party constitutes an error of law.  See Bayne v. Smith, 965 A.2d 265 (Pa. Super. 2009)(finding that the fee-shifting provision of a lease agreement for the prevailing party is enforceable as it is neutral in its application and is intended as an indemnification for reasonable attorney's fees incurred); see also De Lage Landen Financial Services, Inc. v. Rozentsvit, 939 A.2d 915 (Pa. Super. 2007)(holding that a party that prevails in the underlying breach of contract case is entitled to counsel fees it expended, where the written agreement between the litigants provides for such fees and such fees are to be sought after the judgment is entered).

Case ID: 110203388
Control No.: 16050538

Plaintiff's counsel spent well over 200 hours litigating this case, over the course of the past five years, across multiple jurisdictions.  The rate $400.00 per hour is well within the relevant standard for attorneys with comparable years of experience, as determined by the Community Legal Services of Philadelphia Fee Schedule.  See https://clsphila.org/about-cls/attorney-fees, last visited on May 2, 2016.  When calculated at $400.00 per hour, Plaintiff is entitled to reasonable counsel fees of $68,528.71 (on account of $16,751.29 that was credited for counsel fees in the original amount of the judgment).  This amount is eminently reasonable and Plaintiff is entitled to its recovery, even if Defendants will attempt to claim that they were unaware of this language in the Surety Agreement.[4]

To date, Defendant(s) have failed and/or refused to comply with the terms of the parties' Settlement Agreement; in that, they have not made the requisite payments and, thereby, caused Plaintiff to incur and expend additional sums, while seeking payments from Defendants.  In ruling on this Motion, the Court is asked to consider that Plaintiff is being significantly harmed by Defendants' vexatious and dilatory conduct.  Indeed, Plaintiff's right to funds at issue is indisputable.  Although Plaintiff and Plaintiff's counsel have made diligent attempts to resolve this matter without burdening the Court, such efforts have been fruitless and the Court's intervention is the only available remedy remaining.

**5.    Relief Requested**

In light of the foregoing, Plaintiff respectfully petitions that the Honorable Court grant relief as requested in the attached order.

**(SIGNATURE ON THE NEXT PAGE)**

---

[4] See In re Olson Estate, 291 A.2d 95, 98 (Pa. 1972)(observing that "in the absence of proof of fraud, failure to read the contract is an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract or any provision thereof. . . ."); Simeone v. Simeone, 581 A.2d 162, 165 (Pa. 1990)(observing that a party is normally bound by an agreement regardless of whether the contractual terms were read and understood); Mormello v. Mormello, 682 A.2d 824, 828 (Pa. Super. 1996)(observing that "[c]ontracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood"); Germantown Sav. Bank v. Talacki, 657 A.2d 1285, 1289 (Pa. Super. 1995)(noting that "the failure to read a contract before signing . . . is considered supine negligence").

Case ID: 110203388
Control No.: 16050538

Date: <u>May 3, 2016</u>

Respectfully submitted,
**KALIKHMAN & RAYZ, LLC**

Eric Rayz, Esquire
Attorney(s) for Plaintiff(s)
1051 County Line Road, Suite "A"
Huntingdon Valley, PA 19006
Telephone: (215) 364-5030
Facsimile: (215) 364-5029
E-mail: erayz@kalraylaw.com

Case ID: 110203388
Control No.: 16050538

**KALIKHMAN & RAYZ, LLC**                     **ATTORNEY(S) FOR PLAINTIFF(S)**
Eric Rayz, Esquire
Attorney ID No. 87976
1051 County Line Road, Suite "A"
Huntingdon Valley, PA 19006
Telephone: (215) 364-5030
Facsimile: (215) 364-5029
E-mail: erayz@kalraylaw.com

---

| | |
|---|---|
| VERTONIX LIMITED | COURT OF COMMON PLEAS |
| | PHILADELPHIA COUNTY |
| Plaintiff(s) | |
| | February Term 2011 |
| v. | |
| LYUBARSKY, et al. | Docket No. 3388 |
| Defendant(s) | |

---

## CERTIFICATE OF SERVICE

I, Eric Rayz, Esquire, hereby certify that a true and correct copy of the foregoing Plaintiff's Motion

to Reassess Damages were served on the following on or about the date indicated below:

Yuri Lyubarsky                         Steven Maniloff, Esquire
Olga Lyubarsky                         Montgomery, McCracken, Walker & Rhoads, LLP
3140 NE 40th Ct.                       123 South Broad Street, 28th Floor
Ft. Lauderdale, FL 33308               Philadelphia, PA 19109

Date: <u>May 3, 2016</u>                     Respectfully submitted,
                                       **KALIKHMAN & RAYZ, LLC**


_____

                                       Eric Rayz, Esquire
                                       Attorney(s) for Plaintiff(s)
                                       1051 County Line Road, Suite "A"
                                       Huntingdon Valley, PA 19006
                                       Telephone: (215) 364-5030
                                       Facsimile: (215) 364-5029
                                       E-mail: erayz@kalraylaw.com

Case ID: 110203388
Control No.: 16050538

FILED
03 MAY 2016 01:59 pm
Civil Administration
P. MARTIN

# EXHIBIT "A"

Case ID: 110203388
Control No.: 16050538

Initials Y L and O L

## SURETY AGREEMENT

INTENDING TO BE LEGALLY BOUND, the undersigned, YURI LYUBARSKY and OLGA LYUBARSKY (jointly and severally "Surety") agree as follows:

1.   Unconditional Surety.

For full value received, Surety hereby unconditionally guarantees to VERTONIX LIMITED (hereinafter "Bank"), and becomes surety to Bank for, the due and punctual payment and performance of all Obligations (as defined below) of Surety to Bank, now existing or hereafter at any time or times incurred, and all expenses incurred by Bank in collecting same as set forth below. The term "Obligations" means any and all indebtedness, obligations, and liabilities of Surety to Bank, now existing or hereafter arising, direct or indirect, acquired outright, conditionally, or as collateral security from another, absolute or contingent, joint or several, secured or unsecured, matured or not matured, monetary or non-monetary, arising out of contract or tort, liquidated or unliquidated, arising by operation of law or otherwise, and all extensions, renewals, refundings, replacements, advances, and modifications of any of the foregoing, including without limitation all interest, expenses, costs (including collection costs) and fees (including attorney's fees and prepayment fees) incurred, arising or accruing (whether prior or subsequent to the filing of any bankruptcy petition by or against Surety) under or in connection with any of the foregoing. If any Obligation is not paid or performed by Surety punctually when due, including, without limitation, any Obligation due by acceleration of the maturity thereof, or if Surety fails to abide by all terms of this Agreement and all terms of any other documents executed by Surety in connection with any Obligation, Surety will, without demand or notice by Bank, immediately pay or perform all Obligations or cause the same to be paid or performed; and, in such event Surety shall immediately pay to Bank upon demand all costs and expenses, including without limitation all title search, title insurance, and appraisal costs, if any, and all attorney's fees and other costs incurred by Bank as a result of any proceeding, whether in bankruptcy or otherwise, involving any Obligor (defined herein to include Surety and any other person or entity liable for the payment of all or part of the Obligations as well as any other person or entity granting Bank a security interest in any collateral securing any of the Obligations), incurred by Bank to collect all or any portion of the Obligations from any Obligor. All such costs and expenses incurred by the Bank will accrue interest at the highest default rate in any instrument evidencing the Obligations until payment is actually received by the Bank. Interest shall continue to accrue on the Obligations after the entry of any judgment hereunder at the highest rate set forth in any document or instrument evidencing any Obligation.

