**UNITED STATES BANKRTUPCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| LYUBARSKY, et al. | Case No. 18-16659-LMI |
| Debtor(s) | |

**<u>RESPONSE IN OPPOSITION TO DEBTORS' MOTION FOR SANCTIONS</u>**

Date: <u>April 1, 2019</u>                    Respectfully submitted,
                                             **KALIKHMAN & RAYZ, LLC**


                                             /s/
                                             ─────────────────────────
                                             Arkady "Eric" Rayz
                                             Attorney(s) for Claimant(s)
                                             1051 County Line Road, Suite "A"
                                             Huntingdon Valley, PA 19006
                                             Telephone: (215) 364-5030
                                             Facsimile: (215) 364-5029
                                             E-mail: erayz@kalraylaw.com

# <u>TABLE OF CONTENTS</u>

A.    Factual Background ........................................................................................1

B.    Argument .........................................................................................................1

    1.    Allegedly Improper Demand for Payment............................................1

        i.    Debtors' Efforts to Negotiate with Vertonix in 2018 ................2

        ii.    Meeting with Debtors' Counsel in June of 2018 .......................4

    2.    Allegedly Improper Calculation of the Claim .......................................8

        i.    The monetary sanctions imposed against Debtors in Pennsylvania ...........8

        ii.    Reassessment of the judgment entered against Debtors in
Pennsylvania and Debtors' subsequent efforts to avoid
imposition of sanctions ...............................................................9

        iii.    Judge Carpenter imposed monetary sanctions against Debtors in
accordance with Judge Fox's earlier Order ...............................14

        iv.    Judge Carpenter had no legal authority to overrule an earlier
decision by Judge Fox regarding sanctions ...............................15

        v.    Vertonix Properly Calculated the Amount Owed by Debtors ..................17

    3.    Debtors' Request for Sanctions and Damages......................................17

C.    Conclusion .....................................................................................................20

# LIST OF EXHIBITS

Exhibit "1" ................................................................Declaration of Arkady "Eric" Rayz, Esquire

Exhibit "2" ...........................................................................................................Corporate Chart

Exhibit "3" ........Supplemental Brief in Support of Petition to Strike, filed on September 30, 2016

Exhibit "4" ..............Debtors' Brief before the Pennsylvania Superior Court, filed on July 5, 2017

Exhibit "5" ................................Rule 2004 Examination Transcript, taken on November 27, 2018

Exhibit "6" ...........................................................Consulting Agreement, dated October 10, 2013

# RESPONSE

Marcus Tullius Cicero – considered one of Rome's greatest orators – once quipped that "[w]e must make a personal attack when there is no argumentative basis for our speech."[1]  Sadly, the instant Motion for Sanctions ("Motion") appears to be just that – premised on blatant falsehoods and self-contradictory declarations, it is nothing more than a personal attack by Yuri and Olga Lyubarsky (collectively, "Debtors") against Vertonix Limited ("Claimant" or "Vertonix") and its counsel.  If anything, the Motion demonstrates Debtors' utter disregard for the underlying facts and the law.  Ultimately, as explained below, there is no factual or legal basis for Debtors to obtain the relief they are seeking.

### A.    Factual Background

In the interests of brevity and judicial economy, Vertonix will primarily rely on the "Factual Background" section of its earlier Response in Opposition to Debtors' Objection to Proof of Claim ("Response").  <u>See</u> ECF Doc. 54.  The only relevant event that took place since that filing was the Court's approval of a settlement that required Debtors to pay $120,000.00 to settle the Chapter 7 Trustee's claims against them.[2]

### B.    Argument

Debtors seek sanctions against Vertonix and its counsel on two separate bases that will be addressed in the order raised.

#### 1.    Allegedly Improper Demand for Payment

Debtors assert that Vertonix and its counsel violated the automatic stay by "attempt[ing] to

---

[1] <u>Pro Flacco (In Defense of Flaccus)</u>, 59 B.C.

[2] <u>See</u> ECF Doc. 79.  To the extent that Debtors assert that this settlement somehow absolves their misconduct in the underlying litigation and these bankruptcy proceedings, it certainly does not.

obtain a $250,000 direct payment from Debtors under threat of reporting their purported misdeeds to the US Attorney and the Chapter 7 trustee."[3]  In this regard, Debtors point to a meeting that took place in June of 2018 between their bankruptcy counsel – Leonid Nerdinsky, Esquire – and the undersigned counsel for Vertonix.  According to Debtors, at that meeting, counsel threatened to provide Chapter 7 Trustee with information regarding Debtors' hidden assets, unless they made a payment to Vertonix of $250,000.00.[4]  Further, citing affidavits from Yuri Lyubarsky and one of their Pennsylvania attorneys – Marina Kats, Esquire, Debtors assert that this demand for payment could not have been made in the course of any negotiations, because Debtors made no offers to settle with Vertonix in 2018.[5]

As will be demonstrated below, Debtors' claims are disingenuous and baseless.

i.    **Debtors' Efforts to Negotiate with Vertonix in 2018**

On February 6, 2018, the Pennsylvania Superior Court issued a unanimous Memorandum Opinion that affirmed decisions by the Hon. Linda Carpenter and Hon. Daniel Anders of the Court of Common Pleas of Philadelphia County: (a) to deny Debtors' attempt to strike the judgment confessed by Vertonix against them in 2011; and (b) to deny an exemption of Debtors' disability and life insurance policies held by Guardian Life Insurance Company of America ("Guardian").  See Vertonix, Ltd. v. Lyubarsky, et al., 2018 WL 717571 (Pa. Super. 2018).  By Order of April 11, 2018, the Pennsylvania Superior Court unanimously denied re-argument of Debtors' appeal.[6]

In their Motion, Yuri Lyubarsky specifically declares – "I never made any offers to

---

[3] ECF Doc. 81, p. 2.

[4] See id., p. 14.

[5] See id., pp. 42-44, 98-106.

[6] See ECF Doc. 54-1, pp. 216-217.

Vertonix in 2018, nor authorized my Pennsylvania attorney to do so."[7]  Debtors' Pennsylvania counsel, Ms. Kats, on the other hand, asserts that she "made no phone calls to [the undersigned counsel] in April-May 2018" and she is "also not aware of any other attorney at [her] office speaking to [the undersigned counsel] between April 2018 and today."[8]  In this regard, Ms. Kats also claims that "[i]t is virtually impossible that any of them could have done it without speaking to me first."[9]  These affirmations are false.

Even before the Superior Court denied Debtors' re-argument, their Pennsylvania counsel at Kats, Jamison & Associates sought to negotiate a settlement.[10]  For instance, on April 5, 2018, Linda Alle-Murphy, Esquire, left a voice mail with the undersigned counsel regarding the parties' dispute.[11]  During a subsequent call with the undersigned counsel, Ms. Alle-Murphy communicated Debtors' offer to settle with Vertonix for $80,000.00.  She did not express that this offer was contingent on being accepted by a certain date.[12]

---

[7] ECF Doc. 81, p. 105, ¶43.

[8] Id., pp. 43-44, ¶¶15-16.

[9] Id., p. 44, ¶16.

[10] A Declaration of Arkady "Eric" Rayz, Esquire is marked and attached hereto as Exhibit "1."

[11] The undersigned counsel is in possession of an automated email containing an audio recording of the voicemail from Ms. Murphy that documents the time and date of the call.  See Exhibit "1," ¶¶54-56.  This voicemail was peculiar for several reasons.  First, previously, at least four different attorneys from Kats, Jamison & Associates have been involved in representing Debtors in Pennsylvania – Ms. Kats, Liberato P. Verderame, Esquire, Matthew Konchel, Esquire, and Richard S. Seidel, Esquire.  This was the first time, however, that Ms. Alle-Murphy contacted the undersigned counsel about the matter.  Second, the voice mail was particularly remarkable, because, other than to discuss settlement, there was no reason for Debtors' Pennsylvania counsel to contact the undersigned.  At that time, all issues have already been fully briefed and the parties were only awaiting the Superior Court's ruling on Debtors' application for re-argument.  See id., ¶¶57-60.

[12] Id., ¶¶61-64.

Later, on April 27, 2018, the undersigned counsel received a voicemail from counsel for Guardian, Steven Maniloff, Esquire, who related that Debtors' counsel – Ms. Kats – asked him to communicate a settlement offer to Vertonix on Debtors' behalf.[13]    During a subsequent conversation, Mr. Maniloff communicated a monetary offer from Debtors to Vertonix.[14]    During at least one other subsequent call, Ms. Alle-Murphy discussed Debtors' earlier settlement offer and mentioned, for the first time, that Debtors were considering bankruptcy[15]    Thus, at the outset, Debtors' Motion is premised on falsehood.[16]

### ii.    Meeting with Debtors' Counsel in June of 2018

Shortly after Debtors filed for Chapter 7 bankruptcy protection through the office of Leonid Nerdinsky, Esquire, the undersigned counsel reviewed their filings and immediately noted that they were materially false.[17]    For instance, Debtors failed to disclose their corporate interests.[18]

---

[13] The undersigned counsel is in possession of an automated email containing an audio recording of the voicemail from counsel for Guardian that documents the time and date of the call.  See Exhibit "1," ¶¶67-70.  Thus, considering Yuri Lyubarsky's proclamation that Debtors made no offers to resolve the judgment in 2018, see ECF Doc. 81, p. 105, ¶43, to the extent that Ms. Kats asked Guardian's counsel to communicate a monetary offer to the undersigned counsel in April of 2018, either: (1) she acted without her client's consent, which would be a violation of the applicable Pennsylvania Rules of Professional Conduct; or (2) Yuri Lyubarsky's declaration is materially false.

[14] See Exhibit "1," ¶¶71-72.

[15] Id., ¶¶73-75.

[16] The undersigned counsel has never asserted that he spoke directly with Ms. Kats regarding settlement in 2018.  See, e.g., ECF Doc. 54, p. 20, ¶103 (stating that "Debtors' Pennsylvania counsel communicated the Debtors' offer. . ."); ECF Doc. 54-1, p. 30, ¶132 (explaining that "Debtors' Pennsylvania counsel called my office to again communicate the Debtors' offer of $80,000.00. . . .").  Therefore, to the extent Ms. Kats implies otherwise, see ECF Doc. 81, p. 43, ¶15, her claim is overtly disingenuous.

[17] See ECF Doc. 54-1, p. 30, ¶133-134.

[18] See id., ¶134.

Because the undersigned counsel was already scheduled to be in South Florida in June of 2018, the undersigned counsel reached out to Mr. Nerdinsky and asked to meet with him.[19]   The undersigned counsel then met with Mr. Nerdinsky in his office, at approximately 4:00 p.m., on June 21, 2018.[20]

At that time, the undersigned counsel expressly communicated to Mr. Nerdinsky Vertonix's position that Debtors' bankruptcy filing contained material omissions concerning their assets.   Specifically, Debtors' filing appeared to have intentionally failed to disclose over two dozen various domestic and foreign corporate entities affiliated and/or controlled by Debtors in New York, New Jersey, Florida, and abroad.[21]   In this regard, the undersigned counsel shared a chart documenting these corporate entities with Mr. Nerdinsky.[22]   Moreover, the undersigned counsel explained that, contrary to the bankruptcy submission, Yuri Lyubarsky was currently employed by Luxury Gift, Inc., as was evident by multiple online reviews.[23]   This information was disclosed in good faith, to allow Mr. Nerdinsky an opportunity to amend Debtors' filings.   At no point in time was there any suggestion made that this information would be withheld in exchange for anything that Debtors would do.   Indeed, the information shown to Debtors' counsel was

---

[19] See id., p. 30, ¶135.  To the extent that Debtors' submissions imply that the undersigned counsel deliberately travelled to Florida to meet with their counsel, see ECF Doc. 81, p. 104, ¶35, it is blatantly false.  Indeed, the undersigned was in Florida on an unrelated matter.  See Exhibit "1," ¶11.  For this reason, the undersigned counsel has never claimed to have specifically travelled to Florida to meet with Debtors' counsel and has never sought fees for the trip to Florida in June of 2018.  See, e.g., ECF Doc. 54-1, p. 39, ¶170.

[20] See id., p. 30, ¶136.

[21] See id., ¶¶137-138.

[22] Exhibit "1," ¶81.  A true and correct copy of this chart (redacted for purpose of privacy) is marked and attached hereto as Exhibit "2."

[23] See Exhibit "1," ¶82.

compiled from publicly-accessible websites, such as https://dos.myflorida.com/sunbiz/search/, and was available to and/or would have been easily discovered by the Chapter 7 Trustee even without Vertonix's involvement. Moreover, Mr. Nerdinsky was explicitly told that Vertonix had no interest in retaining local counsel in the bankruptcy matter and that, other than by filing a proof of claim, would not be pursuing any further claims against Debtors.[24]

Separately, the undersigned counsel also communicated to Mr. Nerdinsky that the previously-articulated offer by Debtors' Pennsylvania counsel was unacceptable, but that Vertonix would resolve its claims for $250,000.00.[25] There was nothing inappropriate about this demand. First, it was responsive to the earlier offers Debtors' Pennsylvania counsel communicated (whose existence Debtors' Motion now conveniently and falsely denies).[26] Second, it was consistent with an earlier demand of $200,000.00 that was made during a personal meeting between the undersigned counsel and Yuri Lyubarsky in 2017.[27] As explained to Mr. Nerdinsky, the increase in the amount reflected additional interest, sanctions, and attorneys' time incurred in responding to Debtors' filings in Pennsylvania appellate and trial courts in the intervening period.[28]

Mr. Nerdinsky appeared to be visibly surprised by the offers that Debtors communicated through their Pennsylvania counsel, as well as Vertonix's knowledge of Debtors' corporate

---

[24] Id., ¶86.

[25] See Exhibit "1," ¶87; ECF Doc. 54-1, p. 31, ¶139.

[26] See Exhibit "1," ¶¶54-74, 87-89; ECF Doc. 54, p. 17, ¶110; ECF Doc. 54-1, p. 31, ¶139; ECF Doc. 81, pp. 43-44, ¶¶15-16; id., p. 105, ¶43.

[27] See ECF Doc. 54-1, p. 27, ¶103.

[28] See Exhibit "1," ¶¶88-89.

affiliations and attempts to hide personal assets.[29]  After learning this information, Mr. Nerdinsky asked for an opportunity to confer with Debtors.[30]  Mr. Nerdinsky then suggested that Vertonix wait until the following Monday, June 25, 2018 for Debtors' response.[31]  The undersigned counsel agreed on that date.[32]

Ultimately, there was nothing inappropriate about the meeting and communications with Debtors' counsel.  Indeed, Vertonix and undersigned counsel had no intention to violate the automatic stay.  To the contrary, the reason for communicating with Debtors' bankruptcy counsel (as opposed to their Pennsylvania attorneys) was to avoid any appearance that Vertonix was attempting to circumvent the bankruptcy proceedings.  For this reason, upon receipt of an accusatory email from Mr. Nerdinsky on June 26, 2018, which suggested that Vertonix offered not disclose information shown to Mr. Nerdinsky to the Chapter 7 Trustee in exchange for Debtors' payment, the undersigned counsel immediately responded by rejecting this false re-casting of what took place at the meeting.[33]  The whole notion of such a contingency was ridiculous – Vertonix could not hide the information shown to Mr. Nerdinsky, as it was already available to the general

---

[29] See Exhibit "1," ¶90; ECF Doc. 54-1, p. 31, ¶140.

[30] See id., ¶141; see also Exhibit "1," ¶91.

[31] See id., ¶92.

[32] See id., ¶93.  Notably, Mr. Nerdinsky now conceals the fact that the deadline at issue was his own suggestion.  See ECF Doc. 81, pp. 26-29.

[33] See ECF Doc. 81, pp. 38-39; see also Exhibit "1," ¶¶96-104.  In this regard, Mr. Nerdinsky's email was consistent with Debtors' overall *modus operandi*.  Previously, Debtors and their counsel engaged in similar shenanigans – falsely accusing Vertonix's principal of physical violence in Florida state court filings, see ECF Doc. 54-1, p. 21, ¶51, declaring, *inter alia*, that the undersigned counsel was a member of the "Russian mob" during Pennsylvania state proceedings, see Exhibit "1," ¶¶102-103.

public.[34]

## 2.    Allegedly Improper Calculation of the Claim

Debtors also argue for imposition of sanctions based on allegedly improper calculation of the claim submitted by Vertonix.  Specifically, Debtors assert that:

> [The undersigned counsel], acting both as an attorney and an agent for Vertonix . . . committed fraud on this Court by producing a bogus calculation containing $96,800 in sanctions which [the undersigned counsel] knew had already been denied by the Pennsylvania court. While including the $96,800, [the undersigned counsel] purposely withheld a document, his own motion dated May 3, 2016, containing proof that his prior attempt to obtain such sanctions, in the amount of $135,300 was denied by the Pennsylvania court on July 7, 2016.[35]

Debtors' claims are legally and factually without merit.

### i.    The monetary sanctions imposed against Debtors in Pennsylvania

After confessing judgment against Debtors in 2011 in the Court of Common Pleas of Philadelphia County, Vertonix proceeded with post-judgment discovery in Pennsylvania.  When Debtors failed to respond, Vertonix filed a Motion to Compel, which was granted by the Hon. Idee C. Fox on December 19, 2011.  When Debtors did not comply with that Order, Vertonix filed a Motion for Sanctions, which was granted by Judge Fox following a hearing on April 12, 2012. When Debtors still did not comply, Vertonix filed a second Motion for Sanctions, which was granted by Judge Fox following another hearing on July 20, 2012.[36]

These Orders imposed progressively-severe sanctions to compel Debtors' compliance with

---

[34] For this reason, any suggestion that Vertonix and/or its counsel violated 18 U.S.C. § 873 is nonsensical – it is beyond cavil that one cannot be threatened with exposure of information, if that information is already available to the public at large.

[35] ECF Doc. 81, p. 20.

[36] See ECF Doc. 54, pp. 10-12, ¶¶31-49.

their obligations to respond to Vertonix's post-judgment discovery. Thus, the Order from July 20, 2012 imposed monetary sanctions against Debtors, "commencing August 19, 2012 . . . [of] $100.00 per day until they comply fully with th[e] Court's [earlier] Orders."[37]  To date, Debtors have never complied with the Orders of December 15, 2011, April 12, 2012, or July 20, 2012. They also have never sought an appeal or reconsideration of the Order of July 20, 2012. Accordingly, the sanctions at issue remain in effect.[38]

> ii.    **Reassessment of the judgment entered against Debtors in Pennsylvania and Debtors' subsequent efforts to avoid imposition of sanctions**

On October 30, 2015, Vertonix issued a Writ of Execution to Guardian and served this Writ, together with a set of Interrogatories in Attachment.  On November 18, 2015, Guardian responded and disclosed that: (a) Yuri Lyubarsky was receiving monthly payments of more than $7,800.00, under two individual disability policies; and (b) Yuri Lyubarsky owned two life insurance policies.   Vertonix then filed a Motion to Compel discovery, seeking additional documents from Guardian regarding these policies.[39]

On April 6, 2016, Liberato P. Verderame, Esquire from the Law Offices of Kats, Jamison & Associates appeared during a hearing before the Hon. Linda Carpenter of the Court of Common Pleas of Philadelphia County, regarding Plaintiff's Motion to Compel and asserted that his firm was retained to represent Debtors.[40]   After the hearing, the undersigned counsel emailed Mr.

---

[37] ECF Doc. 54-1, p. 141; see also id., pp. 137, 139.

[38] See Exhibit "1," ¶14.

[39] See ECF Doc. 54, p. 13, ¶¶50-54.

[40] See ECF Doc. 54-1, p. 23, ¶72.  Ms. Kats admits that she began representing Debtors "[s]tarting in **early** 2016." ECF Doc. 81, p. 42, ¶4 (emphasis supplied).  Indeed, several weeks prior to the hearing, Ms. Kats called the undersigned counsel to negotiate a settlement on Debtors' behalf.  See

Verderame on April 6, 2016 and, again, on April 13, 2016, regarding this matter.  Mr. Verderame did not respond.[41]

Approximately one month later, on May 3, 2016, Vertonix filed a Motion to Compel Debtors' depositions and a Motion to Reassess Damages.  The Motion to Reassess Damages acknowledged and explicitly credited $175,000.00 that Vertonix received from the sale of Debtors' New Jersey home:

> 26.    As a result of the efforts of Plaintiff's counsel, however, in April of 2013, Plaintiff recovered $175,000.00 from the proceeds of the sale of Defendants' New Jersey property.
>
> 27.    This sum, however, was not sufficient to satisfy the entire outstanding balance of the judgment and, in accepting this partial payment, Plaintiff explicitly reserved the right to continue its collection efforts until the full amount was paid.

ECF Doc. 81, p. 54 (emphasis supplied); see also id., p. 62.[42]  This Motion also sought imposition of sanctions against Debtors, in accordance with Judge Fox's Order of July 20, 2012.[43]

Through counsel from the Law Offices of Kats, Jamison & Associates, Debtors then filed a Claim for Exemption of the Guardian policies, asserting that they were exempt from execution under 42 Pa.C.S. § 8124.  About two weeks later, on May 25, 2016, Defendants filed a Motion to

---

Exhibit "1," ¶20.  Thus, as of July 1, 2016, Ms. Kats and her law firm have been representing Debtors for a period of three months.  See ECF Doc. 54-1, pp. 143-145.  Under any reasonable interpretation, therefore, Ms. Kats' declaration that, as of July 1, 2016, her firm was "**recently retained**" by Debtors is deceptive (to say the least).  ECF Doc. 81, p. 43, ¶11 (emphasis supplied).

[41] See Exhibit "1," ¶¶26-27.

[42] Hence, any argument by Debtors and their counsel that Vertonix somehow sought to conceal receipt of $175,000.00 is intentionally false and slanderous.

[43] See ECF Doc. 81, pp. 23, 31.

Sustain a Claim for Exemption, making an identical argument.[44]

The parties then appeared for oral argument before Judge Carpenter on June 1, 2016, where Debtors were represented by Matthew Konchel, Esquire from the Law Offices of Kats, Jamison & Associates.  After the hearing, Judge Carpenter issued several Orders, *inter alia*: (a) finding the Claim for Exemption to be moot in light of Debtors' Motion to Sustain a Claim for Exemption; (b) allowing parties additional "30 days to file [a] response and/or any additional documentation to support their respective argument" with regard to the exemption sought by Debtors and Vertonix's request to reassess damages; and (c) granting Vertonix's Motion to Compel Debtors' depositions, after Debtors' counsel did not object to its entry.[45]

Debtors did not supplement their Motion to Sustain a Claim for Exemption and did not provide any "additional documentation" to support their argument.  However, on June 23, 2016, through counsel, they filed a Petition to Strike the judgment.  On July 1, 2016, Debtors, also through counsel, filed their opposition to Vertonix's Motion to Reassess Damages.  On July 6, 2016, Judge Carpenter denied Debtors' attempt to exempt Guardian policies from execution and re-assessed damages against them at $141,102.71, as of May 3, 2016.  No appeal or reconsideration was ever filed from the reassessment ruling.[46]

On September 21, 2017, the parties appeared before Judge Carpenter for oral argument regarding Debtors' Petition to Strike.  At the hearing, Debtors were represented by Richard S.

---

[44] See ECF Doc. 54, pp. 13-14, ¶¶56-57; see also ECF Doc. 54-1, p. 24, ¶¶76-78; id., pp. 143-145, 147-154.

[45] ECF Doc. 54-1, pp. 156-159.  Judge Carpenter orders allowing additional time for parties to brief the issues set forth in their submissions, see id., pp. 156-157, further undermine any credibility in Debtors' insistence that they had no time to prepare an adequate response to the arguments and evidence submitted by Vertonix.  See ECF Doc. 47-1, ¶¶24, 26.

[46] See ECF Doc. 54-1, pp. 24-25, ¶¶80-87; see also ECF Doc. 54-1, pp. 161, 163.

Seidel, Esquire from the Law Offices of Kats, Jamison & Associates. Mr. Seidel vociferously argued before Judge Carpenter that the judgment should be stricken in its entirety, because its entry lead to the improper imposition of discovery sanctions against Debtors that were incorporated by Judge Carpenter in the amount of the reassessed judgment.[47] After Judge Carpenter allowed the parties to further supplement their filings, on September 30, 2016 (i.e., more than two months after Judge Carpenter re-assessed the amount of the judgment), Ms. Kats and Ms. Seidel submitted a memorandum, where Debtors, *inter alia*, sought the following relief:

> **WHEREFORE**, Defendants respectfully request this Honorable Court to grant their Petition and Strike the Confessed Judgment of February 24, 2011. Further, they request that this Honorable Court Order that all related sanctions and Orders during execution proceedings be rendered Moot; Order any attachments and garnishments related to the stricken judgment be lifted and stricken; direct Counsel for Plaintiffs to notify any and all entities within twenty (20) days of

A true and correct copy of this document (without exhibits) is marked and attached hereto as Exhibit "3."

On November 8, 2016, Judge Carpenter denied Debtors' Petition to Strike the judgment, explaining her rationale as follows:

> [Debtors] ha[ve] failed to prove that there was a fatal defect. All documents indicate that [Debtors] signed a confession of judgment in which they agreed to waive all arguments with regard to due process, service and their constitutional rights. Further, at the hearing of this matter, **[Debtors] made clear that their real argument was about the amount of the judgment**. However, **[Debtors] have failed to file any appeal of the prior court orders, or other documents with the Court to contest the sanctions imposed, which appear to represent the bulk of the judgment**

---

[47] See Exhibit "1," ¶42.

**that remains unpaid**.[48]

On December 1, 2016, Debtors filed a Notice of Appeal from that Order to the Pennsylvania Superior Court, an intermediate appellate court in Pennsylvania with direct jurisdiction over the matter.[49]  Seven months after re-assessing the judgment, in a formal opinion authored in February of 2017, Judge Carpenter further explained what happened at oral argument in September of 2017 with respect to Debtors' Petition to Strike:

> In the instant matter, Lyubarsky has failed to prove that there was a fatal defect in the record and, as such, this Court properly denied the request to strike the judgment.  **At the hearing in this matter, Lyubarsky made clear that actual service was not in issue and that the real challenge was to the amount of the judgment, in light of payments made and the monetary sanctions that have accrued**; however, such arguments do not address any facial defect in the record.  While **Lyubarsky attempted to argue that a defect existed in the documents thereby causing the aforementioned accrual of sanctions**, such argument remained unsupported by the record and was disingenuously made in light of the Affidavit of Service of the Judgment by Confession entered upon the record in 2011.[50]

Judge Carpenter further noted that, while Debtors were attempting to challenge the amount of the judgment, they "failed to file any appeal of the prior court Orders and ha[ve] failed to submit any other motions with the court **to contest the sanctions imposed, which appear to represent the bulk of the unpaid portion of the judgment**."[51]

The Superior Court then issued a briefing schedule that required Debtors to file a formal

---

[48] ECF Doc. 54-1, p. 169, n. 1. (emphasis supplied).

[49] See ECF Doc. 54-1, p. 15, ¶56.

[50] ECF Doc. 54-1, pp. 179-180 (emphasis supplied).

[51] Id., p. 180, n.1.  (Emphasis supplied).

memorandum.[52]  On July 5, 2017, Ms. Kats and Mr. Seidel submitted such a memorandum on Debtors' behalf, where they described Judge Fox's decision to imposing sanctions and Judge Carpenter's reassessment of the judgment as follows:

regarding the Guardian disability and life insurance policies. Since July 20, 2012, the Lyubarskys have been incurring sanctions at the rate of $100.00 per day for their non-compliance with the two trial court discovery Orders from 2011 and 2012. Although the Lyubarskys satisfied part of the judgment amount by $175,000.00 in proceeds from a lien pursuant to the judgment and sale of their home in New Jersey, damages were reassessed by the Trial Court in the amount of $141,102.71 on July 6, 2016, representing the sanctions and interest.  On July 7, 2016, the Court denied the claim for exemption for all four of the Lyubarsky's

A true and correct copy of this document (without exhibits) is marked and attached hereto as Exhibit "4."  (Emphasis supplied).

> ### iii.  Judge Carpenter imposed monetary sanctions against Debtors in accordance with Judge Fox's earlier Order

The above-cited evidence unequivocally demonstrates that, contrary to Debtors' Motion, Judge Carpenter imposed sanctions against them in reassessing the judgment.  First, in her ruling four months after the judgment was reassessed, Judge Carpenter explicitly notes that "the sanctions imposed . . . appear to represent the bulk of the judgment that remains unpaid."[53]  Seven months

---

[52] See Exhibit "1," ¶48.

[53] ECF Doc. 54-1, p. 169, n. 1.

after the judgment was reassessed, in February of 2017, Judge Carpenter again noted that Debtors have never "contest[ed] the sanctions imposed, which appear to represent the bulk of the unpaid portion of the judgment."[54]  Thus, Debtors' argument that they convinced Judge Carpenter not impose sanctions against them is bellied by Judge Carpenter's decisions and writings.

Second, Debtors' current Motion cannot be reconciled with the arguments made by their own Pennsylvania counsel.  Indeed, according to Debtors' Motion, Judge Carpenter overruled Judge Fox's prior imposition of sanctions against Debtors when the judgment was reassessed in July of 2016 (as claimed, for example, by Ms. Kats, see ECF Doc. 81, p. 43).  Yet, several months after that decision, Debtors' Pennsylvania counsel – Ms. Kats and Mr. Seidel – still complained that the reassessed judgment improperly included discovery sanctions ordered by Judge Fox, as documented in Judge Carpenter's rulings and in Debtors' own filings.[55]  Moreover, a year after Judge Carpenter's decision, before the Superior Court, Ms. Kats and her co-counsel acknowledged that the reassessed amount of the judgment – $141,102.71 – "represent[ed] the sanctions and interest."[56]  Thus, Debtors' current Motion is, quite clearly, nothing more than a desperate "about-face" that finds no support in the record.[57]

### iv.   Judge Carpenter had no legal authority to overrule an earlier decision by Judge Fox regarding sanctions

More importantly, however, Judge Carpenter could not ignore or overrule an earlier

---

[54] Id., p. 180, n.1.

[55] See ECF Doc. 54-1, pp. 169, 179-180; Exhibit "3."

[56] Exhibit "4," p. 12.

