*Tagged Opinion*



**ORDERED in the Southern District of Florida on April 17, 2020.**

Laurel M. Isicoff
Chief United States Bankruptcy Judge

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In re:

YURI LYUBARSKY and                     Case No: 18-16659-LMI
OLGA LYUBARSKY                          Chapter 7

      Debtors.

_____/

**MEMORANDUM OPINION ON DEBTORS' MOTION FOR ENFORCEMENT**
**OF THE AUTOMATIC STAY AND FOR SANCTIONS**

       This matter came before the Court for trial on September 16 and 17, 2019,

on *[Amended] Debtors' Motion For Enforcement Of The Automatic Stay, Sanctions*

*Against Vertonix Ltd And Its Counsel Arkady "Eric" Rayz For Fraud On The Court*

*And Contempt For Willful Violations Of The Automatic Stay* (ECF #81)(the

"Sanctions Motion")[1].  I have considered all of the evidence presented at the trial, including the testimony of witnesses, the stipulated facts set forth in the *Joint Pretrial Stipulation* (ECF #134), as well as the docket in this case, and all pleadings filed associated with the Sanctions Motion, including the competing Proposed Findings of Fact and Conclusions of Law submitted by the parties. Based on all of the foregoing, and for the reasons detailed below, I find that Vertonix Limited ("Vertonix") and attorney Arkady "Eric" Rayz ("Rayz")(when referred to collectively - "Vertonix") violated the automatic stay, that the violation was willful, and that the Debtors are entitled to compensatory damages for emotional distress, for reasonable attorney's fees and costs, as well as punitive damages, all as set forth in the opinion that follows.[2,3]

The parties have a long and tortured history going back many years, countries, and lawsuits.  Vertonix has a judgment against the Debtors which the Debtors have been fighting for many years in various courts.  In connection with that judgment Vertonix issued a writ of garnishment against the Husband Debtor's annuity held by Guardian Life Insurance Company of America ("Guardian Life").  The Debtors fought the garnishment unsuccessfully. On May 31, 2018, the Debtors filed this bankruptcy case.

---

[1] The Sanctions Motion sought damages for the payment demand described in this opinion as well as for filing what the Debtors described as a fraudulent proof of claim.  I have already ruled that the Debtors did not have standing to seek any kind of redress with respect to the proof of claim filed by Vertonix, so my ruling is limited to the $250,000.00 payment demand.

[2] I originally read this ruling into the record on March 11, 2020; however, at the time I did not have the amount of attorney's fees and costs sought by the Debtors.  I advised the parties that once I received that information, and made a determination regarding the allowed fees and costs, I would enter a formal, written opinion that includes the calculation of all damages.

[3] The following constitute my findings of fact and conclusions of law under Fed.R.Civ.P. 52 made applicable to this contested matter pursuant Fed.R.Bankr.P. 7052.

There is no dispute that Vertonix and Rayz knew about the bankruptcy. In fact, Rayz reached out to Leonid Nerdinsky, Debtors' counsel, to set up a meeting with the Debtors and Nerdinsky on June 21, 2018, because Rayz was to be in Florida on that date on other business. The Debtors did not attend the meeting. At that meeting, Debtors' counsel testified that Rayz demanded the Debtors pay Vertonix $250,000.00 by June 25, 2018, or Rayz would send the chapter 7 trustee and the United States Attorney all the information he had about assets Rayz claimed the Debtors owned and had not disclosed on their bankruptcy schedules. Rayz claims that is not the case; rather, Rayz was simply delivering a counteroffer in a settlement discussion that had begun pre-petition, and therefore the offer was not a stay violation. Moreover, Rayz testified, he never threatened to tell the trustee anything; Rayz was merely advising Debtors' counsel that the Debtors had omitted assets, and those assets should be included on amended schedules. Rayz also testified he said the omissions could create discharge issues for the Debtors.

On the evening of June 26, 2018, Nerdinsky advised Rayz via e-mail that the Debtors were not going to pay $250,000.00 and that he believed Rayz' demand was "inappropriate". Starting shortly after 5:00 pm on June 26, and just before Nerdinsky sent his email to Rayz, Rayz sent the trustee several emails with information about assets that Rayz claimed had been omitted from the Debtor's schedules. Nerdinsky was not copied on those emails.

The filing of a bankruptcy case operates as an automatic stay against most entities from, among other actions, "any act to collect, assess, or recover a claim

3

against the debtor that arose before the commencement of the case under this title." 11 U.S.C. §362(a).

If a party willfully violates the automatic stay a debtor who is injured by the willful violation is entitled to recover his or her actual damages including costs and attorneys' fees, and if appropriate, may also recover punitive damages. 11 U.S.C. §362(k).  A violation of the automatic stay is willful if the party knew the automatic stay was invoked and intended the actions which violated the stay. *In re Jove Engineering, Inc.*, 92 F.3d 1539, 1555 (11th Cir. 1996).   A creditor must not only cease the act that would violate the stay, "it must also take all necessary affirmative action to stop the proceedings which are in violation of the automatic stay." *In re Briskey,* 258 B.R. 473, 477 (Bankr.M.D.Ala. 2001).  To avoid a violation, the post-petition action must fall under an exception to 11 U.S.C. §362(b) or else the party must obtain relief from the stay under 11 U.S.C. §362(d).  *Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1268 (11th Cir. 2014).