2.   General Terms and Conditions.

a.   Surety hereby waives (i) notice of acceptance of this Agreement and of any action by Bank in reliance thereon; (ii) presentment, demand of payment, notice of dishonor or nonpayment, protest and notice of protest with respect to the Obligations, and the giving of any notice of default or other notice to, or making any demand on, any Obligor; (iii) notice of any creation, extension, or accrual of any of the Obligations or any election by Bank to sell any of the collateral mortgaged, assigned or pledged as security for any of the Obligations (hereinafter, collectively, the "Collateral") at a public or private sale (Surety agrees that, to the extent notice of such sale shall be required by law, five (5) days notice to Surety of the time and place any public sale or private sale is to be made shall constitute reasonable notification); (iv) any claim, right or remedy which Surety may now have or hereafter acquire against Surety or any other Obligor that arises hereunder and/or from the performance by Surety hereunder including, without limitation, (1) any claim, remedy, or right to seek subrogation, contribution, indemnification or any other form of reimbursement from any other Obligor or (2) any claim, remedy, or right of subrogation, reimbursement, exoneration, indemnification, or participation in any claim, right or remedy of Bank against Surety or any security which Bank now has or hereafter acquires,

Case ID: 110203388

Control No.: 16050538

Initials _YL_ and _OoL_

whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise; (v) notice of any other nature whatsoever; (vi) any requirement that Bank take any action whatsoever against any Obligor or Collateral or file any claim in the event of the bankruptcy of any Obligor; (vii) the failure by Bank to protect, preserve, or resort to any Collateral or to perfect any security interest in or any lien upon the Collateral; (viii) any act or omission of the Bank which materially increases the scope of the Surety's risk, including negligent administration of any loan to Surety; and (ix) all defenses based on suretyship or impairment of collateral and any defenses any Obligor may assert on the Obligations, including but not limited to failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, lack of legal capacity, lender liability, accord and satisfaction, and usury, except the defense of payment of the Obligations in full. Surety further agrees that the guaranty and surety contained herein will not be discharged except by complete performance of all Obligations of the Surety and the liabilities of Surety hereunder.

b.  Surety hereby consents that from time to time, and without further notice to or consent of Surety, Bank may take any or all of the following actions without affecting or impairing the liability of Surety hereunder: (i) extend, renew, increase, modify, compromise, settle, or release the Obligations or any part thereof (including without limitation any increase or decrease in the interest rate); (ii) release or compromise any liability of any Obligor with respect to the Obligations; (iii) release, waive, or subordinate any security interest or lien in any Collateral or exchange, surrender or otherwise deal with the Collateral as Bank may determine; or (iv) exercise or refrain from exercising any right or remedy of Bank. The guaranty and surety contained herein is absolute and unconditional, primary, direct and immediate and shall be valid and binding upon Surety regardless of any invalidity, irregularity, defect or unenforceability of the Obligations or any note, instrument, or agreement evidencing same or relating thereto, or any other circumstance that might otherwise constitute a defense available to, or discharge of, any other Obligor, including but not limited to failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, infancy, statute of limitations, lender liability, accord and satisfaction, and usury. Surety hereby waives any right to require Bank to proceed initially against any other Obligor or any of the Collateral upon any default in the payment or performance of the Obligations. The obligations of Surety hereunder shall not be subject to any counterclaim, set-off, deduction or defense based upon any claim Surety may have against any Obligor or Bank, except payment or performance of the Obligations. No failure or delay on the part of Bank in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies of Bank hereunder are cumulative and concurrent and not exclusive of any other rights or remedies Bank may have.

c.  If any claim is ever made upon Bank for repayment of any amounts, or the recovery of any secured property, received by Bank from any Obligor in payment of any of the Obligations, and Bank repays all or part of said amounts or returns all or part of said secured property by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over Bank or any of its property or (ii) any settlement or compromise of any such claim accomplished by Bank with such claimant then and in such event Surety agrees that any such judgment, decree, settlement or compromise shall be binding upon Surety, notwithstanding any revocation hereof or the cancellation of any note or other instrument evidencing any Obligation, and Surety shall be and shall remain liable to Bank hereunder for the amounts so repaid or the secured property recovered

Page 2 of 5

Initials __YL__ and __OL__

to the same extent as if such amounts or property had never originally been received by Bank. Surety agrees that Bank shall have no duty or affirmative obligation to defend against such claim and may object to or pay such claim in its sole discretion without impairing or releasing the obligations of Surety hereunder. This provision shall survive the termination of this Agreement.

d.  If less than all persons who are intended to sign this Agreement, or any other document evidencing any Obligation, do so, the same shall nevertheless be binding upon those who do sign, and if only one person shall sign any plural references shall be read as a singular.  Any notice to an Obligor by Bank shall not imply that such notice or any further or similar notice was or is required.

3.  Set-off.

As additional collateral security for the Obligations, and not in lieu of any other rights of Bank hereunder or under any other document, Surety hereby grants to Bank a security interest in, a lien upon, and a right of set-off against all funds, balances or other property of any kind of Surety, or in which Surety has an interest, now or hereafter in the possession, custody or control of Bank.  Bank may upon maturity (whether by demand, acceleration, stated maturity, or otherwise) of the Obligations appropriate and apply toward the payment of the Obligations in such order as Bank determines the balance of any account of Surety with, or each claim of Surety against, Bank.

4.  Venue and Exclusive Jurisdiction.

**Surety hereby consents to the exclusive jurisdiction of the Court of Common Pleas of Philadelphia, Pennsylvania or the United States District Court for the Eastern District of Pennsylvania in any legal proceeding involving, directly or indirectly, any matter arising out of or related to this Agreement, or any relationship evidenced hereby, including the collection and enforcement hereof.  Surety expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such Court and waives any objection which Surety may have based upon lack of personal jurisdiction or improper venue and consents to the granting of such legal or equitable relief as is deemed appropriate by such court.  Surety waives personal service of the summons, complaint and any other process issued in any such action or suit and agrees that service of such summons, complaint, and any other process may be made by registered or certified mail, postage prepaid, addressed to the Surety at the address set forth below and that service so made shall be deemed completed upon the providing of such notice.  Nothing in this Agreement shall be deemed or operate to affect the rights of the Bank to serve legal process or to bring any action permitted by law against any Obligor or involving any Collateral in the appropriate court of any other appropriate jurisdiction or forum.**

5.  Waiver of Jury Trial and Certain Damages.

**Surety hereby waives trial by jury in any legal proceeding involving, directly or indirectly, any matter (whether sounding in tort, contract or otherwise) in any way arising out of or related to this Agreement.  The Surety represents and warrants that no representative or agent of the Bank has represented, expressly or otherwise, that the Bank will not, in the event of litigation, seek to enforce this jury trial waiver.  Surety further waives any right it may have to claim or recover, in any such suit, action or proceeding, any special, exemplary, punitive, or consequential damages or any damages other than, or in addition to, actual damages.  This provision is a material inducement for Bank to enter into, rely upon, or accept this Agreement.**

6.  Miscellaneous.

No consent or waiver under this Agreement shall be effective unless in writing. This Agreement and all documents executed hereunder shall be binding upon Surety and its executors, personal representatives, successors and assigns and shall inure to the benefit of Bank and its successors and

Case ID: 110203388

Control No.: 16050538

Initials __YL__ and __OL__

assigns. This Agreement has been delivered to and accepted by Bank in, and shall be governed by the internal laws, and not the law of conflicts of, the Commonwealth of Pennsylvania. If any provision hereof is found by a court of competent jurisdiction to be prohibited or unenforceable, it shall be ineffective only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability shall not invalidate the balance of such provision to the extent it is not prohibited or unenforceable, nor invalidate the other provisions hereof, all of which shall be liberally construed in favor of Bank in order to effect the provisions hereof. The execution and delivery of this Agreement is in addition to, and not in derogation of, any other Surety Agreement of any Obligor heretofore executed and delivered to Bank unless such prior Surety Agreement has been terminated in writing pursuant to the terms thereof. This Agreement and any prior Surety Agreement of Surety to Bank shall be construed as one agreement, and in the event of any inconsistency, the terms of this Agreement shall control the terms of any prior Surety Agreement. This Agreement may be amended or discharged only by a writing executed by Bank and Surety. The undersigned, if more than one, are jointly and severally liable. For purposes of this Agreement, the singular shall be deemed to include the plural and the neuter shall be deemed to include the masculine and feminine, as the context may require.