[57] Alternatively, with the Court's permission, Vertonix would ask that the parties be granted leave to seek clarification of Judge Carpenter's decision – by petition or motion – regarding reassessment of damages with the Court of Common Pleas of Philadelphia County in July of 2016.

decision by Judge Fox on the issue of sanctions.  Indeed, it has long been a fundamental concept of Pennsylvania jurisprudence that judges of the same court, sitting in the same case, cannot overrule each other's decisions.  See Okkerse v. Howe, 556 A.2d 827, 831 (Pa. 1989).  This is known as the "coordinate jurisdiction rule."  See Commonwealth v. Starr, 664 A.2d 1326, 1331 (Pa. 1995)(explaining that "a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter. . . ."); see also Commonwealth v. Brown, 402 A.2d 1007, 1008 (Pa. 1979)(holding that, where the evidence is substantially the same as that originally ruled upon by the first judge, a second judge commits a *per se* abuse of discretion in overruling or vacating the prior order); Musumeci v. Penn's Landing Corporation, 640 A.2d 416, 419 (Pa. Super. 1994)(finding that the "coordinate jurisdiction rule" applies in all cases except where newly-discovered evidence or newly-developed legal authority compel a result different than that reached by the first judge).[58]  Thus, "[o]nce a matter has been decided by a trial judge the decision should remain undisturbed, unless the order is appealable and an appeal therefrom is successfully prosecuted."  Golden v. Dion & Rosenau, et al., 600 A.2d 568, 570 (Pa. Super. 1991).  To put it another way, Judge Carpenter had no legal authority to deny or terminate sanctions imposed earlier by Judge Fox, given that Debtors' never responded to post-judgment discovery.[59]

---

[58] The fact that an order was entered without an opinion does not make a difference for purposes of the "coordinate jurisdiction rule."  See Goldey v. Trustees of the University of Pennsylvania, 675 A.2d 264, 266 (Pa. 1996)(explaining that "[t]he presence or absence of an opinion in support of the initial ruling is not controlling. . . .").

[59] See Exhibit "1," ¶12.  In this regard, the self-serving Declaration by Ms. Kats is telling.  Indeed, as a member of the Pennsylvania bar for over thirty years, she should be keenly aware of the "coordinate jurisdiction" doctrine and its application.  For instance, Judge Anders has denied Debtors' attempt to seek reversal of another decision by Judge Carpenter in this case on this very basis.  See ECF Doc. 54-1, pp. 194-199.  As Debtors' legal counsel "starting in early 2016," see ECF Doc. 81, p. 42, ¶4, Ms. Kats should be certainly aware of Judge Anders's Order.

v.    **Vertonix Properly Calculated the Amount Owed by Debtors**

Ultimately, Judge Carpenter's Order and subsequent decision cannot be reconciled with Debtors' current argument that her earlier reassessment of the judgment did not include sanctions ordered by Judge Fox.  In her later rulings, Judge Carpenter clearly states that Debtors' were, in fact, sanctioned by her.[60]  Moreover, Debtors themselves have acknowledged being sanctioned by Judge Carpenter in their written submissions before Pennsylvania courts.[61]  In all, therefore, it is abundantly clear that: (1) Judge Carpenter sanctioned Debtors, in accordance with Judge Fox's earlier order; and (2) the reassessed amount of the judgment accounts for these sanctions.  Thus, Vertonix properly incorporated the daily sanctions imposed by Judge Fox in the calculation of its Proof of Claim, because Debtors never complied with Judge Fox's orders.  Accordingly, to the extent that Debtors claim that Vertonix or the undersigned counsel should be sanctioned for submitting a Proof of Claim that included the daily monetary sanctions imposed by Judge Fox, their argument is devoid of legal or factual merit.[62]

3.    **Debtors' Request for Sanctions and Damages**

Aside from the fact that Debtors' Motion is factually and legally without basis, their request for sanctions is entirely off base.  Indeed, in filing their Motion, Debtors attempt to deflect the Court's attention from their misdeed by manufacturing nonsensical claims of misconduct.  In

---

[60] See ECF Doc. 54-1, pp. 169, 179-180.

[61] See Exhibit "4," p. 12 (explaining that the reassessed amount of the judgment – $141,102.71 – "represent[ed] the sanctions and interest . . . .").

[62] Debtors' Motion also appears to question why Vertonix's Proof of Claim calculates the sanctions as of May 3, 2016, as opposed to July 7, 2016 (when Judge Carpenter's order regarding reassessment was filed).  See ECF Doc. 81, pp. 7-8.  Judge Carpenter's ruling reassesses the judgment "as of May 3, 2016," ECF Doc. 54-1, p. 161, when the Motion for Reassess Damages was filed.  See ECF Doc. 81, p. 48.  Therefore, the subsequent interest and sanctions began accruing from May 3, 2016 (not from July 7, 2016).

17

ruling on Debtors' Motion, however, the Court should consider, *inter alia*, the following:

- For all of the accusations that Debtors heave at Vertonix and its counsel, they notably do not dispute attempting to hire Vertonix's counsel – the same attorney, who Debtors' repeatedly accuse of "lying" to Pennsylvania judges and this Court[63] – to represent them in a malpractice action against Debtors' own Pennsylvania counsel;[64]

- While receiving (1) thousands of dollars in monthly insurance payments on account of Yuri Lyubarsky's alleged inability to maintain employment;[65] and (2) several hundred thousand dollars in cash disbursements from their "friends," Debtors have failed to file personal income tax returns since 2010;[66]

- While Debtors assert in their bankruptcy filings that they are "unemployed," see ECF Doc. 11, during the Rule 2004 examination, Yuri Lyubarsky admitted to having been gainfully employed since 2013 as a bookkeeper and salesman for Luxury Gift, Inc.;[67]

---

[63] See, e.g., ECF Doc. 47-1, p. 6, ¶26 (asserting that "Rayz was lying to the court. . . ."); ECF Doc. 47-1, p. 10 ¶40 (claiming that the undersigned counsel "has presented knowingly false information at multiple stages of the past case and is now doing it again in Florida. . . ."); ECF Doc. 81, p. 99, ¶7 (claiming that "Rayz . . . is purposefully lying to the court. . . .").

[64] See ECF Doc. 54-1, p. 27, ¶¶105-106.

[65] See ECF Doc. 54, p. 13, ¶¶51-52; Exhibit "1," ¶15.

[66] A true and correct copy of Debtors' Rule 2004 Examination is marked and attached hereto as Exhibit "5." See Exhibit "5," pp. 9-10, 19-20, 41-45, 54.

[67] See Exhibit "5," pp. 24, 28. Prior to the Rule 2004 Examination, Debtors turned over a copy of a so-called "Consulting Agreement," dated October 10, 2013, between Yuri Lyubarsky and Luxury Gift, Inc. A true and correct copy of this document is marked and attached hereto as Exhibit "6." Pursuant to this document, Yuri Lyubarsky began working at Luxury Gift, Inc. in 2013. Id., p. 1.

- Yuri Lyubarsky has admitted to having been gainfully employed since 2013 as a bookkeeper and salesman, while collecting insurance disability benefits on the basis of his inability to maintain employment;[68]

- Although Debtors repeatedly claim that Yuri Lyubarsky suffers from a psychological disability,[69] they have failed to present even a scintilla of medical evidence confirming such a diagnosis or Yuri Lyubarsky's treatment for such a condition (not to mention its supposed exaggeration after Debtors' bankruptcy counsel met with the undersigned counsel in June of 2018);[70] and

- Although Debtors repeatedly claim that Yuri Lyubarsky suffers from a psychological disability that has prevented him from being gainfully employed over the past decade,[71] during the same period of time, Yuri Lyubarsky has been involved in more than a dozen different business ventures (that he either does not recall or claims were unsuccessful without any substantiation) with various

---

However, during a deposition taken on May 6, 2015, Yuri Lyubarsky denied working anywhere. See Exhibit "1," ¶15.

[68] See Exhibit "5," pp. 24, 28; see also ECF Doc. 54, p. 13, ¶¶51-52.

[69] See, e.g., ECF Doc. 81, p. 18.

[70] See generally ECF Doc. 81. In this regard, Debtors' attempt to analogize this matter to In re: Mocella, 522 B.R. 706 (Bankr. N.D. Ohio 2016), where a national mortgage servicer violated the automatic stay by filing a claim (as part of a bulk electronic submission) to which it had no rights and by failing to immediately return payments it had received by the trustee on that claim, fails. Indeed, Mocella is nothing like the present case. First, Vertonix was fully entitled to file its claim in the amount it did. Second, Vertonix never received or retained any payments from the Trustee. Third, its claim had no effect on the bankruptcy estate or its administration. Finally, the debtor in Mocella could not purchase a motor vehicle and was publicly embarrassed as a result of the creditor's violation of the automatic stay. Here, Debtors offer no such evidence whatsoever.

[71] See, e.g., ECF Doc. 81, p. 18.

19

individuals.[72]

Furthermore, contrary to Debtors' argument, Vertonix and the undersigned counsel have made no effort to hide anything from this Court or anyone else.  Indeed, all of the filings made in the Pennsylvania case are (and were) publicly available on http://www.courts.phila.gov/common-pleas/ and Vertonix attached a printed copy of the docket in the Pennsylvania case to its Response.[73]  Thus, a mere click on the links in that exhibit would have made any of the dozens of documents submitted in the Philadelphia Court of Common Pleas by Vertonix and Debtors available for the Court's review.

### C.    Conclusion

Ultimately, Debtors' Motion should be denied outright.  To the extent that the Court requires additional evidence to rule, however, Vertonix respectfully requests the opportunity to conduct discovery, such as deposing, *inter alia*, Debtors, their Pennsylvania counsel – Marina Kats, Esquire, Debtors' current bankruptcy counsel – Leonid Nerdinsky, Esquire and Gary Seitz, Esquire, Leonid Aronov, Sergey and Marina Lyubarsky, Yan Friedman, as well as Alexander and Svetlana Pinkusovich.  Vertonix further respectfully requests permission of the Court to submit additional briefing on the issues raised in Debtors' Motion, after discovery or further hearings on the Motion have concluded, as may be necessary or appropriate.

**(SIGNATURE ON THE NEXT PAGE)**

---

[72] See Exhibit "2;" Exhibit "5," pp. 19-20; see also ECF Doc. 54-1, pp. 35-36, ¶¶160-161.

[73] See ECF Doc. 54-1, pp. 45-78.

Date: <u>April 1, 2019</u>                                    Respectfully submitted,
                                                             **KALIKHMAN & RAYZ, LLC**


                                                             /s/
                                                             _____
                                                             Arkady "Eric" Rayz
                                                             Attorney(s) for Claimant(s)
                                                             1051 County Line Road, Suite "A"
                                                             Huntingdon Valley, PA 19006
                                                             Telephone: (215) 364-5030
                                                             Facsimile: (215) 364-5029
                                                             E-mail: erayz@kalraylaw.com

# EXHIBIT 1

**UNITED STATES BANKRTUPCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| LYUBARSKY, et al. | Case No. 18-16659-LMI |
| Debtor(s) | |

**DECLARATION OF ARKADY "ERIC" RAYZ IN OPPOSITION TO**
**DEBTORS' MOTION FOR SANCTIONS**

I, Arkady "Eric" Rayz, declare as follows:

1.     I make this Declaration in support of a Response in Opposition to Debtors' Motion for Sanctions, being filed on behalf of Vertonix Limited ("Vertonix" or "Claimant").

2.     The information set forth in this Declaration is based upon my personal knowledge.

3.     I have been admitted to the Bar of the Supreme Court of Pennsylvania since 2001.

4.     I am a founding member of the law firm of Kalikhman & Rayz, LLC (the "Firm").

5.     Since March of 2008, the Firm has been representing Vertonix Limited ("Vertonix") to collect the proceeds of a loan assigned to Vertonix by a Latvian bank – "Reġionālā investīciju banka" ("RIB"), *inter alia*, from Yuri and Olga Lyubarsky (collectively, "Debtors").

6.     I have been personally involved in handling this matter ever since.

7.     After confessing judgment against Debtors in 2011 in the Court of Common Pleas of Philadelphia County, captioned and docketed as <u>Vertonix Ltd. v. Lyubarsky, et al.</u>, February Term 2011, Docket No. 3388, Vertonix proceeded with post-judgment discovery.

8.     When Debtors failed to respond, Vertonix filed a Motion to Compel, which was granted by the Hon. Idee C. Fox of the Court of Common Pleas of Philadelphia County, on December 19, 2011.  <u>See</u> ECF Doc. 54-1, p. 137.

1

9.     When Debtors did not comply with that Order, Vertonix filed a Motion for Sanctions, which was granted by Judge Fox following a hearing on April 12, 2012.  See ECF Doc. 54-1, p. 139.

10.     When Debtors still did not comply, Vertonix filed a second Motion for Sanctions, which was granted by Judge Fox following another hearing on July 20, 2012.  See ECF Doc. 54-1, p. 141.

11.     In her Order of July 20, 2012, Judge Fox explicitly imposed daily monetary sanctions against Debtors, "commencing August 19, 2012 . . . [of] $100.00 per day until they comply fully with th[e] Court's [earlier] Orders."  ECF Doc. 54-1, p. 141.

12.     To date, Debtors have never complied with the Orders of December 15, 2011, April 12, 2012, or July 20, 2012.

13.     They also have never sought an appeal or reconsideration of the Order of July 20, 2012.

14.     Accordingly, the sanctions imposed by Judge Fox remain in effect.

15.     On May 6, 2015, I attended Yuri Lyubarsky's deposition, where he testified under oath as follows:

| | |
|---|---|
| Counsel: | So basically, right now, since you're just receiving disability income, you are not working? |
| Yuri Lyubarsky: | No. |
| Counsel: | You're not working; correct? |
| Yuri Lyubarsky: | No. |

16.     On October 30, 2015, Vertonix issued a Writ of Execution to Guardian Life Insurance Company of America ("Guardian") and served this Writ, together with a set of

Interrogatories in Attachment.

17.    On November 18, 2015, Guardian responded and disclosed that: (a) Yuri Lyubarsky was receiving monthly payments of more than $7,800.00, under two individual disability policies; and (b) Yuri Lyubarsky owned two life insurance policies.

18.    Vertonix filed a Motion to Compel discovery, seeking additional documents from Guardian regarding these policies.

19.    The Court of Common Pleas of Philadelphia County scheduled a hearing on this Motion to Compel for April 6, 2016.

20.    Several weeks prior to the hearing, Marina Kats, Esquire from Kats, Jamison & Associates called me to negotiate a settlement on Debtors' behalf.

21.    To the best of my recollection, Ms. Kats offered to resolve the matter for $20,000.00.

22.    On behalf of Vertonix, I rejected this offer and counter-demanded $120,000.00.

23.    I did not hear back from Ms. Kats or anyone else from Kats, Jamison & Associates.

24.    On April 6, 2016, Liberato P. Verderame, Esquire from the Law Offices of Kats, Jamison & Associates appeared during a hearing before the Hon. Linda Carpenter of the Court of Common Pleas of Philadelphia County, regarding Plaintiff's Motion to Compel and asserted that his firm was retained to represent Debtors.

25.    Judge Carpenter granted Vertonix's Motion, but allowed Guardian to redact Debtors' personal information from the records being produced.

26.    After the hearing, I emailed Mr. Verderame on April 6, 2016 and, again, on April 13, 2016, regarding this matter.

27.    Mr. Verderame did not respond to these emails.

3

28.    Approximately one month later, on May 3, 2016, Vertonix filed a Motion to Compel Debtors' depositions and a Motion to Reassess Damages.

29.    The Motion to Reassess Damages acknowledged and explicitly credited $175,000.00 that Vertonix received from the sale of Debtors' New Jersey home.  See ECF Doc. 81, p. 54.

30.    The Motion to Reassess Damages also sought imposition of sanctions against Debtors, in accordance with Judge Fox's Order of July 20, 2012.  See ECF Doc. 81.

31.    Through counsel from the Law Offices of Kats, Jamison & Associates, Debtors then filed a Claim for Exemption of the Guardian policies, asserting that they were exempt from execution under 42 Pa.C.S. § 8124.  See ECF Doc. 54-1, pp. 143-145.

32.    About two weeks later, on May 25, 2016, Defendants filed a Motion to Sustain a Claim for Exemption, making an identical argument.  See id., pp. 147-154.

33.    The parties then appeared for oral argument before Judge Carpenter on June 1, 2016, where Debtors were represented by Matthew Konchel, Esquire from the Law Offices of Kats, Jamison & Associates.

34.    After that hearing, Judge Carpenter issued several Orders, *inter alia*:

    a.    finding the Claim for Exemption to be moot in light of Debtors' Motion to Sustain a Claim for Exemption;

    b.    allowing parties additional "30 days to file [a] response and/or any additional documentation to support their respective argument" with regard to the exemption sought by Debtors and Vertonix's request to reassess damages; and

    c.    granting Vertonix's Motion to Compel Debtors' depositions.  See ECF Doc.

54-1, pp. 156-159.

35.    Debtors did not supplement their Motion to Sustain a Claim for Exemption and did not provide any "additional documentation" to support their argument.

36.    However, on June 23, 2016, through counsel from Kats, Jamison & Associates, they filed a Petition to Strike the judgment.

37.    On July 1, 2016, Debtors, through the same counsel, filed their opposition to Vertonix's Motion to Reassess Damages.

38.    On July 6, 2016, Judge Carpenter denied Debtors' attempt to exempt Guardian policies from execution and re-assessed damages against them at $141,102.71, as of May 3, 2016. See ECF Doc. 54-1, p. 161.

39.    No appeal or reconsideration was ever filed from the reassessment ruling.

40.    On September 21, 2017, the parties appeared before Judge Carpenter for oral argument regarding Debtors' Petition to Strike.

41.    At that hearing, Debtors were represented by Richard S. Seidel, Esquire from the Law Offices of Kats, Jamison & Associates.

42.    Mr. Seidel vociferously argued before Judge Carpenter that the judgment should be stricken in its entirety, because its entry lead to the improper imposition of discovery sanctions against Debtors that were incorporated by Judge Carpenter in the amount of the reassessed judgment.

43.    After Judge Carpenter allowed the parties to further supplement their filings on this issue, on September 30, 2016 (i.e., more than two months after Judge Carpenter re-assessed the amount of the judgment), Ms. Kats and Ms. Seidel submitted a memorandum, where Debtors, *inter alia*, sought the following relief:

> **WHEREFORE**, Defendants respectfully request this Honorable Court to grant their Petition and Strike the Confessed Judgment of February 24, 2011. Further, they request that this Honorable Court Order that all related sanctions and Orders during execution proceedings be rendered Moot; Order any attachments and garnishments related to the stricken judgment be lifted and stricken; direct Counsel for Plaintiffs to notify any and all entities within twenty (20) days of

(Emphasis supplied).

44.    On November 8, 2016, Judge Carpenter denied Debtors' Petition to Strike the judgment, explaining her rationale as follows:

> [Debtors] ha[ve] failed to prove that there was a fatal defect. All documents indicate that [Debtors] signed a confession of judgment in which they agreed to waive all arguments with regard to due process, service and their constitutional rights. Further, at the hearing of this matter, **[Debtors] made clear that their real argument was about the amount of the judgment**. However, **[Debtors] have failed to file any appeal of the prior court orders, or other documents with the Court to contest the sanctions imposed, which appear to represent the bulk of the judgment that remains unpaid**.

ECF Doc. 54-1, p. 169 (emphasis supplied).

45.    On December 1, 2016, Debtors filed a Notice of Appeal from that Order to the Pennsylvania Superior Court, an intermediate appellate court in Pennsylvania with direct jurisdiction over the matter.

46.    Seven months after re-assessing the judgment, in a formal opinion authored in February of 2017, Judge Carpenter further explained what happened at oral argument in September of 2017 with respect to Debtors' Petition to Strike:

> In the instant matter, Lyubarsky has failed to prove that there was a fatal defect in the record and, as such, this Court properly denied the request to strike the judgment. **At the hearing in this matter, Lyubarsky made clear that actual service was not in issue and**

> **that the real challenge was to the amount of the judgment, in light of payments made and the monetary sanctions that have accrued**; however, such arguments do not address any facial defect in the record.  While **Lyubarsky attempted to argue that a defect existed in the documents thereby causing the aforementioned accrual of sanctions**, such argument remained unsupported by the record and was disingenuously made in light of the Affidavit of Service of the Judgment by Confession entered upon the record in 2011.

ECF Doc. 54-1, pp. 179-180 (emphasis supplied).

47.     In her opinion, Judge Carpenter further noted that, while Debtors were attempting to challenge the amount of the judgment, they "failed to file any appeal of the prior court Orders and ha[ve] failed to submit any other motions with the court **to contest the sanctions imposed, which appear to represent the bulk of the unpaid portion of the judgment**." Id., p. 180, n.4 (Emphasis supplied).

48.     The Superior Court then issued a briefing schedule that required Debtors to file a formal memorandum.

49.     On July 5, 2017, Ms. Kats and Mr. Seidel submitted such a memorandum on Debtors' behalf, where they described Judge Fox's decision to impose sanctions and Judge Carpenter's reassessment of the judgment as follows:

**(REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK)**

7

regarding the Guardian disability and life insurance policies. Since July 20, 2012, the Lyubarskys have been incurring sanctions at the rate of $100.00 per day for their non-compliance with the two trial court discovery Orders from 2011 and 2012. Although the Lyubarskys satisfied part of the judgment amount by $175,000.00 in proceeds from a lien pursuant to the judgment and sale of their home in New Jersey, damages were reassessed by the Trial Court in the amount of $141, 102.71 on July 6, 2016, representing the sanctions and interest. On July 7, 2016, the Court denied the claim for exemption for all four of the Lyubarsky's

(Emphasis supplied).

50.     On February 6, 2018, the Superior Court denied a set of three separate appeals filed by Debtors from the decision of the Hon. Linda Carpenter and Hon. Daniel Anders of the Court of Common Pleas of Philadelphia County.  See Vertonix, Ltd. v. Lyubarsky, et al., 2018 WL 717571 (Pa. Super. 2018).

51.     On February 20, 2018, Debtors filed an "Application for Reargument" with the Superior Court.

52.     Vertonix responded to this filing on March 5, 2018.

53.     Since (at the very least) 2017, the Firm has utilized a telephone system that automatically forwards all incoming voice mails left in the recipient's voice mail box to that recipient's email.

54.     At 12:49 p.m., on April 5, 2018, I received the below email:


**(REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK)**

8



55. The email contained an audio file of a voice mail left for me by Linda Alle-Murphy, Esquire from Kats, Jamison & Associates regarding Vertonix.

56. The audio file was saved and remains in my possession.

57. Previously, at least four different attorneys from Kats, Jamison & Associates were involved in representing Debtors in Pennsylvania – Ms. Kats, Mr. Verderame, Mr. Konchel, and Mr. Seidel.

58. This was the first time, however, that Ms. Alle-Murphy contacted me.

59. At the time of Ms. Alle-Murphy's call, all issues have already been fully briefed and the parties were only awaiting the Superior Court's ruling on Debtors' application for re-argument, which was unlikely to be granted. See Pa.R.A.P. 2543 (explaining that "reargument will be allowed **only** when there are **compelling reasons** therefor. . . .")(emphasis supplied).

60. At that point, therefore, other than to discuss settlement, there was no reason for Debtors' counsel to contact me regarding the matter at hand.

9

61.     During the subsequent conversation with Ms. Alle-Murphy later that day, she, in fact, communicated Debtors' offer to settle with Vertonix for $80,000.00.

62.     Ms. Alle-Murphy did not express that this offer was contingent on an acceptance by a certain date.

63.     I explained to Ms. Alle-Murphy that Yuri Lyubarsky has already communicated the same offer during a meeting in May of 2017, before the parties' appeal was fully briefed and before the Superior Court unanimously ruled in favor of Vertonix.

64.     I also expressed to Ms. Alle-Murphy that Vertonix was unwilling to accept $80,000.00, because Vertonix has long been aware of Mr. Lyubarskys employment, substantial corporate interests, and attempts to conceal his personal wealth.

65.     I did not communicate any counter-offers to Ms. Alle-Murphy.

66.     On April 11, 2018, the Superior Court denied Debtors' request for reargument.

67.     At 12:52 p.m., on April 27, 2018, I received the below email:



68.    The email contained an audio file of a voice mail left for me by Steven Maniloff, Esquire of Montgomery McCracken Walker & Rhoads, LLC – the attorney who represented Guardian.

69.    The audio file was saved and remains in my possession.

70.    Mr. Maniloff's voice mail states as follows:

> Eric, good afternoon, it's Steven Maniloff.  How are you?  It is 12:50, on Friday, the 27th.  I received a call from Marina Kats last night.  She is prepared or her clients are prepared to make a settlement offer and she asked if I could be the intermediary in that effort.  So, when you get a chance if you could give me a call.  You know, I think it's a pretty good offer, so perhaps we are getting close to maybe resolving this.  That's my hope.  My number is 2157727512.  It's about 12:50, I should be in all afternoon.  Again, it's Steve Maniloff, 2157727512.  Thanks Eric, bye.

71.    During a subsequent conversation that day, Mr. Maniloff related that Debtors' counsel – Ms. Kats – asked him to communicate a settlement offer to Vertonix on Debtors' behalf.

72.    I do not recall the exact amount of the offer, but believe it was consistent with the same offer communicated by Ms. Alle-Murphy in early April 2018.

73.    I do not recall communicating any counter-offers to Mr. Maniloff.

74.    I also recall at least one subsequent call with Ms. Alle-Murphy regarding the matter, where in a settlement was discussed.

75.    During that call Ms. Alle-Murphy mentioned, for the first time, that Debtors were considering bankruptcy.

76.    Shortly after Debtors filed for Chapter 7 bankruptcy protection through the office of Leonid Nerdinsky, Esquire, I reviewed their filings and immediately noted that they were materially false.

77.    For instance, Debtors failed to disclose their corporate interests.

11

78. Because I was already going to be in South Florida in June of 2018 on an unrelated matter, I reached out to Mr. Nerdinsky and asked to meet with him.

79. I met with Mr. Nerdinsky in his office, at approximately 4:00 p.m., on June 21, 2018.

80. At that time, I expressly communicated to Mr. Nerdinsky Vertonix's position that Debtors' bankruptcy filing contained material omissions concerning their assets.

81. Specifically, Debtors' filing appeared to have intentionally failed to disclose over two dozen various domestic and foreign corporate entities affiliated and/or controlled by Debtors in New York, New Jersey, Florida, and abroad.

82. In this regard, I shared a chart documenting these corporate entities with Mr. Nerdinsky.

83. Moreover, I explained that, contrary to the bankruptcy submission, Yuri Lyubarsky was currently employed by Luxury Gift, Inc., as was evident by multiple online customer reviews.

84. I disclosed this information in good faith, to allow Mr. Nerdinsky an opportunity to amend Debtors' filings.

85. At no point in time was there any suggestion made that this information would be withheld in exchange for anything that Debtors would do.

86. Indeed, the information shown to Debtors' counsel was compiled from publicly-accessible websites, such as https://dos.myflorida.com/sunbiz/search/, and was available to and/or would have been easily discovered by the Chapter 7 Trustee even without Vertonix's involvement.

87. I also explicitly told Mr. Nerdinsky that Vertonix had no interest in retaining local counsel in the bankruptcy matter and that, other than by filing a proof of claim, would not be pursuing any further claims against Debtors.

88.     Separately, I also communicated to Mr. Nerdinsky that the previously-articulated offer by Debtors' Pennsylvania counsel was unacceptable, but that Vertonix would resolve its claims for $250,000.00.

89.     I also explained to Mr. Nerdinsky the basis for Vertonix's demand.

90.     Namely, that since Vertonix demanded $200,000.00 to resolve its claims in May of 2017, additional interest, sanctions, and attorneys' fees have been accruing.

91.     Mr. Nerdinsky appeared to be visibly surprised by the offers that Debtors communicated through their Pennsylvania counsel, as well as Vertonix's knowledge of Debtors' corporate affiliations and attempts to hide personal assets.

92.     After learning this information, Mr. Nerdinsky asked for an opportunity to confer with Debtors.

93.     Mr. Nerdinsky then suggested that Vertonix wait until the following Monday, June 25, 2018 for Debtors' response.

94.     I agreed on that date.

95.     Vertonix and I had no intention to violate the automatic stay and chose to communicate with Debtors' bankruptcy counsel (as opposed to their Pennsylvania attorneys) to avoid any appearance that Vertonix was attempting to circumvent the bankruptcy proceedings.

96.     I had no further communications with Mr. Nerdinsky.

97.     When he did not respond by June 25, 2018, I realized that Debtors had no intention to amend their bankruptcy filings and had no interest in negotiating with Vertonix.

98.     At 6:34 p.m., on June 26, 2018, I received an e-mail from Mr. Nerdinsky that confirmed my suspicion.

99.     In that email, Mr. Nerdinsky accused me of threatening to release damaging

13

information about Debtors, unless they paid $250,000.00 to Vertonix.

100.    This email was blatantly false.

101.    At no point did I ever suggest, imply, or communicate any form of a "quid pro quo" relationship between Vertonix's demand and information I relayed to Mr. Nerdinsky.

102.    Nonetheless, Mr. Nerdinsky's email was entirely consistent with Debtors' previous behavior.

103.    For instance, Debtors and their counsel falsely accused Vertonix's principal of physical violence in earlier Florida state court filings.

104.    Similarly, during Pennsylvania state proceedings, Debtors and their counsel falsely declared that I owned the debt at issue and accused me – immediately following a court hearing that they lost – of being a member of the "Russian mob."

105.    Moreover, on numerous occasions, without their counsel's knowledge, Debtors attempted to directly communicate with Vertonix's principal and me regarding settlement.

106.    For this reason, upon receipt of an accusatory email from Mr. Nerdinsky on June 26, 2018, which suggested that Vertonix offered not disclose information shown to Mr. Nerdinsky in exchange for Debtors' payment, I immediately responded by rejecting this falsehood.

I declare under penalty of perjury that the foregoing is true and correct.  This Declaration was electronically executed on April 1, 2019, in Huntingdon Valley, Pennsylvania.