Vertonix's demand for payment was clearly a stay violation, and it was a willful violation because Vertonix knew about the bankruptcy filing and intended to make the demand. However, Vertonix argues that Rayz' payment demand was not a stay violation, because it was the post-petition continuation of settlement negotiations that began pre-petition.  In support of its argument Vertonix relies on *In re Diamond,*  346 F.3d 224 (1st Cir. 2003) and *In re Keaty*, 350 B.R. 723 (Bankr.W.D.La. 2006).

Vertonix is correct that there are cases that carve out an exception to stay violations for settlement discussions.  However, even if I were to agree with the

holdings in the cases cited by Vertonix, those would be of no help to Vertonix here, because Rayz' "offer" on behalf of his client was made in the context of a threat.

In *In re Jamo,* 283 F.3d 392 (1st Cir. 2002), relied upon by the First Circuit in *In re Diamond,* the case cited by Vertonix, the court wrote:

> To be sure, there is a fine line between hard-nosed negotiations and predatory tactics—and if the automatic stay is to have any bite, it must forfend against the latter. Courts have labored long to plot this line. The most sensible rule—and one that we endorse—is that a creditor may discuss and negotiate terms for reaffirmation with a debtor without violating the automatic stay as long as the creditor refrains from coercion or harassment....We believe that this measured approach gives effect to all parts of the statutory scheme, affording all parties a reasonable opportunity to consummate binding reaffirmation agreements while at the same time shielding debtors from unseemly creditor practices. Accordingly, we hold that, while the automatic stay is in effect, a creditor may engage in post-petition negotiations pertaining to a bankruptcy-related reaffirmation agreement so long as the creditor does not engage in coercive or harassing tactics.

*In re Jamo,* 346 F. 3d at 399. (internal citations omitted).

The First Circuit extended the *Jamo* holding in *In re Diamond,* holding that whether settlement negotiations violate the automatic stay depends on whether the creditor's negotiations "constituted impermissible 'coercion or harassment.'". *In re Diamond,* 346 F.3d at 227.  The court stated that in order to make that determination the court must "look at the context in which a statement is made." *Id.* In *Diamond,* the court found that a creditor's threat during settlement negotiations to seek revocation of a debtor's real estate license if the debtor didn't resolve an adversary proceeding in a manner favorable to the creditor violated the automatic stay.  The First Circuit found the debtor's complaint sufficiently

alleged a stay violation, reversing the bankruptcy court and the district court, both of which had dismissed the debtor's complaint.

All the courts that have adopted this "post-petition settlement" exception have the same standard – if the negotiations are coercive, if threats are made, if the debtor is harassed, the discussions are violations of the automatic stay. So, while the parties dispute whether the Vertonix $250,000.00 "offer" was a continuation of prepetition settlement discussions, the real issue is whether the "offer" was in fact coercive or threatening. I find that, irrespective of whether there was a pre-petition pattern of negotiation that could have been continued post-petition[4], Vertonix still violated the automatic stay because the $250,000.00 was not a settlement offer – it was a demand coupled with a threat.

There are many reasons that I find that Nerdinsky's testimony is believable and Rayz' is not regarding what occurred at the June 21 meeting. First, it is at least curious that Rayz felt the need to deliver his message in person, when Rayz could easily have told Nerdinsky by email that the Debtors' schedules appeared incomplete. Moreover, since all the settlement discussions that had previously occurred between the parties had been conducted by email or by phone, Vertonix did not present any evidence why *this* particular "counteroffer" needed to be made in person. The only logical conclusion is that the "message" was one that

---

[4] I find that the $250,000.00 offer was *not* a continuation of any prepetition settlement discussions. The prior settlement discussions between the parties are laid out in the Joint Pretrial Stipulation and illustrate that there were unsuccessful settlement discussions in March of 2016, May of 2017, and the Spring of 2018. Discussions in the Spring of 2018 were short-lived, arguably one-sided, and undisputedly unsuccessful.

could not be in writing – that is, the message was the threat described by Nerdinsky.

Second, there is contemporaneous evidence to support Nerdinsky's version of the facts. Immediately following the meeting, Nerdinsky sent an email to his clients, which email is consistent with Nerdinsky's version of the discussion. Nerdinsky told his wife/law partner about what happened on the same day that it happened. Nerdinsky also advised the trustee about the conversation just a few days after it occurred.