7.    Confession of Judgment.

Surety hereby irrevocably authorizes and empowers the prothonotary or clerk or any attorney of any court of record to waive the issuance and service of process and to appear for and confess judgment therein against Surety and in favor of Bank or any subsequent holder hereof at any time, whether or not the indebtedness evidenced hereby has matured (by acceleration or otherwise), for the full amount of all Obligations due or that may become due, including but not limited to late charges and interest accrued at the rate provided herein. Such confession shall be with all costs of suit and an attorneys' commission in an amount equal to all attorneys' fees incurred but in no event less than the greater of ten percent (10%) of the full amount confessed hereunder or $1,000. Although Surety agrees that the confession may include the amounts of the attorneys' commission specified in the preceding sentence, Surety reserves the right only to contest the collection by Bank of any unreasonable attorneys' fees. The authority and power to appear for and confess judgment against Surety shall not be exhausted by the initial exercise thereof and the same may be exercised from time to time, as often as Bank shall deem necessary and desirable, and a copy of this Agreement shall be sufficient warrant. Bank may, in its sole discretion, exercise the authority contained herein against one or more Sureties at one and the same time or at different times. Such confession shall be with or without declaration or complaint filed, with release of errors, without stay of execution, and Surety waives the right of inquisition on any real estate levied upon pursuant to the provisions hereof, and does hereby voluntarily condemn same and authorizes the prothonotary to enter upon the writ of execution a voluntary condemnation, and further agrees that the real estate may be sold on a writ of execution with a waiver and release of all relief from all appraisement, stay or exemption laws or rules of court, now in force or hereafter enacted or adopted.

In granting the above warrant of attorney to confess judgment, the Surety hereby knowingly, intentionally, and voluntarily waives any and all constitutional rights the Surety has or may have either upon the confession of judgment against the Surety or (after the maturity of the indebtedness evidenced hereby) upon execution process thereon, by garnishment or otherwise, against property of the Surety to: (i) prior notice; (ii) a prior judicial proceeding; (iii) prior review by an authorized public official; and (iv) the prior opportunity to raise a defense, setoff, or counterclaim. The Surety expressly waives such rights as an explicit and material part of the consideration hereof.

IN WITNESS WHEREOF, the parties hereunto set their hand and seal:

(SIGNATURE ON THE NEXT PAGE)

Case ID: 110203388

Control No.: 16050538

Initials _YL_ and _OL_

_____
**On behalf of Olga Lyubarsky**

_Olga Lyubarsky_
Olga Lyubarsky

_01. 14. 09_
Date

_____
**On behalf of Yuri Lyubarsky**

_Yuri Lyubarsky_
Yuri Lyubarsky

_01. 14. 09_
Date

- SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me by
_Yuri Lyubarsky_ and _Olga Lyubarsky_ on the
_14_ day of _January_, 200_9_.

Notary Public
State of _Florida_

My commission expires: _____

STEPHANIE L SMITH
NOTARY
My Comm. Expires
February 11, 2012
DD757591
PUBLIC
STATE OF FLORIDA

Page 5 of 5

Case ID: 110203388
Control No.: 16050538

# EXHIBIT "B"

Case ID: 110203388
Control No.: 16050538

Initials _YL_ and _Od_

## DISCLOSURE AND WAIVER OF RIGHTS REGARDING CONFESSION OF JUDGMENT

**Intending to be legally bound hereby**, and for value received, and to induce VERTONIX LIMITED (hereinafter "Bank"), as assignee for Reģionālā Investīciju Banka (Regional Investment Bank), to enter a certain Settlement Agreement, the undersigned, whether one or more persons, partnerships, corporations, or other entities (jointly and severally, the "Obligor"), agrees as follows:

1.     On the date hereof, or previously dated, the Obligor is signing and delivering to the Bank a Settlement Agreement and a Surety Agreement (hereinafter "Settlement Documents")(as the same may be renewed, modified, amended, extended, restated or replaced) whether one or more, whereby the Obligor is obligated to repay monies (hereinafter "Obligations") to the Bank or by which the undersigned has granted security to the Bank to repay the Obligations. The Obligor has been advised by the Bank (and by the Obligor's legal counsel, if applicable) that these Settlement Documents contain a clause that provides that the Bank may confess judgment against the Obligor. The Obligor has read Settlement Documents and clearly and specifically understands that by signing these Settlement Documents which contain such confession of judgment clause:

   a.     The Obligor is authorizing the Bank to enter a judgment against the Obligor and in favor of the Bank, which will give the Bank a lien upon any real estate which the Obligor may own wherever the judgment is entered.

   b.     If the Settlement Documents include a Security Agreement, the Obligor is also authorizing the Bank, upon the occurrence of an event of default under the Settlement Documents, to enter a judgment against the Obligor and in favor of the Bank, which will give the Bank in an action for replevin possession of secured personal property.

   c.     The Obligor is waiving all constitutional rights that the Obligor may have to any prior notice, to prior review by an authorized official, or to an opportunity for a hearing before the entry of such judgment by or for the benefit of the Bank on the records of the Court.

   d.     The Obligor understands and agrees that the Bank may enter such judgment and understands that the Obligor will be unable to contest the validity of the judgment, should the Bank enter it, unless the Obligor successfully challenges entry of the judgment on procedural grounds through a petition to open or strike the judgment, which will require the Obligor to retain counsel at the Obligor's expense.

   e.     The Obligor is waiving all constitutional rights that the Obligor may have to prior notice, to prior review by an authorized official, or to an opportunity for a prior hearing before the Bank may request and use the power of the state government to deprive the Obligor of his, her, or their property pursuant to the judgment by seizing or having the Sheriff or other official seize or garnish the Obligor's bank accounts, inventory, equipment, furnishings, or any other personal property that the Obligor may own, to satisfy, in whole or in part, the Obligations, or by seizing or having the Sheriff or other official eject the Obligor from possession of his, her, or their real property.

   f.     The Obligor understands and agrees that the Obligor may be immediately deprived of the use of any property that is thus seized or affected pursuant to such judgment without prior notice, a prior hearing, or prior review by an authorized official, and the procedural rules of the court system do not necessarily guarantee that the Obligor will receive a prompt hearing after the Obligor's property is seized or otherwise affected.

Page 1 of 2

Case ID: 110203388

Control No.: 16050538

Initials _YL_ and _OL_

2.    The Obligor knows and understands that it is the confession of judgment clause in the Settlement Documents, which gives the Bank the rights described in Subparagraphs (a) through (f) of Paragraph 1 above.

3.    Fully and completely understanding the rights which are being given up if the Obligor signs the Settlement Documents containing the confession of judgment, the Obligor nevertheless freely, knowingly and voluntarily waives said rights and chooses to sign the Settlement Documents.

4.    The Obligor acknowledges that he/she is a natural person and the Obligations at issue do not arise in connection with a consumer credit transaction.

5.    The Obligor acknowledges that the Obligations at issue relate to commercial transactions.

6.    The Obligor acknowledges that the proceeds of the Obligations are to be or were used for business purposes.

7.    If the Obligor is an individual, the Obligor certifies that his/her annual income exceeds $10,000.00.

The Obligor has read this Disclosure and Waiver prior to signing the Settlement Documents and fully understands the contents hereof and thereof.

**On behalf of the Obligor**
**Olga Lyubarsky**

_Olga Lyubarsky_
Olga Lyubarsky

_01. 14. 09_
Date

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me by
_Olga Lyubarsky_ on the _14_ day of _January_, 200_9_.