_/s/_____
Arkady "Eric" Rayz

# EXHIBIT 2



STEVEN KILICHOWSKI
3400 NW 78 Avenue
Margate, FL 33063

GARY ZALEVSKY
116 Dover Street
Brooklyn, NY 11235

LEONID ERLIKH
570 Evelyn Pl.
Beverly Hills, CA 90210

ARKADIY MIRER
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414

ELI DZHABRAILOV
17038 West Dixie Hwy #133
Miami, FL 33160

ANDRE BALAGUTA
1833 S. Ocean Dr., 905
Hallandale Beach, FL 33009

VLADIMIR SHATS
290 174th Street, 705
Sunny Isles Beach, FL 33160

ELOCAL MARKETING, LLC
2700 W. Oakland Blvd.
Oakland Park, FL 33311-1381
YL – MN/SL – MN (Checks – BOA)

ELS WHOLESALE, LLC
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414
YL – MN/LE – MN/SL – MN

UAR, LLC
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414
YL – MN/AM – MN/SL – MN

INTEKO, LLC
17038 West Dixie Hwy #133
Miami, FL 33160
YL – RA/AM – MN

REAL DEAL, L.L.C.
2999 NE 191st Street, 709
Aventura, FL 33180
YL – MN/AM – MN

DEEMAR USA, LLC
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414
YL – MN/AB – RA

NYQ ACUPUNCTURE, LLC
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414
YL – MN/VS - RA

OLIMPIC CHIROPRACTIC, LLC
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414
YL – MN/SL – MN

AH PHYSICAL THERAPY, LLC
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414
YL – MN/SL – MN

MB MED HEALTHCARE, LLC
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414
YL – MN/SL – MN

FFEPA, LLC
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414
YL – MN/SL – MN

SERGEY LYUBARSKY
Son
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414
SSN:

YURI LYUBARSKY, LLC
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414
SL – RA/ML - MN

MERCHANT PHYSICAL THERAPY, LLC
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414
SL – RA/ML – MN

EXCLUSIVE DIAMONDS, LLC
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414
ML – RA/SL – MN/OT - MN

MONAQUE, INC.
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414
ML – RA/SL – MN/AM - MN

ADVANCED RX, LLC
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414
SL – RA/ML – MN/BL - MN

OLEG TOPILSKY
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414

ALEXEY MONAKHOV
205 Seabreaze Ave., Apt. 5G
Brooklyn, NY 11224
YL/OL address in NYC

BORIS LOPATA
210 174th Street, #1502
Sunny Isles Beach, FL 33160

YURI/OLGA LYUBARSKY
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414
YL SSN:
OL SSN:

MARINA LYUBARSKY
Daughter
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414

ALEX NIZNIK
6067 Hollywood Blvd., St. 355
Hollywood, FL 33024

YAN ARONOV
6067 Hollywood Blvd., St. 355
Hollywood, FL 33024

ELISABET NIZNIK
2200 N. Federal Hwy 206
Boca Raton, FL 33431

ILYA REZNIK
21399 Marina Cove Circle #12
Aventura, FL 33180

FEPA WEST, LLC
1411 N. West Shore Blvd., St. 110
Tampa, FL 33607
YL – MN/YA- MN/AN-MN

FEPA PALM BEACH, LLC
10800 N. Military Trl.
West Palm Beach, FL 33410
YL - MN

FEPA BOCA, LLC
2200 N. Federal Hwy., St. 206
Boca Raton, FL 33431-7741
YL – MN/YA – MN/AN – MN/IR - MN

CASTLE MEDICAL MANAGEMENT, INC.
19 Shallow Brook Rd.
Morganville, NJ 07751-4649

Y.S.L. MEDICAL SUPPLIES, INC.
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414

ADVANCED MOBILE TECHNOLOGIES, LLC
19 Shallow Brook Rd.
Morganville, NJ 07751-4649
YL

MIDWOOD MEDICAL CARE P.C.
18 Scotland Drive
Livingstone, NJ 07039

CASTLE PROFESSIONAL SERVICES, INC.
3140 NE 40th Ct.
Ft. Lauderdale, FL 33308-6414

# EXHIBIT 3

PHILADELPHIA COURT OF COMMON PLEAS
**PETITION/MOTION COVER SHEET**

| CONTROL NUMBER: |
|---|
| 16063238 |
| *(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)* |

**FOR COURT USE ONLY**

ASSIGNED TO JUDGE:     ANSWER/RESPONSE DATE:

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response. Status may be obtained online at http://courts.phila.gov*

<u>VERTONIX LIMITED VS LYUBARSKY ETAL</u>

<u>February</u> Term, <u>2011</u>
    *Month*           *Year*
No.      <u>03388</u>

Name of Filing Party:
<u>OLGA LYUBARSKY-DFT</u>
<u>YURI LYUBARSKY-DFT</u>

**INDICATE NATURE OF DOCUMENT FILED:**
☐ Petition *(Attach Rule to Show Cause)*   ☐ Motion
☐ Answer to Petition           ☐ Response to Motion

Has another petition/motion been decided in this case?   ☐ Yes ☐ No
Is another petition/motion pending?                 ☐ Yes ☐ No
*If the answer to either question is yes, you must identify the judge(s):*

TYPE OF PETITION/MOTION *(see list on reverse side)*
MOTION/PETITION BRIEF FILED

PETITION/MOTION CODE
*(see list on reverse side)*
BREFM

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding):
MTOPN - MOT-OPEN/STRKE CONFESSED JDGMT

**I. CASE PROGRAM**

OTHER PROGRAM

Court Type: <u>JUDGMENTS</u>
Case Type: <u>CONFESSION OF JUDGMENT</u>

**II. PARTIES** *(required for proof of service)*
(Name, address and **telephone number** of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.)

ERIC RAYZ
   1051 COUNTY LINE RD SUITE "A" ,
   HUNTINGDON VALLEY PA 19006
MICHAEL J HALAIKO
   MILES & STOCKBRIDGE PC 100 LIGHT
   STREET 4TH FLOOR , BALTIMORE MD 21202
JON C SIRLIN
   123 SOUTH BROAD STREET SUITE 2100 ,
   PHILADELPHIA PA 19109
STEVEN MANILOFF
   MONTGOMERY, MCCRACKEN 123 SOUTH BROAD
   STREET 28TH FLOOR , PHILADELPHIA PA
   19109
MARINA KATS
   1 BUSTLETON PIKE , FEASTERVILLE PA
   19053

**III. OTHER**

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

September 30, 2016      MARINA KATS

*(Attorney Signature/Unrepresented Party)*      *(Date)*      *(Print Name)*      *(Attorney I.D. No.)*

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date.**
**No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

30-1061B E-File# 1609070596
03-OCT-16 10:11:55

**FILED**

30 SEP 2016 06:45 pm

Civil Administration

E. MASCUILLI

## COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
### FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### CIVIL TRIAL DIVISION

| | |
|---|---|
| **VERTONIX LTD** | : |
| **Plaintiff** | : |
| **v.** | : **FEBRUARY TERM, 2011** |
| | : |
| **YURI and OLGA LYUBARSKY, h/w** | : No. 03388 |
| | : |
| **Defendants** | : |
| | : |
| **v.** | : |
| | : |
| **THE GUARDIAN LIFE INSURANCE** | : |
| **COMPANY OF AMERICA** | : |
| | : |
| **Garnishee** | : |
| | : |

### ORDER

AND NOW, this            day of                            , 2016, upon

consideration of Defendants' Petition to Strike Confessed Judgment and Plaintiff's response

thereto, along with the supplemental briefs submitted by the parties in this matter, it is hereby

**ORDERED** and **DECREED** that the rule to show cause of July 22, 2016, is made absolute and

the judgment by confession of February 24, 2011, in the above-captioned matter is stricken. All

related sanctions and Orders during execution proceedings are hereby rendered Moot. Any

attachments and garnishments related to the stricken judgment are lifted and stricken. Counsel for

Plaintiffs shall notify any and all entities within twenty (20) days of this Order to discontinue any

and all action related to the judgment. All property obtained in execution of this judgment shall

be returned within thirty (30) days.

BY THE COURT:

_____
J.

Case ID: 110203388
Control No.: 16063238

**KATS, JAMISON & ASSOCIATES**
By:   **Marina Kats, Esquire**
       **Richard S. Seidel, Esquire**
       **I.D. Nos. 53020 and 55801**
       **1 Bustleton Pike**
       **Feasterville, PA 19053**
       **215-396-9001**
       **marina@mkats.com**           **Attorneys for Defendants**

| | |
|---|---|
| **VERTONIX LTD** : | **COURT OF COMMON PLEAS** |
|      **Plaintiff** : | **PHILADELPHIA COUNTY** |
|   **v.** : | |
| : | **CIVIL ACTION** |
| **YURI and OLGA LYUBARSKY, h/w** : | |
| : | **FEBRUARY TERM 2011** |
|     **Defendants** : | |
| : | **No. 03388** |
|   **v.** : | |
| : | |
| **THE GUARDIAN LIFE INSURANCE** : | |
| **COMPANY OF AMERICA** : | |
| : | |
|     **Garnishee** : | |

**DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR PETITION TO STRIKE CONFESSED JUDGMENT**

I.    <u>Matter before the Court:</u>

    Pursuant to the Court's Order of September 21, 2016, this is the Defendants'

Supplemental Brief to Strike Confessed Judgment of February 24, 2011.

II.    <u>Statement of question involved:</u>

    Should this Honorable Court strike the confessed judgment of February 24, 2011 due to a

fatal defect on the face of the record, specifically the failure to include the address where process

and documents would be served on Defendants and the failure to properly serve Defendants?

    SUGGESTED ANSWER: Yes.

Case ID: 110203388
Control No.: 16063238

III.    Facts:

Plaintiff, Vertonix Ltd., commenced this action on February 24, 2011, by complaint to confess judgment against Defendants upon a commercial loan obligation secured by a "Surety Agreement" containing a warrant of attorney provision and a confession of judgment clause. On June 23, 2016 Defendants petitioned this Honorable Court to Strike the Judgment. (A true and correct copy of the Petition is attached hereto as **Exhibit "A"**). On September 21, 2016, oral argument was held on the Motion to Strike. The Court entered an Order to "file supplemental briefs to clarify any matters at the hearing today." (A true and correct copy of the Order from the hearing on September 21, 2016 is attached hereto as **Exhibit "B."**)

IV.    Argument:

Defendants incorporate herein by reference their Petition to Strike and Memorandum thereto as if fully set forth herein. This Supplemental Brief clarifies the legal standard of review, the remedy sought, analysis of fatal defects in confessed judgments as pertains to service of process, and raises several points of rebuttal with respect to Plaintiff's written and oral replies to the Petition to Strike.

The legal standard of review on a Motion to Strike is limited. "When deciding if there are fatal defects on the face of the record for the purposes of a petition to strike a judgment, a court may only look at what was in the record when the judgment was entered." *Cintas Corp. v. Lee's Cleaning Servs.,* 549 Pa. 84, 90 (Pa. 1997). Here, the entire record subject to the court's review is attached as Exhibit A to Defendants' petition. The record in its entirety consists only of the complaint and the exhibits thereto. *Neducsin v. Caplan*, 121 A.3d 498, 504 (Pa. Super. Ct. 2015). Every filing with the Court subsequent to the entry of the judgment is therefore irrelevant for purposes of the Petition. Thus, this Honorable Court must strike the judgment if, on the face of

Case ID: 110203388
Control No.: 16063238

this record, it finds a fatal defect or irregularity. The issue is necessarily a narrow one.

During oral argument, counsel for Plaintiff urged this Honorable Court that Defendants did not understand the distinction between a motion to strike and motion to open. This proposition is inaccurate, and this Honorable Court should disregard the argument. Unlike a Motion to Open, "the courts of this Commonwealth have long held that an individual may seek to strike a void judgment at any time." *Mother's Rest., Inc. v. Krystkiewicz*, 861 A.2d 327, 337 (Pa. Super. Ct. 2004). As the Superior Court explained, "the petition to strike a confessed judgment must focus on any defects or irregularities appearing on the face of the record, as filed by the party in whose favor the warrant was given, which affect the validity of the judgment and entitle the petitioner to relief as a matter of law." *Neducsin* at 504. Since the address where service was supposed to be made is missing from the Surety Agreement – **which Plaintiff drafted** – the document must be strictly construed against the drafter. This omission is reason alone why the record is facially defective and not self-sustaining. Therefore, Defendants have properly petitioned this Honorable Court to strike the fatally flawed Confession of Judgment. This irregularity, this omission, then naturally leads to the discovery of another defect, that is, improper service.

Defendants direct the Court's attention to the persuasive rationale and holding of this Honorable Court by the Honorable Leon W. Tucker in the case of *Bancorp Bank v. Mancini*, 28 Pa. D. & C.5th 388 (Pa. C.P. 2013). That case is strikingly similar to the one now before this Honorable Court. In *Bancorp Bank,* the Court of Common Pleas of Philadelphia County struck the confessed judgment entered pursuant to a Surety Agreement, warrant of attorney provision, and confession of judgment clause because, *inter alia*, conflicting addresses for service were in the document and as a result, service was improper.

Case ID: 110203388
Control No.: 16063238

In *Bancorp Bank,* Judge Tucker stated the standard with respect to service of process and fatal defects as follows:

> In contrast to procedural rules promulgated to merely protect parties in litigation, it is well-settled that procedural rules governing service of process must be strictly followed because service of process is the mechanism by which a court obtains jurisdiction over a defendant. As such, service of process is not 'merely a procedural defect that can be ignored when a defendant subsequently learns of the action against him or her.' Therefore, improper service of process is an incurable defect on the record which supports granting a petition to strike a confession of judgment, particularly where plaintiff has failed to comply with the requirements of Rule 403. (citation omitted) 28 Pa. D. & C.5th 388, 397 (Pa. C.P. 2013). (emphasis supplied)

The assertion of Plaintiff's counsel during oral argument that at some point during execution of the *ex parte* confession of judgment Defendants became aware of the proceedings is of no moment because that does not remedy the fatal defects of the failure to include a proper address for service of process and defective service itself.

Persuasive is Judge Tucker's analysis of the failure to comply with Rule 403, and in consequence, the discovery of a fatal defect. The issue is precisely the same here as in *Bancorp Bank.* Pa. R.C.P. 2958.1(b)(1)(ii), requires Plaintiff to mail a copy of the original process and notice of judgment to a Defendant who has not entered an appearance on the record, via mail and in the manner set forth in Rule 403, thirty days before the filing of a Writ of Execution. Plaintiff fatally failed to comply with these requirements. Rule 403 states in relevant part:

> If a rule of civil procedure authorizes original process to be served by mail, a copy of the process shall be mailed to the defendant by any form of mail requiring a receipt signed by the defendant or his authorized agent. Service is complete upon delivery of the mail. (emphasis supplied).

Case ID: 110203388
Control No.: 16063238

In this instance, Pa. R.C.P. 2958.1, is the relevant rule of civil procedure which authorizes the Plaintiff to serve original process in actions of Confession of Judgment for Money. Accordingly, the manner of such service must comport with the above provision, which requires for good service, and therefore, jurisdiction to enter a confessed judgment, a receipt signed by the Defendants. Plaintiff admittedly failed to comply, and this is a fatal defect as well as the omission. See **"Exhibit C"** – Plaintiff's "Affidavit of Mailing of Notice of Judgment by Confession." The affidavit makes no mention of a return receipt or certified mail, only "First Class U.S. Mail, postage pre-paid, to Defendants at their last known address … 19 Shallow Brook Road Morganville, NJ 07751." By the terms of the Surety Agreement containing the confession of judgment provision, and the supporting documents thereto, as well as the Pennsylvania Rules, an address for service of process had to be agreed to and be contained in the agreement. The failure to so state the address for service is alone a fatal flaw by the very terms of the agreement drafted by the judgment holder. The resulting ineffective service and inability of the judgment holder to prove service in the manner required by their own agreement, Rule 2958.1, and Rule 403, demonstrates the cascade of fatal flaws stemming from the first fatality in the Surety Agreement itself. Thus, the confessed judgment is a nullity and *void ab initio*. It should be noted that Plaintiff's affidavit is functionally equivalent to the return of service as per Pa. R.C.P. No. 405(d), which states that, "a return of service by a person other than the sheriff shall be by affidavit." Further, no such receipt is attached in the record, and indeed it is the wrong type of mailing, and to an address on which the Surety Agreement is entirely silent. As Defendants have already pointed out in their Petition, on page 3 of 5 of the Surety Agreement, under subsection 4. Venue and Exclusive Jurisdiction, is the following:

> "Surety waives personal service of the summons, complaint and
> any other process issued in any such action or suit and agrees that

> service of such summons, complaint, and any other process may be
> made by *registered or certified mail*, postage prepaid, addressed to
> the Surety *at the address set **forth below*** and that such service so
> made shall be deemed completed upon the providing of such
> notice." (emphasis added).

The omission of the address for service as required by Plaintiff's own writing, and the lack of a

certified or registered mailing in compliance with the Surety Agreement and Rule 403 requiring

a return receipt are, either taken together or alone, fatal defects requiring the confessed judgment

to be stricken. Consequently, these are two grounds upon which the judgment must be stricken.

Both grounds independently lead to the conclusion that the Court does not have jurisdiction due

to the fatal flaws created by the judgment holder, and the judgment must be stricken.

> The crescendo of Judge Tucker's analysis was:

>> On May 02, 2012, Appellant attached a Certification of Service
>> stating that a copy of the Complaint in Confession of Judgment
>> was sent "via first class mail" to Appellee at an address in
>> Turnersville, NJ. The Court notes that, the 2006 Surety agreement
>> lists Appellee's address as being in Marlton, NJ… First class mail,
>> electronic filing and/or U.S. Mail do not require a return receipt;
>> therefore Appellant failed to serve original process of the
>> Complaint in Confession of Judgment upon Appellee. The
>> confession of judgment was properly stricken because Appellant's
>> failure to properly serve Appellee constituted an incurable defect
>> on the record. *Bancorp Bank* at 398. (emphasis added)

> Here, Plaintiff failed in the same manner as in *Bancorp Bank*. Following Judge Tucker's

rationale, the omission of an address is arguably a more severe flaw than the two conflicting

addresses in *Bancorp Bank*. The failure to use a return receipt, certified or registered mail,

however, in violation of both their own agreement and Rule 403 are fatal flaws more significant

than the flaws which justified striking the confession of judgment in *Bancorp Bank* by Judge

Tucker.

Plaintiff incorrectly asserts "there is no fatal defect in the record at issue." They compound their incorrect assertions by stating: "Plaintiff has fulfilled all requirements of the applicable Rules and Defendants have not identified any provision of Pa. R. Civ. Pa. 2951-2957 that has not been complied with." Yet they avoid acknowledging their fatal failure to comply with their own agreement, Rule 2958.1, and Rule 403. This purposeful ignorance demonstrates what is plain to all : their confession of judgment is fatally flawed and must be stricken. While citing Rules 2951-2957, plaintiff fails to acknowledge, Rule 2958.1.<u>Notice Served Prior to Execution</u>. Rule 2958.1 refers to and incorporates the method of service in Rule 403 as previously stated. Therefore, Plaintiff is simply wrong. Mere compliance with some of the rules is insufficient in actions for judgment by confession because "any doubt as to the validity of such judgments <u>must be</u> resolved against the party entering the judgments." *Scott Factors, Inc. v. Hartley*, 425 Pa. 290, 293 (Pa. 1967). (emphasis added).

Plaintiff inexplicably argues the Defendants do not claim improper service. While this is factually untrue, it is <u>Plaintiff's</u> burden to demonstrate good service, which they cannot. Contrary to Plaintiff's specious assertions of "notice" from the prothonotary, it is of no legal significance if Defendants received "notice" but did not receive proper service. It is not for the prothonotary to do Plaintiff's job. It is not for the prothonotary to cure Plaintiff's failure to properly draft the Surety Agreement. It is not for the prothonotary to cure the fatal flaws of the Surety Agreement and Service. In fact, such flaws cannot be cured by anyone or any action other than the striking of the confessed judgment.

Both the Surety Agreement in this case and the Rules of Civil Procedure required service by registered or certified mail to a specified address in the Surety Agreement, which was missing, or more broadly with a return receipt to the address required to be stated in the Surety

Agreement. It was the duty of the Plaintiff under both the Rules and their own Agreement to perform service of process as plainly required. The Rules and the Agreement are actually consistent in the manner of service required, but Plaintiff fatally failed to comport with either their own agreement or the Rules.

Here, Plaintiff entirely omitted an agreed upon address for service of process, which would convey this court's jurisdiction to enter the confessed judgment. Compounding that fatal flaw, Plaintiff failed to follow Rule 2958.1 and Rule 403 making the egregious flaw worse. The fact that the Prothonotary provides notice does not alleviate the fatal flaws created by the Plaintiff. Madame Justice Newman, writing for the Supreme Court of Pennsylvania in 1997, reinforces this proposition:

> Service of process is a <u>mechanism by which a court obtains jurisdiction</u> of a defendant, and therefore, <u>the rules concerning service of process must be strictly followed.</u>  <u>Without valid service, a court lacks personal jurisdiction of a defendant</u> and is powerless to enter judgment against him or her. Thus, improper service is <u>not merely a procedural defect that can be ignored when a defendant subsequently learns of the action against him or her.</u> *Cintas Corp.* at 91 (Pa. 1997). (emphasis added).

In their Petition, Defendants alleged that these are not merely correctable flaws. Improper service and the omission of an agreed upon address for service of process are indeed incurable, fatal defects absent striking the judgment. In their argument, Plaintiff strains to manipulate the facts and law applicable herein. Despite the law, the Rules, and their own Agreement, Plaintiff desperately argues that "defendants waived any procedural defects related to the confession of judgment," and that "even if the Court finds that a procedural error took place, Defendants agreed to the confession 'with release of errors. They then press on from the ridiculous to the sublime and urge, "even if there is a technical irregularity regarding service, the judgment at issue should not be stricken." This strained argument fails on its face. The failure to

Case ID: 110203388
Control No.: 16063238

identify an address, as stated in the agreement itself, and the failure to properly serve cannot be mischaracterized as mere error, procedure, or technicality. By Plaintiff's own agreement and per the Supreme Court by Justice Newman, these failures divest the court of jurisdiction to enter the confessed judgment and are therefore fatal flaws. "The release of errors in connection with the warrant of authority operates only on irregularities in the proceeding apparent on the record. It does not reach the defect of a lack of authority to proceed. *Boggs v. Levin*, 297 Pa. 131, 135 (Pa. 1929). Also, in *Cintas Corp*, a distinction is made between the fact of service, which is the critical issue, and the return or proof of service, which is merely technical. Unlike in that case, where the court found that "the face of the record (i.e. the return of service) alleges ample facts to show that service was proper," such is not the same here. Plaintiff's own Affidavit attests to the fact of a defect, namely, the mailing which requires no return receipt; thus the Court cannot find that service was not fatally defective where both the agreement drafted by Plaintiff and Rules 2958.1 and 403 were violated, as in *Bancorp Bank*.

Finally, Plaintiff continues its contortions. The Plaintiff urges this Honorable Court to turn a blind eye to the address in the complaint which very well could have been the address typed into the Surety Agreement, but we will never know. That failure alone is at the very heart of the fatal flaw of the record. It is a fatal defect that the address was omitted from the Surety Agreement. This defect was then compounded when Plaintiff failed to send proper service by mail as required by Rule 403 and did not receive a signature from or on behalf of the Defendants. See also *Clymire v. McKivitz*, 350 Pa. Super. 472 (Pa. Super. Ct. 1986) (finding a default judgment fatally defective and affirming trial court's order to strike where the record did not show that the complaint was ever served on Defendant) and *Sharp v. Valley Forge Medical Center & Heart Hospital, Inc.*, 422 Pa. 124 (Pa. 1966) (where sheriff's return on its face

discloses no service in conformance with rules for service, it is invalid and a judgment based upon it is properly stricken). Consequently, either independently or in conjunction, an omitted address for service in the Surety Agreement drafted by the judgment holder and improper manner of service are precisely the sorts of fatal defects -- as a matter of law -- which justify striking a confession of judgment.

Further examples of fatal defects justifying striking a judgment are as follows:

- *East Coast Insulation Sales Co. v. Stevenson,* 1990 Del. Super. LEXIS 220 (vacating judgment by confession where the attempt to serve the guarantor was faulty. Plaintiff did not attempt to serve the guarantor at his home and certified mail did not yield any return receipts).

- *Mt. Empire Ventures, L.L.C. v. Bal*, 73 Va. Cir. 198 (Cir. Ct. 2007) (motion to set aside confession of judgment granted where service was improperly effectuated under the applicable Virginia statute).

- H. Landau & Co. v. Quiles, CIVIL ACTION No. 94-4185, 1995 U.S. Dist. LEXIS 7769 (E.D. Pa. June 5, 1995) (striking judgment by confession where attorney was not authorized to enter it; entry of valid judgments by confession can only be accomplished in strict adherence to provisions of the instrument).

- *Grady v. Schiffer*, 384 Pa. 302 (1956) (judgment by confession stricken where property taken was in excess of what the instrument authorized).

- *Consolidation Loans, Inc. v. Guercio*, 200 So. 2d 717 (La. Ct. App. 1966) (Failure of a creditor to serve a wife with the mandatory notice of demand for payment prior to foreclosure was a fatal defect that vitiated the foreclosure sale of the property in its entirety).

V.    <u>Relief:</u>

**WHEREFORE**, Defendants respectfully request this Honorable Court to grant their Petition and Strike the Confessed Judgment of February 24, 2011. Further, they request that this Honorable Court Order that all related sanctions and Orders during execution proceedings be rendered Moot; Order any attachments and garnishments related to the stricken judgment be lifted and stricken;  direct Counsel for Plaintiffs to notify any and all entities within twenty (20) days of this Honorable Court's Order to discontinue any and all action related to the judgment; and Order that all property obtained in execution of this judgment must be returned within thirty (30) days of this Honorable Court's Order or incur sanctions for failure to comply with this Court's Order.

Respectfully submitted,
Kats, Jamison & Associates

By: _____
Marina Kats, Esquire
Richard S. Seidel, Esquire
Attorneys for Defendants
Yuri and Olga Lyubarsky

Date:

Case ID: 110203388
Control No.: 16063238

## **VERIFICATION**

I, Marina Kats, Esquire, hereby state that I am the attorney for the Defendants herein, that I am acquainted with the facts set forth in the foregoing and that the same are true and correct to the best of my knowledge, information and belief and that this statement is made subject to the penalties of 18 Pa. C.S. 4904 relating to unsworn falsification to authorities.

Marina Kats, Esquire
Attorney for Defendants

## CERTIFICATION OF SERVICE

I, Marina Kats, do hereby certify that service of a true and correct copy of Defendants' Supplemental Brief In Support Of Their Petition To Strike Confessed Judgment has been forwarded to Plaintiff's counsel and Garnishee's Counsel via e-filing and/or First Class United States mail, postage pre-paid, dated September 30, 2016 to:

Eric Rayz, Esquire
Kalikhman & Rayz, LLC
1051 County Line Road, Suite "A"
Huntingdon Valley, PA 19006
Counsel for Plaintff, Vertonix Ltd.


Steven Maniloff, Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street, 28th Floor
Philadelphia, PA  19109
Counsel for Garnishee, The Guardian Life Insurance Company of America

Marina Kats, Esquire
Attorney for Defendants

# EXHIBIT 4

Filed 7/5/2017 4:28:00 PM Superior Court Eastern District
3787 EDA 2016

IN THE

# Superior Court of Pennsylvania
# Eastern District

—————————•—————————

3787 EDA 2016
477 EDA 2017

VERTONIX, LTD,

*Appellee,*

v.

YURI AND OLGA LYUBARSKY, H/W

*Appellants,*

v.

THE GUARDIAN LIFE INSURANCE
COMPANY OF AMERICA,

*Appellee.*

_____

*On Appeal from the Orders entered November 7, 2016, and January 27, 2017,
in the Court of Common Pleas of Philadelphia County,
February Term, 2011, No. 03388*

## BRIEF FOR APPELLANTS

MARINA KATS, ESQ.
Id. No. 53020
RICHARD S. SEIDEL, ESQ.
Id. No. 55801
KATS & ASSOCIATES PC
1 Bustleton Pike
Feasterville, Pennsylvania 19053
(215) 396-9001
mkats@mkats.com
rseidel@mkats.com

*Attorneys for Appellants,*
  *Yuri and Olga Lyubarsky,*
  *husband and wife*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................ iii

STATEMENT OF JURISDICTION.....................................................................1

ORDERS IN QUESTION.....................................................................................1

STATEMENT OF SCOPE AND STANDARD OF REVIEW ................................2

STATEMENT OF QUESTIONS INVOLVED......................................................3

STATEMENT OF THE CASE..............................................................................5

     1.    Form of Action and Brief Procedural History .....................................5

     2.    Prior Determination ..................................................................................8

     3.    Names of Judges Whose Determinations are Under Review ..............8

     4.    Condensed Narrative Statement of Facts Necessary to Determine Points in Controversy ................................................................................9

     5.    Brief Statement of the Orders under review .......................................10

SUMMARY OF ARGUMENT ...............................................................................11

ARGUMENT ...........................................................................................................14

     I.    THE CONFESSED JUDGMENT OF FEBRUARY 24, 2011 IS FATALLY FLAWED AND MUST BE STRICKEN AS IT CONTAINS A CRITICAL OMISSION CAUSING IMPROPER SERVICE AND LACK OF JURISDICTION ....................................14

II.   THE PETITION TO STRIKE WAS PROPERLY PLED, AND
      IT WAS ERROR FOR THE TRIAL COURT TO FIND
      WAIVER OF THE LYUBARSKY'S RIGHT TO SERVICE AS
      SPECIFIED IN THE AGREEMENT AND WAIVER OF THE
      ARGUMENT OF IMPROPER SERVICE AND FAILURE TO
      APPLY ESTABLISHED RULES OF CONSTRUCTION ...............23

III.  THE LYUBARSKYS' GUARDIAN LIFE INSURANCE
      POLICY IS EXEMPT FROM EXECUTION BY STATUTE
      AND PA SUPREME COURT PRECEDENT ...................................25

CONCLUSION AND RELIEF SOUGHT ............................................................31

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Bancorp Bank v. Mancini,*
    28 Pa. D. & C.5th 388 (Pa. C.P. 2013)..............................................18, 19, 20

*Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC,*
    40 A.3d 145 (2012).....................................................................................3

*Boggs v. Levin,*
    297 Pa. 131 (Pa. 1929)...............................................................22

*Cardiello v. LaMond (In re LaMond),*
    No. 07-21021-MBM, 2008 Bankr. LEXIS 154
    (U.S. Bankr. W.D. Pa. Jan. 25, 2008)............................................27

*Cintas Corp. v. Lee's Cleaning Servs.,*
    549 Pa. 84 (Pa. 1997).......................................................14, 21, 22

*Clymire v. McKivitz,*
    350 Pa. Super. 472 (Pa. Super. Ct. 1986)....................................15

*Consumers Time Credit, Inc. v. Remark Corp.,*
    248 F. Supp. 158 (E.D. Pa. 1965)...............................................27

*Franklin Interiors v. Wall of Fame Mgmt. Co.,*
    511 A.2d 761 (1986)...................................................................24

*In re Lang,*
    20 F.2d 236 (E.D. Pa. 1927).......................................................27

*In re Phillips,*
    7 F. Supp. 807 (M.D. Pa. 1934)..................................................27

*In re Wettach,*
    489 B.R. 496 (Bankr. W.D. Pa. 2013)..........................................26

*Jordan v. Fox, Rothschild, O'Brien & Frankel,*
    20 F.3d 1250 (3d Cir. 1994) ........................................................................25

*Mother's Rest., Inc. v. Krystkiewicz,*
    861 A.2d 327 (Pa. Super. Ct. 2004) ...........................................................14

*Neducsin v. Caplan,*
    121 A.3d 498 (Pa. Super. Ct. 2015) ...................................................2, 14, 15

*Oral & Maxillofacial Surgery Assocs. of Chester Cty., Ltd. v. Kolimaga,*
    34 Pa. D. & C.5th 520 (C.P. 2013) ..............................................................29

*Resolute Ins. Co. v. Pennington,*
    423 Pa. 472 (1966).................................................................5, 13, 29, 30

*Scott Factors, Inc. v. Hartley,*
    425 Pa. 290 (Pa. 1967)...............................................................................21, 24

*Schmitz v. Schmitz,*
    305 Pa. Super. 328 (1982) ........................................................................28

*Sharp v. Valley Forge Medical Center & Heart Hospital, Inc.,*
    422 Pa. 124 (Pa. 1966).........................................................................16, 18

## Statutes

40 P.S. §517 ................................................................................26, 27, 28

42 Pa.C.S. § 8124.............................................................................3, 26, 28

42 Pa.C.S. § 8124(c)(6)..................................................................5, 13, 27, 28

## Rules

Pa. R.A.P. 311(a) .....................................................................................10

Pa. R.A.P. 311(a)(1)....................................................................................1

Pa. R.A.P. 311(a)(2) ................................................................................1

Pa. R.C.P. 403 .............................................................................*passim*

Pa. R.C.P. 405(d) ................................................................................17

Pa. R.C.P. 2951-2957 .........................................................................21

Pa. R.C.P. 2958.1 ................................................................3, 12, 17, 21

## STATEMENT OF JURISDICTION

This is a consolidated appeal of two interlocutory orders appealable as of right pursuant to Pa. R.A.P. 311(a)(1) Affecting Judgments and Pa. R.A.P. 311(a)(2) Attachments, etc.