In contrast, Rayz has only his testimony. I have several reasons to doubt Rayz' veracity. First, as I already noted, Rayz provided no reason why he needed to meet with Nerdinsky in person if Rayz' intentions were as noble as he testified. Second, Rayz submitted a photo of Mr. Lyubarsky taken in 2004 but edited to try to make the photo look recent (*see* ECF #54, p.45). Third, although I am not awarding sanctions for the proof of claim dispute, there is no question that Vertonix tried to hide a Pennsylvania state court order that made clear that Vertonix's claim was exaggerated, and then offered a convoluted excuse for its omission.

In addition, it is curious that Rayz sent the trustee emails with the purported "incriminating evidence" after the Debtors response deadline had passed, and did so without copying Nerdinsky. Why did Rayz have to send the emails on June 26, the day after his "offer" expired, if he hadn't tied acceptance of the "offer" to non-disclosure of the alleged evidence? Why did Rayz wait to send the trustee the "incriminating evidence" if the "disclosures" weren't tied to

7

the $250,000.00 demand and Rayz felt "obligated" to inform the trustee because he believed the Debtors were "engaged in criminal conduct"?   Finally, in questioning Mr. Lyubarsky at trial, Rayz stated to Mr. Lyubarsky that Dr. Kaplan's records didn't indicate that Mr. Lyubarsky ever told Dr. Kaplan about the June 21 incident but that is not true.   So, I find that the combination of Rayz' evident unconcern with accuracy, coupled with a lack of corroborating evidence, makes Rayz' testimony unbelievable.   In contrast, I find Nerdinsky's testimony believable and therefore, I find that Rayz threatened the Debtors in the manner described in Nerdinsky's email to the Debtors.

Because Rayz threatened the Debtors in order to try to get $250,000.00 as payment for his client, I find that Rayz and Vertonix both willfully violated the automatic stay and the Debtors are entitled to seek damages under 11 U.S.C. §362(k).

The Debtors seek damages for emotional distress; Mr. Lyubarsky argues that he suffers from a severe panic disorder that was exacerbated by the bad acts of Rayz and Vertonix. Mrs. Lyubarsky, through her husband and counsel, says she has suffered from the threat as well. The Debtors seek actual damages of $20.00 for medical expenses related to those increased panic attacks[5], additional damages for emotional distress of $250,000.00, as well as attorney's fees and punitive damages.

The Eleventh Circuit has recognized that debtors who are subjected to a stay violation are entitled to claim emotional distress damages under section

---

[5] After trial the Debtors' supplemented their out of pocket expenses. *See n.* 7, *infra.*

362(k). *Lodge v. Kondaur Capital Corp.* at 1271. "[T]o recover 'actual' damages for emotional distress under § 362(k), a plaintiff must (1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between that significant emotional distress and the violation of the automatic stay." *Id. (internal citations omitted).*

Vertonix argues that the Debtors could not suffer emotional damages because the threat was made by Rayz to Nerdinsky and the Debtors only knew because Nerdinsky sent Mr. Lyubarsky an email. This precise argument was rejected by the First Circuit in the *Diamond* case – "[t]he fact that the statement was made by [Creditor's] attorney to [Debtor's] attorney does not detract from its coerciveness." *Id* at 228. The First Circuit also rejected as irrelevant the creditor's argument that it had a good faith basis to report the debtor to the real estate commission; the threat, whether or not founded on an actual right, was still made for the purpose of coercing the debtor into settlement.

Vertonix also argues that the Debtors have failed to prove the Debtors are entitled to a claim for emotional distress under *Lodge v. Kondaur Capital Corp.* I agree with Vertonix that the Debtors have not met their burden with respect to Mrs. Lyubarsky. While she was certainly upset by the threats, the Debtors failed to present any evidence that would support an award of emotional distress to Mrs. Lyubarsky based on that criteria. However, the Debtors have met their burden regarding a claim for emotional distress by Mr. Lyubarsky - through the testimony of Mr. Lyubarsky, somewhat through the testimony of Mr. Nerdinsky, and through the testimony of Mr. Lyubarsky's psychiatrist, Dr. Marina Kaplan.

The evidence showed that Mr. Lyubarsky suffers from anxiety. Indeed, that is why he receives disability payments. Mr. Lyubarsky's psychiatrist, Dr. Kaplan, testified (by deposition) as follows:

> Q. Did he report --- did he report to you, an
> incident where someone told his lawyer that --- that if
> he didn't pay a certain amount of money, that they
> would report him to the U.S. Attorney's Office?
> A. Yes.
> Q. And as a result of that information, what happened
> to Mr. Lyubarsky?
> A. He got --- got progressively worse. This is a
> huge trigger for his anxiety. He's --- he is on max
> doses of --- max doses of the medications. He had
> several panic attacks, his physical condition is --- he
> totally gave up, feeling hopeless. So he's not taking
> great care of himself. And he's on the constant sense
> of fear and helplessness.
> Q. And would an incident such as this cause him great
> anxiety?
> A. Absolutely.
> Q. And would this deteriorate his previous condition?
> A. It makes it worse.