_[Notary seal: STEPHANIE L SMITH, NOTARY, My Comm. Expires February 11, 2012, DD757591, PUBLIC, STATE OF FLORIDA]_

Notary Public
State of _Florida_

My commission expires: _____

Page 2 of 2

Case ID: 110203388
Control No.: 16050538

Initials _Y L_ and _O L_

## DISCLOSURE AND WAIVER OF RIGHTS REGARDING CONFESSION OF JUDGMENT

**Intending to be legally bound hereby**, and for value received, and to induce VERTONIX LIMITED (hereinafter "Bank"), as assignee for Reģionālā Investīciju Banka (Regional Investment Bank), to enter a certain Settlement Agreement, the undersigned, whether one or more persons, partnerships, corporations, or other entities (jointly and severally, the "Obligor"), agrees as follows:

1.    On the date hereof, or previously dated, the Obligor is signing and delivering to the Bank a Settlement Agreement and a Surety Agreement (hereinafter "Settlement Documents")(as the same may be renewed, modified, amended, extended, restated or replaced) whether one or more, whereby the Obligor is obligated to repay monies (hereinafter "Obligations") to the Bank or by which the undersigned has granted security to the Bank to repay the Obligations.  The Obligor has been advised by the Bank (and by the Obligor's legal counsel, if applicable) that these Settlement Documents contain a clause that provides that the Bank may confess judgment against the Obligor.  The Obligor has read Settlement Documents and clearly and specifically understands that by signing these Settlement Documents which contain such confession of judgment clause:

   a.    The Obligor is authorizing the Bank to enter a judgment against the Obligor and in favor of the Bank, which will give the Bank a lien upon any real estate which the Obligor may own wherever the judgment is entered.

   b.    If the Settlement Documents include a Security Agreement, the Obligor is also authorizing the Bank, upon the occurrence of an event of default under the Settlement Documents, to enter a judgment against the Obligor and in favor of the Bank, which will give the Bank in an action for replevin possession of secured personal property.

   c.    The Obligor is waiving all constitutional rights that the Obligor may have to any prior notice, to prior review by an authorized official, or to an opportunity for a hearing before the entry of such judgment by or for the benefit of the Bank on the records of the Court.

   d.    The Obligor understands and agrees that the Bank may enter such judgment and understands that the Obligor will be unable to contest the validity of the judgment, should the Bank enter it, unless the Obligor successfully challenges entry of the judgment on procedural grounds through a petition to open or strike the judgment, which will require the Obligor to retain counsel at the Obligor's expense.

   e.    The Obligor is waiving all constitutional rights that the Obligor may have to prior notice, to prior review by an authorized official, or to an opportunity for a prior hearing before the Bank may request and use the power of the state government to deprive the Obligor of his, her, or their property pursuant to the judgment by seizing or having the Sheriff or other official seize or garnish the Obligor's bank accounts, inventory, equipment, furnishings, or any other personal property that the Obligor may own, to satisfy, in whole or in part, the Obligations, or by seizing or having the Sheriff or other official eject the Obligor from possession of his, her, or their real property.

   f.    The Obligor understands and agrees that the Obligor may be immediately deprived of the use of any property that is thus seized or affected pursuant to such judgment without prior notice, a prior hearing, or prior review by an authorized official, and the procedural rules of the court system do not necessarily guarantee that the Obligor will receive a prompt hearing after the Obligor's property is seized or otherwise affected.

Case ID: 110203388

Control No.: 16050538

Initials _YL_ and _OL_

2.      The Obligor knows and understands that it is the confession of judgment clause in the Settlement Documents, which gives the Bank the rights described in Subparagraphs (a) through (f) of Paragraph 1 above.

3.      Fully and completely understanding the rights which are being given up if the Obligor signs the Settlement Documents containing the confession of judgment, the Obligor nevertheless freely, knowingly and voluntarily waives said rights and chooses to sign the Settlement Documents.

4.      The Obligor acknowledges that he/she is a natural person and the Obligations at issue do not arise in connection with a consumer credit transaction.

5.      The Obligor acknowledges that the Obligations at issue relate to commercial transactions.

6.      The Obligor acknowledges that the proceeds of the Obligations are to be or were used for business purposes.

7.      If the Obligor is an individual, the Obligor certifies that his/her annual income exceeds $10,000.00.

The Obligor has read this Disclosure and Waiver prior to signing the Settlement Documents and fully understands the contents hereof and thereof.

**On behalf of the Obligor**
**Yuri Lyubarsky**


_____
Yuri Lyubarsky

_01. 14. 09_
_____
Date


SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me by
_Yuri Lyubarsky_ on the _14_ day of _January_ , 2009.

_____
Notary Public
State of _Florida_

My commission expires: _____

STEPHANIE L SMITH
NOTARY
My Comm. Expires
February 11, 2012
DD757591
PUBLIC
STATE OF FLORIDA


Page 2 of 2

Case ID: 110203388
Control No.: 16050538

# EXHIBIT "C"

Case ID: 110203388
Control No.: 16050538

**FILED**

**22 NOV 2011 03:12 pm**

**Civil Administration**

**L. OWENS**

RECEIVED

DEC 16 2011

CIVIL ADMINISTRATION

| | |
|---|---|
| VERTONIX LIMITED<br><br>                   Plaintiff(s)<br><br>         v.<br><br>LYUBARSKY, et al.<br><br>                   Defendant(s) | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>February Term 2011<br><br>Docket No. 3388 |

### ORDER

AND NOW, this ___15___ day of ___December___, 20__11__ upon consideration of Plaintiff's Motion to Compel Defendants' Responses to Post-judgment Discovery and any response thereto, it is hereby **ORDERED** and **DECREED** that:

1.        The Motion is GRANTED;

2.        Defendants, YURI LYUBARSKY and OLGA LYUBARSKY, must provide full and complete answers to the interrogatories and full and complete responses to the requests for production of documents, without objection or motion for a protective order, within `thirty (30) days of this Order or sanctions shall be imposed.`

DOCKETED
CIVIL ADMINISTRATION

DEC 19 2011

M. GRAHAM

BY THE COURT:

Vertonix Limited Vs Lyu-ORDER



11020338800009

_____ J.

DOCKETED
CIVIL ADMINISTRATION

DEC 19 2011

M. GRAHAM

Case ID: 110203388

Case ID: 110203388

Control No.: 11113229

Control No: 16050538

# EXHIBIT "D"

Case ID: 110203388
Control No.: 16050538

FILED
10 FEB 2012 12:24 pm
Civil Administration
K. PERMSAP

| | |
|---|---|
| VERTONIX LIMITED <br><br>                    Plaintiff(s) <br><br> v. <br><br> LYUBARSKY, et al. <br><br>                    Defendant(s) | COURT OF COMMON PLEAS <br> PHILADELPHIA COUNTY <br><br> February Term 2011 <br><br> Docket No. 3388 |

DOCKETED

APR 1 3 2012

S. MacGREGOR
CIVIL ADMINISTRATION

ORDER

AND NOW, this _12_ day of _April_, 20__, upon consideration of Plaintiff's Motion for Sanctions and any response thereto, it is hereby **ORDERED** and **DECREED** that:

1.      The Motion is GRANTED;

2.      The Court finds that Defendants, YURI LYUBARSKY and OLGA LYUBARSKY, are in willful disregard of this Court's Order of December 15, 2011, and that Defendants' willful disregard of this Court's Order caused irreparable harm and prejudice to Plaintiff;

3.      Within ten (30) *thirty (30)* days of this Order, Defendants shall pay Kalikhman & Rayz, LLC: (a) $57.68 for the cost of filing the original Motion for Sanctions; and (b) $750.00 in counsel fees for the preparation of this motion and attendance of any related hearing(s);

4.      Within ten (10) *thirty (30)* days of this Order, Defendants must provide full and complete answers to the interrogatories and full and complete responses to the requests for production of documents, without objection or motion for a protective order; and

5.      Defendants are cautioned that their continued and unexplained failure to comply with the Orders of this Court, may occasion even harsher sanctions.