## ORDERS IN QUESTION

I.    Order of November 7, 2016

Pursuant to Pa. R.A.P. 2115, the text of the two Orders which are the subject of this consolidated appeal are set forth verbatim:

AND NOW, this 7th day of Nov., 2016, it is hereby ORDERED that the Petition to Strike Confessed Judgment is DENIED. [1]

II.    Order of January 27, 2017

AND NOW, this 27th day of January, 2017, upon consideration of the Motion for a Judgment against The Guardian Life Insurance Company of America (hereinafter "Garnishee"), filed by Vertonix Limited (hereinafter "Plaintiff") and any response thereto, it is hereby ORDERED and DECREED that:

1. The Motion is GRANTED.

---

[1] Petitioner has failed to prove that there was a fatal defect. All documents indicate that Petitioners signed a confession of judgment in which they agreed to waive all arguments with regard to due process, service, and their constitutional rights. Further, at the hearing of this matter, Petitioners made clear that their real argument was about the amount of the judgment. However, Petitioners have failed to file any appeal of the prior court orders, or other documents with the Court to contest the sanctions imposed, which appear to represent the bulk of the judgment that remains unpaid.

2. Unless, within (10) days of the entry of this Order, Plaintiff notifies
   Garnishee in writing that Defendants Yuri Lyubarsky and/or Olga
   Lyubarsky (hereinafter "Defendants") fully and completely satisfied the
   judgment entered against them on February 24, 2011 in this matter,
   Garnishee shall forthwith surrender and thereafter pay over to Plaintiff, via
   its counsel, Kalikhman & Rayz, LLC, the sum of $21,981.15, with a check
   made payable to "Kalikhman & Rayz, LLC, as counsel for Vertonix
   Limited," representing the current net cash surrender value of any life
   insurance policy owned by Defendants and held on their behalf (or for their
   benefit) by Garnishee.

## STATEMENT OF SCOPE AND STANDARD OF REVIEW

The standard of review applied by an appellate court is *de novo* for denial of

a Petition to Strike Confessed Judgment as it is a pure question of law whether the

record is sufficient to sustain the judgment and whether petitioners are entitled to

relief as a matter of law.  A Petition to Strike operates as a demurrer to the record

and the scope of review is limited to the complaint and exhibits, focusing on

facially fatal defects or irregularities. *Neducsin v. Caplan*, 121 A.3d 498, 504 (Pa.

Super. Ct. 2015).

The standard and scope of review of the Order of January 27, 2017 denying

a claim of exemption of property from execution pursuant to the exemption statute,

42 Pa.C.S. § 8124, involve issues of "statutory interpretation, raise a question of law, and are subject to *de novo* and plenary review." *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC,* 40 A.3d 145, 151 (2012).

## STATEMENT OF QUESTIONS INVOLVED

I.       Order of November 7, 2016 – 3787 EDA 2016

1.  Is the confessed judgment of February 24, 2011 fatally defective on its face and *void ab initio* due to the omission of an address from the record where original process may be effectuated on the Lyubarskys?

    A. The Trial Court disagreed.

2.  Is the confessed judgment fatally irregular on its face where the Complaint's Affidavit of Mailing avers original process was sent by regular mail to "19 Shallow Brook Road Morganville, NJ 07751" which is inconsistent and non-compliant with the terms of the Surety Agreement's Venue and Exclusive Jurisdiction section requiring service by certified mail to an address included in the Agreement containing the confession of judgment clause?

3.  Was the trial court without jurisdiction to enter the confessed judgment against the Lyubarskys due to a failure of proper service of process, in violation of Pa. R.C.P. 2958.1, Pa. R.C.P. No. 403, and the terms of the

Surety Agreement, where original process was sent by regular mail and to an address on which the agreement was entirely silent?

     A. The Trial Court disagreed.

4. Did the Trial Court err by finding waiver in that the Lyubarskys "agreed to waive all arguments with regard to due process, service, and their constitutional rights," in light of the Surety Agreement's language reserving service of process to the Lyubarskys by certified mail to an address contained in the agreement?

     A. The Trial Court disagreed.

5. Did the Trial Court improperly cite to matters dehors the record in footnote 5 of its Opinion of February 13, 2017 and thereby commit reversible error when it assumed without any factual support in the record that "the parties all knew" what the service address was?

     A. The Trial Court disagreed.

6. Did the Trial Court err by ruling in its Opinion "that actual service was not in issue" despite the issue being plainly pled in the Petition to Strike – "this effectuation of process being missing" -- and over defense counsel's three objections at oral argument that the trial court may not look to extrinsic evidence regarding service and must confine its inquiry to the record?

     A. The Trial Court disagreed.

7.  Did the Trial Court fail to strictly construe and resolve any doubts or
    ambiguities regarding the validity of the judgment in favor of the
    Lyubarskys in accordance with the established rules of construction that any
    doubts as to the judgments' validity are to be resolved against the party
    entering such judgments and that a written instrument must be strictly
    construed against its maker?

    A. The Trial Court did not address the question.

II.     Order of November 7, 2016

8.  Whether the Trial Court erred as a matter of law in its statutory
    interpretation and failure to apply Pennsylvania Supreme Court precedent by
    granting Vertonix Ltd.'s Motion for Judgment and denying the Lyubarsky's
    claim of immunity from execution on the life insurance policy in
    contravention of 42 Pa.C.S. § 8124(c)(6) and the holding of *Resolute Ins.*
    *Co. v. Pennington*, 423 Pa. 472 (1966)?

    A. The Trial Court disagreed.


## STATEMENT OF THE CASE

### 1.     Form of Action and Brief Procedural History

Vertonix Ltd. commenced this confession of judgment action by Complaint
on February 24, 2011 and confessed judgment against the Lyubarskys in the

amount of $184, 264.19. Vertonix proceeded to conduct post-judgment discovery in search of the Lyubarskys' assets for execution for several years by way of various discovery motions. During this time, Mr. and Mrs. Lyubarsky went unrepresented and/or *pro se* and did not participate in the litigation of this matter in the Philadelphia Court of Common Pleas for approximately five years until May of 2016 when they retained Kats, Jamison & Associates to represent them.

On May 10, 2016 the Lyubarskys, by and through their attorneys, made their first filing in this litigation which was a Claim For Exemption with the Sherriff of Philadelphia County for all interest and proceeds of the four Guardian insurance policies identified by Guardian in its responses to Vertonix's Interrogatories in Attachment. On May 25, 2016, the Lyubarskys filed a Motion with the Court of Common Pleas of Philadelphia County to sustain the claim for exemption regarding the Guardian disability and life insurance policies. Since July 20, 2012, the Lyubarskys have been incurring sanctions at the rate of $100.00 per day for their non-compliance with the two trial court discovery Orders from 2011 and 2012. Although the Lyubarskys satisfied part of the judgment amount by $175,000.00 in proceeds from a lien pursuant to the judgment and sale of their home in New Jersey, damages were reassessed by the Trial Court in the amount of $141, 102.71 on July 6, 2016, representing the sanctions and interest. On July 7, 2016, the Court denied the claim for exemption for all four of the Lyubarsky's

Guardian insurance policies, two disability insurance policies and two life insurance. On December 16, 2016, Vertonix filed a Motion for Judgment applying to the Trial Court for an Order compelling Guardian to force a liquidation of one of its insured's life insurance policies that the Court had determined earlier was not exempt in an amount equal to the present cash surrender value of Mr. Lyubarsky's Guardian Life insurance policy, number 06450023. The Lyubarskys filed Preliminary Objections to the Motion for Judgment on January 4, 2017. The Trial Court granted Plaintiff's Motion for Judgment on January 27, 2017, which constitutes one of the Orders in this consolidated appeal, captioned at 477 EDA 2017 and filed on February 1, 2017.

On June 23, 2016, the Lyubarskys petitioned the Trial Court to Strike the Judgment. Following oral argument and supplemental briefing, the Petition was denied on November 7, 2016, leading to the filing of this Appeal on December 1, 2016, captioned at 3787 EDA 2016.

On February 2, 2017, the Lyubarskys filed an Emergency Motion to Stay Proceedings applying to the Trial Court for a Stay of the January 27, 2017 Order pending Appeal. On February 3, 2017, counsel for all parties appeared, and the Trial Court held a hearing on the Motion to Stay the Order. The Trial Court entered an Order granting the Stay in part and denying it in part. The Court Ordered that the application for a Stay would be granted with the instruction that an Emergency

Application for a Stay of the Order be filed with the Superior Court no later than February 7, 2017. Lyubarskys complied with the Trial Court's Order and filed the Application for a Stay in this Honorable Court, which was denied by a *Per Curiam* Order docketed on March 17, 2017. The Lyubarskys sought review of the denial of the stay in the Supreme Court of Pennsylvania, and the Stay was denied by the Supreme Court on April 24, 2017.

### 2.    Prior Determinations

Before the two Orders which are the subject of this appeal, the Lyubarskys did not participate in the lower court proceedings until May of 2016. The Court entered several discovery and sanctions Orders for non-participation. On July 6, 2016 the Trial Court determined that none of the four insurance policies held by the Lyubarskys, two life insurance, and two disability, were exempt from execution.

### 3.    Names of Judges Whose Determinations are Under Review

The Honorable Linda Carpenter of the Philadelphia County Court of Common Pleas entered the Order of November 7, 2016 denying the Petition to Strike the Judgment. The Honorable Daniel J. Anders of the Philadelphia County Court of Common Pleas entered the Order of January 27, 2016 denying Preliminary Objections claiming an exemption from execution on the Lyubarskys' Guardian life insurance policy.

8

4.    **Condensed Narrative Statement of Facts Necessary to Determine Points in Controversy**

Vertonix Ltd. commenced this confession of judgment action on February 24, 2011, by complaint to confess judgment against the Lyubarskys upon a commercial loan obligation secured by a "Surety Agreement" containing a warrant of attorney provision and a confession of judgment clause (R. 31a-70a). The Complaints and its exhibits constitute the entire record and all facts necessary for the determination of the sufficiency of the record to sustain the judgment are contained therein. On June 23, 2016 the Lyubarskys petitioned the Trial Court to Strike the Judgment raising the issues of improper service and supporting documents which omitted entirely a service address. (R. 119a-127a). Specifically, the issues of the omitted address and improper service were raised and preserved at (R.125a) of the Petition to Strike.

On October 30, 2015, Vertonix filed a Praecipe for Writ of Execution which the Prothonotary issued pursuant to the confessed judgment directing The Guardian Life Insurance Company of America as Garnishee to levy and attach the Lyubarskys' property in its possession. On November 18, 2015 Guardian filed its Answers and Objections in response to Vertonix's Interrogatories in Attachment along with New Matter raising the defense of immunity from execution of disability and life insurance proceeds (R. 71a – 76a). On September 21, 2016, oral argument was held on the Motion to Strike. The Court entered an Order to "file

9

supplemental briefs to clarify any matters at the hearing today." (R. 163a.)
Following supplemental briefing, the Court denied the Petition by its Order of
November 7, 2016, entered by the Honorable Linda Carpenter, which denial is one
of the subjects of this consolidated appeal. (R. 200a)

On July 7, 2016, the Trial Court by the Honorable Linda Carpenter denied
the Lyubarskys' Motion to exempt the four Guardian insurance policies (R. 148a).
On December 16, 2016, Vertonix filed a Motion for Judgment applying to the Trial
Court for an Order compelling Guardian to force a liquidation of one of its
insured's life insurance policies in an amount equal to the present cash surrender
value of Mr. Lyubarsky's Guardian Life insurance policy, number 06450023. (R.
201a). The Lyubarskys filed Preliminary Objections to the Motion for Judgment on
January 4, 2017. (R. 209a) raising and preserving the issue of the statutory
exemption for appeal. (R.212a).  The Trial Court granted Plaintiff's Motion for
Judgment on January 27, 2017. The Order of January 27, 2017 was entered by the
Honorable Daniel J. Anders, and is the second Order whose determination is also
the subject of this consolidated appeal.

### 5.    Brief Statement of the Orders under review

The Orders appealed from, the Orders of November 7, 2016 and January 27,
2017 are both interlocutory but appealable as of right pursuant to Pa. R.A.P. 311(a)
(1) and (2) as affecting judgment and possession of property, respectively. In the

footnote to the November 7, 2016 Order, the Court found that the Lyubarskys failed to prove there was a fatal defect in the record. The Court further found waiver of "all arguments with regard to due process, service and their constitutional rights."

In the Order of January 27, 2017 Judge Anders denied the Lyubarskys claim of exemption from execution of their Guardian life insurance policy.

## SUMMARY OF THE ARGUMENT

1.     The Surety Agreement containing the confession of judgment clause and warrant of attorney provision provided that service was to be by certified mail to an address supplied in in the agreement (R. 60a). The failure to supply the service address in the Agreement and it omission from the record is a fatal defect.

2.     In the Complaint's Affidavit of Mailing Eric Rayz, Esq., counsel for Vertonix, personally avers he sent original process via regular mail to "19 Shallow Brook Road Morganville, NJ 07751." (R.53a). Therefore, such service is inconsistent and non-compliant with the terms of the Surety Agreement's Venue and Exclusive Jurisdiction section requiring service by certified mail and to an address included in the Agreement, neither of which conditions occurred as the Affidavit itself admits.

3.     The Trial Court was without jurisdiction to enter the confessed judgment because the omission of the service address in the Agreement

11

consequently led to the critical flaw of improper service in violation of the Surety Agreement's terms, Pa. R.C.P. 2958.1, and Pa. R.C.P. No. 403. Therefore, since the record shows that service of process was improper, the Court did not have jurisdiction over the Lyubarskys.

4.    The Trial Court erred in the footnote of its Order of November 7, 2016 by finding that the Lyubarskys "agreed to waive all arguments with regard to due process, service, and their constitutional rights," when the specific contractual text of the Surety Agreement containing the confession of judgment clause and warrant of attorney provision explicitly reserved service of process by certified mail to an address in the agreement and there was no indicia of affirmative waiver of that right in the record.

5.    The Trial Court erred in footnote 5 its Opinion of February 13, 2017 when it assumed, without any factual support from the record, that "the parties all knew" what the service address was supposed to be that was omitted from the Agreement.

6.    The Trial Court erred by ruling in its Opinion of February 13, 2017 that "actual service was not in issue" when the issue was properly pled and preserved in the Petition to Strike (App. Record at) and was argued at the hearing on the petition.

7.    The Trial Court erred in failing to apply the established rules of construction regarding three presumptions that the Lyubarskys were entitled to: first, that any doubts as to the validity of entry of confessed judgments should be strictly construed and resolved against the party confessing judgment, Vertonix Ltd; second, that any ambiguities in a contract be resolved against its draftsman, and third that a finding of waiver of federal constitutional rights, here the due process right through proper service of pre-deprivation notice and hearing, is disfavored absent a clear showing of intentional relinquishment.

8.    The Trial Court erred as a matter of law in its statutory interpretation and failure to apply Pennsylvania Supreme Court precedent by granting Vertonix Ltd.'s Motion for Judgment and denying the Lyubarsky's claim of immunity from execution on the life insurance policy in contravention of 42 Pa.C.S. § 8124(c)(6) and the holding of *Resolute Ins. Co. v. Pennington*, 423 Pa. 472 (1966).

# ARGUMENT

## I.    THE CONFESSED JUDGMENT OF FEBRUARY 24, 2011 IS FATALLY FLAWED AND MUST BE STRICKEN AS IT CONTAINS A CRITICAL OMISSION CAUSING IMPROPER SERVICE AND LACK OF JURISDICTION (Questions 1-3).

The scope of review on a Motion to Strike is limited. "When deciding if there are fatal defects on the face of the record for the purposes of a petition to strike a judgment, a court may only look at what was in the record when the judgment was entered." *Cintas Corp. v. Lee's Cleaning Servs.,* 549 Pa. 84, 90 (Pa. 1997). Here, the entire record subject to the court's review is found at R. 31a-70a. The record in its entirety consists only of the complaint and the exhibits thereto. *Neducsin v. Caplan*, 121 A.3d 498, 504 (Pa. Super. Ct. 2015). Every filing with the Court subsequent to the entry of the judgment on February 24, 2011 is therefore extrinsic and irrelevant for purposes of the Petition and review of its denial. Thus, this Honorable Court must strike the judgment if, on the face of this record, it finds a fatal defect or irregularity in the complaint or its exhibits. The issue is necessarily a narrow one.

Unlike a Motion to Open, "the courts of this Commonwealth have long held that an individual may seek to strike a void judgment at any time." *Mother's Rest., Inc. v. Krystkiewicz*, 861 A.2d 327, 337  (Pa. Super. Ct. 2004). As this Honorable Court explained, "the petition to strike a confessed judgment must focus on any defects or irregularities appearing on the face of the record, as filed by the party in

whose favor the warrant was given, which affect the validity of the judgment and entitle the petitioner to relief as a matter of law." *Neducsin* at 504. Since the address where service was supposed to be made is missing from the Surety Agreement – which Plaintiff drafted – the document must be strictly construed against the drafter as being fatally defective by way of omission. This omission is reason alone why the record is not self-sustaining. Therefore, the Lyubarskys have properly petitioned the Trial Court to strike the fatally flawed Confession of Judgment and properly preserved the omission and service issues for appeal.

The irregularity of this omission leads to the discovery of a further inconsistency and fatal defect, improper service. This Honorable Court in *Clymire v. McKivitz*, 350 Pa. Super. 472 (Pa. Super. Ct. 1986) affirmed a trial court's order to strike because the judgment was fatally defective where the record did not show that the complaint was ever served on Defendant. The record here is defective in the same respect. Nowhere in the Complaint or its Exhibits, and therefore nowhere in the record, is there a proper address for service (R. 31a – 70). The record here shows that Vertonix did not serve the Complaint on the Lyubarskys in accordance with the terms of the Surety Agreement attached to it (R.60a). In fact, what the record does show is the wrong type of mailing, regular instead of certified, to an address on which the Surety Agreement is entirely silent (R.53a – 54a), which amounts to improper service.

The Pennsylvania Supreme Court stated that "the rules relating to service of process must be strictly followed, and jurisdiction of the court over the person of the defendant is dependent upon proper service having been made." *Sharp v. Valley Forge Medical Center & Heart Hospital, Inc.*, 422 Pa. 124, 127(Pa. 1966). Here, Vertonix has failed to comply with both the rules of civil procedure and the terms for service of the Surety Agreement, and thus the Trial Court was without jurisdiction to enter the judgment due to the defect of improper service created by the omission. In *Sharp*, the Court affirmed as properly stricken a judgment based on the invalid sheriff's return which "on its face discloses no service in conformity with the existing rules." *Id.* at 127. Here, (R. 53a – 54a), Vertonix's own Affidavit of Mailing of Notice of Judgment by Confession attests improper service. The affidavit makes no mention of a return receipt or certified mail, only "First Class U.S. Mail, postage pre-paid, to Defendants at their last known address … 19 Shallow Brook Road Morganville, NJ 07751." By the terms of the Surety Agreement containing the confession of judgment clause and warrant of attorney provision, and the supporting documents thereto, as well as the Pennsylvania Rules, an address for service of process had to be agreed to and be contained in the agreement. The Surety Agreement provides (r.60a), under subsection 4. Venue and Exclusive Jurisdiction, the following waiver of personal service in exchange for

16

the specifically reserved right to receive service by certified mail to an address

stated in the agreement:

> "Surety waives <u>personal</u> service of the summons,
> complaint and any other process issued in any such
> action or suit and agrees that service of such summons,
> complaint, and any other process may be made by
> *registered or certified mail*, postage prepaid, addressed to
> the Surety *at the address set **forth below*** and that such
> service so made <u>shall</u> be deemed completed upon the
> providing of such <u>notice</u>." R. 60a. (emphasis added).

The failure to so state the address for service is a fatal flaw by the very terms

of the agreement drafted by the judgment holder, Vertonix. The resulting

ineffective service and inability of the judgment holder to prove service in the

manner required by their own agreement, Rule 2958.1, and Rule 403, demonstrates

the cascade of fatal flaws flowing from the omission. Thus, the confessed

judgment is a nullity and *void ab initio*.

It should be noted that Vertonix's affidavit is functionally equivalent to the

return of service as per Pa. R.C.P. No. 405(d), which states that, "a return of

service by a person other than the sheriff shall be by affidavit." In this instance, Pa.

R.C.P. 2958.1, is the relevant rule which authorizes service of original process in

actions of Confession of Judgment for Money. Accordingly, the manner of such

service must comport with the provision of Pa. R.C.P. No. 403, which requires for

good service, and therefore, jurisdiction to enter a confessed judgment, a receipt

signed by the Lyubarskys. Rule 403 states in relevant part:

17

> If a rule of civil procedure authorizes original process to
> be served by mail, a copy of the process <u>shall</u> be mailed
> to the defendant by any form of mail <u>requiring a receipt
> signed by the defendant or his authorized agent</u>. Service
> is complete upon delivery of the mail. (emphasis
> supplied).

Vertonix admittedly failed to comply, and this is a fatal defect as well as the

original omission. R. 53a – 54a. "There is no presumption as to the validity of the

service and the return itself is required to set forth service in conformance with the

rules." *Sharp* at 127. When Vertonix's affidavit and the Venue and Exclusive

Jurisdiction section of the Surety Agreement are read together, it is clear that the

confession of judgment documents are fatally flawed on their face for the glaring

omission of an address which caused improper service and a lack of jurisdiction. It

was the duty of Vertonix under both the Rules and their own Agreement to

perform service of process as plainly required. The Rules and the Agreement are

actually consistent in the manner of service required, but Vertonix fatally failed to

comport with either their own agreement or the Rules.

The Lyubarskys would direct this Honorable Court's attention to the

persuasive rationale and holding of *Bancorp Bank v. Mancini*, 28 Pa. D. & C.5th

388 (Pa. C.P. 2013). That case is strikingly similar to the one now before this

Honorable Court on appeal. In *Bancorp Bank,* the Court of Common Pleas of

Philadelphia County struck the confessed judgment entered pursuant to a Surety

Agreement, warrant of attorney provision, and confession of judgment clause

because, *inter alia*, conflicting addresses for service were in the document and as a result, service was improper.

In *Bancorp Bank,* Judge Tucker stated the standard with respect to service of process and fatal defects as follows:

> In contrast to procedural rules promulgated to merely protect parties in litigation, it is well-settled that procedural rules governing service of process must be strictly followed because service of process is the mechanism by which a court obtains jurisdiction over a defendant. As such, service of process is not 'merely a procedural defect that can be ignored when a defendant subsequently learns of the action against him or her.' Therefore, improper service of process is an incurable defect on the record which supports granting a petition to strike a confession of judgment, particularly where plaintiff has failed to comply with the requirements of Rule 403. (citation omitted) 28 Pa. D. & C.5th 388, 397 (Pa. C.P. 2013). (emphasis supplied)

The assertion of Vertonix's counsel that at some point during execution of the *ex parte* confession of judgment the Lyubarskys became aware of the proceedings is of no moment because that does not and cannot remedy the fatal defects of the failure to include a proper address for service of process and defective service itself. Vertonix inexplicably argues the Lyubarskys do not claim improper service. While this is factually untrue, it is Vertonix's burden to demonstrate good service, which they cannot. Contrary to Vertonix's specious assertions of "notice" from the prothonotary, it is of no legal significance if the Lyubarskys received "notice" but did not receive proper service. It is not for the prothonotary to do Vertonix's job. It

19

is not for the prothonotary to cure Vertonix's failure to properly draft the Surety

Agreement. It is not for the prothonotary to cure the fatal flaws of the Surety

Agreement and Service. In fact, such flaws cannot be cured by anyone or any

action other than the striking of the confessed judgment.

The crescendo of Judge Tucker's analysis was:

> On May 02, 2012, Appellant attached a Certification of
> Service stating that a copy of the Complaint in
> Confession of Judgment was sent "via first class mail" to
> Appellee at an address in <u>Turnersville</u>, NJ. The Court
> notes that, the 2006 Surety agreement lists Appellee's
> address as being in <u>Marlton</u>, NJ...  First class mail,
> electronic filing and/or U.S. Mail do not require a return
> receipt; therefore Appellant <u>failed to serve original</u>
> <u>process of the Complaint in Confession of Judgment</u>
> <u>upon Appellee</u>. The confession of judgment was properly
> stricken because Appellant's <u>failure to properly serve</u>
> Appellee constituted an <u>incurable defect on the record.</u>
> *Bancorp Bank* at 398. (emphasis added)

Here, Vertonix failed in a highly similar manner as the Appellant in

*Bancorp Bank*. Following Judge Tucker's rationale, the <u>omission</u> of an address is

arguably a more severe flaw than the two conflicting addresses in *Bancorp Bank*.

The failure to use a return receipt, certified or registered mail, however, in

violation of both their own agreement and Rule 403 are the same fatal flaws.

Vertonix would be incorrect in asserting that there is no fatal defect in the

record at issue. They compound their incorrect assertions by stating: "Plaintiff has

fulfilled all requirements of the applicable Rules and Defendants have not

20

identified any provision of Pa. R. Civ. Pa. 2951-2957 that has not been complied with." (R. 156a). Yet Vertonix avoids acknowledging the fatal failure to comply with their own agreement, Rule 2958.1, and Rule 403. This purposeful ignorance demonstrates what is plain to all: their confession of judgment is fatally flawed and must be stricken. While citing Rules 2951-2957, Vertonix fails to acknowledge, Rule 2958.1.<u>Notice Served Prior to Execution</u>. Rule 2958.1 refers to and incorporates the method of service in Rule 403 as previously stated. Therefore, Vertonix is simply wrong. Mere compliance with some of the rules is insufficient in actions for judgment by confession because "any doubt as to the validity of such judgments <u>must be</u> resolved against the party entering the judgments." *Scott Factors, Inc. v. Hartley*, 425 Pa. 290, 293 (Pa. 1967). (emphasis added).

Madame Justice Newman, writing for the Supreme Court of Pennsylvania in 1997, reinforces this proposition:

> Service of process is a <u>mechanism by which a court obtains jurisdiction</u> of a defendant, and therefore, <u>the rules concerning service of process must be strictly followed.</u>  <u>Without valid service, a court lacks personal jurisdiction of a defendant</u> and is powerless to enter judgment against him or her. Thus, improper service is <u>not merely a procedural defect that can be ignored when a defendant subsequently learns of the action against him or her</u>. *Cintas Corp.* at 91 (Pa. 1997). (emphasis added).

In their Petition, the Lyubarskys alleged that these are not merely correctable flaws (R.124a).  Improper service and the omission of an agreed upon address for

service of process are indeed incurable, fatal defects absent striking the judgment. The failure to identify an address, as stated in the agreement itself, and the failure to properly serve cannot be mischaracterized as mere error, procedure, or technicality. By Plaintiff's own agreement and per the Supreme Court by Justice Newman, these failures divest the court of jurisdiction to enter the confessed judgment and are therefore fatal flaws. "The release of errors in connection with the warrant of authority operates only on irregularities in the proceeding apparent on the record. It does not reach the defect of a lack of authority to proceed. *Boggs v. Levin*, 297 Pa. 131, 135 (Pa. 1929). Also, in *Cintas Corp*, a distinction is made between the fact of service, which is the critical issue, and the return or proof of service, which is merely technical. Unlike in that case, where the court found that "the face of the record (i.e. the return of service) alleges ample facts to show that service was proper," such is not the same here. Vertonix's own Affidavit attests to the fact of a defect, namely, the mailing which requires no return receipt and to an address on which the Agreement is silent; thus the Court cannot find that service was not fatally defective where both the agreement drafted by Plaintiff and Rules 2958.1 and 403 were violated, as in *Bancorp Bank*.

Vertonix urges the Court to turn a blind eye to the address in the complaint which very well could have been the address typed into the Surety Agreement, but we will never know. That failure alone is at the very heart of the fatal flaw of the

record. It is a fatal defect that the address was omitted from the Surety Agreement. This defect was then compounded when Vertonix failed to send proper service by mail as required by Rule 403 and did not receive a signature from or on behalf of the Defendants. Therefore, the Court was without jurisdiction to enter the confessed judgment. Consequently, either independently or in conjunction, an omitted address for service in the Surety Agreement drafted by the judgment holder and improper manner of service are precisely the sorts of fatal defects -- as a matter of law -- which justify striking a confession of judgment.