Debtors' Trial Exhibit 1.6, pp. 12-13. On cross examination, reading from the notes of the July 2018 session with Mr. Lyubarsky, Dr. Kaplan read:

> You want me to read July notes?
> BY ATTORNEY RAYZ:
> Q. Yes.
> A. Okay.
> Anxiety --- anxiety not changed. Usually, it's in
> my notes because it's --- I have a highest level of
> anxiety from zero to ten. That, he's at ten. A lot of
> anxiety, feeling stressed, not going well, actually
> depressed, panic attacks, anxious and don't worry to
> making thoughts. And that's listed here.
> What's happening with physical symptoms, anxiety.
> Blood pressure evaluation, muscle tension, chest
> pressure, tri-symptoms, anticipation anxiety.
> Isolate him so --- from a lot of people. He said
> he gets overwhelmed, depressed, feeling helpless, low
> energy, low self-esteem, difficulty with concentration,

> unable to relax, takes medication as prescribed,
> applying for bankruptcy, doesn't get his disability
> checks for more than a year due to past partners in
> business suing him.

Debtors' Trial Exhibit 1.6, pp. 58-59.

And although Mr. Lyubarsky wasn't hospitalized, he testified that he went to the hospital several times with panic attacks that subsided once he got to the hospital exterior.    Dr. Kaplan testified that this was something that Mr. Lyubarsky did when he had severe anxiety attacks. Vertonix argues that Mr. Lyubarsky never mentioned these hospital visits to Dr. Kaplan or in his affidavit filed on Dec. 3, 2018.  I do not find that omission relevant.  Moreover, these hospital visits are only one aspect of the emotional distress evidence presented by Mr. Lyubarsky.

Thus, I find that the Debtors have proven that Mr. Lyubarsky (1) suffered significant emotional distress caused by the violation of the automatic stay, (2) established the increased significant emotional distress caused by the violation of the automatic stay, and (3) demonstrated a causal connection between that increased significant emotional distress and the violation of the automatic stay.

Having found that Mr. Lyubarsky is entitled to damages for emotional distress caused by the stay violation, I must now turn to how much Mr. Lyubarsky is entitled to.  At trial the Debtors only presented evidence of actual

damages in the amount of $20.00[6].  Are the Debtors limited to $20.00?  I hold "no".

In its decision in *Lodge v. Kondaur Capital Corp.*, the Eleventh Circuit adopted the reasoning of the Ninth Circuit in *In re Dawson*, 390 F.3d 1139 (9th Circuit 2004), abrogated on other grounds by *In re Gugliuazza,* 852 F.3d 884 (9th Cir. 2017). In *In re Dawson,* the Ninth Circuit held that a debtor who suffers emotional distress due to a willful stay violation does not have to prove financial harm.  *See Sundquist v. Bank of America, N.A.,* 566 B.R. 563, 587 (Bankr.E.D.Ca. 2017)(vacated in part due to the settlement of the parties involved). The Eleventh Circuit avoided this issue in *Lodge v. Kondaur Capital Corp.* because the court found the creditor had not willfully violated the stay – "In light of the result we reach today, we need not decide whether the [debtors] were also required to show financial or physical injury before a court could award emotional distress damages under § 362(k)." 750 F.3d at 1272.

While I don't find that the Debtors should be awarded $250,000.00 for Mr. Lyubarsky's emotional distress, I do find that Mr. Lyubarsky should be awarded something, notwithstanding there is only evidence of $20.00 in financial damages.  While "[t]here is no 'legal yardstick' by which to accurately measure reasonable compensation for injuries such as emotional distress", *In re Lansaw,* 2015 WL 224093 at 8 (Bankr.W.D.Pa. 2015),*aff'd Zokaites v. Lansaw,* 2016 WL 1012597 (W.D. Pa. 2016), *aff'd In Re Lansaw,* 853 F.3d 657, 670 (3rd Cir. 2017),

---

[6] The Debtors subsequently submitted a request for, and evidence of additional expenditures in the amount of, $3,504.75.  For the reasons addressed below, I have increased the Debtors' actual out-of-pocket damages to $2,524.75.

in determining an appropriate amount, I consider the egregious nature of Vertonix's demand and consider how other courts have calculated damages for emotional distress.[7]

Having reviewed exhaustively the law on calculation of damages for emotional distress under section 362(k) and damages for emotional distress under Florida law, I have determined there is no mathematical formula for calculating damage awards for emotional distress - the cases, fortunately or unfortunately, leave damages to the "gut" of the jury or the judge.  Vertonix never objected the *amount* of damages for emotional distress the Debtors were seeking, but argued, extensively, that the Debtors failed to meet the test set out in *Lodge v. Kondaur Capital Corp.*  I have already found to the contrary with respect to Mr. Lyubarsky.  Thus, I find that I may exercise my discretion and determine the appropriate amount of damages for Mr. Lyubarsky's enhanced emotional distress.  *See Carsle v. National Commercial Services, Inc.,* 722 Fed. App'x 864 (11th Cir. 2018).

Based on all of the foregoing, I find that it is appropriate to award Mr. Lyubarsky $25,000 plus the $20.00 for the emotional damages distress caused by Vertonix's intentional violation of the automatic stay.