BY THE COURT:

Vertonix Limited Vs Lyu-ORDER



_____ J.

11020338800018

Case ID: 110203388
Case ID: 110203388
Control No.: 12021457
Control No.: 16050538

# EXHIBIT "E"

Case ID: 110203388
Control No.: 16050538

**IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

---

| | | |
|---|---|---|
| **VERTONIX LIMITED** | : | |
| | : | **FEBRUARY TERM, 2011** |
| | : | |
| **v.** | : | **NO.    3388** |
| | : | |
| | : | **CONTROL NO.    12052539** |
| **YURI and OLGA LYUBARSKY, et al** | : | |

### ORDER

**AND NOW,** this   *20*   day of July, 2012, upon consideration of Plaintiff's Second

Motion for Sanctions and no response thereto, it is hereby **ORDERED** and **DECREED** as follows:

1. The Court finds that Defendants, Yuri Lyubarsky and Olga Lyubarsky, have willfully
   disregarded this Court's Orders of December 15, 2011 and April 12, 2012.

2. Within thirty (30) days of the entry of this Order, Defendants shall pay Kalikhman & Rayz,
   LLC the sum of $557.68 representing filing costs of $57.68 and attorney fees of $500.00.

3. Within thirty (30) days of this Order Defendant shall provide full and complete answers to
   the Interrogatories and full and complete responses to Plaintiff's Request for Production of
   Documents without objection or Motion for Protective Order.

4. Should Defendants not comply with this Order, commencing August 19, 2012, Defendants
   are sanctioned $100.00 per day until they comply fully with this Court's Orders.

5. Defendants are cautioned that their continued and unexplained failure to comply with
   Orders of the Court may result in further sanctions.

**BY THE COURT:**

_____

**IDEE C. FOX, J.**

DOCKETED

JUN 2 9 2012

T. DUGAN

Vertonix Limited Vs Lyu-ORDER



Case ID: 110203388
11020338800027
Control No.: 16050538

# EXHIBIT B3

FILED

01 JUL 2016 05:36 pm

Civil Administration

K. EDWARDS

## COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## CIVIL TRIAL DIVISION

| | |
|---|---|
| **VERTONIX LTD** | : |
|     **Plaintiff** | : |
|    **v.** | : **FEBRUARY TERM, 2011** |
| | : |
| **YURI and OLGA LYUBARSKY, h/w** | : No. 03388 |
| | : |
|     **Defendants** | : |
| | : |
| **v.** | : |
| | : |
| **THE GUARDIAN LIFE INSURANCE** | : |
| **COMPANY OF AMERICA** | : |
| | : |
|     **Garnishee** | : |
| | : |

## <u>ORDER</u>

AND NOW, this      day of          , 2016, upon

consideration of Plaintiff's Motion to Reassess Damages and Defendants' response thereto, it is

hereby **ORDERED** and **DECREED** that the motion is denied.

BY THE COURT:

_____

                       J.

Case ID: 110203388
Control No.: 16050538

**KATS, JAMISON & ASSOCIATES**
**By:    Marina Kats, Esquire**
      **I.D. No. 53020**
      **1 Bustleton Pike**
      **Feasterville, PA 19053**
      **215-396-9001**
      **marina@mkats.com**               **Attorney for Defendants**

| | |
|---|---|
| **VERTONIX LTD** | : **COURT OF COMMON PLEAS** |
| **Plaintiff** | : **PHILADELPHIA COUNTY** |
| **v.** | : |
| | : **CIVIL ACTION** |
| **YURI and OLGA LYUBARSKY, h/w** | : |
| | : **FEBRUARY TERM 2011** |
| **Defendants** | |
| | No.   03388 |
| **v.** | |

**THE GUARDIAN LIFE INSURANCE**
**COMPANY OF AMERICA**

**Garnishee**

### <u>DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO REASSES</u>

Defendants, Yuri and Olga Lyubarsky, husband and wife, by and through their undersigned

counsel, Marina Kats, Esq. of the firm Kats, Jamison & Associates file with this Honorable Court

their response to Plaintiff's Motion to Reassess Damages and in support aver as follows:

1-44. Inclusive: Plaintiff specifically says without any support whatsoever that defendants

have never *fully* complied in paragraph 24 of its motion (emphasis supplied). The burden

is on the movant to demonstrate justification for the imposition of sanctions of over

$144,000. It is not enough to say that defendants have not fully complied without, at the

very least, showing the extent of compliance and non-compliance. The defendants,

unfortunately, have lived under the specter of this litigation, *pro se* for approximately five

years. It is clear from conversations that they have not understood, appreciated, or

conceptualized the implications of the failure to act in response to very sophisticated

Case ID: 110203388
Control No.: 16050538

opposing counsel and their filings. Having now understood the significance of having counsel to advise them, counsel have attempted, on many occasions to convey the respect required to this Court and the attention it must be paid to these unresolved issues. Unfortunately, plaintiff seeks to nearly double defendants' indebtedness by way of sanctions for failing to *fully* comply where counsel cannot reasonably figure out what has and what has not been complied with. Plaintiff's counsel makes bald, unsupported and unspecific allegations of alleged partial compliance. It would be one thing if plaintiff's counsel alleged that there was no compliance. Instead, counsel vaguely alleges that the defendants have never *fully* complied. Consequently, even now, counsel of record for the previously *pro se* defendants cannot figure out what has and has not been complied with. If a layperson were to look at allegations such as what is contained in paragraph 24, defendants' counsel cannot understand, despite many years before the bar, what the phrase "never fully complied" means. To impose sanctions, on *pro se* defendants that almost doubles alleged indebtedness is simply an attempt to take advantage of *pro se* parties who have not had the benefit of advice of counsel. A further example is our Petition to Strike the Confessed Judgment (Control Number 16063238) which demonstrates that the more sophisticated parties, and drafters of the instrument in the underlying dispute, "hid the ball" by never providing an address for service that was supposed to be supplied in the alleged agreement. Consequently, even an attempt at compliance would be unsuccessful given the failure to provide adequate information. The reason counsel is compelled to group all of the allegation paragraphs together for its response is because there is no indication of what was and was not complied with. What more can be responded to than to explain to the Court that given the impossibility of adequate and specific responses to each paragraph

that our formerly *pro se*, lay defendants could not be expected to do any better than their "hog-tied" counsel.

**WHEREFORE,** Defendants respectfully request this Honorable Court to deny the Plaintiff's Motion to Reassess in the above captioned matter, as stated in the proposed Order.

Respectfully submitted,

**KATS, JAMISON & ASSOCIATES**

Date: 7/11/16

**By:** _____
**Marina Kats, Esquire**
**Atty ID 53020**
Attorney for Defendants

**KATS, JAMISON & ASSOCIATES**
**By:**   **Marina Kats, Esquire**
**I.D. No. 53020**
**1 Bustleton Pike**
**Feasterville, PA 19053**
**215-396-9001**
marina@mkats.com                              **Attorney for Defendants**

| | |
|---|---|
| **VERTONIX LTD** | : **COURT OF COMMON PLEAS** |
| **Plaintiff** | : **PHILADELPHIA COUNTY** |
| **v.** | : |
| | : **CIVIL ACTION** |
| **YURI and OLGA LYUBARSKY, h/w** | : |
| | : **FEBRUARY TERM 2011** |
| **Defendants** | |
| | **No.   03388** |
| **v.** | |

**THE GUARDIAN LIFE INSURANCE**
**COMPANY OF AMERICA**

**Garnishee**

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR RESPONSE TO
PLAINTIFF'S MOTION TO REASSESS DAMAGES**


I.   <u>Matter before the Court:</u>

This is the Defendants' Response to Plaintiff's Motion to Reassess Damages.

II.   <u>Statement of question involved:</u>

Did the Plaintiff as Movant carry its burden to demonstrate with any specificity the

failure to comply with the Court's Orders?

SUGGESTED ANSWER: No.

III.   <u>Facts:</u>

Plaintiff, Vertonix Ltd., commenced this action on February 24, 2011, by complaint to

confess judgment against defendant upon a commercial loan obligation secured by a "Surety

Agreement" containing a warrant of attorney.