## II.  THE PETITION TO STRIKE WAS PROPERLY PLED, AND IT WAS ERROR FOR THE TRIAL COURT TO FIND WAIVER OF THE LYUBARSKY'S RIGHT TO SERVICE AS SPECIFIED IN THE AGREEMENT AND WAIVER OF THE ARGUMENT OF IMPROPER SERVICE AND FAILURE TO APPLY ESTABLISHED RULES OF CONSTRUCTION (Questions 4-7).

The Petition to Strike was properly pled and the issues raised therein properly preserved: the omitted address and its effect on failure of service of process. R. 122a, 124a, 125a. It was error for the court to disregard these arguments where the Opinion of February 13, 2017 stated incorrectly that "actual service was not in issue" when that was what the Lyubarskys were arguing the whole time. In fact the court acknowledged that was the Lyubarsky's position. During oral argument counsel for the Lyubarskys said (Transcript pg18, lines 18-23):

Mr. Seidel: "You cannot give a right to service by certified mail and then take it

away by saying you waive all rights."

The Court: "Well, that's your argument. Here's what I'm going to ask you. The confession of judgment was for how much?"

The Court then went on in its Opinion to say the "real argument" of the Lyubarskys was the balance of the judgment, which was not true, as that information was offered for context and to answer the Judge's question. The Court also erred by finding waiver of the constitutional right to due process by service. The Court violated the canon of construction that the specific trumps the general. Here, the reservation of right to service of process by certified mail to an address in the agreement, (R. 60a) must control as against any general waivers. It must control because any doubt as to the validity of such judgments <u>must be</u> resolved against the party entering the judgments." *Scott Factors, Inc. v. Hartley*, 425 Pa. 290, 293 (Pa. 1967). (emphasis added). Further, the confession of judgment documents were drafted by Vertonix Ltd. and not the Lyubarskys. To the extent there is any tension or ambiguity in the contractual terms, such ambiguities must be resolved in favor of the Lyubarskys, who did not draft the documents. "Our rules of construction, in fact, require that a written instrument must be strictly construed against its maker." *Franklin Interiors v. Wall of Fame Mgmt. Co.,* 511 A.2d 761, 763 (1986).

Finally, the court erred in finding waiver because there was no finding of intentional relinquishment of the right to service by certified mail to an address in

the agreement. "In *Overmyer*, the court assumed, without deciding, that waiver would be judged under the same standards that apply to a criminal defendant's waiver of constitutional rights," meaning that unless the waiver of service of process was voluntary, knowing, and intelligently made, because the waiver of constitutional rights is disfavored. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1272 (3d Cir. 1994). In fact the strongest evidence against waiver is the inclusion and reservation of the right in the Agreement. (R.60a). Vertonix failed to comply with its own agreement by omitting the address and making improper service. The Trial Court erred by refusing to apply the proper presumptions in evaluating the Petition to Strike. It did not resolve in the Lyubarskys favor any of the doubts, ambiguities, and irregularities in the record. The Court should have strictly construed the confession of judgment for technical compliance in all respects and found it fatally flawed as against Vertonix, the party entering the judgment and who drafted the agreement. It should also not have found waiver because there was no facts in the record to suggest the Lyubarskys waived either their right to service, or their argument of improper service.

## III. THE LYUBARSKYS' GUARDIAN LIFE INSURANCE POLICY IS EXEMPT FROM EXECUTION BY STATUTE AND PA SUPREME COURT PRECEDENT (Question 8)

The Trial Court incorrectly ruled in its Order of January 27, 2016 that Vertonix can reach the Guardian life insurance policies or their cash surrender

value in execution because they are in a category of property which is exempt from execution. Please see 42 Pa. Cons. Stat. Ann. § 8124 – Exemption of Particular Property and specifically subsections (c) and (6) thereof which provides:

> (c) Insurance proceeds. — The following property or other rights of the judgment debtor shall be exempt from attachment or execution on a judgment:

> (6) The net amount payable under any annuity contract or policy of life insurance made for the benefit of or assigned to the spouse, children or dependent relative of the insured, whether or not the right to change the named beneficiary is reserved by or permitted to the insured. The preceding sentence shall not be applicable to the extent the judgment debtor is such spouse, child or other relative.

There is ample case law for the Lyubarskys' proposition that the life insurance policies and their cash surrender value in question here are exempt and immune from Vertonix's attempt at execution. Vertonix on the other hand, cites to no authority which would show such execution as legitimate, because there is none which exists to support Vertonix's position.

The Federal District and Bankruptcy Courts of the Third Circuit have consistently held when interpreting 42 Pa. Cons. Stat. Ann. § 8124, and its precursor statute, 40 P.S. §517, that life insurance policies owned by judgment debtors are immune from execution by their creditors. For example, *In re Wettach*, 489 B.R. 496, 522, 523 (Bankr. W.D. Pa. 2013), the bankruptcy trustee itself acknowledged that the life insurance policy's cash value is "an amount beyond the

26

reach of the Debtor's creditors," and the Court concluded that "it appears the Guardian Life policy is exempt under 42 Pa.C.S.A. §8124(c)(6)."

A similar ruling was made four years prior in the case of *Cardiello v. LaMond (In re LaMond)*, No. 07-21021-MBM, 2008 Bankr. LEXIS 154 (U.S. Bankr. W.D. Pa. Jan. 25, 2008). There the Bankruptcy Court ruled that "the Life Insurance Policies, including their present cash surrender value, are, however, EXEMPT pursuant to 42 Pa.C.S.A. § 8124(c)(6)." id. In *Lamond*, the Court relied on *Consumers Time Credit, Inc. v. Remark Corp.*, 248 F. Supp. 158 (E.D. Pa. 1965) because although it was "construing 40 P.S. §517, which provision is the precursor … the language of which provision is identical in all significant respects – to 42 Pa.C.S.A. § 8124(c)(6)." id. The Plaintiff in *Consumers Time* took the same position as this present case: "that the statute is inapplicable where both husband and wife are the debtors", yet the Court disagreed and explained that the public policy of "statutes granting exemptions from the claims of creditors are to be construed liberally because of their benign motivation," and the court therefore held that the life insurance policy is exempt from attachment and execution. Consumer's Time at 160 and 161. See *also In re Lang*, 20 F.2d 236 (E.D. Pa. 1927) and *In re Phillips*, 7 F. Supp. 807 (M.D. Pa. 1934); in both cases it was held that the cash surrender value of debtor's life insurance policies are exempt from the claims of creditors. Finally, the Third Circuit Court of Appeals observed in an

attempt to execute on a life insurance policy:

> As we explained in the prior appeal, the Policy is also protected by law. The plain language of the Pennsylvania exemption statute, 42 Pa.C.S. § 8124, makes clear that, regardless of the subjective intent of Mr. DePasquale when he took out the Policy, the funds are safe from his creditors. Plastipak has offered neither arguments nor any case that even suggests that Pennsylvania law allows creditors to access otherwise-protected assets on proof of the debtor's subjective intent. *Plastipak Packaging, Inc. v. DePasquale*, 363 F. App'x 188, 190-91
>
> (3d Cir. 2010).

Likewise, under the case law of the State Courts of this Commonwealth it is clear that under 42 Pa. Cons. Stat. Ann. § 8124 and its precursor 40 P.S. §517, life insurance policies are a class of property exempt from execution and attachment of creditors. For instance: "The general rule in a majority of jurisdictions is that the cash surrender value of a debtor's life insurance policy is merely an optional right which cannot be attached or garnished by a judgment creditor." *Schmitz v. Schmitz*, 305 Pa. Super. 328, 331(1982). This is the rule in Pennsylvania as well, and therefore Mr. Lyubarsky cannot be compelled to exercise his optional right to the cash surrender value of the Guardian Life insurance policy so Vertonix can then execute on those funds. Likewise, Guardian as Garnishee cannot be compelled to exercise that right for its insured.

The last sentence of § 8124(c)(6) reads: "The preceding sentence shall not be applicable to the extent the judgment debtor is such spouse, child or other relative," presumably referring to the life insurance policy exemption itself. One

Court of Common Pleas confronted with the issue observed: "This legislation is not a model of clarity. What does 'The preceding sentence shall not be applicable to the extent the judgment debtor is such spouse, child or other relative' mean?" *Oral & Maxillofacial Surgery Assocs. of Chester Cty., Ltd. v. Kolimaga*, 34 Pa. D. & C.5th 520, 522 n.1 (C.P. 2013). Despite the legislation's lack of clarity, the record makes it clear per (Record Reprocuded App) that Olga Lyubarsky, co-defendant and judgment debtor is not the sole beneficiary of Guardian life insurance policy number 6450023. The defendants' children who are named beneficiaries are not judgment debtors. In light of this statutory ambiguity and dearth of authority regarding the statutory language "to the extent," this Honorable Court should read subsection (c)(6) in the traditional manner in which federal and state courts have read it and its precursor: broadly and liberally to comport with the precedent and public policy of the past century as elucidated in the several opinions brought to this Honorable Court's attention by the Defendants. The Supreme Court of Pennsylvania has stated in *Resolute Ins. Co. v. Pennington*, 423 Pa. 472, 474 (1966) that the exemption statute "is to be construed as being primarily for the benefit and protection of the insured and his family, and secondly for the information and benefit of the insurer, and not for the protection of creditors." Mr. Lyubarsky and his family, therefore, specifically the children named as beneficiaries should not be deprived of the protection of well-settled law

29

and their life insurance policies and insurance proceeds on the novel, hyper-technical, ambiguous, and practically baseless construction of this statute urged by the Plaintiff only because his wife, amongst others, is named as a beneficiary and because she is also a judgment debtor. The legal precedent and public policy of this Commonwealth and the federal common law work against such a proposed construction of the statute, and the exemption should apply as it always did. Therefore, it was error for the Trial Court to cite to two Courts of Common Pleas opinion, which are not binding on itself, while disregarding *Resolute Ins. Co. v. Pennington*, 423 Pa. 472 (1966) in finding to the contrary weight of authority that the life insurance policy is not exempt.

## <u>CONCLUSION AND RELIEF SOUGHT</u>

**WHEREFORE**, the Lyubarskys respectfully request this Honorable Court to Strike the Confessed Judgment of February 24, 2011.

**WHEREFORE**, the Lyubarskys respectfully request this Honorable Court to declare the life insurance policy exempt from execution.

Respectfully submitted**,**
**Kats, Jamison & Associates**

By: /s/ Marina Kats, Esq.
Marina Kats, Esquire
Richard S. Seidel, Esquire
*Attorneys for Appellants-Defendants*
*Yuri and Olga Lyubarsky*

# EXHIBIT 5

Page 1

```
1        UNITED STATES BANKRUPTCY COURT
         SOUTHERN DISTRICT OF FLORIDA
2              MIAMI DIVISION
3   In re:        Case No. 18-16659-LMI
4   YURI LYUBARSKY and OLGA      Chapter 7
    LYUBARSKY,
5
6       Debtors.
    _____/
7
8
9
               Dunn Law, P.A.
10             555 N.E. 15th Street
               Suite 934-A
11             Miami, Florida 33132
               Tuesday, November 27, 2018
12             11:11 a.m. - 1:20 p.m.
13
14
15
16           2004 EXAMINATION
                   OF
17
       YURI LYUBARSKY and OLGA LYUBARSKY
18
19      Taken on behalf of the Trustee before Maggie Rubio,
20  Registered Professional Reporter, Notary Public in and for
21  the State of Florida at Large, pursuant to a Notice of
22  Taking Rule 2004 Examination filed in the above cause.
23
24            - - - - -
25
```

Page 2

```
1
2          APPEARANCES:
3       DUNN LAW, P.A., by
        ALEXIS S. READ, ESQUIRE
4       555 N.E. 15th Street, Suite 934-A
        Miami, Florida  33132
5       Attorneys for Trustee

6       NERDINSKY LAW GROUP, P.A., by
        LEONID NERDINSKY, ESQUIRE
7       3800 South Ocean Drive, Suite 242
        Hollywood, Florida 33019
8       Attorneys for Debtors

9         ALSO PRESENT:
10      ELENA SHEVERDINOVA, RUSSIAN INTERPRETER
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                  INDEX
2   Witness      Direct    Cross    Redirect
    --------     ------    -----    --------
3
4   YURI LYUBARSKY
    and OLGA LYUBARSKY
5   (by Ms. Read)    4
6
7
8
9      TRUSTEE'S EXHIBITS
10
    EXHIBIT       DESCRIPTION           PAGE
11
    No. 1      Consulting Agreement      38
12
    No. 2      Notepad - Loan to Yuri    42
13
    No. 3      Loan Agreement            50
14
    No. 4      Wells Fargo Way2Save Account    57
15
    No. 5      Amended Schedule A/B      59
16
    No. 6      Checks - Luxury Gift Acct.    61
17
    No. 7      Checks from Yuri and Luxury Gift   62
18
    No. 8      BB&T Account 4699         74
19
    No. 9      Wells Fargo #7697 April 2018    76
20
    No. 10     Wells Fargo #7697 October 2018    81
21
    No. 11     Wells Fargo #7697 February 2018    82
22
    No. 12     Public Storage listing    85
23
24  (All original exhibits were retained by Ms. Read.)
25
```

Page 4

```
1       (Thereupon, ELENA SHEVERDINOVA was duly sworn to
2    translate from English to Russian and from Russian
3    to English.)
4    THEREUPON:
5        YURI LYUBARSKY AND OLGA LYUBARSKY
6    having been first duly sworn and responding, "I do",
7    were examined and Olga Lyubarsky testified through the
8    interpreter as follows:
9        DIRECT EXAMINATION
10   BY MS. READ:
11   Q.  Good morning.  My name is Alexis Read.  I am the
12   attorney for Marcia T. Dunn, the Chapter 7 trustee in this
13   bankruptcy case.
14       This is a Rule 2004 Examination.  I'm going to ask
15   you a series of questions under oath regarding your joint
16   bankruptcy, your assets, liabilities, finances and
17   businesses.
18       To the extent you understand my questions, please
19   answer them to the best of your knowledge and as completely
20   as possible.
21       Okay.  If at any point you don't understand a
22   question or I'm talking too fast, please let me know, and I
23   will repeat, rephrase, explain, or withdraw it.
24       Do not guess.  If you don't know an answer, say "I
25   don't know."  Only guess if I ask you to.
```

1 (Pages 1 to 4)

Page 5

1    The court reporter cannot record gestures, so
2  please say "yes" or "no."  We need a negative or affirmative
3  verbal response for the record.
4    If you need a break to use the restroom or stretch
5  your legs, please let know.  As long as there's not a
6  pending question, you are free to go.
7    Okay.  Since I'm going to be asking you both
8  questions, if I ask you, Mrs. Lyubarsky, a question, I need
9  you to answer it; if I ask Mr. Lyubarsky a question, I need
10  him to answer it.  I need you guys to not talk over each
11  other.
12    Okay.  Mrs. Lyubarsky, are you currently taking any
13  medications or under the influence of any drugs or alcohol
14  that would impair your ability to understand my questions
15  today?
16    MRS. LYUBARSKY:  No.
17  BY MS. READ:
18    Q.  Mr. Lyubarsky, are you currently taking any
19  medications or under the influence of drugs or alcohol that
20  would impair your ability to understand my questions today?
21    A.  I do take drugs, but they are not affiliated with
22  answering my question -- I mean, your questions and my
23  answers.  It's just because of my -- like a disease or
24  whatever.  Illness.
25    Q.  Okay.

Page 6

1    A.  So, I am constantly on drugs on a daily basis, and
2  particularly within a stress situation I take drugs, but
3  they are just maybe slowing down my response, but they will
4  not have any influence on my answers.
5    Q.  Are they opioids?
6    A.  What does it mean?
7    Q.  Is it like Xanax?
8    A.  Not really.  No.  The last one that I took was
9  Clonazepam.
10    Q.  Okay.
11    A.  Which calms down the person.
12    Q.  Okay.
13    A.  So, this is something that doesn't have, you know,
14  a serious influence.
15    Q.  Okay.
16    A.  But will calm me down and I hope that our
17  conversation will be nice and smooth.
18    MS. READ:  Okay.  Can I please have you state,
19  Mrs. Lyubarsky, your name for the record and I'm not going
20  to make you spell it, but ---
21    MRS. LYUBARSKY:  Olga Lyubarsky.
22    MS. READ:  Do you have any aliases?
23    MRS. LYUBARSKY:  No.
24    MS. READ:  And what is your birth date?
25    MRS. LYUBARSKY:  October 31st, 1955.

Page 7

1  BY MS. READ:
2    Q.  Mr. Lyubarsky, please state your name for the
3  record.
4    A.  Yuri Lyubarsky.
5    Q.  Do you have any aliases?
6    A.  No.
7    Q.  And what is your birth date for the record?
8    A.  August 5th, 1955.
9    Q.  Okay.  Mr. Lyubarsky, can you tell me where you
10  currently live?  I'm asking you.
11    THE INTERPRETER:  Oh, you're asking him?
12    MS. READ:  Where he currently lives.
13  BY MS. READ:
14    Q.  Mr. Lyubarsky, where do you currently live?
15    A.  We live at 375 Poinciana Drive, Sunny Isles Beach,
16  Florida 33160.
17    Q.  And is this the address listed on your driver's
18  license?
19    A.  Yes.
20    Q.  Can I see a copy of your driver's license?
21    A.  I can give you a ---
22    MS. READ:  For the record, I'm looking at a
23  driver's license, Yuri Lyubarsky, with the address 375
24  Poinciana Drive, Sunny Isles Beach, date of birth 1955.
25    MR. LYUBARSKY:  Thank you.

Page 8

1  BY MS. READ:
2    Q.  How long have you lived there?
3    A.  About three years.  Three years and change.
4    Q.  Do you own it?
5    A.  No.
6    Q.  Who owns it?
7    A.  My children.
8    Q.  Do you pay rent?
9    A.  We used to pay rent, but right now I live on my
10  children's expense, so -- I'm supposed to pay, but I don't.
11    Q.  Okay.  Who lives there with you?
12    A.  My wife.
13    Q.  Mrs. Lyubarsky?
14    A.  Yes.
15    Q.  How long have you guys been married?
16    A.  41 years.
17    Q.  Where are you originally from?
18    A.  Ukraine.
19    Q.  And when did you come here?
20    A.  1989.
21    Q.  Okay.  Are you a U.S. citizen?
22    A.  Of course.
23    Q.  Okay.  Just you and your wife live in the house?
24    A.  Yes.
25    Q.  It's an apartment or a house?

Page 9

1    A. It's apartment.
2    Q. Okay. When was the last time you paid rent on the
3  apartment?
4    A. Back in May.
5    Q. May 2018?
6    A. Yes.
7    Q. Okay. And what was the approximate rental amount?
8    A. 3500.
9    Q. And how were you paying it? By check? By cash?
10    A. Our relationship with children, that I live on my
11  children expense.
12    Q. Okay.
13    A. So, when I'm getting money -- right now I'm not,
14  but I used to get money from the person that you are asking
15  about, Mr. Pinkusovich. He gives me the money. I -- I put
16  all the money to my son's account.
17    Q. Got you.
18    A. And from that account it's disbursed.
19    Q. What's this person's name?
20    A. Alexander Pinkusovich.
21    Q. Can you spell that?
22    A. P-I-N-K-U-S-O-V-I-C-H. That's the person that lent
23  me the money during my two years.
24    Q. And when did you stop working for Mr. Pinkusovich?
25    A. We -- I think we do not understand each other.

Page 10

1    Q. All right.
2    A. I said he lent me the money.
3    Q. He lent you money. I'm sorry. Okay. When did he
4  lend you money?
5    A. From 2016 until 2018. And this is on the record.
6    Q. How much did he lend you?
7    A. It's on the record. I don't remember exactly the
8  amount.
9    Q. And this is a family friend or a business
10  associate?
11    A. No, no business. Just a family friend.
12    Q. Okay. You don't know how much he lent you?
13    A. It's there exactly. 180-something. It's on the
14  record. You can look at it.
15    Q. In the affidavit you provided?
16    A. Absolutely.
17    Q. Okay. And how did he pay you this? Was it by
18  check, cash, money order?
19    A. Cash practically lent it to me.
20    Q. Okay.
21    A. Because I travel to New York all the time.
22    Q. Is there a promissory note?
23    A. Absolutely.
24    Q. Do you have a copy of that?
25    A. You have a copy.

Page 11

1    Q. I have a copy of it? I don't think I saw that, but
2  I'll check again.
3      All right. We'll go back to that.
4      So, you were previously paying $3500 a month in
5  rent and you were receiving cash from a loan and you would
6  pay this cash to your children for rent?
7    A. Yes.
8    Q. Okay. And who owns that apartment?
9    A. There was a company that was made on behalf of my
10  children. It's like my daughter's company --
11    Q. Okay.
12    A. -- that owns the apartment.
13    Q. And what's your daughter's name?
14    A. Marina. The same last name.
15    Q. Can you spell her full name for me?
16    A. M-A-R-I-N-A L-Y-U-B-A-R-S-K-Y.
17    Q. Okay. How old is your daughter?
18    A. 32.
19    Q. And do you have any other children?
20    A. Yes.
21    Q. And what are their names?
22    A. Sergey, S-E-R-G-E-Y. The same last name. 40 years
23  old.
24    Q. And do both of your children live in the United
25  States?

Page 12

1    A. Yes.
2    Q. And do they live in the apartment with you?
3    A. No.
4    Q. Okay. Does your daughter Marina own any other real
5  estate?
6    A. No.
7    Q. What about Sergey; does he own any real estate?
8    A. No.
9    Q. So, both Sergey and Marina own the apartment you
10  currently live in through an entity?
11    A. Yes.
12    Q. Okay. Do you know the name of the entity?
13    A. 375 Poinciana LLC.
14    Q. And do you know who the managers of that LLC are?
15    A. No. No.
16    Q. Do you know why your daughter put it in an LLC?
17    A. Because the main portion of -- the main money, I
18  would say, that was paid for the apartment came from a
19  friend of the family. So, basically he owns maybe 75
20  percent of this apartment. That's why he didn't allow --
21  initially I wanted to put it on my name, but he said because
22  he puts the money, he wants it to be on the LLC, in case
23  something goes wrong, he will just take the LLC and take the
24  apartment.
25    Q. Did you help your daughter set this up?

3 (Pages 9 to 12)

Page 13

1    A. No, no, no, no. I didn't. I don't know about
2 those -- you know -- I'm not a lawyer, so ---
3    Q. Gotcha. Have you talked to anyone other than your
4 lawyer about your deposition today or taking a deposition in
5 this bankruptcy case?
6    A. No.
7    Q. You haven't talked to your daughter or your son
8 about this deposition today?
9    A. I didn't -- basically I didn't -- he did know about
10 it. But there was nothing serious. I mean, I didn't tell
11 them what I'm going to say or what they're going to ask me,
12 nothing like this. Just I said that I have a deposition.
13 That's all.
14    Q. And you've been deposed before, correct?
15    A. Yes. Three years ago.
16    Q. Okay.
17    A. Three and a half years ago.
18    Q. And is that the only time you've been deposed?
19    A. Yes.
20    Q. And that was for the Vertonix case, right?
21    A. Yes.
22    Q. And we have a copy of that transcript, right?
23    A. Yes, we do.
24    Q. What about Mrs. Lyubarsky; do you know if she's
25 ever been deposed before?

Page 14

1    A. She was deposed exactly at the same time, but there
2 was no real deposition because there was nothing to ask,
3 because she doesn't know anything.
4    Q. Okay. How did you prepare for today? Did you
5 review any documents before coming today?
6    A. I didn't really prepare myself because, you know,
7 when you are telling the truth, you don't need to be
8 prepared. You're just telling what you remember.
9    Q. Okay.
10    A. So, there is no reason for preparation.
11    Q. All right. And you had provided, I guess, an
12 affidavit or ---
13    A. Yeah. It would be very nice if you read it
14 thoroughly.
15    Q. I did read it. I'm going to print a copy and I'll
16 show you some of the things in it.
17       Okay. Do you know if there's a mortgage on the
18 apartment you currently live in?
19    A. Yes, there is.
20    Q. Okay. Do you know how much that mortgage is for?
21    A. You mean the balance?
22    Q. Yeah.
23    A. Right now -- I cannot say a hundred percent, but
24 it's a little bit over a quarter of a million.
25    Q. Do you know if it's current?

Page 15

1    A. Yes. That's for sure.
2    Q. Okay. And how do you pay for your household
3 expenses, such as utility, water, sewer, groceries?
4    A. Everything is paid with cash or from my son's
5 account.
6    Q. Okay. We're going to talk about your son's account
7 in a little bit. How much are your monthly household
8 expenses?
9    A. Very hard to figure out. When I used to get my
10 monthly payment for my disability benefits, they were close
11 to -- between 9,000, something like -- in the area of nine
12 grand a month.
13    Q. Expenses?
14    A. Yes. For everything.
15    Q. And that's including gas, groceries?
16    A. Yes.
17    Q. Insurance? Things like that?
18    A. Yes.
19    Q. And what about now? What are your monthly
20 expenses?
21    A. They are close, but maybe less a little bit
22 because, you know -- although I know that my disability
23 money eventually I will get, because I hope that the -- you
24 know, the law will prevail. But we might spend maybe six,
25 7,000, maybe. Again, minus 3500 that I don't pay. So,

Page 16

1 maybe 5,000, six -- 5,000.
2    Q. Okay.
3    A. Maybe something like this.
4    Q. Okay. So, tell me how you pay for FPL, for
5 example. How do you pay that every month?
6    A. I have an access to Sergey's account where the
7 money is. I go online and I make a payment.
8    Q. Okay. So, you do it online through FPL login?
9    A. Yes.
10    Q. Do you have any credit cards?
11    A. At this time all my credit cards were revoked,
12 although I was a good payer and -- but when I filed for
13 bankruptcy, credit cards were completely, you know, taken
14 from me.
15    Q. But do you currently have any credit cards?
16    A. On my name, no.
17    Q. Can I see your wallet? Can you take your wallet
18 out for me?
19    A. My son has credit cards, yes, but it's not my
20 credit cards.
21    Q. Okay. But you currently have credit cards on you?
22    A. I have credit card, but this credit card is my
23 son's account, not mine.
24    Q. Okay. Let's take a look. Is this the only credit
25 card?

Page 17

1    A.  Yes.
2    Q.  This is a BMW Visa card ending in 4495.
3    A.  Yes.  It's Sergey's card.  Yes.
4    Q.  And so, you're just an authorized user on this
5  card?
6    A.  Absolutely.
7    Q.  Is this the only credit card you are using?
8    A.  Yes.
9    Q.  Okay.  What about Mrs. Lyubarsky; does she have any
10  credit cards?
11    A.  She has the same identical card.
12    Q.  It's a BMW Visa card?
13    A.  Absolutely.  This is the only account that we use.
14    Q.  Okay.  And how do you make payments on that every
15  month?
16    A.  From the same account.
17    Q.  And this is a Wells Fargo account?
18    A.  This is Wells Fargo account.
19    Q.  Okay.  How many other accounts, bank accounts, do
20  you access monthly?
21    A.  None.
22    Q.  Just the Wells Fargo account?
23    A.  Yes.
24    Q.  And do you have an online access to it?
25    A.  Yes, I do.

Page 18

1    Q.  Okay.  And do you have a debit card for that
2  account?
3    A.  Yes.
4    Q.  Okay.  And so, you go on monthly and you pay that
5  credit card utilizing the Wells Fargo account?
6    A.  Basically -- again, everything I used to do,
7  everything comes online.
8    Q.  And this is a Wells Fargo account ending in 7697.
9    A.  Correct.
10    Q.  Okay.  Can tell me your previous home address?
11    A.  You mean the house that I ---
12    Q.  Where did you live prior to the Poinciana
13  apartment?
14    A.  We lived in 3140 Northeast 40th Court.
15    Q.  Okay.  How long did you live there?
16    A.  From 2006 to 2015.
17    Q.  And why did you leave that residence?
18    A.  Foreclosure.
19    Q.  Okay.  Do you own any real estate currently?
20    A.  No.
21    Q.  In the past 10 years, how much real estate have you
22  owned?
23    A.  I used to own a house in Malboro, or Morganville,
24  New Jersey that was also foreclosed or short sale in 2013.
25    Q.  So, you haven't lived in New Jersey since 2013?

Page 19

1    A.  Correct.
2    Q.  Can you tell me your education?
3    A.  My main education is the Institute of Refrigerating
4  Industry in Ukraine.
5    Q.  And what is your current occupation?
6    A.  I'm retired.
7    Q.  Okay.  When did you retire?
8    A.  In 2009 or '10, something like this, because of a
9  disability.
10    Q.  Okay.  What was your last employer?
11    A.  I didn't have any employers.  I worked for myself
12  all the time.  And the last employer, I don't remember.
13  More than 20 years ago probably.
14    Q.  Okay.  So, you said you were previously employed by
15  yourself -- or you were self-employed?  Sorry.
16    A.  I was self-employed, but it was years ago.  Many
17  years ago.  It was over 10 years ago.
18    Q.  Okay.  And what was that business?
19    A.  That was a business -- it was a management company
20  for medical office.  That was the last business.
21    Q.  What was the name of that business?
22    A.  Castle Professional Services.
23    Q.  So, you have not worked since 2009, correct?
24    A.  I have not worked since 2004.
25    Q.  Since 2004.  So, what were you doing between 2004

Page 20

1  and 2009?
2    A.  I was trying different ventures.  None of them
3  worked out.  So, no success.  There was a lot of tries and
4  all of them failed.
5    Q.  Okay.  So, what did you do for income between 2009
6  and the present, other than this loan from Mr. -- I'm
7  butchering his name -- Pinkusovich?
8    A.  There was a loan from Mr. Friedman.  There was
9  disability benefit income.  There was Mr. Friedman and
10  disability.  Everything is on file.
11    Q.  Okay.  So, your background or your profession was
12  management?
13    A.  No.  Management is something that I picked up
14  during the years.
15    Q.  Okay.  In the past five years, how many businesses
16  have you owned?
17    A.  None.
18    Q.  Okay.  And this Kessler Professional Services, what
19  kind of industry was this?
20    A.  We were working with medical businesses, but it was
21  15 years ago.
22    Q.  Right.  Is that your background?
23    A.  No.  As I explained, I'm an engineer of
24  refrigerating industry.  I'm supposed to be an air
25  conditioning engineer, my profession.