The Debtors also seek attorney's fees and costs. The Eleventh Circuit has held that the actual damages recoverable by a debtor who suffered damages from

---

[7] I will not, however, consider damages under Civil Rights Act cases or Fair Housing cases, the calculation of which damages, the Eleventh Circuit noted in *Lodge v. Kondaur Capital Corp.*, do not apply to stay violations.  I also note that Mr. Lyubarsky was already suffering severe anxiety disorder and taking the maximum dosage of anxiety medicine that he may take.

a creditor's stay violation under section 362(k) include those attorney's fees incurred not only in stopping the violation, but also attorney's fees and costs incurred in prosecuting a damages action and defending the damages on appeal. *Mantiply v. Horne (In re Horne),* 876 F.3d 1076, 1081 (11th Cir. 2017)("This explicit, specific, and broad language permits the recovery of attorney's fees incurred in stopping the stay violation, prosecuting a damages action, and defending those judgments on appeal.").  An award of attorney's fees may be awarded as actual damages even if a debtor has not suffered other actual damages for the stay violation. *Parker v. Credit Central South, Inc.,* 634 Fed.Appx. 770 (11th Cir. 2015).

As directed at the conclusion of my oral ruling, the Debtors submitted the *Debtors' Application For Allowance Of Attorneys' Fees And Costs Incurred In Connection With Prosecution Of Their Motion For Enforcement Of The Automatic Stay And For Sanctions Against Vertonix Ltd, Eric Rayz, And Kalikhman & Rayz, LLC* (ECF # 152)(the "Fee Requests") in the amount of $221,575.00.  This includes $18,900 for the services of Mr. Nerdinsky,  $113,250.00 for attorney Gary Seitz, and his firm Gellert Scali Busenkell & Brown LLC ("GSBB"), who acted as lead counsel in the trial, and $89,425.00 for Andrew Mogilyansky, a paralegal, and his company Litigation Support Services LLC ("LSS").  The Debtors also seek reimbursement of expenses incurred by their professionals in the amount of $9,858.02, as well as reimbursement of additional expenses directly incurred by the Debtors in the amount of $3,504.75. As directed by my oral

14

ruling Vertonix and Rayz filed an *Objection to the Fee Requests* (ECF #153)(the "Fee Objection").

The criteria for determining the reasonableness of the fees requested is not 11 U.S.C. §330 because the Debtors' professionals were not retained pursuant to 11 U.S.C. §327[8]. However, the applicable criteria is similar, and well known to practitioners in the Eleventh Circuit – reasonableness of the fees is measured by the standards set forth in *Johnson v. Georgia Highway Exp.,* 488 F.2d 714 (5th Cir. 1974) as reaffirmed in *Norman v. Housing Authority of the City of Montgomery,* 836 F. 2d 1292 (11th Cir. 1988). *See Mantiply v. Horne* 876 F.3d at 1084.[9] I have reviewed the Fee Requests as well as the Objection,[10] and determined it is appropriate to award the Debtors a total of $85,150.00 in attorney fees and $5,584.50 in attorney expenses.

Prior to receiving the Fee Requests, Vertonix argued that the Debtors are not entitled to an attorney's fee award because Mr. Nerdinsky testified that the Debtors are not paying him for his work associated with the Sanctions Motion; Nerdinsky will only be paid out of any fee award he receives in connection with

---

[8] Fed.R.Bankr.P. 2016 and this Court's *Guidelines For Fee Applications for Professionals in the Southern District of Florida in Bankruptcy Cases* are also inapplicable.

[9] Those factors are (i) the time and labor involved; (ii) the novelty and difficulty of the questions; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment by the attorney due to acceptance of the case; (v) the customary fee; (vi) whether the fee is fixed or contingent.; (vii) time limitations imposed by the client or the circumstances; (viii) the amount involved and the results obtained; (ix) the experience, reputation, and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and  (xii) awards in similar cases.

[10] As I have repeatedly said in this court, I practiced bankruptcy law for 22 years and I have been a bankruptcy judge for 14 years; I do not need expert testimony to determine reasonable attorney's fees in a bankruptcy case.

the stay violation. The fact that Nerdinsky is not getting paid by the Debtors is not relevant to whether I should award attorney's fees.