IV.    Argument:

Plaintiff specifically says without any support whatsoever that defendants have never *fully* complied in paragraph 24 of its motion (emphasis supplied). The burden is on the movant to demonstrate justification for the imposition of sanctions of over $144,000. It is not enough to say that defendants have not fully complied without, at the very least, showing the extent of compliance and non-compliance. The defendants, unfortunately, have lived under the specter of this litigation, *pro se* for approximately five years. It is clear from conversations that they have not understood, appreciated, or conceptualized the implications of the failure to act in response to very sophisticated opposing counsel and their filings. Having now understood the significance of having counsel to advise them, counsel have attempted, on many occasions to convey the respect required to this Court and the attention it must be paid to these unresolved issues. Unfortunately, plaintiff seeks to nearly double defendants' indebtedness by way of sanctions for failing to *fully* comply where counsel cannot reasonably figure out what has and what has not been complied with. Plaintiff's counsel makes bald, unsupported and unspecific allegations of alleged partial compliance. It would be one thing if plaintiff's counsel alleged that there was no compliance. Instead, counsel vaguely alleges that the defendants have never *fully* complied.  Consequently, even now, counsel of record for the previously *pro se* defendants cannot figure out what has and has not been complied with. If a layperson were to look at allegations such as what is contained in paragraph 24, defendants' counsel cannot understand, despite many years before the bar, what the phrase "never fully complied" means. To impose sanctions, on *pro se* defendants that almost doubles alleged indebtedness is simply an attempt to take advantage of *pro se* parties who have not had the benefit of advice of counsel. A further example is our Petition to Strike the Confessed Judgment (Control Number 16063238) which demonstrates that the more

Case ID: 110203388
Control No.: 16050538

sophisticated parties, and drafters of the instrument in the underlying dispute, "hid the ball" by never providing an address for service that was supposed to be supplied in the alleged agreement. Consequently, even an attempt at compliance would be unsuccessful given the failure to provide adequate information. The reason counsel is compelled to group all of the allegation paragraphs together for its response is because there is no indication of what was and was not complied with. What more can be responded to than to explain to the Court that given the impossibility of adequate and specific responses to each paragraph that our formerly *pro se*, lay defendants could not be expected to do any better than their "hog-tied" counsel.

<u>Relief:</u>

Defendants therefore respectfully request this Honorable Court to deny Plaintiff's Motion to Reassess Damages, as stated in the proposed order.

Respectfully submitted,
Kats, Jamison & Associates

By: _____
Marina Kats
Attorney for the Defendants
Yuri and Olga Lyubarsky

Date: 7/1/16

Case ID: 110203388
Control No.: 16050538

## **VERIFICATION**

I, Marina Kats, Esquire, hereby state that I am the attorney for the Defendants herein, that I am acquainted with the facts set forth in the foregoing and that the same are true and correct to the best of my knowledge, information and belief and that this statement is made subject to the penalties of 18 Pa. C.S. 4904 relating to unsworn falsification to authorities.

Marina Kats, Esquire
Attorney for Defendants

## CERTIFICATION OF SERVICE

I, Marina Kats, do hereby certify that service of a true and correct copy of Defendants'

Response to Plaintiff's Motion to Reassess Damages has been forwarded to Plaintiffs's counsel

and Garnishee's Counsel via e-filing and/or First Class United States mail, postage pre-paid, dated

July 1, 2016 to:


Eric Rayz, Esquire
Kalikhman & Rayz, LLC
1051 County Line Road, Suite "A"
Huntingdon Valley, PA 19006
Counsel for Plaintff, Vertonix Ltd.


Steven Maniloff, Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street, 28th Floor
Philadelphia, PA  19109
Counsel for Garnishee, The Guardian Life Insurance Company of America


Marina Kats, Esquire
Attorney for Defendants

# EXHIBIT B4

03 MAY 2016 01:59 pm
**Civil Administration**
P. MARTIN

| | |
|---|---|
| VERTONIX LIMITED | COURT OF COMMON PLEAS |
| Plaintiff(s) | PHILADELPHIA COUNTY |
| v. | February Term 2011 |
| LYUBARSKY, et al. | Docket No. 3388 |
| Defendant(s) | |

## ORDER

AND NOW, this **6th** day of **July**, 20**16**, upon consideration of Plaintiff's Motion to Reassess Damages, it is hereby ORDERED and DECREED that:

1. The Prothonotary is to amend the judgment entered in this matter on February 24, 2011, for the Plaintiff and against Defendants, YURI LYUBARSKY and OLGA LYUBARSKY, to reflect that, as of May 3, 2016, the amount of the judgment is ~~$270,402.71~~ *$141,102.71*; and

2. Defendants are to pay interest at the legal rate of six (6) percent per annum, upon the amount of the judgment entered in this matter, from the date of this Order, and until it is paid in full.

BY THE COURT:

_____

Vertonix Limited Vs Lyu-ORDER

11020338800082

RECEIVED
JUL 07 2016
OFFICE OF JUDICIAL RECORDS

DOCKETED
JUL 07 2016
MICHAEL TIERNEY
JUDICIAL RECORDS

Case ID: 110203388
Control No.: 16122014

Case ID: 110203388
Control No.: 16050338

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b)   07/07/2016

# EXHIBIT C

## DECLARATION OF YURI LYUBARSKY

I, Yuri Lyubarsky, hereby solemnly affirm and declare as follows:

1. I am writing this declaration after spending many days looking at the 279 pages in new documents filed by Vertonix's lawyer Eric Rayz on January 3, 2019.

2. I am diagnosed with "severe panic disorder", a debilitating mental health condition that causes me to have panic attacks which are somewhat mitigated by medication, but sometimes I end up in a hospital.

3. I write this as a cry for help because I feel Rayz is playing shell games with time, facts and words, purposefully misquotes me in his filings, uses grossly outdated photos and intentionally withholds facts, in order to paint a false picture of me as a supposedly wealthy individual today.

4. While I understand that the issue of my assets is no longer relevant since I have already settled this issue with the Trustee (who sees all the same information Rayz does, and certainly has much better search tools at her disposal). Still, I want anyway to explain the many falsities that Rayz is stating, because I think it is important for the court to see the correct picture.

5. More important, I also want to describe the terrible effect that threats by Rayz and his violations of the "automatic stay" and illegal blackmail against me during the bankruptcy process have had on me and my wife.

6. Here's an example of how Rayz plays games with pictures trying to show that I am a rich man. He includes a bashful picture of me in his filing, with a cigar and an expensive watch, as proof of my current "wealth". It is an impressive picture, appearing to show someone who is clearly doing well. He pretends like it is a current or recent picture. Problem is – he purposefully edited information out of that picture that shows how awfully outdated it is to prove my "wealth":

As shown by Rays to the court:          Actual picture:

   

Please look in the left upper corner of the full picture, which Rayz intentionally cut off to make it appear that this is a current photo of me. The clock on the wall shows it was taken at a New Year's party at 11:57:33pm on December 31, **2004**. That's over 14 years ago! Yes, at that time I was indeed doing better than now. I didn't have my disability yet, and I had a profitable business. Still, even then, I purposefully posed for this picture with my daughter in a show-off, cartoonish manner. I was poking fun at myself.

7. As an even more blatant example of how Rayz plays shell games with words and tries to dupe the court, here is an excerpt from his filing where he accuses me of not telling the truth about the original guarantee for the loan agreement:

> *In his Affidavit, Yuri Lyubarsky asserts that the Debtors signed the Personal Guarantee, when "a representative [arrived] at [their] home in New Jersey with the documents" and that* ***"the representative visiting my home on that day was Eric Rayz, the lawyer for Vertonix."*** *ECF Doc. 47-1, pp. 1-2. This statement is false.*
> (Note: this is from footnote on page 2 at the bottom, I added ***bold and underline***)

This is a purposeful, outright lie by Rayz, who intentionally skipped over a part of a sentence I wrote and purposefully turned my entire statement 180 degrees. What I actually wrote was:

> ***I am not 100% certain, but I believe*** *the representative visiting my home on that day was Eric Rayz, the lawyer for Vertonix.*
> (Note: this is from paragraph 6 of my affidavit, I added ***bold and underline font***)

I wrote in my affidavit that was <u>doubly</u> unsure by saying "*I am not 100% certain, but I believe…*". However, Rayz only took the part I was unsure about, quoted it in his filing <u>as if I said it without any qualifiers</u>, and then accused me of lying.