5 (Pages 17 to 20)

1    Q.  And where did that business operate out of?
2    A.  Which one?
3    Q.  Kessler -- you said that's the last business you
4  were involved in?
5    A.  Castle Professional Services.  Yes, it was a
6  constant business from 2001 to 2004.
7    Q.  How do you spell that?  Is it Kessler?
8    A.  No.  Castle.
9    Q.  Castle?  Okay.
10    A.  Castle Professional Services.
11    Q.  What about the jewelry business?  Have you ever
12  been in the jewelry business?
13    A.  Tried once.  I received a phone call from Russia.
14  Didn't work out.  We opened a corporation.  He promised to
15  deliver something.  He never did.  And then he had some
16  issues and never worked.
17    Q.  When was this?
18    A.  It was about maybe 10 years ago.  I don't know.
19    Q.  So, you're not in the watch business?
20    A.  I am in the watch business, but not as a worker or
21  as an owner or anything.  I'm just -- it's -- it's something
22  that I can describe.  If you need, I can tell.
23    Q.  Yes.  Tell me what do you do in the watch industry.
24    A.  In the watch industry, I cover -- okay.  Let me a
25  little bit rephrase the whole thing when you have a minute

1  to listen to me.
2    Q.  I'm listening.  I'm looking something up.
3    A.  All right.  Back in 2013, when I lost my house in
4  New Jersey, I was approached by a long-time friend and he
5  asked me if I can help him because he lives in Ukraine and I
6  live in America and he asked me if I can help him.  I said
7  that basically I'm retired and have no intentions to do any
8  businesses because my income is sufficient to live.  I don't
9  know what will happen tomorrow, but today I'm not
10  interested.  He said, "Okay.  In this case, if you can go to
11  New Jersey -- you go to your mother every month.  I need to
12  see if my business is clean or someone is stealing there."
13  I said, "As a favor, considering we know each other for
14  quite a while, I can do you a favor."
15    So, I went to New Jersey and I spent a couple of
16  weeks in his business, which was already seven years or more
17  opened in New Jersey and in Ukraine, and I told him that
18  from whatever I saw, people stealing, it's not looking good.
19    Q.  Okay.
20    A.  So, he said, "Can you help me with this?"  I said,
21  "How do you want me to help you?  I don't want to work.  You
22  know me.  I don't work for salary or something.  If you can
23  offer me something -- and I won't go to New Jersey."
24  "Okay," he said, "I'll think."
25    So, I came back to Florida and for a month or two I

1  didn't hear from him.  Then he came back with an offer that
2  is enclosed in the documents.  You probably read it.  And
3  first I didn't want to do it, then I realized that -- again,
4  as always, when somebody offers me something interesting, I
5  always, you know, jump.
6    At the same time I thought -- my son was going in
7  and out of Russia and here.  My granddaughter was born and I
8  thought that if I put my family into this business and
9  relocate this business to Florida, maybe I can bring it to
10  the certain level.
11    Q.  What was the name of this business?
12    A.  It had two names.  At that time I think it was
13  Luxury Gift.  It's still Luxury Gift, World of Luxury.
14  There are two names in the business.
15    Anyway, the agreement was that he fires everybody,
16  he relocates the business to Florida, I put my family into
17  business.  And from my point of view, I thought, considering
18  all the stealing that is going on in the business, I will be
19  able very soon to bring it to the certain level.
20    The contract was made in Ukraine.  I read it.  I
21  thought that it's a good contract.  Right now I realize,
22  obviously, that it was not the best contract I could sign
23  like all other previous deals.  But as of today,
24  unfortunately, it's not going to work.
25    I hope -- I will renegotiate it maybe.  I need to

1  work until the end of this year and I have an option for the
2  next year to bring the business to the certain level.  But
3  my son worked constantly there for a while, for a few years.
4  Then Leonid immigrated back to America and he said that he
5  doesn't need him anymore.  So, right now only two people get
6  involved in this, is my daughter-in-law and my daughter, and
7  I provide services in bookkeeping.
8    Q.  Okay.
9    A.  Sometimes.
10    Q.  Okay.  So, you currently provide bookkeeping
11  services to Luxury Gift, Inc.?
12    A.  Correct.
13    Q.  Okay.  How long have you been doing bookkeeping?
14    A.  From the first day, because he was out of the
15  country for years.
16    Q.  Who is "he"?
17    A.  The owner, Leonid Aronov.
18    Q.  Okay.  And what's your relationship with him?
19    A.  We know each other for almost 20 years.
20    Q.  Okay.
21    A.  Not something like friend of the family, but we
22  know each other and I was the only person that he could
23  trust, at least he thought so, and I think so, and that's
24  why I signed all the checks, because he couldn't find
25  anybody.  He was out of the country.  So, he said that, "I

Page 25

1  put you as a signer." I said, "Okay. I don't care, as long
2  as I'm not responsible for anything." That was the
3  agreement.
4      Q. So, you're an authorized signer on Luxury Gift,
5  Inc.'s bank accounts?
6      A. Correct.
7      Q. Are you still an authorized signer?
8      A. Yes.
9      Q. Okay. Where does Luxury Gift, Inc. do business in
10 Florida?
11     A. On 163rd Street.
12     Q. Is it a storefront, an office?
13     A. No.
14     Q. What is it?
15     A. It's an office.
16     Q. Okay. And how often do you go to that office?
17     A. I used to go there once in a while. Right now I
18 was trying to do something better, to achieve certain goals.
19 Sometimes three times a week. Sometimes four times a week.
20 Depends if I need. Sometimes I work from home doing things.
21 Sometimes I don't need to be there. It's ---
22     Q. Is this business an online business?
23     A. Mostly, yes.
24     Q. Okay. Does it have a store in New Jersey?
25     A. Not anymore.

Page 26

1      Q. Okay. So, it primarily just operates out of
2  Florida?
3      A. Yes.
4      Q. And you said you have no ownership interest in this
5  company?
6      A. At all. Even one percent.
7      Q. Okay. Are you an officer? Are you a director?
8      A. No. Nobody.
9      Q. And you said your son worked there. How long did
10 your son work at Luxury Gift, Inc.?
11     A. '14, '15, '16, I think '17. Like for four years.
12     Q. What does your son do now?
13     A. He has a few projects that he helps me with and he
14 says that he doesn't need it anymore and basically he was --
15 the owner told him that he doesn't need his services
16 anymore. So, he decided to find something better.
17     Q. So, your son is in the jewelry business as well?
18     A. No.
19     Q. Okay. And Luxury Gift, Inc. is watches and
20 jewelry, correct, or is it just watches?
21     A. Watches and jewelry, but 90 percent watches.
22     Q. Is it resale or wholesale?
23     A. It's both. Resale more. Wholesale, I don't think
24 so.
25     Q. And was your son an owner in that company?

Page 27

1      A. No.
2      Q. Did he have any title in that company?
3      A. None.
4      Q. Did he have signature authority in that company?
5      A. No.
6      Q. What was his position with the company?
7      A. He was managing. He was selling -- mostly he was
8  in sales. He was picking up the phone, talking to the
9  customers. He was going on the shows. Basically sales.
10     Q. What's the alias or other name of Luxury Gift,
11 Inc.? What's the name of it?
12     A. Luxury Gift, Inc. or World of Luxury, Inc.
13     Q. Not World of Watches, right?
14     A. No. No.
15     Q. Different?
16     A. A different company.
17     Q. Okay.
18     A. World of Luxury Gift, Inc.
19     Q. Okay. And how many employees did Luxury Gift, Inc.
20 have?
21     A. The employees changed over the years. Currently
22 two full-time employees. Leonid is the owner, full-time
23 employee. It's three. And one time -- so three -- and one
24 part-time employee. So, three and a half.
25     Q. And they are here in Miami?

Page 28

1      A. Yes.
2      Q. Okay. And where does Mr. Aronov live currently?
3      A. Here in Sunny Isles. The same place where the
4  business is.
5      Q. And when you -- you still work there as a
6  bookkeeper. Were you previously doing any sales?
7      A. Yes.
8      Q. Okay. Were you working on commission?
9      A. No.
10     Q. Was your son working on commission?
11     A. Yes.
12     Q. Okay. Between 2014 and current, what was your
13 compensation from Luxury Gift, Inc.?
14     A. Zero.
15     Q. You never made any money?
16     A. At all.
17     Q. Okay. You still don't make any money as a
18 bookkeeper?
19     A. I don't make any money. That was the agreement.
20 And I took this chance. If you ask me for the smart move,
21 maybe if I -- you know, if I got to the goal that I thought
22 I will, then it will be a smart move. Right now, I realize
23 it's not as smart as I thought.
24     Q. You said that it was an agreement. Was there a
25 signed agreement?

7 (Pages 25 to 28)

Page 29

1  A. Yes. It's on file.
2  Q. You provided it to me?
3  A. Yes.
4  Q. In that stack?
5  A. It's there.
6  Q. Okay. I don't remember seeing that either. And
7  this agreement is 2014, you said?
8  A. I think '13.
9  Q. '13. Okay. So, for five years you have taken no
10 compensation from Luxury Gift, Inc.?
11 A. Not at all. That was my chance. It was a gamble.
12 I -- again, as I said, if I made the right decision, yes and
13 no. Yes, because I thought I'll get somewhere and -- you
14 know, the agreement was not a simple agreement. I'm
15 supposed to get 50 percent of the company, but -- in case I
16 got there. But, unfortunately, I didn't get there. So now
17 I think the agreement was not as good as I thought. But
18 still I got a lot of experience and sometimes it's more than
19 money.
20 Q. Okay. 375 Poinciana LLC --
21 A. Right.
22 Q. -- do you know what that is?
23 A. I told you before it's a corporation that owns the
24 apartment where we rent.
25 Q. Okay. Do you have signature authority on any of

Page 30

1  those bank accounts?
2  A. No.
3  Q. Okay. And Mr. Aronov is an investor in 375
4  Poinciana LLC?
5  A. Why?
6  Q. Is he?
7  A. Why? No. He has nothing to do with the apartment.
8  Q. Okay. Why would he be a registered agent?
9  A. Just because probably it was easier to open the
10 corporation, but he has nothing to do with it.
11 Q. Okay.
12 A. We needed the address where to send the paper. You
13 know how the company is registered. We need some address
14 where you can send the papers. You can't send it to the
15 same place.
16 Q. And does your daughter work for Luxury Gift, Inc.?
17 A. Yes. Partially. She's a professional marketer,
18 advertiser. That's her profession full-time and she works
19 part-time as well.
20 Q. Okay. How long has she worked there?
21 A. A few years. Right now more, but before that,
22 less. But a few years.
23 Q. Can you tell me the last time you had a bank
24 account?
25 A. My personal?

Page 31

1  Q. Uh-huh.
2  A. That's a very hard question to ask. Many years
3  ago, but I can be mistaken.
4  Q. And why did you close it?
5  A. Because of Vertonix.
6  Q. Do you remember the name of the bank?
7  A. I think Wells Fargo was the bank. Because, you
8  know, they were harassing me for over 10 years, an extortion
9  nonstop, and I didn't have a choice.
10 Q. How many personal bank accounts have you closed in
11 the past five years?
12 A. None.
13 Q. So, you haven't had a bank account over five years?
14 A. I think so.
15 Q. Okay. What about Mrs. Lyubarsky?
16 A. She has none. She never had any.
17 MS. READ: Okay. Mrs. Lyubarsky, what do you do
18 for a living?
19 MRS. LYUBARSKY: I have a pension of $610.
20 MS. READ: Are you retired?
21 MRS. LYUBARSKY: Yes.
22 MS. READ: And when did you retire?
23 MRS. LYUBARSKY: A year ago, in December.
24 MS. READ: And what was your previous occupation?
25 MRS. LYUBARSKY: I was a housewife at home. I

Page 32

1  didn't work. I have a granddaughter.
2  MS. READ: Right. But she said she retired a year
3  ago. She retired from what?
4  THE INTERPRETER: The interpreter is going to use
5  "she" as ---
6  MS. READ: "She" is Mrs. Lyubarsky.
7  THE INTERPRETER: I'm going to use "she" when you
8  speak like that. Just use the first person, "When are you?"
9  Because then I'm going to confuse her, if I'm going to use
10 "she."
11 MS. READ: Okay. Strike that question.
12 How much English do you understand?
13 MRS. LYUBARSKY: Not very well.
14 MS. READ: Do you understand some of what I'm
15 saying?
16 MRS. LYUBARSKY: When you ask such questions as
17 son, daughter. I do understand simple things.
18 MS. READ: Keywords she understands?
19 MRS. LYUBARSKY: Not all of them.
20 MS. READ: Okay. When was the last time,
21 Mrs. Lyubarsky, you were employed?
22 MRS. LYUBARSKY: Before 2000. I did work before
23 2000.
24 MS. READ: Okay. So, you haven't worked in 18
25 years?

Page 33

1    MRS. LYUBARSKY:  Well, before, my husband provided
2    for me and now my children do that.
3        MS. READ:  Okay.  Let's go off the record for a
4    second.
5        (Thereupon, a brief recess was taken at 11:51 a.m,
6    after which the examination reconvened at 12:00 p.m.)
7    BY MS. READ:
8    Q.  Okay.  Other than the loan -- the proceeds from the
9    loan that you received from -- what's his name?
10    A.  Pinkusovich.
11    Q.  From Pinkusovich.
12    A.  Pinkusovich.
13    Q.  That's the recent loans, right?
14    A.  Yes.
15    Q.  Do you have any other sources of income?
16    A.  I used to have my disability benefits.
17    Q.  And that's it?
18    A.  That's it.
19    Q.  Okay.
20    A.  My pension.
21    Q.  Okay.  But you're currently receiving pension
22    payments, right?
23    A.  Correct.  1,000 and change.
24    Q.  And are you receiving Social Security?
25    A.  That's the Social Security.

Page 34

1    Q.  That's the Social Security.
2    A.  Yes.
3    Q.  Okay.  Anything else?
4    A.  No.
5    Q.  Okay.  You don't have any financial like retirement
6    accounts, IRA or 401(k)?
7    A.  No.
8    Q.  Okay.
9    A.  I never believe in it.
10    Q.  Okay.  Do you ever do day trading?
11    A.  That's what?
12    Q.  Day trading.  Do you invest in stock options, money
13    market accounts?
14    A.  I risk a lot, but not with this.
15    Q.  Okay.  Do you have any vehicles in your possession
16    currently?
17    A.  As you remember, in the papers there was one
18    vehicle by the name Tesla.  Yes.  It was purchased by my
19    son.  He put the initial down payment, then I paid for
20    monthly payments with six years a loan from the bank, and he
21    currently pays for it, and that's basically -- although it's
22    his car, but I consider it my car because I drive it.
23    Q.  Okay.
24    A.  And there is another car that Marcia decided to
25    leave because it's a lease car.  So, there's no equity in

Page 35

1    the car because it's a leased Lexus.
2    Q.  Meaning she decided to leave it -- Marcia, the
3    trustee?
4    A.  Yeah.
5    Q.  You mean she abandoned it?
6    A.  She abandoned it.
7    Q.  Right.  Okay.  So, you're the only one that drives
8    the Tesla.  What's the make and model?
9    A.  Tesla S.
10    Q.  An S.  Okay.  And it's financed.  So, you go log in
11    every month and you make a payment using the Wells Fargo
12    account?
13    A.  Correct.
14    Q.  But it's insured in your name?
15    A.  No, in Sergey's name.  It his car.  I drive it,
16    but -- all cars -- let me explain you.  In order for us to
17    receive a financing, Sergey had to do it because he put the
18    down payment and he had a credit history and I didn't have
19    any.  So, automatically it was in his name.
20    Q.  So, it's registered in his name and it's insured in
21    his name?
22    A.  Absolutely.
23    Q.  Okay.  But you drive it?
24    A.  Correct.
25    Q.  What car does he drive?

Page 36

1    A.  Right now he has Navigator, Lincoln Navigator.
2    Q.  Do you ever drive that vehicle?
3    A.  What's that?
4    Q.  Do you ever drive that vehicle?
5    A.  Never.  It's a new car.
6    Q.  What car does your wife drive?
7    A.  The Lexus that was abandoned.
8    Q.  Okay.  And who was making payments on that?
9    A.  Everything comes from the same account.
10    Q.  The Wells Fargo account?
11    A.  Correct.
12    Q.  Does your wife use that account?
13    A.  She doesn't know how to use computer.
14    Q.  Okay.  But she also has a debit card for that Wells
15    Fargo account?
16    A.  No.
17    Q.  No.  Just the credit card that --
18    A.  Yes.
19    Q.  -- that you pay?
20    A.  She knows how to go to the store and buy groceries.
21    That's all she learned.
22    Q.  Before I get to this, let me just finish the
23    vehicles.
24        Have you ever had any repossessions in the past
25    five years?

Page 37

1    A. No.
2    Q. Okay. Do you own any boats or other vessels?
3    A. Never.
4    Q. Have you sold any vehicles or boats in the past
5 five years?
6    A. Never.
7    Q. Okay. What about your wife?
8    A. No.
9    Q. Does she have ---
10    MS. READ: Mrs. Lyubarsky, do you have a driver's
11 license?
12    MRS. LYUBARSKY: Yes, of course.
13 BY MS. READ:
14    Q. And she's currently not driving any vehicles?
15    A. Driving the Lexus.
16    Q. The Lexus.
17    A. Yeah, the one that was abandoned.
18    Q. Oh, okay. That's fine.
19    Do you have auto insurance on the vehicles?
20    A. Sergey has and we are in this.
21    Q. You're covered?
22    A. We are covered. Yes. It's a family.
23    Q. Do you have an insurance card that has your name on
24 it, for the vehicle?
25    A. No.

Page 38

1    Q. No. So, when you get pulled over, you don't have
2 an insurance card that has your name on it?
3    A. It's my son's name on it.
4    Q. Okay. Because his name is on the registration?
5    A. On the registration. On the insurance. And I'm in
6 the insurance as a driver of one vehicle.
7    Q. Okay.
8    A. So, everything you read ---
9    MS. READ: Let me mark this Exhibit 1. This is a
10 consulting agreement between you and Luxury Gift, Inc.
11    (Thereupon, Exhibit Number 1 was marked for
12 identification.)
13    THE WITNESS: Correct.
14 BY MS. READ:
15    Q. Okay. This is dated at the top October 10, 2013,
16 correct?
17    A. Correct.
18    Q. Was it signed in 2013?
19    A. Yes.
20    Q. Okay. Is this the agreement you were telling me
21 about before?
22    A. Correct.
23    Q. Okay. You had said that -- explain this agreement
24 to me.
25    A. When I entered this project, I was under impression

Page 39

1 that the amount of money that Aronov is losing because of
2 the stealing in his business and I thought -- because I
3 didn't have any knowledge, but I had some kind of ideas that
4 I would be able to raise the income of the company on to the
5 certain level. And things were, I would say, great. And
6 the first year I was like 60 percent almost to the aim that
7 we had. Then the second year, I think it was -- it was
8 good, but it was not great. Then the third year, I think we
9 failed completely, and then Leonid arrived to the United
10 States. And again, I cannot blame him. I can blame myself,
11 as always, because I'm the one that makes mistakes. But
12 things started slowing down. People say the market is bad.
13 So, my dreams to come to the certain level didn't work out.
14    So, basically I had to raise the income of the
15 company to the certain level and it did work out.
16    Q. Okay. Can you turn to the last page, the addendum?
17 At the top it says April 28, 2017.
18    A. Yes, I see it.
19    Q. Okay. Why did you modify this in 2017?
20    A. Let me -- okay. That happened when Leonid arrived
21 to U.S. permanently.
22    Q. Okay.
23    A. So, about two years ago, a little bit less, a year
24 and a half ago he arrived, and that's when we start, you
25 know, thinking what can be done and that's probably when we

Page 40

1 signed, you know, this addendum.
2    Q. Okay.
3    A. Because things changed. You know, we thought that
4 we would get somewhere, but -- again, as I said, several
5 reasons. My fault, market change, maybe Leonid's
6 leadership. Who knows.
7    Q. So, where was Leonid? He was in Russia?
8    A. Ukraine.
9    Q. Ukraine. So, during the period Leonid was in the
10 Ukraine you were operating or running his business for him?
11    A. Sergey was doing it and I was just overlooking it
12 because Sergey was in charge. The thing is that I told him
13 from the very beginning, "Stress is something that I cannot
14 tolerate. I cannot be responsible for anything, period.
15 So, if you are -- if you agree, I'm in. I can come to the
16 office one day a week, or six days a week, or not to come
17 two weeks in a row. You cannot tell me a word. I need to
18 get to those numbers. How? It's my point."
19    Q. So, your understanding is you had to reach these
20 numbers in order to exercise the option to buy into the
21 company?
22    A. Absolutely.
23    Q. Okay.
24    A. And I thought that I would be able to. That was my
25 dream. That was my -- another chance and another failure,

Page 41

1  unfortunately.
2     Q.  Okay.  Where were you going to get the money to
3  exercise this option?
4     A.  As you see, I have friends that respect me.  I have
5  friends that give me money when I'm in trouble, plus I
6  receive $10,000 tax-free income.  And if I thought that this
7  is going to work, maybe I would spend less, maybe I would
8  borrow somewhere.  I would find a way.  But, unfortunately,
9  this was -- this was not the case.  So, I couldn't come up
10  with the results.
11    Q.  What about your son; did he get a similar agreement
12  like this?
13    A.  My son had nothing to do with it.
14    Q.  So, Leonid didn't propose him a similar agreement
15  to buy into the company?
16    A.  Absolutely not.  First of all, because he wanted me
17  and I gave him my word.  Leonid doesn't know my son at all.
18    Q.  You just said Leonid worked for him, though?  I
19  mean, that your son worked for Leonid.
20    A.  Right, but when we met in 2013 he didn't know
21  Leonid at all.
22    Q.  Okay.  And what about subsequently he got to know
23  him?
24    A.  Absolutely.  When he started working for him he
25  became, you know, exchanging phone calls, e-mails, and stuff

Page 42

1  like that, but it was the first time when they, you know,
2  got acquainted.
3        MS. READ:  Okay.  Mark this Exhibit 2.
4        (Thereupon, Exhibit Number 2 was marked for
5     identification.)
6  BY MS. READ:
7     Q.  Do you recognize that document?
8     A.  Oh, this document -- this document -- let me check.
9  Yes, I do.
10    Q.  Okay.  And how much do you currently owe -- and
11  this is a promissory note to repay Mr. Yan Friedman.
12    A.  Correct.
13    Q.  Okay.  And each of these subsequent pages, these
14  are draws on this -- we'll call it a revolving line.
15    A.  Yeah, that was -- you know, when I took the money
16  from Yan I was a hundred percent sure that this was a
17  temporary process, because my house at that time worth over
18  $3 million.  And I was under impression that if the worst
19  comes to worst, this was peanuts compared to what the equity
20  I had in the house.  But, unfortunately, you know, the
21  collapse of the market brought my house upside down and I
22  owed for the house more than it's worth.
23    Q.  Okay.  So, since 2010, which is -- we're almost
24  in -- almost nine years ago, you've continued -- this is
25  dated 2010, correct?

Page 43

1     A.  Yes.
2     Q.  Okay.  So, since 2010 you have borrowed a total
3  amount of $289,000, approximately?
4     A.  No.  That's including interest.
5     Q.  Okay.  Well, that's borrowed.  You've borrowed
6  money plus interest.  The total amount is up to ---
7     A.  Right.  Because the interest has doubled.
8     Q.  Okay.  Have you made any payments on this -- we'll
9  call it the Friedman revolving note?
10    A.  Yes.
11    Q.  Okay.
12    A.  I made a payment back in 2013, when I -- when the
13  house was sold on short sale.  I think more than half of
14  what I received from the sale.  Because at that time the
15  attorneys grabbed almost $200,000 from that sale.  And I
16  thought that we were done with them, but they tried to
17  collect more and more.  But I gave Yan at that time certain
18  amount of money.  That was at that time.  Correct.
19    Q.  So, you have not repaid anything since 2013?
20    A.  Not really.  No.
21    Q.  Okay.  What is your relationship to Mr. Friedman?
22    A.  We know each other since 1970 and change.  He's
23  like nine years older than me, but we were musicians in
24  Odessa and we were friends.
25    Q.  Does Mr. Friedman expect to be repaid on this note?

Page 44

1     A.  I assume.  I don't know how.  I don't know.  I'll
2  try.  I'll do my best, considering I have money that should
3  be released, but -- so far, right now, I cannot predict
4  anything.  I don't want to speculate before the -- you know,
5  everything is resolved.
6     Q.  And what were you using all this money for?  What
7  was the purpose?
8     A.  There were different purposes.  There were living.
9  There were some projects that I tried and it didn't work
10  out.  There were some companies that we opened, put some
11  money.
12       You know, it's very hard right now to remember, but
13  there were some necessities that, you know -- you know --
14  again, when I heard that course that I took in Bankruptcy
15  Court, I, obviously, realized that the way I spent money in
16  my life was not the correct one.  And I think that there
17  were so many mistakes made.  You know, I spent money more
18  than I made and it was, obviously, you know -- it's my fault
19  and I admit it.
20    Q.  These draws were all given to you in cash?
21    A.  Yes.
22    Q.  Okay.  What did you do with the cash when you
23  received it?
24    A.  Spent.
25    Q.  Did you keep it in a safe?

11 (Pages 41 to 44)

Page 45

1    A. No. First of all, I didn't keep anything because
2    whatever I received, it was spent within weeks, whether it
3    was some kind of idea, if I had involved with somebody, with
4    something, or I paid for something. It was not, you know --
5    what would be the reason for me to stock money? I spent it.
6    Q. Okay. Did you deposit it in the Wells Fargo
7    account?
8    A. No.
9    Q. So, you held on to it?
10   A. Yes.
11   Q. Okay. Do you remember when you filed for
12   bankruptcy?
13   A. On what day?
14   Q. Uh-huh.
15   A. 31st of May, I think.
16   Q. Okay. How much cash did you have on that day?
17   A. A few hundred dollars.
18   Q. Okay. So, all of these payments, 14, 15, this
19   looks like once or twice a month you received increments
20   between 1500 to 2,000. These were all received in cash and
21   they were never deposited into a bank account?
22   A. No.
23   Q. Okay. When was the last time you filed taxes?
24   A. 2010.
25   Q. Okay. Why haven't you filed taxes since 2010?

Page 46

1    A. By law I'm not -- I don't have to.
2    Q. Okay. You don't consider this to be income?
3    A. No.
4    Q. Okay. Did you ---
5    A. How could it be income if I borrow money? Again,
6    it's you to decide, but ---
7    Q. No, I'm just asking. I'm curious what ---
8    A. No, I don't think ---
9    Q. Because this is a lot of money.
10   Okay. Luxury Gift, Inc., that's the name of it?
11   A. Right.
12   Q. Did you prepare their tax returns?
13   A. No. I don't know how to do it.
14   Q. Do they have an accountant?
15   A. I think so. Yes.
16   Q. Well, you're the bookkeeper. You don't deal with
17   the accountant?
18   A. Yeah, I send them the -- I send them the -- you
19   know, the -- how to say ---
20   Q. Ledger?
21   A. Yeah. Like the ---
22   Q. Do you use QuickBooks?
23   A. Yes.
24   Q. Okay. What's the accountant's name? Do you know?
25   A. Alex Sorsher.

Page 47

1    Q. Sorsher? Is he local?
2    A. Yes.
3    Q. In Sunny Isles?
4    A. No.
5    Q. Where?
6    A. I think it's in Hollywood.
7    Q. Is he a CPA?
8    A. I can't say. Maybe.
9    Q. Okay. So, this agreement -- were you keeping track
10   of Luxury Gift, Inc.'s income and revenue? Were you
11   responsible for keeping track of this?
12   A. Yeah, we were -- we were comparing every year and
13   every year we were close -- one year we were very close and
14   then one year we were completely down and I was very upset,
15   but I thought we'll go back and we'll be better next year,
16   but -- again, I think I did a lot of good things for the
17   business. But, again, as I said, it was a gamble. It
18   didn't work out, but I got a lot of experience. And who
19   knows, maybe it will give me one day some plus.
20   Q. You've seen Luxury Gift's tax returns?
21   A. I didn't -- I don't pay attention because tax
22   returns is something that -- the last thing that I need.
23   Q. What about profit and losses? Do you prepare
24   those?
25   A. No. I don't know even how to do it. I know that

Page 48

1    in QuickBooks there is a button that does it.
2    Q. Okay.
3    A. But I'm not a professional in this. I just put in,
4    out, in, out. That's all I know.
5    Q. Do you review the bank statements for Luxury Gift?
6    A. No, I don't.
7    Q. So, you don't log in and review daily balance?
8    A. I review -- let's say Leonid tells me, "Check if we
9    received a payment." I check if we received a payment.
10   "Can you please send certain amount of money to this
11   vendor?" I say, "Okay. I'll send the money to this
12   vendor."
13   Q. Electronic? Like a wire transfer?
14   A. Yes.
15   Q. So, you have to log in? You have login
16   credentials?
17   A. Yes. Yes. Yes. I have all the access.
18   Q. Okay. Do you have a corporate credit card?
19   A. Yes, I do have a corporate credit card, but not in
20   my name.
21   Q. But do you have it with you?
22   A. Yes. And sometimes I need to use it for the
23   company.
24   Q. Can I see it?
25   A. Of course.