If a litigant is entitled to an award of attorney's fees, whether based on statute, procedural rule or contract, federal courts have awarded attorney's fees to parties, irrespective of the client's obligation to pay attorney's fees to the lawyer, including where a litigant is represented by counsel pro bono. The United States Supreme Court explained that "where there are lawyers or organizations that will take a plaintiff's case without compensation, that fact does not bar the award of a reasonable fee. All of this is consistent with and reflects our decisions in cases involving court-awarded attorney's fees." *Blanchard v. Bergeron,* 489 U.S. 87, 94 (1989). *See also Blum v. Stenson,* 465 U.S. 886, 895 (1984)(attorney's fees may not be reduced because the attorney conducted the litigation pro bono); *In re Law,* 497 B.R. 843 (Bankr.N.D.Tex. 2013)(awarding sanctions in the form of attorney's fees to a legal aid organization for its pro bono representation of a debtor and calculating those fees using a lodestar theory at an assumed hourly rate of $400.00). In *Tam v. Lin (In re Vu),* 591 B.R. 596 (Bankr.E.D.Penn. 2018), a bankruptcy court awarded attorney's fees where a landlord's willful violation of the automatic stay caused the debtor-tenant to suffer actual damages due to emotional distress. In support of this award of fees, the court stated

> Plaintiff's counsel approached her client's pauperism with nobility and did not charge her impecunious client additional thousands of dollars. I will not follow the courts who require that counsel actually bill their clients without regard to their poverty. Our noble profession should look with approval at actions such as counsel's in this case.

16

*Id. at* 606-607.

Vertonix also objects to the fees on the basis that a great deal of the time is bunched without delineation, does not appear reasonable based on time spent, includes time that is not related to the Sanctions Motion, and is otherwise excessive. I agree. As a preliminary observation I will note that it appears each of the professionals seeks fees relating to the entire Sanctions Motion, including that portion relating to the proof of claim, despite my ruling that the Debtors had no standing to object to the proof of claim, and my denial of the Sanctions Motion with respect to the filing of the proof of claim. Accordingly, any time spent on the proof of claim (to the extent it can be identified) is not allowable as part of the damages I am awarding for the stay violation. I have also eliminated any other fees clearly associated with other matters (e.g. time spent dealing with the Motion For Relief From Stay.)

I will start with Mr. Nerdinsky's fees. Mr. Nerdinsky's time, by his own admission, was, for the most part, not kept contemporaneously, and was lumped, not only by task but by several days or weeks. There is no way, for the most part, for me to determine whether the time spent on any particular task, other than those performed on a particular day, is even reasonable. However, I am able to assess the reasonableness of Mr. Nerdinsky's time that was broken out by day. That time (attendance at trial, attendance at the oral ruling, etc.) I find reasonable. Moreover, I find that Mr. Nerdinsky's hourly rate is reasonable based on his experience, and therefore of the fees requested by Mr. Nerdinsky, I find it is appropriate to allow $6,300.00 in fees for Mr. Nerdinsky's time.

17

Mr. Seitz, and his firm, Gellert Scali Busenkell & Brown LLC ("GSBB") seek fees totaling $113,250.00.   Unlike Mr. Nerdinsky, who volunteered his time relating to the Sanctions Motion, the Debtors and GSBB had a written agreement (the "GSBB Agreement"). The GSBB Agreement stated that the Debtors would pay GSBB $9,000.00 for representing the Debtors, with an additional 10% of any monetary recovery.   However, I am not bound by the contractual limitations of the GSBB Agreement. *See Blanchard v. Bergeron,* 489 U.S. 87.

Although I find Mr. Seitz' hourly rate reasonable based on his years of experience,  I find that Mr. Seitz charged for tasks that are not included in the award to which the Debtor is entitled (*e.g.* Motion For Relief From Stay, the proof of claim issues) and in certain instances I find the time was excessive and adjusted the hours (*e.g.* preparation of the Fee Requests as it related to the LSS fees and to the testimonials relating to those fees, and preparation of the findings of fact and conclusions of law).  I also eliminated some charges, albeit minor, that were clearly ministerial, such as advising everyone that I had changed the date and time of the oral ruling. Finally, I eliminated the ten hours associated with travel.  Travel time is not usually compensable; any work done during travel should be separately identified and billed.  Accordingly, after reviewing the time records submitted, I find that it is appropriate to award Mr. Seitz and GSBB $78,850.

The time sought by Mr. Mogilyansky and his company, LSS, is not compensable at all.  First and foremost, Mr. Mogilyansky was not engaged by the Debtor.  It is not clear how Mr. Mogilyansky got involved, but it appears his

involvement predated Mr. Seitz' involvement.  Nonetheless, it is clear, since Mr. Mogilyansky is not an attorney, that any services he provided would be as a consultant or paralegal to counsel.    Mr. Seitz' engagement letter specifically states,

> Fees and expenses of others (such as consultants, appraisers, financial advisers or other counsel) will be paid by [GSBB] and will be considered a part of "costs and expenses" described above.  You have authorized us to engage services of a litigation support firm, to be retained in our discretion, to assist us in the extensive and very time-consuming analysis....You will not be responsible for the cost of such services unless there is recovery; however, in case of recovery is [sic] obtained, these services will be included in the "costs and expenses" calculation.

GSBB Engagement Letter, ECF #152-8, pp. 6-7.