If I didn't notice this, I am sure the judge, when reading Rayz' lie above, would not bother to check my original affidavit to see what I wrote – and reach the decision that I am a liar. This is because Rayz is a lawyer, and an "officer of the court", and he is not supposed to do things like this. He is misleading the court so I would be incorrectly branded a liar. When in fact, it is Rayz who is purposefully lying to the court.

This is the same gamesmanship that earned Rayz and Vertonix many of their past victories against me in Pennsylvania – except that back then I was not in the court, and my lawyers didn't have enough information or knowledge of prior facts and documents to show where Rayz was lying.

8.  To figure out the above lie by Rayz, I had to do the type of work I have no competence in doing – analyzing documents filed by Rayz, looking for little "Easter eggs" in them, comparing them to my lawyers' filings... I never knew how to do this, and do not know this today. I actually trusted lawyers, even lawyers for the other side, to "play fair", because I thought that since they were lawyers, they are supposed to be honest professionals, and it would be improper for them to cheat me. I wish I knew this was a false expectation when my wife and I were signing the "Personal Guarantee" in 2005, which was prepared by the other side's lawyers, or the $119,000 settlement agreement in 2006 which could be undone if I was late, and result in a $184,000 debt which could simply be recorded against me by "confession of judgment". I would have never agreed to any of this if I understood what was going on.

9.  Cutting words out of a sentence to turn it around, cropping the date out of a picture to pretend like it is recent – these are the usual things Rayz does, where in his mind anything goes to achieve the objective, his duty as an "officer of the court" forgotten.

10. I was never an owner of Reemstor Commers, Inc. ("Reemstor") nor its officer or member. Neither, of course, was my wife. Rayz knows that very well, I am sure he has access to other loan documents (which I do not have) that show the real owners of Reemstor on the registration papers. The language on the 2005 loan agreement produced by Rayz that says my wife and I were "members" of Reemstor is plainly false. It was put in the documents by whoever drafted them, not by me. I have lost my copy of this agreement long ago and was unable to get it from the New Jersey court when I tried, because they said all records from the case were no longer available.

11. This is also the reason I did not remember exactly how much Vertonix was suing me for in New Jersey and gave a figure of "approximately $185,000" which was my best recollection, but now I see it was actually $156,450 on the original paperwork. I remember a figure of $185,000 being discussed when settlement was being negotiated after the lawsuit was already ongoing, and I think my mistake stems from there. Again, Rayz states that $185,000 was "false" even though I wrote "approximately".

12. During the past decade I lost both my houses, one in New Jersey and one in Florida, and many other assets because I was unable to pay for them. Both houses lost were "upside down" heavily, and I was unable to pay their mortgages for years while the foreclosures were being completed. If I had any money to speak of at the time of these foreclosures, I would have tried to keep at least one of my homes.

13. The pictures of the house in Florida in Vertonix's pleadings and declarations were made after it was foreclosed. It is clear when you see all pictures without furniture.

14. It is true that I liked flashy items in the past, and I leased several expensive cars when I had more money. This was 10-15 years ago. The only "flashy" thing I have left now is my 6-year old Tesla that is worth little more than the loan on it.

15. I wear mock brand-name watches I bought in China many years ago for a few hundred dollars. This was included in my paperwork when I filed for bankruptcy. These watches look pretty real from ten feet away, but if I take the watch off my wrist and show it, people who know watches can see right away it is fake.

16. After my "341" meeting in July, the Trustee told me and my wife to go home right away, where an appraiser was already waiting by the door to examine my apartment. This was a surprise inspection, I had no idea something like this would (or could) happen, and neither did my lawyer. So hopefully it is clear I had no chance to prepare or hide anything. Everything I owned was in the apartment. If I had something to hide, the appraiser would find it. I went straight home from the "341" meeting and the appraiser was there waiting for me. He looked through every single item in my apartment with a fine-tooth comb. He asked me to open all closets, cabinets and drawers. He found nothing valuable, nothing at all. No cash, no jewelry, no expensive watches, none of the "wealth" which Rayz keeps imagining. He saw several cognac bottles which he appraised at $10 each. Some of them had iced tea in them instead of cognac, which I showed to him. He saw a few watches made in China, examined them and took a picture of them – I can show them to the judge when I am in court, if necessary. They are old and worthless knockoffs.

17. It is impossible to prove a negative. I cannot prove that I do not have great assets. I cannot prove that I do not have active money-making companies. I cannot prove I do not own expensive watches, cash or whatever else Rayz pretends I could have. If I had anything worth mentioning, it would have been in my apartment. In the end the appraiser, who was specifically sent by the Trustee to surprise me (presumably at Rayz' suggestion) came up with a similar figure for all my assets as what I put on my petition. The only thing he valued slightly higher than I did was the Tesla car. I am paying tens of thousands of dollars more money to the Trustee than all my assets were appraised for – so that at least some of my disability money would finally be paid to me.

18. I have lost control of all my business assets a long time ago. I am not a shareholder in any active or open businesses at this time and have not been for years. All companies in which I have ever been involved have gone "belly up" years ago. They have been closed or are defunct. Any money I had in any businesses I ever owned has long been spent or lost. If any companies are still not de-registered, this is a mistake that may be only because, due to my incompetence, I did not follow through with all the proper agencies to close them many years ago when they went defunct. If this was not so, Vertonix would have seized all these businesses I supposedly owned a long time ago. But the reality is – they don't exist, I don't have any businesses, plain and simple.

19. Today, fifteen years since then, I the only true thing about that picture that still applies to me today, is that I occasionally give myself a luxury to smoke an inexpensive cigar. It calms me down and makes it easier for me to deal with my panic disorder. I do it maybe once a week. The appraiser saw the cigar box in my apartment with several cigars in it and did not think the box or the cigars were worth anything.

20. The picture at the beach was taken a decade ago on a $1,000 per person Celebrity cruise. I wish I still looked so young…

21. Rayz makes it seem like all these pictures show my current wealth. It is a purposeful lie.

22. I have tried to defend myself in courts, but it was a futile effort against Rayz, who was far more knowledgeable about how to use the system to his advantage. I tried to hire lawyers several times to try to push back, each time paid a few thousand dollars "retainer", but then could not afford to continue paying them in the longer term. For example, in the spring of 2016 I think I paid my lawyers in Pennsylvania $5,000 to help me fight against Vertonix because Rayz was trying to cut off my disability income, but I could not afford to pay them any more after that. I don't think my lawyers ever spent the kind of time and effort that Rayz was willing to devote.

23. When I wrote that I could not afford "to hire a trial attorney to fight the Vertonix case head on" (I added the underlines), what I meant was that I could not afford to hire a lawyer who could fight the case to the end and prove that I owed Vertonix much less than Rayz claimed. The amortization schedule I included shows the correct amount, $34,000 and change. To this day I have no idea how Rayz calculated $156,000 in his New Jersey lawsuit. There has to be a lot of late fees and penalties to turn $34,000 into $156,000. Unable to fight on, I settled for $119,000 out of desperation, not because I truly owed anywhere near this amount. Little did I know that after I would pay $33,000 on the $119,000 settlement, Rayz would turn my debt into $184,000 yet again by "confession" – a term I still do not understand.

24. I did not know, nor did my lawyers ever say, that the Pennsylvania courts had no jurisdiction over my disability policies. This information was first suggested by a Pennsylvania bankruptcy trustee, Gary Seitz, who heard about my case, and thought it was so outrageous what was happening to me, that he agreed to help me "pro bono" (that is, without payment). He said that while the Pennsylvania courts had the right to determine how much I owed Vertonix (because that "jurisdiction" was written in the settlement contract), they should have never, ever, had the right to touch my disability policies because these policies were neither issued nor paid in Pennsylvania, because I never lived in Pennsylvania, and therefore collecting against them was simply not a Pennsylvania matter. Because I live in Florida, only there, under Florida law, was it permissible to try to "collect" against them.