12 (Pages 45 to 48)

Page 49

1    Q. What other credit cards do you have in there?
2    A. This one that you saw and the Wells Fargo.
3    Q. That's the debit card?
4    A. Yeah.
5    Q. Okay. Can I see this?
6    A. Absolutely.
7    Q. This is a Chase Ink Business Cash Visa with the
8  name Leonid ---
9    A. That's the owner. Leonid Aronov.
10    Q. Okay. How often do you use this card?
11    A. Practically once a month, maybe. If we need, let's
12  say, to pay for something and they expect -- they accept
13  credit card, I have it for just -- for the payment.
14    Q. Do you ever put personal expenses on there?
15    A. No way. How could I?
16    Q. But do you ever have to advance expenses on behalf
17  of the company?
18    A. No way.
19    Q. Personally?
20    A. How can I touch money that doesn't belong to me?
21    Q. No. No. I'm asking you, do you have to advance,
22  you personally, any money on behalf of the company?
23    A. I don't understand. Can you rephrase it, please?
24  If I give advance to who?
25    Q. No. Do you ever have to make advances on behalf of

Page 50

1  the company, like pay expenses on behalf of the company,
2  ever, and then you get reimbursed?
3    A. You mean if I pay my money --
4    Q. Right.
5    A. -- and then -- I don't pay ---
6    Q. So, you have no reimbursable expenses?
7    A. No, no, no. I don't -- I don't have that.
8    Q. Okay. And what about your son; does he have a
9  credit card?
10    A. No.
11    Q. What about your daughter; does she?
12    A. No.
13    Q. So, you're the only one with the corporate credit
14  card?
15    A. I'm the only one that he trusts.
16    Q. Okay.
17    A. I'm the only person that he trusted from the first
18  day when, you know, we started this and I'm the only one who
19  sends money, receives money. I think I have enough respect
20  from the owner that, you know, he trusts me. I never lost a
21  dollar on his account.
22    (Thereupon, Exhibit Number 3 was marked for
23  identification.)
24  BY MS. READ:
25    Q. Okay. I'm going to show you what's marked as

Page 51

1  Exhibit 3. This is a loan agreement dated August 24, 2016
2  between you and Svetlana Pinkusovich.
3    A. Pinkusovich.
4    Q. I can't ---
5    A. Pinkusovich.
6    Q. Pinkusovich. Sorry. I'll give you the name.
7    A. Pinkusovich. All right.
8    Q. Okay.
9    A. Svetlana and Alexander.
10    Q. All right. Tell me your relationship with them
11  again.
12    A. Well, it's an interesting story. We met three
13  years ago, three and a half -- three and change. But I can
14  tell you that this family became the closest people in my
15  life ever.
16    Q. Okay.
17    A. For 60 years I never had a brother or a sister.
18  I'm the only child, but I consider them the closest people
19  in my family and -- I don't know. Maybe it's -- maybe God
20  gave me those kind of friend and that's -- that's people
21  that -- who they are.
22    Q. So, between 2016 and May 2018 they have lent you a
23  total of approximately $181,000?
24    A. Yeah, maybe.
25    Q. Okay. Have you ever repaid any of this?

Page 52

1    A. Ah -- no.
2    Q. Okay. Do they expect to be repaid on this?
3    A. They have collateral, I would say, the apartment.
4  But I don't think that they think about it.
5    Q. What do you mean they have collateral on the
6  apartment?
7    A. The apartment where we live.
8    Q. Okay.
9    A. Purchased.
10    Q. Yes.
11    A. 75 percent of their money.
12    Q. Let me back up here.
13    So, the apartment -- we'll call it the Poinciana
14  apartment. The Pinkusoviches are 75 percent owner of that
15  apartment? Okay. This 181,000, was this a draw on a
16  mortgage?
17    A. Has nothing to do with it.
18    Q. Who holds the mortgage on the Poinciana apartment?
19    A. Mr. Gru, the seller of the apartment.
20    Q. It's a seller mortgage?
21    A. Right.
22    Q. Okay. But why would this 181,000 on this note be
23  collateralized by the apartment?
24    A. Not collateral. Just ---
25    Q. You just said they had collateral.

13 (Pages 49 to 52)

Page 53

1    A.  No.  Okay.  We don't understand each other.  Okay.
2  Let me explain you something.  I owe them money.
3    Q.  Correct.
4    A.  Okay?  The apartment that was purchased at 375
5  Poinciana was so expensive that my children could not come
6  up with the amount -- with the money to buy that apartment.
7  So, Alex and Svetlana gave money and continued giving money
8  to my children to cover the apartment.  So, God forbid I
9  don't pay them, they will just take the apartment and it's
10  gone.
11    Q.  But the money Svetlana -- we'll call them the
12  Pinkusoviches -- lent your children is different than this
13  money they lent you?
14    A.  Absolutely.  It has nothing to do with it.
15    Q.  Do they have a note?  Do the Pinkusoviches have a
16  note with your children for those amounts?
17    A.  Of course, they do.
18    Q.  Okay.
19    A.  It's a different thing.  It's a completely
20  different thing.
21    You know, we live for the last two years
22  practically on them.  They're rich people.  They are
23  doctors, both.  But, you know, again, as I said, it was a
24  blessing from God probably that I met this -- they never
25  told me, you know, a word.

Page 54

1    Q.  They're very old.  How ---
2    A.  They are 73 each.
3    Q.  Are they American citizens or Russian?
4    A.  They are American citizens for 30-plus years.
5  They're one of the most well-known psychiatrists in the --
6  in New York.
7    Q.  Okay.  These advances you received, what looks like
8  monthly, of between 4,000 and 7,000 a month, was this given
9  to you in cash?
10    A.  Uh-huh.
11    Q.  Okay.  And did you deposit this anywhere?
12    A.  Sometimes yes.  Sometimes no.
13    Q.  Okay.  And you would deposit it into the Wells
14  Fargo account?
15    A.  In my -- I only have one account that Sergey and me
16  have.  We use them, both.  But they could be deposits.
17    Q.  Does your son have other bank accounts?
18    A.  Yes, he does.
19    Q.  Is this Wells Fargo account ending in 7697 --
20  that's not his primary account; is it?
21    A.  Not primary.  No.
22    Q.  Okay.
23    A.  This is his secondary account.
24    Q.  Are you the only one that uses this account, the
25  Wells Fargo?

Page 55

1    A.  Huh?
2    Q.  Are you the only one that uses this Wells Fargo
3  account?
4    A.  I would not say a hundred percent, but almost.
5    Q.  Okay.  Well, does your daughter use the account?
6    A.  Never, and she doesn't even know about it.
7    Q.  Okay.  But Sergey has other bank accounts --
8    A.  Yes.
9    Q.  -- he uses?  Okay.
10    So, if I went through and I looked and I went
11  through these statements -- and they're all out of
12  chronological order.  Out of order.  They're not -- some of
13  them are -- like 2014 is at the end and then we have two of
14  '14 at the beginning.  That's fine.  I tried to do it the
15  best I could.
16    A.  You asked for certain dates.
17    Q.  No.  No.  It's fine.  It's fine.
18    If I went through and I cross-checked these
19  deposits, would I see them reflected in the bank statements?
20    A.  Some of them I think so.
21    Q.  Okay.  So, we talked about your household expenses.
22  You said you have FPL, your groceries, and things like that.
23  Are most of those things put on a credit card or are they
24  paid for in cash?  You said FPL you paid online.  So, what
25  about groceries?  Are those paid in cash?

Page 56

1    A.  Both.
2    Q.  Okay.  Health insurance, is that paid in cash?
3    A.  Health insurance we don't pay.
4    Q.  Okay.  You don't have -- I thought I saw in these
5  expenses there were some health insurance.  You don't have
6  any health insurance?
7    A.  I pay for -- partially for health insurance.
8    Q.  Okay.  What about Mrs. Lyubarsky; does she have
9  health insurance?
10    A.  She used to have.  Right now she doesn't have.
11    Q.  So, are you guys on Medicaid or Medicare?
12    A.  Medicare.
13    Q.  Medicare.  Okay.
14    So, groceries are partial.  What else do you put on
15  the credit cards?  When you go out to dinner, do you pay
16  cash or credit card?
17    A.  Mostly credit card.
18    Q.  Okay.
19    A.  If we buy Bounty or toilet paper, if we go to
20  Costco and buy something, or let's say we buy a toy for our
21  grandkid, we use credit card mostly.
22    Q.  Cable, you pay that on a credit card, right, or
23  electronically?
24    A.  Electronically and it goes from Wells Fargo.
25    Q.  Okay.  You go on using the Wells Fargo account to

14 (Pages 53 to 56)

1  pay that credit card, right, the BMW credit card?
2       Okay. Do you have a PayPal account?
3       A. Do I have PayPal account? Used to have.
4       Q. When did you close it?
5       A. I don't even remember.
6       Q. Okay.
7       A. No, I don't remember.
8       Q. When was the last time you used PayPal?
9       A. I don't use PayPal.
10      Q. Okay. You don't have any PayPal accounts in your
11  name?
12      A. No. Right now, no.
13      Q. Okay. Do you sell anything online?
14      A. I don't. My son does. Clothes. I think they
15  sell -- I tried a few times to sell some garbage from --
16  from the -- what do you call it? From the storage facility,
17  but it didn't work out. It stays on eBay for years and --
18  my daughter-in-law, I think she sells some stuff, like
19  shoes. I personally don't sell anything. I have nothing to
20  sell.
21      Q. You don't use eBay?
22      A. Yes.
23      Q. You do. Okay.
24      (Thereupon, Exhibit Number 4 was marked for
25  identification.)

1  BY MS. READ:
2       Q. This is a bank statement from January 1st, 2016.
3  Sorry, I'm going to reach across. Do you recognize this
4  statement?
5       A. Wells Fargo.
6       Q. Okay. Can you tell me why there is deposits from a
7  PayPal account in your name? Substantial deposits.
8       A. Hold on. Well, maybe at that time I still had one.
9       Q. Okay. What did you sell for $8,000 in 2016?
10      A. I have no idea. I don't remember.
11      Q. So, when I asked you if you closed any accounts in
12  the past five years ---
13      A. No, five years ---
14      Q. This is 2016.
15      A. Right. Again, I didn't hear five years. I think
16  recently.
17      Q. Okay.
18      A. Again, as I said, I don't remember what it could
19  be.
20      Q. So, this is not an open, currently active account?
21      A. Not with my name, for sure.
22      Q. Do you have access to it?
23      A. Yes. If I need to, yes.
24      Q. Okay. But you didn't schedule this on your
25  bankruptcy schedules; did you?

1       A. Bankruptcy schedules? Why should I -- hold on one
2  second. What should I put on the bankruptcy schedule?
3       Q. It's not listed on there. That account is not
4  listed on your bankruptcy schedules; is it?
5       A. I don't know if I should.
6       Q. Do you want me to show you your schedules?
7       A. No. Who -- where could I -- where could I see that
8  I had to schedule PayPal account?
9       Q. Well, it's -- any kind of deposit account. What do
10  you think a PayPal account is? It's a virtual account,
11  right?
12      A. Maybe.
13      Q. Do you hold money in it?
14      A. I didn't held -- I didn't -- I didn't hold any
15  money as per se. But if that was some kind of a sale and we
16  sold something, so -- it was spent anyway. So, what's
17  the -- what does it have any relevance to the current
18  situation or even to the situation of 2018?
19         I'm just trying to understand what's this -- how
20  it's relevant to the current situation. Let's say if in
21  2016 something was sold for $8900 and then 8900 was spent.
22  I'm just trying to understand why this is a question.
23      (Thereupon, Exhibit Number 5 was marked for
24  identification.)
25  BY MS. READ:

1       Q. Can you take a look at your amended schedules that
2  were filed last week, Exhibit 5?
3       A. Yeah, yeah, yeah.
4       Q. Okay. Can you turn to Page 4?
5       A. 1, 2, 3 -- yes, I'm here.
6       Q. Okay. Number 17, deposits of money. There's no
7  PayPal account listed, correct?
8       A. Again, there is nothing that says PayPal account.
9  If that would be the PayPal that I saw, I would be listing
10  it. But again, there is nothing on PayPal account, not even
11  a dollar.
12      Q. Do you have any other virtual or financial accounts
13  like Bitcoin?
14      A. No.
15      Q. Do you know what Bitcoin is?
16      A. Yes.
17      Q. What about like a Zelle account, or Coin, any of
18  those virtual online? Do you ever use those?
19      A. I think Zelle. Yeah, one time I used Zelle.
20      Q. What about Venmo? Have you ever used Venmo?
21      A. Venmo? Maybe. I don't know, but it's something --
22  yeah, I think -- you know, I have some.
23      Q. Do you have a Venmo account?
24      A. It's not just an account. Maybe somebody, you
25  know, transfer me some money or I transfer some money, so

Page 61

1  maybe we use it, or let's say Sergey wanted to transfer
2  money or I wanted to transfer.  I don't know exactly, but it
3  could be.  It could be.
4      Q.  Have you ever paid for anything in Bitcoin?
5      A.  What?
6      Q.  Have you ever paid for anything in Bitcoin?
7      A.  No.
8      MS. READ:  Let me mark Exhibit 6.
9      (Thereupon, Exhibit Number 6 was marked for
10  identification.)
11  BY MS. READ:
12     Q.  Take a look at these checks for me.  Do you
13  recognize these checks?
14     A.  Yes.
15     Q.  Okay.  Is that your signature on all of these
16  checks?
17     A.  No.
18     Q.  Okay.  Let's go through them.  Is that your
19  signature?
20     A.  It's not my signature.
21     Q.  Okay.  Is that your signature?
22     A.  No.
23     Q.  Is that your signature?
24     A.  No.
25     Q.  How about that or that (indicating)?

Page 62

1      A.  No.  This is my son's checks, but it's not my
2  signature.  This is my signature (indicating).
3      Q.  That's your signature?
4      A.  Yes.  This is my signature.  This is my signature
5  (indicating).
6      Q.  Okay.
7      A.  This is my signatures also (indicating).
8      MS. READ:  Okay.  Mark as Exhibit 7.
9      (Thereupon, Exhibit Number 7 was marked for
10  identification.)
11  BY MS. READ:
12     Q.  These are additional checks from Luxury Gift.
13     A.  These are all checks.  Yeah, it's my signature all
14  of them.
15     Q.  Okay.  What were you writing these checks for?
16  There's no memo line, so I don't know what these are for.
17     A.  This is a salary.  24501, it's his monthly --
18  monthly -- yeah, monthly salary, 2501.
19     Q.  And these checks were all deposited into 7697, the
20  Wells Fargo account?
21     A.  Most likely, yes.
22     Q.  Did you deposit them or did Sergey?
23     A.  Sergey did.
24     Q.  Okay.  This wasn't your salary?
25     A.  No.  Why?

Page 63

1      Q.  This wasn't your compensation?
2      A.  No.
3      Q.  Okay.
4      A.  Why it should be?
5      Q.  Sergey is still receiving compensation or salary?
6      A.  No.  He's no longer with the company for now.
7          This is so simple.  Why would I hide a couple of
8  thousand dollars a month income?  What could be the reason
9  for me?
10     Q.  Well, you said before you closed bank accounts ---
11     A.  Right.  Because of the -- okay.  I won't use words.
12         But again, if I wanted to -- let's say -- if I get
13  paid, I would be able to get, you know, checks.  But there
14  is no --- I don't think you need it.  I think -- you want to
15  know if I own the company, multi-million-dollar company,
16  with five dollars in my pocket.
17     Q.  Is that how much the company makes, millions a
18  year?  How much does it make in revenue a year?
19     A.  Revenue?  A few hundred thousand.  Can you imagine
20  if I can be a part of it with zero money in my pocket?  This
21  company has -- it's a big company.
22     Q.  Have you ever paid any money to Luxury Gift, Inc.?
23     A.  What was that?
24     Q.  Have you personally ever paid any money to Luxury
25  Gift, Inc.?

Page 64

1      A.  Me to them?
2      Q.  Uh-huh.
3      A.  What for?
4      Q.  I'm asking have you ever?
5      A.  No.
6      Q.  Never written a check?  Never gave cash to the
7  company?
8      A.  No.  As far as I know, I don't remember any time.
9      Q.  What about your son?
10     A.  That I don't know.  I don't know what he did.
11         Hold on one second.  Hold on.  I remember there was
12  a case when the customer -- when the customer couldn't send
13  the money to the business account and he -- and Leonid asked
14  Sergey if he can take the money to his account and then the
15  same day they transferred the funds to Luxury Gift, Inc.
16  Yeah, it was a couple of times.  I think it was the same
17  customer.
18     Q.  You transferred the money?
19     A.  No, no, no.  Again, one more time, slowly.  The
20  customer -- the customer conditions was that he couldn't
21  wire the payment to his business account.  He could wire the
22  money only to the personal account.
23     Q.  Okay.
24     A.  And Leonid asked Sergey if it's possible that he
25  accepts the money and immediately put it back on Luxury Gift

16 (Pages 61 to 64)

Page 65

1  account, because the money doesn't belong to him.
2      Q.  Would Sergey have used the Wells Fargo account?
3      A.  Probably.  Yes.
4      Q.  When was that?
5      A.  I have no idea.  It was years -- a few years ago.
6  Maybe two years ago.  Maybe three.  I don't remember.
7  That's very hard to recollect.
8      Q.  Okay.  Have you ever transferred money between
9  Luxury Gift, Inc.'s bank accounts and your personal bank
10  accounts?
11      A.  I don't have personal bank account.
12      Q.  Well, the Wells Fargo account, or other accounts,
13  PayPal.  Have you ever transferred money between the
14  accounts?
15      A.  No.
16      Q.  Okay.  Have you ever transferred money between
17  Luxury Gift, Inc.'s and Sergey's bank accounts?
18      A.  Again, that case that I just mentioned, maybe.
19      Q.  Okay.  Other than that?
20      A.  Don't remember.
21      Q.  Okay.  Does anyone owe you money currently?
22      A.  Yes.
23      Q.  Who owes you money?
24      A.  There are one gentleman -- it's written.  The
25  restitution.  He robbed my house in New Jersey, completely

Page 66

1  destroyed the house.  The damage was about $300,000.  He
2  pays me a hundred bucks every month.
3      Q.  Where does that go?
4      A.  To the same account.
5      Q.  Into the Wells Fargo account?
6      A.  Yeah.  Even you can see on the schedule.  It's
7  there.
8      Q.  Okay.
9      A.  And there is another guy who robbed me for a few
10  hundred thousand dollars.  It was a scam.  He was arrested,
11  arraigned, and he's paying me 230 a month.  That's also on
12  the schedule.
13      Q.  That was -- was that a judgment?
14      A.  No.  He was caught ---
15      Q.  Is that another restitution?
16      A.  It's a restitution.  Yes.
17      Q.  Okay.
18      A.  It's there.
19      Q.  Okay.  Have you lent any family member a loan or
20  money over a thousand dollars in the past four years?
21      A.  Mostly it's coming from them, not from me.
22      Q.  Okay.  Have you lent your daughter money say in the
23  past five years?
24      A.  No.
25      Q.  Have you lent your son money in the past five

Page 67

1  years?
2      A.  No.  The other way.
3      Q.  Okay.  Given any gifts over a thousand dollars in
4  the past two years?
5      A.  No.
6      Q.  Have you sold anything recently, jewelry?
7      A.  We don't buy.  We don't sell.  We used to sell
8  years -- over 10 years ago, when things were not great.  But
9  there's nothing to sell.
10      Q.  Is anyone holding any money in trust for you?
11      A.  No.
12      Q.  Are you the beneficiary of any life insurance
13  policies?
14      A.  There are life insurance policies with Guardian.
15      Q.  Okay.  Are you a beneficiary?
16      A.  On life insurance, no.  In case of my death, my
17  wife is a beneficiary and my children are the beneficiary.
18      Q.  Okay.  Is it term or whole?  Do you know?
19      A.  Both.
20      Q.  Both?
21      A.  One is term.  Another is whole life.  Both are
22  exempt.
23      Q.  And you make payments to that every month, right?
24      A.  Absolutely.
25      Q.  And that's through the Wells Fargo account?

Page 68

1      A.  Absolutely.
2      Q.  Okay.  Other than your Social Security, that I see
3  gets deposited, what are the other -- because I don't have
4  copies of checks to those bank statements.  What other
5  amounts are being deposited into that account for the past
6  two years?  Are you the only one making deposits into that
7  account, the Wells Fargo account?
8      A.  Not me.  Sergey makes all the deposits.
9      Q.  Okay.  Do you ever sign any contracts on behalf of
10  Luxury Gift, Inc.?
11      A.  I don't have the power to sign contracts.
12      Q.  Have you?
13      A.  No, never.
14      Q.  Never signed any agreements on behalf of it?
15      A.  No.  As far as I remember, no.
16      Q.  Have you ever negotiated anything, any contracts or
17  vendors or things like that?
18      A.  I don't have the right to do it.  It's Leonid is
19  the only person that makes decisions and signs contracts or
20  anything.
21      Q.  What about when he wasn't living here and he was
22  living in Russia, or Ukraine, wherever he was living?
23      A.  Yeah, he was living in Ukraine.  Again, what kind
24  of contracts?  Can you be more specific?
25      Q.  Vendors, suppliers, customers.  Were you

17 (Pages 65 to 68)

Page 69

1  negotiating those things?
2      A.  Could be.
3      Q.  Would you sign purchase orders?  Did you ever sign
4  purchase orders?
5      A.  Maybe.
6      Q.  Did you sign invoices?
7      A.  Maybe.
8      Q.  All right.
9      A.  And again, as I said, even if I signed something,
10  the agreement was I'm not responsible for anything.
11  Whatever is there, it's his responsibility.
12      Q.  Are you guarantor on any loan or obligation that's
13  owed by Luxury Gift, Inc.?
14      A.  I cannot be.
15      Q.  Do you know if you are?
16      A.  I know for sure that I cannot be a guarantor.
17      Q.  Has Luxury Gift, Inc. taken any loans out in the
18  past four years?
19      A.  As far as I know, no.
20      Q.  Does it own any real estate?
21      A.  No.
22      Q.  It just owns inventory?
23      A.  Yes.
24      Q.  And where is that inventory kept?
25      A.  In the office and the Ukraine.

Page 70

1      Q.  Okay.  How often do you travel to Ukraine?
2      A.  How often?  The last time I was there -- but again,
3  I don't travel to the place where the business is because I
4  have nothing to do with it.
5      Q.  Have you ever been there?
6      A.  No, never.
7      Q.  Okay.  You know where it is, though, right?
8      A.  I know the city, but I don't know exactly where.
9      Q.  How often do you travel to Ukraine?
10      A.  Generally speaking?
11      Q.  Yeah.
12      A.  Once every five years.
13      Q.  Okay.  And what do you go for?
14      A.  My father buried there.  My oldest brother lives
15  there.  So, we have there relatives and friends.
16      MS. READ:  Mrs. Lyubarsky, does anyone owe you any
17  money?
18      MRS. LYUBARSKY:  No.
19      MS. READ:  Is anyone holding any money in trust for
20  you?
21      MRS. LYUBARSKY:  No.  I don't have any money.
22      MS. READ:  And you still have family in Ukraine?
23      MRS. LYUBARSKY:  Well, my relatives there are
24  rather wealthy people and I don't have any relations.
25      MS. READ:  You have no relations with your family

Page 71

1  in Ukraine?
2      MRS. LYUBARSKY:  Well, I do go there, visit them.
3  My brother is there.
4      MS. READ:  Okay.
5      MRS. LYUBARSKY:  But we do not have anything to do
6  about the money between two of us.
7      MS. READ:  Is anyone holding any money in trust for
8  you?
9      MRS. LYUBARSKY:  No.
10      MS. READ:  Do you have any bank accounts here in
11  the United States?
12      MRS. LYUBARSKY:  No.
13      MS. READ:  Do you have any bank accounts abroad?
14      MRS. LYUBARSKY:  No.
15      MS. READ:  When was the last time you had a bank
16  account here in the U.S.?
17      MRS. LYUBARSKY:  I didn't have.  Or I do not
18  recall.
19      MS. READ:  So, you said you have a brother still in
20  Ukraine?
21      MRS. LYUBARSKY:  Yes.
22      MS. READ:  And are your parents still alive in the
23  Ukraine?
24      MRS. LYUBARSKY:  They are deceased.
25      MS. READ:  Deceased.  Okay.  And they're from

Page 72

1  Odessa?
2      MRS. LYUBARSKY:  Yes.
3      MS. READ:  Okay.  And when was the last time you've
4  been to Ukraine?  When's the last time you went back?
5      MRS. LYUBARSKY:  Two years ago.
6      MS. READ:  Do you have any other siblings?
7      MRS. LYUBARSKY:  Siblings?  No.
8      MS. READ:  Okay.  Does anyone owe you money?
9      MRS. LYUBARSKY:  No.
10      MS. READ:  Have you lent anyone money in the past
11  two years?
12      MRS. LYUBARSKY:  No.
13  BY MS. READ:
14      Q.  Mr. Lyubarsky, do you have any bank or financial
15  accounts abroad?
16      A.  No.
17      Q.  Have you ever held any accounts abroad?
18      A.  Never.
19      Q.  You've never held any accounts in Ukraine?
20      A.  Never.
21      Q.  Are you still a Ukrainian citizen?
22      A.  No.  I'm U.S. citizen for 25 years.
23      Q.  No, I know you are, but do you still hold a
24  passport for Ukraine?
25      A.  No.  When I immigrated it was the Soviet Union.

Page 73

1  There was no Ukraine at that time.
2    Q.  It was Russia?
3    A.  No, it was USSR.  So, there was no separate
4  countries.  So, when we gave up our citizenship, Soviet
5  citizenship, we paid the fine.
6    Q.  And you surrendered your passports?
7    A.  We surrendered our passports and we were stateless.
8  When we moved into U.S., we were with no -- any kind of
9  nationality.
10    Q.  All right.  What about your children; do they hold
11  Russian or Ukrainian passports?
12    A.  No.
13    Q.  Are they citizens of Russia or Ukraine?
14    A.  No.
15    Q.  Okay.  Does Sergey own a house?
16    A.  No.
17    Q.  And where does he live?
18    A.  In the apartment at Sunny Isles.
19    Q.  Different than the Poinciana one, right?
20    A.  Different.
21    Q.  What about your daughter; does she own an
22  apartment?
23    A.  No.
24    Q.  Where does she live?
25    A.  In Downtown Brickell.

Page 74

1    Q.  Do they rent?
2    A.  Yes.
3    MS. READ:  Can we go off the record?  I think we're
4  done.
5    (Thereupon, a brief recess was taken at 12:45 p.m.,
6  after which the examination resumed at 1:01 p.m.)
7  BY MS. READ:
8    Q.  Mr. Lyubarsky, in the production you gave me of the
9  BB&T statement there was no check support.
10    MS. READ:  We're on Exhibit 8?  Okay.  Let me mark
11  this as Exhibit 8.
12    (Thereupon, Exhibit Number 8 was marked for
13  identification.)
14  BY MS. READ:
15    Q.  You provided this to me.  Can you tell me why you
16  provided this to me?
17    A.  Why I provided this?
18    Q.  Yes.
19    A.  Because you asked.
20    Q.  So, do you use this BB&T account?
21    A.  Just to put the checks from disability benefits.
22    Q.  That's the only thing that gets deposited into that
23  account?
24    A.  The only thing.  Nothing else it was used for.
25    Q.  Okay.  So, you see these three deposits, one for

Page 75

1  19,000?  What is that for?
2    A.  Again, it was my and Sergey's account, and I have
3  no idea.  Maybe he put it for some reason.  I don't know.
4  You have to understand, it's a mutual account.  I know that
5  I put there only disability benefit checks.  Nothing else,
6  ever.
7    Q.  But I thought you haven't been getting disability
8  checks.
9    A.  What?
10    Q.  I thought you haven't been getting disability
11  checks?  Isn't that the issue with Vertonix?
12    A.  Yes.
13    Q.  Right.  So, you haven't been getting any disability
14  checks, correct?
15    A.  From 2016, yes.
16    Q.  Okay.
17    A.  So, it means that if there is some deposit that was
18  here, probably Sergey did it, but not me.
19    Q.  Okay.  Do you have access to this account?
20    A.  Yes, I think I -- I don't have a signature power.
21  No, I don't.  I have an access online, yes.
22    Q.  Okay.  Do you ever utilize this account?
23    A.  What do you mean by that?
24    Q.  Do you ever use it?
25    A.  No, never.

Page 76

1    Q.  The Wells Fargo checking account 7697, do you ever
2  write checks on that account?
3    A.  I don't have a signature on that account.
4    Q.  Have you ever written checks on that account?
5    A.  Have I ever?
6    Q.  Uh-huh.
7    A.  Maybe years ago could be, but I'm not sure.
8    Q.  Okay.  Because I don't have a check support.  So,
9  if I subpoena the check support, am I going to see that you
10  wrote checks on this account?
11    A.  No, I don't think you'll get any.
12    Q.  Okay.
13    A.  I even -- you know, I was under impression --
14  because many, many years ago I thought that I had some kind
15  of a power of attorney or something, but when I called the
16  bank, they said, "No, no, no.  You have nothing to do with
17  this bank."  So, that's why I'm absolutely sure that -- you
18  know.
19    MS. READ:  I'm going to mark Exhibit 9.
20    (Thereupon, Exhibit Number 9 was marked for
21  identification.)
22  BY MS. READ:
23    Q.  This is a Wells Fargo account from April of 2018.
24  Can you tell me what these PayPal transactions are for on
25  April 9th and April 19th?

19 (Pages 73 to 76)

Page 77

1    A.  This account is used by my daughter-in-law and
2  that's why -- could be she sold something.  Could be she did
3  something.  Because, again, as I said, I don't use any
4  account.  My bank account is used by my daughter-in-law and
5  my son.  They sell shoes.  Sometimes they sell some
6  clothing.  I have nothing to do with it.
7    Q.  What's your daughter-in-law's name?
8    A.  Natalia.
9    Q.  Can you spell that?
10   A.  N-A-T-A-L-I-A.
11   Q.  Do you see all these transactions for payments for
12  credit cards, Sapphire?
13   A.  That was my card.
14   Q.  Okay.  You have a Chase Sapphire card?
15   A.  Yes, I did.
16   Q.  Okay.  Where is that card now?  This is in 2018.
17   A.  Revoked.
18   Q.  When was it revoked?
19   A.  On the 31st of May, when I filed for bankruptcy.  I
20  was very upset because I paid -- I was paying on time.  It
21  was a big credit line, like $13,000.  I was trying to call
22  them and say that I can use their card, I'll pay the
23  balance -- the balance was about four grand.  So, I didn't,
24  you know, use $13,000 just to, you know, scam them.  It was
25  not right.