Even if there were a basis to compensate Mr. Mogilyansky for any of his time, Mr. Mogilyansky's fees are not broken down by task, or even day, or even weeks, but, for the most part, clumped together in a confusing narrative that makes it impossible to figure out exactly what tasks could have been appropriately charged, let alone how much time was to spent on each task.[11] What is clear is that included in the narratives is time for services unrelated to the payment demand, and a great deal of time comforting and reassuring the Debtors.  While that is certainly kind, it is not compensable. Even if, as the various testimonials included with the Fee Requests lay out, Mr. Mogilyansky is an incredible asset to any litigation team, I would strongly recommend that should Mr. Mogilyansky expect his services ever to be compensated by a court,

---

[11] If LSS had been engaged by the Debtor, then the only time I would have compensated was time spent preparing the exhibits for trial and attending the trial.  But because the time records are so useless, I have no way to calculate the time associated with those tasks.

that he learn to keep contemporaneous time records, broken down by task, so that the nature of the tasks, and the reasonableness of the time spent on those tasks, can be properly assessed.

I find the Debtors are entitled to reimbursement of attorney expenses in the amount of $5,584.50 - $2045.70[12] for costs incurred by Mr. Mogilyansky, which, according to the application, must be reimbursed by GSBB, $3538.80 for expenses of GSBB; and $2504.75 as additional out-of-pocket expenses by Mr. Lyubarsky. In doing so, I assume that the hotel and airfare including in Mr. Mogilyansky's expenses are for Mr. Seitz as well (the description is ambiguous). I eliminated any expenses for snacks and drinks, only meals are compensable; I also took out the expensive dinner at the Rusty Pelican. I did not allow expenses from GSBB for online research or court fees since the nature of the research and fees were not identified and I cannot confirm these costs were associated with the Sanctions Motion. As for Mr. Lyubarsky's expenses, I agree that it is not appropriate to include in the sanctions the costs associated with determining Vertonix' corporate status, however, I do find it appropriate to reimburse Mr. Lyubarsky for the cost of Dr. Kaplan's testimony and the other expenses.

Finally, the Debtors seek punitive damages against Vertonix in the amount of $750,000.00. Punitive sanctions are appropriate when a party acts with "reckless or callous disregard for the law or rights of others." *Parker v. Credit Central South, Inc.*, 634 Fed.Appx. at 773 (internal citations omitted). "The

---

[12] Even though I will not award any fees to LSS, I will allow GSBB to be reimbursed for the expenses associated with Mr. Mogilyansky's attendance at the trial.

imposition of punitive damages for a violation of the automatic stay is appropriate when the violator acts in an egregious intentional manner. . . where a violator's acts are egregious, malicious or accompanied by bad faith." *In re Roche*, 361 B.R. 615, 624 (Bankr.N.D.Ga. 2005).

"Courts in the Eleventh Circuit have used five factors in determining whether an award of punitive damages is proper: "(1) the nature of the [defendant]'s conduct; (2) the nature and extent of the harm to the plaintiff; (3) the [defendant]'s ability to pay; (4) the motives of the defendant; and (5) any provocation by the debtor." *In re Harrison*, 599 B.R. 173, 182 (Bankr.N.D.Fla. 2019); *In re Roche*, 361 B.R. at 624.

Given the nature of Vertonix's stay violation, punitive damages under section 362(k) are appropriate. I find that Vertonix deliberately exploited the Debtors' bankruptcy to try to extract money that it had been unsuccessful in obtaining any other way. I cannot determine from what source Vertonix thought the Debtors were going to come up with $250,000.00.  Perhaps, as the Debtors argue, Vertonix thought the Debtors were going to get the money from the alleged hidden assets Vertonix threatened to expose. Moreover, the sneakiness of Vertonix's efforts during bankruptcy with respect to these Debtors, whether it was this "in person" meeting even though Rayz' alleged purposes could have easily been communicated telephonically, the doctored photo, the deliberately omitted order, all highlight that Vertonix was acting in bad faith during all aspects of this bankruptcy case.

I also find that Mr. Lyubarsky, already disabled due to a severe anxiety disorder, suffered exacerbated anxiety due to Vertonix's threats.    As we all learned in law school from the *Palsgraf*[13] case, we take our victims as we find them.  Mr. Lyubarsky suffered from severe anxiety and this threat almost pushed him over the edge.

While I have no evidence of the ability of either Rayz or Vertonix to pay any punitive damages, based on the way Vertonix has pursued the Debtors over the years to get paid, it appears its resources are generous. [14]  It is clear that Vertonix and Rayz have pursued payment of this judgment at all costs and, at least in this bankruptcy case, without regard to appropriate and legally imposed boundaries.