25. I think Rayz, being so super competent, knew this when he got the Pennsylvania judgment "domesticated" in Florida, but he also knew that a Florida court would never let him touch my disability policies, and he went to the wrong court. He did this knowing that as weak of a fighter as I was, it would be even more difficult for me to fight in Pennsylvania, and I would never figure out that Pennsylvania was the wrong place to have the fight about the disability policies (nor would be able to get lawyers who would understand that). Over the years, I had little understanding about what was happening in the Pennsylvania courts and why, and my lawyers there could only push back so hard with the little money I could afford to pay them.

26. I was stunned to see, for the first time just last month, that Vertonix's "motion to reassess damages" in May of 2016 stated that **I owed only $34,251.44** in "principal balance and accrued interest as of April 30, 2013", and that this amount **already included $16,751.29 in legal fees**. This means that my original loan balance at the time was just $17,500.15! The remaining $259,651.42 of the $276,402.71 that Vertonix was trying to get was all legal fees, costs and "sanctions" which Rayz claimed I owed to Vertonix.

27. I am saddened that my lawyers in Pennsylvania only contested the sanctions – which Rayz tried to claim to be a whopping $135,300. I wish my lawyers also made the argument that it was not reasonable for Vertonix to get the additional $123,601.95 in legal fees to collect my $17,500.15 principal balance. Thank God the judge at least denied the sanctions! I am sure he would have done the same to legal fees if my lawyer asked for that.

28. Even with these legal fees, in 2016 all I was ordered to pay Vertonix was $142,102.71 plus 6% interest. In 2017 when I saw Rayz in Florida, he told me to forget any numbers I had in my head, because he could make my debt as large as he wanted. After everything I saw him achieve, I believed him. After that, I could only see all Rayz' demands above the $142,102.71 amount (plus 6% interest) as pure blackmail and extortion against me and my wife.

29. I am stunned that after the $135,300 was denied in Pennsylvania, Rayz is trying to pretend that the $100/day is still ongoing **after** it was already denied, and is trying to add $96,800 to my debt. I also know that to do this, Rayz hid the document showing the $135,300 he tried to claim in 2016 (and was denied) were the same sanctions.

30. This is the same pattern as he did with mis-quoting me, and with showing only the part of the picture that supposedly shows me as "wealthy" without showing the picture was taken 15 years ago.

31. Rayz' claim to fame is to purposefully withhold the most important part of something, pretend that the other part is the entire picture, and use that other part to bamboozle others into a flawed decision.

32. And now he is also trying to add $168,075 in legal fees – legal fees he supposedly spent in efforts to collect a debt in the false amount, i.e. above the $142,102.71 amount awarded to him in Pennsylvania, and far above the $17,500.15 in "principal and interest" that I owed as of 2016.

33. By May 2018, I had no more power to fight this anymore, nor money to pay anyone to do it for me. This is why I filed for bankruptcy, hoping to finally be done with all my debts and be left alone. My lawyer said that Rayz would not be able to keep attack me after the bankruptcy because of something called the "automatic stay", a law which prohibits creditors from making demands and harassing debtors after they file for bankruptcy.

34. Knowing this, during the first part of June 2018, I was finally able to get a good nights' sleep several times, for the first time in nearly a decade, without waking in the middle of almost every night in cold sweat, heart racing, certain beyond doubt that I am about to die.

35. **This short period of calm did not last. Three weeks after I filed for bankruptcy, Eric Rayz flew to Florida, met with my lawyer, and demanded that I pay him $250,000 immediately, and made blackmail threats against me if I did not comply.**

36. The day he did this, Thursday, June 21, 2018, left an indelible scar on me and my wife, and will be ingrained in my memory forever. This day drew a bright red line in my belief that the law can protect me, or that the law worked at all. I saw clearly that Rayz did not care about the law, and my panic attacks resumed with unprecedented intensity. I woke up in the middle of almost every night, certain beyond doubt that I was dying and nothing could help. I was running around the room looking for help, my wife was running together with me holding glass of water with pills trying to help… – but nothing helped.

37. I was dying every day… I would never wish this feeling to my worst enemy. And even after taking the maximum dosage of pills with the highest permitted frequency, this condition would disappear for an hour, but I knew with certainty that this relief was only temporary, and I was constantly waiting for the next strike every day, and it is a nightmare. No money in the world can cover this devastating damage this did to me. All this is thanks to the great talent of Eric Rayz, which combined with his disregard for the law and honesty wreaked havoc with my life.

38. While I was honest in my bankruptcy petition, I also knew how crafty Eric Rayz could be, and how he had gotten away with lies before, obtaining court decisions nobody (including my lawyers in Pennsylvania) consider borderline appropriate. Therefore, his threats caused me great pain and anxiety, which have continued for the past 8.5 months. I saw that my adversary did not care about the law. I saw he was getting away with anything he would try. When my lawyer wrote to Rayz that the threat was inappropriate, Rayz responded laughingly that he "did not care."

39. I was afraid my lawyer, the bankruptcy law and the "automatic stay" would give me no protection from Rayz. My lawyer had said before the "automatic stay" would stop Rayz from making demands – but Rayz did it anyway, and nothing happened to him.

40. I am so happy that the Trustee, after she did her research, saw that there was little to get from me, and we have finally agreed to settle so I can finally put all this behind me. All I have left financially were my disability policies, and I even agreed to part with some of that money, just to get everything resolved once and for all.

41. My agreement with the Trustee was signed in early February, and the past three weeks have been the first time in over a decade when I have not had regular panic attacks. I actually got several full nights' sleep without waking up several times in the middle of the night with fast heartbeat and shortness of breath.

42. I am certain that part of the $168,075 which Rayz is trying to get in legal fees includes the time he spent making the $250,000 demand during the "automatic stay" and for blackmailing me, and his time, at $400+ per hour, for flying to Florida in 2017 to tell me he didn't care about the amount the court wrote in the judgment, because he could get the judgment to be whatever he wanted.

43. I never made any offers to Vertonix in 2018, nor authorized my Pennsylvania attorney to do so.

44. I know that I must demonstrate "actual damages" in order to be awarded sanctions. My wife are not seeking a compensation for expenses. The damage done by Rayz' actions is 99.99% psychological, not monetary. However, to the extent expenses must be demonstrated, due to the exacerbation of my medical condition after Rayz tried to blackmail me into paying $250,000, my wife had to drive me to the hospital several times during the past 8 months. Being in the car often soothes my symptoms, and by the time we were getting to the hospital, the medication I took back home would start "kicking in" and relaxing me, and I would ask my wife to turn the car around and go home. I estimate that during the past 8 months this "ritual" took place at least 12-14 times, or about every two weeks. Each time I estimate the cost of gasoline expended to be $2. Before the blackmail threat, such trips only took place once every few months. Accordingly, I estimate that my wife and I sustained about $20 in actual damages due to the 10 or so extra trips we had to take to/from the hospital due Mr. Rayz' misconduct.

45. I also request "punitive" damages for the blackmail (and the "violation of the automatic stay") I experienced, in an amount calculated by the court while keeping in mind that Rayz tried to extort $250,000 from me while violating the automatic stay.

46. My life during bankruptcy became miserable since I received the threats and payment demands from Rayz. I was trying to get some calm when I filed for bankruptcy, but instead got the exact

opposite. I now understand Rayz broke the law when he demanded $250,000 from me, and maybe even committed a crime when he made his threats. I hope he is properly punished for doing this. I am not sure how this can be done, but I am told the judge can "sanction" even lawyers for violating bankruptcy rules such as "automatic stay". I know this is rare, but hopefully in this case proper justice can be done.

I hereby affirm and declare that the foregoing is true to the best of my knowledge and belief.

Yuri Lyubarsky
March 4, 2019