Page 78

1    Q.  Okay.  What other credit card did you have before
2  you filed for bankruptcy?
3    A.  There were two of them.  One of them was this one.
4  Another one was Capital One.  There was nothing else.
5    Q.  What about Sea Breeze?  What is that?
6    A.  Sea Breeze is my mother.  That's the apartment.
7    Q.  What apartment?
8    A.  My mother lives -- she's 92 and she lives in the
9  apartment in Brooklyn.  That's a payment -- a rent payment.
10   Q.  Okay.  And who is Alexander Lipp?
11   A.  Alexander Lipp is the gentleman that works for the
12  company Luxury Gift.
13   Q.  Okay.  Why would he be depositing money into this
14  account?
15   A.  Maybe -- I don't know.  Maybe he -- you know,
16  sometimes he's asking for loan.  I take money for -- give it
17  to him.  Not my money.  You know, money from -- from the
18  Luxury Gift money.
19   Q.  So, why would he be repaying it to you?
20   A.  Because then I take the money and put it back into
21  the ---
22   Q.  The company?
23   A.  Yes.
24   Q.  So, if Alexander Lipp deposits $700 into this Wells
25  Fargo account, you then take that 700 and give it back to

Page 79

1  the company?
2    A.  Yeah.
3    Q.  Okay.  When I asked you before about transferring
4  money in between accounts, you said you didn't do that.
5    A.  Again, it's not the company.  Okay.  The company
6  has account and the company has liquid cash.
7    Q.  Right.
8    A.  Okay?  Imagine the company has $5,000 in cash.
9  Okay?  He asked Leonid, "Leonid, may I take $500 or $700?"
10   Q.  An advance?
11   A.  Leonid says, "Yes, Yuri, give him $700."  To make
12  it easier, then he sends money back to me and I put it back
13  into -- into Castle.  That's all.  It's not something that,
14  you know ---
15   Q.  Right.  I understand.  So, the $700, how would you
16  repay this?  By check?  By cash?
17   A.  Repay to who?
18   Q.  You said this is owed to the company.
19   A.  Cash.  I have to put cash.  It's Leonid's money.
20   Q.  Okay.  So, you would withdraw $700 from this
21  account?
22   A.  Right.
23   Q.  And then give it to Luxury?
24   A.  To Luxury.  Yeah.  To Leonid.  It's his money.  His
25  safe.  He puts it in his safe.

Page 80

1    Q.  But why would Alexander Lipp be paying you the
2  money instead of Luxury Gift?
3    A.  Because I'm a bookkeeper.  It's easier for him.
4    Q.  Right.  I understand that.  But this is a personal
5  account.  This is an account ending in 7697.
6    A.  Right.
7    Q.  Why would an employee of the company be giving you
8  money to repay the company?
9    A.  It's easier for him.
10   Q.  It's not easier just to deposit it into the
11  corporate bank account?
12   A.  You cannot do it.  It's a personal money.  It has
13  nothing to do with business.
14   Q.  Okay.
15   A.  He takes -- okay.  Let me ---
16   Q.  No, no, no.  It's fine.
17   A.  He wants money.  He comes to the boss and says,
18  "Leonid, can you borrow me $700, that I need to pay my rent,
19  my expenses?"  Okay?  Leonid says, "Yuri, give him $700."  I
20  take money, I give him.
21   Q.  How often does this happen?
22   A.  I don't know.  Last time -- if it's a big deal, I
23  can ask him not to do it again.
24   Q.  How often does it happen?
25   A.  I know he takes money every month.

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 81

1     MS. READ: Okay. Mark this as Exhibit 10. This is
2  a Way2Save Wells Fargo account for October 2018.
3     (Thereupon, Exhibit Number 10 was marked for
4  identification.)
5  BY MS. READ:
6     Q. See these charges?
7     A. Yeah. Yeah.
8     Q. On October ---
9     A. That's what I'm saying. He ---
10     Q. Excuse me.
11     A. He takes money -- he takes money and then he
12  puts -- it's the same thing as I said. Every month he is
13  begging for money. Leonid tells him -- listen, I'm the one
14  that just does whatever, you know, Leonid says.
15     Q. Okay. I don't see a withdrawal here for $900.
16  There's a deposit of 900, but I don't see a withdrawal here.
17  Where would that be reflected?
18     A. What I can say, that the last time -- $900 ---
19     Q. Okay. Let's move on.
20     I see here there's PayPal for Auto World. What is
21  Auto World? Payable to you. What is that? Or excuse me.
22  These are withdrawals. What is that?
23     A. It's something that -- okay. Auto World is from
24  this account. It's a friend of mine. We -- 36238 -- it's a
25  friend of mine.

Page 82

1     Q. What are you paying him for?
2     A. He is -- let me check. He -- let me see. What I
3  was paying him for? 238. I think it was something for a
4  car, but ---
5     Q. For the Tesla?
6     A. It was something -- no, not for Tesla. It was --
7  we have a gentleman in Kiev, in Ukraine that asked for some
8  spare parts. That I remember.
9     Q. Right.
10     A. Right. Every time he asks -- sometimes he asks for
11  this, for that. Probably that's the thing.
12     Q. Okay. Do you have an Amazon account?
13     A. Not really. I don't use it. I used to have one,
14  but I didn't -- sometimes I buy on Amazon some simple
15  things.
16     Q. Do you use Amazon bill pay?
17     A. No. That I don't know. What is that?
18     Q. What about Alliant Credit Union? What is that?
19     A. That's the payment for Tesla.
20     Q. $1300 a month is the payment for Tesla?
21     A. Correct.
22     MS. READ: Mark this as Exhibit 11.
23     (Thereupon, Exhibit Number 11 was marked for
24  identification.)
25  BY MS. READ:

Page 83

1     Q. Wells Fargo checking, February 2018. I see here
2  Amazon and TJX. Is that Target?
3     A. No. TJX, it's -- what's the name of the store?
4     Q. TJ Maxx?
5     A. TJ Maxx.
6     Q. Okay. Is that a credit card?
7     A. It's like bonus card.
8     Q. Okay. Is this Amazon bill pay, is this an Amazon
9  credit card?
10     A. No. We don't have Amazon credit card.
11     Q. Okay. Do you have access to any savings accounts
12  attached to this account?
13     A. No.
14     Q. No?
15     A. There is no savings account as far as I know.
16  Maybe there is, but there is zero balance, because we never
17  use it.
18     Q. What's Sea Breeze?
19     A. I just told you. My mother's ---
20     Q. Oh, that's right. All right.
21     Okay. We're wrapping up. I know you've got some
22  issues with Vertonix and so do we.
23     What is the current status of the lawsuit in
24  Philadelphia?
25     A. The current status, as far as I know, that there

Page 84

1  was a decision, softly saying illegal decision, by a
2  Philadelphia judge that my attorney will describe it later,
3  but they -- three years ago they -- after I paid them over
4  $200,000, they still want more.
5     Q. Right.
6     A. And in 2016, with all the allegedly lies in
7  court -- that's the way they behave themselves -- they won
8  the decision in court fooling the judge that I'm a
9  millionaire, that I have eight luxury cars and $2 million
10  house. Mr. Rays (phonetic) knew that one year before that
11  court hearing my house was lost on foreclosure, but he never
12  mentioned it. He just gave the judge the photos of that
13  particular house that was already sold a year ago.
14     Q. Uh-huh.
15     A. And said that, "This is Yuri's house. He's a rich
16  person and he doesn't need those payments." And that's why,
17  you know, the judge -- first of all, the judge got the wrong
18  statute --
19     Q. Right.
20     A. -- to determine.
21     Q. No, I understand. What's the current status? Are
22  you still litigating it in Philadelphia?
23     A. No.
24     Q. No?
25     A. It's done.

21 (Pages 81 to 84)

Page 85

1    Q. It's over?
2    A. It's over.
3    Q. Have you been in communication with Guardian?
4    A. Yes.
5    Q. Okay. And are they going to ---
6    A. They are on my side.
7    Q. Okay.
8    A. Although they want 50 grand for something that they
9    don't deserve.
10   Q. Okay.
11   A. But they said that they know that the decision of
12   the judge wasn't legal and they told the judge about it, but
13   nothing worked. Because we don't know how they got this
14   decision. But right now I have no idea what's going on. I
15   know it's done in Philadelphia and right now the Bankruptcy
16   Court will make a decision --
17   Q. Right.
18   A. -- whether they are entitled on any money.
19   Q. Okay. Lastly, you said there's a Public -- you
20   have a Public Storage unit?
21   A. Correct.
22       MS. READ: Okay. I'm marking this as Exhibit 12.
23   You provided this to me.
24       (Thereupon, Exhibit Number 12 was marked for
25   identification.)

Page 86

1    BY MS. READ:
2    Q. Is that a complete inventory of what's in it?
3    A. At this particular time, yes. It used to be some
4    furniture, TVs that we gave to Salvation Army. There were
5    some boxes. There was a lot of different things. We had a
6    bigger unit, Unit 15, and then we moved to Unit 5 to pay
7    less money and right now it's Unit 5.
8    Q. Okay. When was the last time you've been there?
9    A. A few days ago.
10   Q. Okay. Could I have access to that?
11   A. Absolutely.
12       MS. READ: Okay. I don't have anything further at
13   this time. There were a lot of documents that I need, which
14   I'll -- or I may need to subpoena. The credit card
15   statements, things like that, check support. I'm not
16   concluding this deposition. I'm keeping it open. I don't
17   think I'm going to need to call them back, but reserving my
18   right to recall them pending additional documents.
19       Are they going to read or waive?
20       MR. NERDINSKY: We'll read.
21       MS. READ: They'll read. Okay.
22
23       AND FURTHER DEPONENT SAITH NOT.
24
25       (Thereupon, formalities having not been
     waived, the examination was adjourned at 1:20 p.m.)

Page 87

1
2
3       EXCEPT FOR THE CORRECTIONS MADE
        HEREIN BY ME, I CERTIFY THIS IS
4       A TRUE AND ACCURATE TRANSCRIPT.
5
        _____
6                 Deponent
7
8    Sworn and subscribed to before me
9    this _____ day of _____, 2019.
10   PERSONALLY KNOWN _____ OR I.D. _____
11
     _____
12   Notary Public in and for the
     State of Florida at Large
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 88

1
2       CERTIFICATE OF OATH
3
     STATE OF FLORIDA      )
4                          ) SS
     COUNTY  OF  MIAMI-DADE)
5
6       I, Maggie Rubio, RPR, Notary Public in and
7    for the State of Florida at Large, certify that
8    the witness, YURI LYUBARSKY and OLGA LYUBARSKY,
9    personally appeared before me and were duly sworn.
10      WITNESS my hand and official seal this 21st
11   day of February, 2019.
12
13
14
        MAGGIE RUBIO
15      Notary Public - State of Florida
        Commission No. GG 179907
16      My Commission Expires: April 14, 2022
17
18
19
20
21
22
23
24
25

22 (Pages 85 to 88)

Page 89

1
       REPORTER'S DEPOSITION CERTIFICATE
2
3       I, Maggie Rubio, RPR, certify that I was
4    authorized to and did stenographically report the Rule
5    2004 Examination of YURI LYUBARSKY and OLGA LYUBARSKY
6    the witnesses herein; that a review of the transcript
7    was requested; and that the foregoing pages numbered
8    from 1 to 90 inclusive is a true and complete record of
9    my stenographic notes of the Rule 2004 Examination by
10   said witnesses; and that this computer-assisted
11   transcript was prepared under my supervision.
12       I further certify that I am not a relative,
13   employee, attorney or counsel of any of the parties,
14   nor am I a relative or employee of any of the parties'
15   attorney or counsel connected with the action.
16       DATED this 21st day of February, 2019.
17
18
            MAGGIE RUBIO, RPR
19
20
21
22
23
24
25

Page 90

1           OUELLETTE & MAULDIN
              Court Reporters, Inc.
2         1550 S. Dixie Highway, Suite 205
              Coral Gables, Florida  33146
3            Phone:  (305) 358-8875
4    February 21, 2019
5    YURI LYUBARSKY and OLGA LYUBARSKY
     c/o Nerdinsky Law Group, P.A.
6    Attn: Leonid Nerdinsky, Esquire
     3800 South Ocean Drive, Suite 242
7    Hollywood, Florida  33019
8    CASE:      IN RE:  YURI LYUBARSKY and OLGA
                LYUBARSKY
9    DATE TAKEN:  November 27, 2018
10   Dear Mr. and Mrs. Lyubarsky:
11      Please be advised that your Rule 2004 Examination
     taken in the case and on the date described above has
12   been transcribed and is ready for your review.
13      Please contact us for an appointment to read and
     sign this Rule 2004 Examination at your earliest
14   convenience.
15      The transcript will be sent to counsel with or
     without your signature in 30 days or at the time of
16   trial, whichever comes first.
17      Our office hours are 9:00 a.m. to 4:30 p.m., Monday
     through Friday.
18
        If you have any questions regarding this matter,
19   please feel free to contact us at the above number.
20          Sincerely,
21
22          MAGGIE RUBIO, RPR
23
24   cc: Alexis S. Read, Esquire
25

23 (Pages 89 to 90)

# EXHIBIT 6

## CONSULTING AGREEMENT
### between
### Leonid Aronov ("Owner"),
### Luxury Gift, Inc. ("Business") and
### Yuri Lyubarsky ("Consultant")

### October 10, 2013

**WITNESSETH:**

**WHEREAS:**

- Business is a 7-year old jewelry/watch sales business in Carteret, NJ;

- Owner is the 100% owner and President of Business;

- Owner resides permanently overseas, is an absentee owner/operator of the Business, and as a result of this has difficulty properly auditing the financials of the Business or regularly verifying its security procedures;

- In early 2013, Owner came to believe that some employees of the Business may be secretly diverting sales of products to themselves and/or to other entities competing against the Business;

- Owner also came to believe that the bookkeeping staff of the business may not be properly or competently keeping the financial books of the Business;

- Consultant is a friend of Owner who has competence is bookkeeping and sales operations, but lives in Florida, while the Business is located in New Jersey;

- In July 2013, Owner requested Consultant's assistance in auditing the books of the Business and the security procedures of the sales operations of the Business;

- In July-October 2013, Consultant made several trips to the location of the Business in New Jersey to review its books and perform spot security checks to see if sales were being diverted;

- Consultant has identified a number of bookkeeping issues at the Business, as well as assisted Owner in identifying diversion of sales from the Business by some of its employees;

- Consultant is handicapped and has a number of medical and mental health conditions that make it difficult for him to make any firm time commitments or to continue to provide assistance to Owner while the Business located in New Jersey;

- Consultant and Owner have discussed commercial terms on which Consultant may continue to assist Owner on a more permanent basis, with provisions made for the health conditions of Consultant which preclude him from taking a full-time job or experiencing significant stress;

- As part of such discussions, Consultant has recommended that Owner relocate the Business to Florida, where Consultant's family members (who, as Consultant has assured Owner, can be trusted better than existing sales staff) may begin working for the Business, which Consultant believes will ensure the future integrity of the Business and eventually increase its profitability;

- Owner and Consultant have discussed a possibility of immediate buy-in for Consultant to become a partner in the Business, and could not agree on the terms of such buy-in, since Consultant is unable to contribute any meaningful portion of the ongoing value the Business, while Owner is unwilling to sell any portion of the Business until Consultant has proven by track record that he is able to substantially improve the performance of the Business;



- Instead of an immediate buy-in, Owner and Consultant have discussed an option compensation package where, in exchange for his services in auditing the books of the Business and his ongoing assistance in its operations, Consultant would be given an option to purchase a 49% equity stake in the Business for an appropriate portion of its value as an ongoing concern, on the condition that Consultant's work leads to a significant increase in the gross profit of the Business over a term of five (5) years;

**NOW, THEREFORE,** Owner and Consultant agree as follows:

### 1. Term and Definitions.

The term of this agreement shall be from the date hereof and until December 31, 2018 ("Term"). As more fully provided herein, certain obligations and rights of parties hereunder shall extend until December 31, 2019.

The Business operates by reselling luxury watches, jewelry and related items which are owned by Owner ("Owner's Inventory") as well as its own inventory of similar items ("Business Inventory"). It is expected that in the future Owner will contribute Owner's Inventory to the Business and it will become part of Business Inventory. The present value of Owner's Inventory is approximately $2,000,000 (Two Million US Dollars), and the present value of Business Inventory is approximately $50,000 (Fifty Thousand US Dollars).

### 2. Services.

Consultant shall, at no separate charge except the consideration provided in Section 4 hereof, provide the following services ("Services") to Owner/Business during the Term:

   a. make monthly visits to the Business premises while it operates in New Jersey to perform bookkeeping work, and report the results to Owner;

   b. make security spot checks/calls on the Business sales department to determine if sales are being diverted away from the Business;

   c. assist in relocating the Business to Florida;

   d. upon relocation of the Business to Florida and subject to agreement of Consultant's family members to work for the Business (to be approved or rejected in Owner's full and unfettered discretion), assist Owner in hiring and training Consultant's family members;

   e. during operations of the Business in Florida, continue to perform bookkeeping reviews and audits of the Business;

   f. assist other staff in performing sales duties;

   g. perform other duties as may be agreed from time to time with Owner.

### 3. Performance and Termination by Consultant.

It is acknowledged by Owner that Consultant has significant chronic medical and mental health conditions which may regularly or occasionally preclude him from providing the Services and/or continuing to provide the Services. The above Services shall be provided at such times, and only at such times, which are convenient for Consultant, and subject to Consultant being healthy enough to provide said Services, in Consultant's full and unfettered discretion. For the avoidance of doubt, Consultant has no duty to provide the Services on an ongoing basis and may terminate

the Services at any time of his choosing, which may result in a consequential termination of Owner's obligations as more fully specified herein.

4. **Option.**

   a. Owner hereby provides Consultant with an option ("Option") to acquire a 49% interest in the Business in the form of non-voting shares of the Business, and a 49% interest in Owner's Inventory, in exchange for a payment to Owner of $150,000 plus 49% of the net value of all assets of the Business (to be determined, for the avoidance of doubt, as the total value of all assets of the Business less the value of accounts payable and other liabilities to third parties, both amounts to be appraised/determined at the time of exercise of the Option by Consultant), plus 49% of the value of Owner's Inventory (to be appraised/determined at the time of exercise) if and when **any** of the following conditions ("Goals") are met (the term "Sales" below to mean all revenue received by the Business from all its sales operations):

      i.   2014 Sales exceed 2013 Sales by a factor of 2.00 (+100% on top of 2013); or
      ii.  2015 Sales exceed 2013 Sales by a factor of 2.50 (+150% on top of 2013); or
      iii. 2016 Sales exceed 2013 Sales by a factor of 3.00 (+200% on top of 2013); or
      iv.  2017 Sales exceed 2013 Sales by a factor of 3.50 (+250% on top of 2013); or
      v.   2018 Sales exceed 2013 Sales by a factor of 4.00 (+300% on top of 2013).

   b. The Option shall be effective at the conclusion of any calendar year when any of the Goals is met, or at the end of the Term, whichever comes sooner, and shall **not** expire until one year from the end of the Term irrespective of when any of the Goals is met, or when the Option becomes effective;

   c. Upon exercise of the Option by Consultant, in addition to Consultant becoming a shareholder in the Business and a co-owner of Owner's Inventory, Owner shall also procure that the Business shall begin to employ Consultant in a salaried position as a bookkeeper and/or sales agent for $3,500 per month plus standard benefits provided to other employees or, in case of continuing daily consulting-type work, for $175 per day as an independent contractor, without benefits;

   d. The Option shall remain in effect on terms specified above as long as Owner remains an absentee owner/operator of the Business. If Owner becomes active in the operation of the Business, the parties shall conduct negotiations in good faith to revise upwards the figures in clause 4(a) above. If no agreement can be reached through negotiations, it is agreed that the factors in clause 4(a) above shall be revised upwards by 25% (e.g. the 3.5 factor in 4(a)(iii) shall a become 3.75 factor), and the percentages shall be revised upwards accordingly.

5. **Termination.**

This Agreement, including but not limited to all obligations of Owner hereunder, shall automatically terminate upon occurrence of any of the following:

   a. if none of the Goals are achieved in any of the years specified in clause 4(a) (as may be adjusted under clause 4(d) by the end of the Term hereof; or

   b. if, prior to any of the Goals being met, Consultant fails, refuses or becomes unable to perform the Services for over 3 consecutive months, irrespective of the reason for such inability, failure or refusal, including but not limited to Consultant's inability, failure or refusal to perform the Services due to health reasons or any other reasons, including any reasons beyond Consultant's control;

   c. if the Business is not relocated to Florida within 6 months from the date hereof;

d.  if any of the relatives of Consultant commit fraud against the Business, materially violate the terms of their employment at the Business, or are fired for cause by the Business;

e.  if Consultant purports, attempts or takes any steps whatever to transfer, assign, bequeath, sell or otherwise convey his interest in this Agreement to a third party;

f.  if Consultant intentionally harms the Business;

## 6. Obligations of Owner and Business

The Business shall reimburse Consultant for any expenses incurred by Consultant while performing the Services during the Term.

Owner shall not sell or encumber his 100% ownership interest in the Business at any time during the Term and, if the Option becomes effective at any time during the Term, for one additional year after the end of the Term.

If Consultant exercises the Option, pays for 49% of the net asset value of the Business, but is unable to make the payment proscribed in Clause 4(a) that corresponds to 49% of the value of Owner's Inventory, to allow Consultant to fulfill this obligation by making five (5) annual installment payments, each equal of 9.8% of the value of Owner's Inventory, plus interest accruing on each payment at the rate of 6% per annum, starting on the day the Option is exercised and ending (prorated) as of the date the payment is made.

## 7. Assignment.

The rights of Consultant under this Agreement are not transferrable or assignable to any third party under any circumstances. Any attempt to transfer or assign this Agreement to a third party shall invalidate and terminate this Agreement, and all rights of Consultant hereunder shall terminate immediately upon any attempt to transfer or assign Consultant's interest hereunder.

It is expressly agreed and understood that Owner is unwilling to allow anyone other than Consultant to own a share in the Business. Accordingly, Owner has entered into this Agreement under the specific condition, which is a significant material consideration for Owner's entry into this Agreement, that under no circumstances could this Agreement result in any share in the Business belonging to anyone other than Consultant, or any of the Business property, including intellectual property or information, to become available to any third party.

Consultant's personal rights hereunder are not an asset and may not be sold, assigned, pledged, conveyed, encumbered or otherwise bargained for with any third parties. Owner is entering into this agreement with the explicit expectation and understanding that, subject to the Goals being reached, he is willing to be partners in the Business with, and only with, the individual Consultant named in the heading of this Agreement.

Accordingly, in the event of Consultant's death, mental or physical incapacity causing him to be unable to provide Services, or other events which may result in the rights of Consultant being owned by or transferred to any third party, this Agreement and any rights of Consultant hereunder shall automatically and immediately terminate with no equity of redemption due to Consultant or to any third party.

## 8. Default.

The events described in the last paragraph of Section 7 above (i.e. death, mental or physical incapacity of Consultant, etc.), as well as any attempt by Consultant to transfer, assign, convey, encumber or otherwise bargain for his rights under this Agreement with any third party, shall

constitute an incurable default under this Agreement, and shall automatically and immediately cause this Agreement and any Option granted hereunder to be terminated and cancelled.

## 9. Exercise of the Option.

Consultant shall notify Owner and Business in writing if and when he chooses to exercise the Option ("Exercise Notice"). Upon receipt of such notice, Owner shall schedule a closing within 30 to 45 days from the date of the Exercise Notice and shall cooperate with Consultant during said 30-45 day period in performing a full inventory and accounts-payable audit of the Business to determine the price for which the 49% non-voting interest in the Business is to be given to Consultant.

The price ("Option Price") to be paid to Owner in the exercise of the Option by Consultant shall be equal to the sum of the following:
- $250,000, representing part of the agreed goodwill value of the business, plus
- 49% of the difference between the assets owned by the Business and its liabilities, plus
- 49% of the value of Owner's Inventory at the time of exercise of the Option.

Owner shall have the choice of whether (a) to sell a corresponding number of existing shares in the Business to Consultant (subject to a waiver by Consultant of voting rights thereunder), or (b) to cause the Business to issue new non-voting shares in the Business to Consultant, or (c) to arrange for a transaction involving a combination of (a) and (b) above, it being understood that under any such scenario Consultant must come into ownership of a 49% interest in the Business upon payment of the appropriate Option Price to Owner. Owner shall bear all tax consequences from such sale and/or issuance of shares.

The payment of the Option Price and the transfer/issuance of shares in the Business to Consultant ("Closing"), shall take place on date and time chosen by Owner in the presence of an attorney representing the Business, at a law office of such attorney. Consultant and Owner shall have the option of coming with his own attorneys. Consultant and Owner shall cooperate in good faith on preparing all relevant documentation.

If Consultant notifies Owner that he will exercise the Option, but then fails to pay the Option Price at the Closing, the Option shall be deemed waived, null and void, and this Agreement shall immediately terminate, with no remaining rights of Consultant.

A portion of the Option Price corresponding to 49% of the value of Owner's Inventory may be financed by Owner at the request of Consultant over five (5) years, such financing arrangement bearing the annual interest rate of 6%. If this amount is so financed, Consultant shall make payments to Owner in the applicable amounts (i.e. 1/5th of 49% of the value of Owner's Inventory, plus interest accrued on such amount prior to the date of the payment) no later than each of the first five (5) anniversaries of the Option exercise. A financing agreement may be signed by Owner and Consultant for this portion of the Option Price.

Nothing herein obligates Consultant to exercise the Option.

## 10. Non-Compete.

Consultant may not obtain employment, consult, own, finance, provide services or otherwise participate in any business that competes with the Business at any time during the Term and for two (2) years after the end of the Term ("Non-Compete Restriction"). This Non-Compete Restriction shall survive an early termination of this Agreement, irrespective of which party or for what reason terminates this Agreement. The Non-Compete Restriction shall persist for the entire duration of the Term and for two (2) years thereafter if Consultant ceases to provide the Business with Services at any time during the Term.

Consultant shall not disclose to third parties any information he obtains while providing the Services to the Business, including but not limited to any information about vendors and customers of the Business, the operations of the Business, the financial information about the Business, or any other information that becomes available to him while he provides the Services ("Business Intellectual Property").

Notwithstanding the foregoing, it is agreed by Consultant and Owner that if Consultant has not met the Goals, or has met the Goals but then chose not to exercise the Option, Consultant shall be permitted to open and operate a new business that may compete with the Business, and that Owner and the Business shall provide Consultant with initial support for such new business by lifting the Non-Compete Restriction for such purposes, and providing Consultant's new business a limited permission to use some of the Business Intellectual Property to launch operations.

Accordingly, the Non-Compete restriction shall be lifted at the end of the Term for the purpose if all of the following conditions are met:

    a.  Consultant has performed Services for the entire duration of the Term;
    b.  The Goals are not reached, or the Goals are reached but the Option is not exercised;
    c.  Consultant opens a new business in the same market segment as the Business;
    d.  Consultant owns 100% of such new business subject to no rights of third parties;
    e.  Consultant submits a written request requesting assistance for his new business from Owner and the Business pursuant to this Section 10 of the Agreement, specifying security procedures which will be implemented at Consultant's new business that will ensure any information provided to it by the Business will not be released to any third parties.

In these circumstances, Owner and the Business shall:

    a.  Issue a waiver of the Non-Compete Restriction for the sole and explicit purpose of Consultant's ownership and/or operation of his new business;
    b.  Upon execution by Consultant, on behalf of his new business, of a document expressing commitment to utilize information provided by the Business in a secure fashion so as to preclude its transfer to any third parties, provide Consultant's new business with a complete vendor list of the Business as of the time the Option was exercised;
    c.  Provide Consultant's new business with an express permission to contact and do business with any of the vendors whose information is provided by the Business;
    d.  Provide a limited waiver of non-compete restrictions that may be in effect for any of Consultant's family members, allowing for the specific purpose of their work at Consultant's new business.

Consultant and Owner shall cooperate in good faith in effectuating the above provisions, the spirit and purpose of which is to provide Consultant, at the end of the Term (and assuming Consultant provided the Services throughout the Term), with the ability to start and operate a business in the same market segment as the Business that deals with vendors of the Business.

## 11.    Effect of Termination.

If Consultant and/or Owner terminate this Agreement, or if this Agreement is terminated automatically under any of the provisions herein, Consultant shall have no obligations to perform any Services for Owner of Business immediately effective the termination date. If Owner wishes to have Consultant perform any further Services after the cancellation, Owner and Consultant may negotiate a fee-based agreement under terms and conditions to be agreed at such time. If such agreement is not or cannot be reached, Owner and Consultant shall have no obligations towards each other.

## 12.    Automatic Termination.

This Agreement shall automatically terminate one year after the end of the Term if by then (a) none of the Goals has been reached in any of the years during the Term, or (b) any of the Goals has been reached in any of the years during the Term (making the Option effective), but the Option has not been successfully exercised by Consultant.

13.    **Disputes.**

In the event of any dispute, claim or controversy between or among the parties to this Agreement arising out of or relating to this Agreement or any breach thereof, including, without limitation, any claim that this Agreement or any of its parts is invalid, illegal or otherwise voidable or void, whether such dispute, claim or controversy sounds in contract, tort, equity or otherwise, and whether such dispute, claim or controversy relates to the meaning, interpretation, effect, validity, performance or enforcement of the Agreement, such dispute, claim or controversy shall be settled by and through an arbitration proceeding to be administered by the American Arbitration Association (or any like organization successor thereto) nearest the then-present offices of the Business, in accordance with the American Arbitration Association's Commercial Arbitration Rules. Each of the parties to this Agreement hereby agrees and consents to such venue and waives any objection thereto. The arbitrability of any such dispute, claim or controversy shall likewise be determined in such arbitration. Such arbitration proceeding shall be conducted in as expedited a manner as is then permitted by the commercial arbitration rules (formal or informal) of the American Arbitration Association. Both the foregoing agreement of the parties to this Agreement to arbitrate any and all such disputes, claims and controversies and the results, determinations, findings, judgments and/or awards rendered through any such arbitration shall be final and binding on the parties hereto and may be specifically enforced by legal proceedings. Notwithstanding any provision of this Agreement relating to which state laws govern this Agreement, all issues relating to arbitrability or the enforcement of the agreement to arbitrate contained herein shall be governed by the Federal Arbitration Act (9 U.S.C. SSSS 1 et seq.) and the federal common law of arbitration.

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, Owner, Business and Consultant have executed this Agreement as of the date first noted above.

Owner:
_____
Leonid Aronov

Business:
_____
By: Leonid Aronov, President

Consultant:
_____
Yuri Lyubarsky

## ADENDUM 1

### April 20, 2017

<u>Parties in consulting agreement of October 10, 2013 agreed as follow:</u>

1. Owner moved back to the USA and now active works at the Business on site.
2. The fractions in the agreement are modified as follows.
3. The option fraction for 2017 stays the same as 3.5 (extra 250 percent) versus 2013 sales.
4. The option fraction for 2018 is changed to 5 (extra 400 percent) versus 2013 sales.
5. Everything else in consulting agreement remains same.

Owner                                 Consultant

_____               _____
Leonid Aronov                         Yuri Lyubarsky