In determining the *amount* of punitive damages, "[a]n award of punitive damages should be gauged by the gravity of the offense and set at a level sufficient to insure that it will <u>punish and deter</u>." *In re Novak*, 223 B.R. 363, 368 (Bankr.M.D.Fla. 1997) (emphasis added).  *See, e.g., In re Campbell*, 553 B.R. 448, 557 (Bankr.M.D.Ala. 2016)(awarding $50,000.00 in punitive damages where the Court determined "that such an amount is necessary to deter [the party] from engaging in such conduct in the future."); *In re Brodgen*, 588 B.R. 625 (Bankr.M.D.Fla. 2018)(awarding punitive damages that doubled actual damages, exclusive of attorney's fees; the court found that even if the punitive damages

---

[13] *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1928).
[14] To the extent that Rayz or Vertonix dispute their ability to pay the awarded punitive damages, I will conduct an evidentiary hearing on this issue. However, I note that in the Fee Objection neither Rayz nor Vertonix claimed either would be unable to pay punitive damages based on the Fee Requests, if awarded, or requested an evidentiary hearing on their ability to pay.

were insufficient to deter future behavior, that the amount was "not insignificant"); *In re Harrison*, 599 B.R. at 191(awarding punitive damages against parties, the court multiplied actual damages by factors of 2 and 3.375 in an effort to deter future behavior). The amount of punitive damages "[is] largely left to the discretion of the bankruptcy court." *In re Lansaw*, 853 F.3d at 670.

The Debtors argue that Vertonix sought to extort $250,000.00 from the Debtors and that the punitive damages should be driven either by a multiple of the actual damages (citing *In re Mocella,* 552 B.R. 706 (Bankr.N.D.Ohio 2016) or by the Florida criminal fines for extortion - $10,000.00 per event, citing Florida Statutes §836.05.

Based on the foregoing factual determinations, I find that the Debtors are entitled to punitive damages based on a multiplier of 2 of what the Debtors' ultimate actual damages are.  I find that a multiplier is an appropriate way to recognize the threat made by Rayz on behalf of his client, which was not only a violation of the automatic stay but also an affront to the bankruptcy system. Moreover, I find that Rayz' misrepresentations in his testimony underscore his knowledge that what he did was, in the words of Mr. Nerdinsky "inappropriate", a characterization that Rayz said was of no importance to him or to his client. However, because there was one violation of the automatic stay, rather than an ongoing violation, I find a multiplier of 2 is appropriate.

The Debtors' actual damages, including attorney's fees and costs is $118,259.25.  Therefore, I find it is appropriate to award punitive damages in

the amount of $236,518.50.  Thus, the total damages awarded to the Debtors is $354,777.75.

Finally, I find that Vertonix and Rayz should be jointly and severally liable for the damages I have awarded to the Debtors. "Sanctions in the form of punitive damages are appropriate to punish [a creditor's] bankruptcy counsel for enabling and participating in [a creditor's] bad conduct. *In re Harrison*, 599 at 189-190. As summarized by the court in *Bailey v. Davant*, 428 B.R. 694, 700 (Bankr.N.D.W.Va. 2010), there are many examples of when a court finds a creditor and its client liable for stay violations.

> *In re Crawford*, 388 B.R. 506 (Bankr.S.D.N.Y.2008) (agent held liable along with principal for willful stay violation); *In re Johnson*, 253 B.R. 857, 861 (Bankr.S.D.Ohio 2000)("Courts have imposed joint and several liability against creditors and their counsel for willful stay violations."); *Vazquez v. Sears, Roebuck & Co. (In re Vazquez)*, 221 B.R. 222, 231 (Bankr.N.D.Ill.1998)("A creditor and its attorney are jointly and severally liable for their violations of the discharge injunction because under general principles of agency law, an agent whose tortious conduct renders the principal liable is also liable for his own tortious acts."); *In re Baker*, 183 B.R. 30, 33 (Bankr.D.R.I.1995)("Norwest and its attorney are determined to be jointly and severally liable for the legal fees incurred herein by the Debtors [in response to a stay violation]."); *Restatement (Third) of Agency* § 7.01 (2008)("An agent is subject to liability to a third party harmed by the agent's tortious conduct ... an actor remains subject to liability although the actor acts as an agent or an employee....").

Rayz' actions on behalf of Vertonix were extreme and troubling.  Not only did he threaten the Debtors on behalf of Vertonix, Rayz enabled and furthered his client's agenda with bad acts of his own.  Consequently, Rayz and Vertonix shall be jointly and severally liable for the damages awarded herein.

## **CONCLUSION**

Vertonix has aggressively pursued the Debtors for years in an effort to collect on their ever-growing judgment. My place is not to opine as to the behavior of either party prior to bankruptcy. But in this bankruptcy case, Vertonix went too far, and the Debtors were damaged. Vertonix made choices in this bankruptcy case for which Vertonix must accept the consequences.

Therefore, I find that the Debtors are entitled to actual damages of $27,524.75 for emotional distress suffered by Mr. Lyubarsky. I find the Debtors are entitled to actual damages for reasonable attorney's fees and costs associated with the prosecution of the Sanctions Motion, which total $90,734.50. I find the Debtors are also entitled to punitive damages with a multiplier of 2 of the actual damages. In sum, the Debtors are owed a total of $354,777.75 in damages (both actual and punitive) by Vertonix.


###

*Copies furnished to:*

*Leonid Nerdinsky, Esq.*

*Attorney Nerdinsky is directed to serve a copy of this opinion on all parties and file a certificate of service.*